N/S/I
NO CV30

FEE PAID

FILED
CLERK, U.S. DISTRICT COURT
JUN 3 2023
CENTRAL DISTRICT OF CALIFORNIA
BY: EEE DEPUTY

Amy R. Weissbrod
CEO LIVE-Fi® Technologies, LLC
7302 Woodstone Circle
Princeton, NJ 08540
PH 917-733-9981
amyg@live-fi.com

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LACV23-04381-MEMF(Ex)

_______________________________________X

Amy R. Weissbrod,

US Patentee, Plaintiff,
California State Bar #87419

v.

LIVE NATION ENTERTAINMENT INC., TICKETMASTER, INC., LIVE NATION, INC., INSTANT LIVE CONCERTS, LLC, MLB/MLB ADVANCED MEDIA, INC., PHISH/PHISH LIVE, COWAN LIEBOWITZ & LATMAN, PC, HINSHAW & CULBERTSON, LLP, BAKER BOTTS, LLP, Does I-X,

Defendants.

_______________________________________X

**CASE NO.**

**JURY TRIAL REQUESTED**

**COMPLAINT SEEKING DAMAGES FOR PATENT AND COPYRIGHT INFRINGEMENT, RICO PATENT FRAUD CONSPIRACY, AIDING AND ABETTING WRONGFUL STATE ACTION, UNFAIR COMPETITION & BREACH OF CLAYTON ANTITRUST MERGER MANDATES**

**35 USC§ 271, 284, 285, 286; 17 USC §1; 15 USC §12-17, 1125; 42 USC §1983, 18 USC§ 1962**

## I. INTRODUCTION - STATEMENT OF RICO, PATENT INFRINGEMENT, UNFAIR COMPETITION, WRONGFUL STATE ACTION, AND ANTITRUST COMPLAINT

1. In January 2010, the United States Dept. of Justice (DOJ) solicited public

comments in opposition to the vertical merger of defendants Live Nation and Ticketmaster. Plaintiff's company, LIVE-Fi ®Technologies, LLC's comments of 150+ pages warning of the dangers of an antitrust behemoth that would exclude all companies from revenue-generating fields related to concerts, entertainment and sports, were selected and remain posted as "E" on the DOJ Media and Entertainment website since March 2010 as public records. The documents included fraudulent public filings sworn to under oath by named defendants herein Live Nation and its attorneys/agents, Baker Botts, LLP, Hinshaw & Culbertson, LLP (Richard Supple, partner) and Cowan Liebowitz & Latman, PC during a 15-year SDNY patent and taking litigation during which time, defendant Live Nation ludicrously claimed it "*had no NY contacts*" to answer for infringement of Plaintiff's ticketing management patents or for engaging in acts of unfair competition[1]  [2]

2.        In 2021, defendant Ticketmaster was criminally prosecuted by the US Attorney for the EDNY for placing spiders on competitors' website attempting to steal customer ticketing data for its own use and database, proving significant contacts with NYS. and rampant fraud by defendant Live Nation in Plaintiff's SDNY lawsuit [3] By 2005, defendant Live Nation was the sole surviving entity of Clear Channel Entertainment SPINCO and acquired NY venues Irving Plaza, House of Blues, Roseland Ballroom and the Jones Beach Theatre. In 2007, a SDNY judge stayed patent discovery without legal justification, Second Circuit reversed that order in 2012, and for 13 years Plaintiff got no infringement hearings on her ticketing management patents in violation of her constitutional rights guaranteed by the Fifth Amendment and the Fourteenth Amendment's guarantee of equal protection. *Bytemark v. Xerox*, 342 F. Supp. 3d 492 (SDNY 2018). 2022 WL 94859 (SDNY 2022)(PG). Each newly issued patent entitled Plaintiff to vacate a previous order or judgment. *Metzler Investments Gmbh v. Chipotle Mexican Grill*, 970 F. 3d 133 (2d Cir 2020); see also *Grant Williams v. Citicorp*., 659 F. 3d 208 (2d Cir 2011). Shortly thereafter, Plaintiff lost her attorney who moved to unilaterally withdraw claiming the case was

---

[1] *US v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408 (DDC January 25, 2010), Amendment Judgment imposing sanctions, January 8, 2020

[2] *Gurvey v. Cowan Liebowitz & Latman, Live Nation, Inc. Instant Live Concerts, LLC, Mike Gordon, (named partners omitted), et al*, 06cv1202 (SDNY)

[3] *US v. Ticketmaster*, 21-CR-22, 24 (EDNY 2021)

"rigged". It was rigged. Plaintiff won the first appeal pro se and never got patent discovery or a hearing on her infringement claims. 462 Fed. Appx. 26 (2d Cir. 2012). There is no comparable fact pattern in the national repertoire of patent cases. Investigation ensued.

3. Plaintiff's valuable patent portfolio is comprised of apparatuses, methods and screen analytics that disclose the standard essential algorithms for ticketing management in the United States. Gurvey US Patents 11043566, D647910S, 7603321[4]. The most recent continuation patent, 11403566, was based on an application filed October 11, 2009, was suspiciously delayed 13 years at the USPTO and got no office action for 9 years. The time limit is 14 months for an office action and 3 years for an issued patent. *Wyeth v. Kappos*, 591 F. 3d 1364 (Fed Cir. 2010). The continuation claims issued on August 2, 2022 were sufficient to vacate any order or judgment entered by the SDNY because the claims were anticipated in the early operative complaints. FRCP Rule 60(b); *Metzler Investments Gmbh v. Chipotle Mexican Grill*, 970 F. 3d 133 (2d Cir 2020); *Anza Technologies v. Mushkin*, 934 F. 3d 1349 (Fed Cir. 2019); see also *Grant Williams v. Citicorp*., 659 F. 3d 208 (2d Cir 2011). Plaintiff continued to be denied a hearing by the SDNY twice, the last time on May 6, 2023. Plaintiff's motion papers were returned by the court without adjudication. It became clearer and clearer that Plaintiff was being denied constitutional access to the court in violation of the Fifth and Fourteenth Amendments to the United States Constitution. See, e.g., *Bytemark v. Xerox*, 342 F. Supp. 3d 492 (SDNY 2018). 2022 WL 94859 (SDNY 2022)(PG).

4. In 2022 at the time notice of issuance for the 566 patent was entered[5], SDNY Circuit Executive (CE) officers gave shocking news to Plaintiff. CE officers admitted that based on *ex parte* proffers they got from Plaintiff's adversary, Richard Supple on behalf of defendants Live Nation, H&C, and Cowan Liebowitz & Latman (Cowan defendants), her good name was deleted ex parte in 2013 from the roster of SDNY attorneys without notice hearing or due process of law. The acts of the SDNY CE administrative officers defy the Fifth Amendment and

[4] Plaintiff's California Bar Registration is under the name "Weissbrod". Plaintiff's US patents are under the name "Gurvey"

[5] The 566 patent is a continuation of the 321 patent that issued on October 13, 2009 containing the remainder of claims that were owed to Petitioner in 2006. The continuation application for the 566 patent, 12587759, was filed two days earlier on October 11, 2009.

mandates of the US Supreme Court. *Bradley v. Fisher*, 80 US 335 (1871) They constitute wrongful state action. Supple's actions aided and abetting wrongful state action by the SDNY CE officers, two judges and one magistrate. *Blum v. Yaretsky*, 457 US 991 (1992). All officers of the court knew of the false proffers and knew that Plaintiff did not know. The court stopped adjudicating Plaintiff's motions. An order was entered that Plaintiff needs prior permission to file motions. Plaintiff moved for prior permission; her letters were never answered or adjudicated. The situation was so violative of Plaintiff's constitutional rights that it appeared there might be no remedy available.

5. There is not much time left to recover strict liability damages on Plaintiff's issued patents. Other patent applications remain pending in the queue. Mandamus from the Federal Circuit has been properly sought to disqualify the court, vacate its orders and transfer the action. *Liljeberg v. Health Services Acquisition Corp*., 486 US 847 (1988) . Plaintiff has no other remedy at law. The Federal Circuit should abhor a forfeiture. However, regardless of the outcome of the mandamus petition, Plaintiff's right to enter other courts of competent jurisdiction is absolute wherever infringing defendants reside and do business. The three patents that have issued thus far have differing staggered priority dates based on different inventions disclosed in the specifications; and are before the USPTO on applications for correction.

6. A RICO corruption enterprise was confirmed to have been orchestrated by Supple of defendant H&C as attorney for the Cowan and Live Nation defendants. However, investigation revealed that Supple was also dually serving – an unlawfully so – as planted leak for the State of NY, seven agencies of which had taken Plaintiff's patents in violation of the Takings and Just Compensation Clauses of the Fifth Amendment.

7. Defendant MLB/MLB Advanced Media herein, was, all along, Cowan's other client with whom a conflict of interest existed in 2003 but was unlawfully concealed when patent retainer was offered to Plaintiff. It appears that Cowan defendants who offered Plaintiff a retainer per se unlawful in NYS to invest in her patent applications, had conjured up a secret plan to broker deals for Plaintiff's inventions with its other clients to generate more business. *Buechel v. Rhodes*, 285 AD 2d 274 (1st Dept. 1999). The plan failed miserably. Cowan defendants' other clients defendants Live Nation, Mike Gordon of Phish and MLB (not a party to the previous action) took Plaintiff's patents viral for their own use - alone and with venture partners -

including with Apple's iTunes, while Cowan defendants engaged in abandonment and conflict of interest violations before the USPTO causing significant prejudice, delays in prosecution and reduction of patent term.[6] Applications for patent term adjustment had to be filed and are pending.

8. It was confirmed that Supple of defendant H&C, was at all times dually serving as a concealed NYS court attorney on the First Dept. attorney grievance committee (AGC) and engaging in "crafting" and corruption of state and federal files during the SDNY lawsuit. This is how the documents proffered ex parte to the magistrate judges and SDNY CE officers were created. The crafted documents were constructed to falsely mar Plaintiff's otherwise stellar record and resume to get the court to deny Plaintiff a hearing on her patents by creating the faux pretext of attorney jurisdiction over Plaintiff in favor of the First Dept. AGC that never existed. Crafted documents were discovered signed by dead prior chief counsels without signations of any current member of the AGC, proving a scandal.

9. Supple, however, had actual notice that Plaintiff was not admitted to practice law in NYS. The Cowan defendants paid Plaintiff's bar dues to California when also offering her a one-year of counsel agreement under false pretenses to get access to her formal patent drafts, client lists and contacts. What Cowan wanted was for Plaintiff to refer patent clients from California where Plaintiff is in excellent standing since 1979. Abuse of process in the absence of jurisdiction is deemed breach of a purely administrative non-judicial duty not protected by immunity and subjected Supple and defendant H&C to aiding and abetting wrongful state action. *Forrester v. White*, 484 US 219 (1988); *Stump v. Sparkman*, 435 US 379 (1978); accord, Alvarez v. Snyder, 264 AD 2d 27 (AD 1st Dept. 2000)

---

[6] Plaintiffs ticketing management systems were trademarked as "*STickets*" and provide unique extra revenue-generating functions and platforms such as editing, customization, interactive capability, and digital transmission of live content as packaged. Plaintiff's patents perform royalty accounting to all partners and parties. They create derivative copyrightable works inclusive of user generated content uploaded after ticketing and in response to the event. Valuable outputs include statistics on first run mobile and user engagements with sponsor messages.

10.       However, what Supple did does not save the SDNY or its CE officers.  Only one bar is required for SDNY listing and it need not be NYS.  *In re Gouiran*, 58 F. 3d 54 (2d Cir 1995). The CE officers admitted that they did not investigate the documents proffered ex parte by Supple, because of his post as a NYS court attorney, and in 2013 did delete Plaintiff's good name from the roster of attorneys without notice, hearing or due process of law. These acts violated Plaintiff's most basic constitutional rights to have and hold property – here both her good standing and her patents - and served to deny her a hearing on her patents for the next 10 years. *Bradley v. Fisher*, 80 US 335 (1871).  The State of NY conveniently destroys records after 7 years; but Plaintiff has all the records.  A SDNY magistrate and judge were induced to abort adjudication of Plaintiff's lawsuit. Plaintiff's constitutional rights under the Fifth and Fourteenth Amendment's Equal Protection Clause were contumaciously defied.

11.       The Cowan defendants knew full well that Plaintiff was not admitted in NYS. That knowledge is imputed to Supple and his firm defendant H&C and to other AGC state officers and attorneys working with Supple.  Because the Cowan defendants aided and abetting infringement by its other clients, so did Supple and defendant H&C who were also defending defendant Live Nation in the SDNY lawsuit since 2012; and were concealed agents of NYS seven agencies of which are infringers and takers of Plaintiff's patents. 35 USC §271(h); *Ulico v. Wilson Elser, Moskowitz, Edelman and Dicker*, 56 AD 3d 1 (AD 1st Dept. 2008)

12.       Plaintiff fulfilled her obligations under the faux of counsel contract that Cowan signed and then revoked in four months.  Plaintiff sent Cowan a patent client Legend Films, Inc. of San Diego, and knew from its draft patent application, that Legend officers also harbored conflicts of interest with certain of Plaintiff's novel algorithms for content editing.  Cowan defendants filed a PCT for Legend that issued as a patent in 2007 (7181081) but only and after Cowan defendants took Plaintiff's inventions that had been copied into their database without Plaintiff's knowledge or consent, to create a patentable disclosure for Legend. Cowan defendants thereby engaged in non-joinder torts when they omitted Plaintiff's name as a co-inventor of the disclosure.  Plaintiff's claims for non-joinder arise under the patent laws. They accrued on February 20, 2007, the date a patent issued to Legend. *Carter v. ALK Holdings*, 605 F. 3d 1319 (Fed. Cir. 2010) The claims never received adjudication by the SDNY.  Cowan defendants actually knew of Plaintiff's vested contract with Legend to be paid 3% of the stock at founder's

level because the contract was tendered when Cowan defendants were assessing the of counsel contract.  When Legend was sold with the patents Plaintiff helped invent, she was not paid her stock, proving every element of both a non-joinder and tortious interference cause of action. Discovery was ordered by the Second Circuit on these claims and on conflicts of patent interest in 2012 and again, never granted by the SDNY. Emails uncovered say that Cowan defendants' partner J. Christopher Jensen and managing partner Simon Gerson were "*following the clients' instructions*".

13.      In  2023, the Senate Judiciary Committee (SJC) seeking that the DOJ break up defendants Ticketmaster and Live Nation, contacted Plaintiff to submit updated documents to the DOJ.  For ten years, the merged entity organized as defendant Live Nation Entertainment, Inc. (LNE) had contumaciously defied eight of the signed 2010 antitrust proscriptions, and on January 8, 2020 were severely sanctioned in an Amendment Judgment.  The proscriptive mandates were extended through 2026 and remain in full force and effect. *US v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408) (DDC 2010) (sanctions entered January 8, 2020). Vertical integration had created a monopolistic behemoth attempting to control revenues from all sources related to concerts, entertainment and sports and keep all other companies out of the relevant markets. An express proscriptive mandate that defendant Ticketmaster and the merged entity cannot withhold ticketing data from companies seeking to enter Live Nation's dominant share of event venues to conduct non-ticketing businesses continued to be contumaciously defied.[7] [8]

14.      Senators Amy Klobuchar (D. MN) and Mike Lee (R. UT) helmed the SJC hearings on January 24, 2023. Testimony by industry artists and ticketing entrepreneurs was unanimous that defendants LNE and Ticketmaster have continued to require long-term servicing contracts with venues owned and not owned by defendant Live Nation.  Venues not agreeing to use defendant Ticketmaster's software are denied access to Live Nation's top-tier artists and

---

[7] *Ticketmaster v. Tickets.com*, 2003 WL 21406489 (CD Cal. 2003).

[8] As additional conditions of the merger defendant Ticketmaster was required to divest itself of its Host and Paciolan software and make that software available other venue owners including AEG/Anschutz Entertainment Group and Comcast.

tours. Moreover, if an artist wants to bring in his own expanded ticketing system to record and/or distribute the live concerts or single selections for example, he will not be permitted to perform at Live Nation venues. More recently defendant Ticketmaster also requires that consumers using its website sign a release that defendants can use the data before the customer can buy a ticket or get access to the deeper pages of its website.

15. Defendants' continuing anticompetitive activities, policies and practices therefore still involve illegal tying of ticketing data with access to event content and top-tier artists in violation of the Clayton Act, 15 USC§§ 12-17. Defendants also still withhold ticketing data from companies seeking to conduct non-ticketing businesses in violation of the signed competitive impact statement.

16. At the 2023 SJC hearings, defendant LNEs' divisional president Joe Berchtold testified that the software crash during the November 2022 Taylor Swift presale sweeps was "*solely the fault of scalper bots*". Upon information and belief, this statement is false. In 2017, the merged entity having been sued in 2015 for antitrust violations in the field of artist presale software by Songkick of London and US entity Complete Entertainment Resources, Inc. before this Court, settled the lawsuit for $115mil in 14 months. Upon belief, defendant LNE acquired Songkick's artist presale software as part of the settlement that was "tweeked" to create the system that crashed in November 2022.[9] There are other admissions from defendant Ticketmaster in other litigations that at great expense, it had to update the software it acquired.

17. In addition, Berchtold testified that even before the merger in 2009, defendant LNE acquired a ticketing system from CTS Eventim of Germany to compete with Ticketmaster. Berchtold clearly misspoke when he said that ticketing data was *not* used to distribute live recordings. In 2005, defendants Live Nation and Instant Live Concerts acquired the "Griner" patent, 6614729, to perform this exact function and then deployed the ticketing system imported from CTS Eventim of Germany to enter a joint venture with Apple's iTunes to master recordings and distribute live concert CDs to ticket holders. In that venture, defendant Live Nation split

[9] *Compete Entertainment Resources v. Live Nation*, 2015 WL 9311666 (CD Cal. 2015)

infringement of Plaintiff's ticketing managing algorithms by the doctrine of equivalents. [10] The relevant proof is in Plaintiff's "E" postings on the DOJ website. These claims were in Plaintiff's docketed infringement complaint date stamped and filed on April 22, 2010 and never given hearing.

18. Moreover, when this inventor's first US ticketing management patent issued on October 13, 2009 and an infringement complaint was date-stamped and filed by the SDNY on April 22, 2010, defendant Live Nation's employees Hamlet Newsom and Richard Munieri along with attorneys at two defendant law firms herein – Baker Botts, LLP and Hinshaw & Culbertson, LLP- filed fraudulent jurisdictional papers that defendant had "*no NY contacts*" to answer Plaintiff's claims. At the same time, defendant H&C via Supple was proffering crafted documents Supple created in his concealed dual state AGC post, to the sitting SDNY judges and CE officers. None of the CE administrative officers or the judges investigated or researched these documents or gave Plaintiff a hearing. The documents had gotten no hearing in the state.

19. The sworn affidavits that defendant Live Nation submitted to the SDNY that it has "no NY contacts" constitute actionable perjury and fraud and the continuing acts toll prevailing statutes of limitation. These were the first acts in furtherance of an illegal conspiratorial enterprise orchestrated by defendants before the court. Defendant Live Nation is the sole surviving entity of Clear Channel Entertainment SPINCO, and in 2005 acquired NY venues Irving Plaza, House of Blues, Roseland Ballroom and Jones Beach Theatre. By 2007, defendant Live Nation was importing the CTS ticketing system to service these venues. This is admitted in the competitive impact statement signed in 2010. Defendant Live Nation also owns and operates principal iHeart radio stations in NYC - 106.7 WLTW Lite FM and Z-100. Coincidentally, WLTW broadcasts from the same building where the Cowan defendants had their law offices for 25 years at 1133 Avenue of the Americas, New York, NY 10036. In the theatrical film "*August Rush*" shot in NYC in 2005, stills of Irving Plaza with defendant Live Nation's logos were incorporated into the director's cut.

20. The "Griner" recording patent acquired by defendants Live Nation and subsidiary Instant Live Concerts, LLC was invalidated in 2007 by the USPTO. Yet, defendant Live Nation

[10] Griner, US Patent 6614729 (invalidated by the USPTO 2007)

continued to issue, order and place false and misleading press releases in domestic and international journals that it "*owned a monopoly*" on distributing live concert recordings. _Defendants never owned a monopoly on distributing live concerts_. The same deceiving ads were posted on subsidiary defendant Instant Live Concerts' website since 2004 and were immediately removed when Plaintiff was invited to meet with defendant Live Nation's president Stephen Prendergast in 2005 who told Plaintiff that "*her patents could be used by anyone, Live Nation would continue to use them, and Plaintiff could sue"*. These ads are also posted on the DOJ website. Then after defendant Live Nation finalized a joint venture with Apple's iTunes in 2007 to split the functional algorithms disclosed in Plaintiff's patents, in 2008, Apple applied for its own competing patent in ticketing management. Apple wrote its claims for the iOS operating system, but was denied a patent for 8 years because examiners cited to Plaintiff's applications as prior art. The ads did however induce major artists Madonna, Jay-Z and Shakira to leave their respective labels and sign on with defendant Live Nation in all fields. For seven+ years defendant Live Nation was attempting to become a live record label.

21. All the while, Plaintiff's patent applications were delayed in USPTO prosecution based on the Cowan defendants' abandonment and conflict of interest torts, band Cowan defendants and Supple were engaging in backstage crimes, intentional breaches of fiduciary duty and attorney client privilege to further delay the patents including contacting Plaintiff's next patent attorney and threatening him. An investigation opened by the Commissioner of Patents concerned Cowan defendants' admitted conflicts of interest in filed forms seeking unilateral withdrawal from Plaintiff's early applications. The admission of conflicts resulted in the USPTO's denying withdrawal based on Cowan defendants' contumacious defiance of practitioner mandates and fraud in declarations of inventorship filed on behalf of Legend Films before the Office. 37 CFR 2.10, 2.19, 10.66, 11.116. 37 CFR 1.36. Plaintiff lost three US applications, one PCT application and valuable priority dates against competitors, and her first patents were delayed 7 ½ years. The limit is 3 years. _Wyeth v. Kappos_, 591 F. 3d 1364 (Fed Cir. 2010). None of Plaintiff's delay claims were adjudicated by the SDNY.

22. Because defendants Cowan and Phish's Mike Gordon's acts demonstrate intentional bad faith and were not negligent, Plaintiff's claims elevated to strict liability aiding and abetting infringement once US patents issued to Plaintiff in 2009. Those claims may be

enforced for the full term of patent.  There is no such thing as laches. *SCA Hygiene Products Aktiebolag v. First Qualify Baby Products*, 173 S Ct. 954 (2017) Manifest injustice suffered by Plaintiff is undisputed.  During the delay, Plaintiff's patents were being misappropriated and outsourced to create ticketing solutions for Apple and defendant Live Nation, defendant MLB/MLB Advanced Media and the Glenn Beck program[11], the latter two other Cowan clients, and by other ticketing companies and start-ups.  By 2012, defendants Live Nation and MLB had not only taken Plaintiff's patents viral and penetrated the large arena market but were boycotting Plaintiff, Plaintiff's company LIVE-Fi ® Technologies and Plaintiff's proprietary technologies from their dominant share of event venues in her own field of invention.  In addition, defendants LNE and Ticketmaster continued to withhold ticketing data from their concerts and sports events in violation of the signed competitive impact statement, to make it far more difficult for Plaintiff to practice her inventions and create new platforms. If Plaintiff had not been issued US patents, she would have been precluded from her field entirely.

23.     The national import of this litigation cannot be underestimated. A patent practitioner harboring conflicts of interest emanating from competing interests between small vs. larger technology clients can, as the Cowan defendants did, manipulate the system to get a windfall for the practitioner.  A patent lawyer can file defective applications for the smaller client as occurred here, abandon those applications based on a conflict of interest, not withdraw the holdings of abandonment and significantly cut into the small inventor's term of patent that is 20 years post filing. The delay from a single act of abandonment can be 3+ years.  The term of patent was 17 years post issuance under the old law that was more favorable to inventors. Now, by the time a decision denying a patent is entered, the prevailing state statutes of limitation on patent malpractice, breach of retainer and fiduciary duty will likely have run the clock in most of the several states and the client may no longer be able to sue the lawyer in state court.  Without a patent issued, the claims do not arise under the patent laws.  *Gunn v. Minton*, 133 S. Ct. 1059 (USSC Tex. 2013).  Plus, an issued patent is a prerequisite to file a complaint for aiding and abetting infringement by a practitioner delaying recovery of damages when a delayed patent does issue. *Uni-Systems v. USTA*, 350 F. Supp. 2d 143 (EDNY 2018)

---

[11] *Front Row v. MLB , the Glenn Beck Program*, 2012 WL  6736301 (D. N. Mex 2012)

24. Conversely, if, as here, the client does achieve a delayed patent, the claims for fraudulent breach of fiduciary duty based on concealment of known conflicts of interest are elevated to strict liability aiding and abetting infringement at least with respect to the clients with whom the conflicts were known to exist. *Mindy's Cosmetics v. Dakar*, 611 F. 3d 590 (9th Cir. 2010). The larger client will necessarily have benefitted from a significant amount of lead time in the market during the delay. The patentee can sue both the client and the lawyer for strict liability infringement and aiding and abetting infringement to achieve a full satisfaction but must wait to file until a patent issues. *Uni-Systems v. USTA*, 350 F. Supp. 2d 143 (EDNY 2018) To the extent that any delay is the fault of the USPTO or its officers, the inventor can also apply for a patent term adjustment *Wyeth v. Kappos*, 519 F. 3d 1364 (Fed. Cir. 2010) The period of loss of patent term that is the fault of the attorney will be deducted from the patent term adjustment allowance under the theory of "overlap". *Ibid.*

25. In 2003, defendant Ticketmaster sued Tickets.com for placing spiders on its website to steal customer ticketing data before this Court. After the litigation, defendant MLB, Cowan defendants' client with whom conflicts of interest were known to exist, acquired the Tickets.com platform. All twenty teams in the American and National Leagues are required to use the platform and team owners must agree to serve as certified investors in updates, making it harder for a ticketing patentee to work for league or individual baseball team based on conflicts of interest. Plaintiff was a former counsel and agent for Hal Steinbrenner, owner of the Yankees; and because of the Cowan defendants representation of MLB in trademarks when the new Yankee Stadium was building and her patents pending were taken by Cisco, Plaintiff had no mature claims yet to enforce even to negotiate a an agreement to work for the new venture.

26. The editing and distribution of live concerts CDs, customized individual concert selections, sports stills and clips for rebroadcast, ring tones, playlists and sports betting transmission, and marketing food and beverages based on seat selection are some of the additional non-ticketing businesses that defendant LNE attempted to monopolize in violation of the merger mandates.

27. In February 2023 in the aftermath of the SJC hearings participated in by bipartisan members of Congress, defendant Live Nation's new EVP of Regulatory Affairs, Dan Wall posted an article in *Pollstar* arguing that the CTS Eventim ticketing system defendant Live

Nation imported in 2007 did not work, the DOJ approved the merger in 2010 and should not break it up now.  Virtually all of Wall's statements are red herrings and contradicted by the record. The hearings produced hard evidence of defendant LNE's proclivity to lie, expand into all fields live event revenues, and defy most of the proscriptive mandates. The *Pollstar* article should be seen as what it is -  another sham perpetrated by defendant LNE and its executives to deceive the press, the public and artists.

28.      Berchtold's testimony was impeached by several witnesses.  His misrepresentations included that all sources of concert revenue with the exception of onsite parking and concession/merchandise sales are shared with artists. *This statement is false*.  The sale of live concert recordings has been a significant source of revenue reported and detailed in defendant's 10Ks and annual reports since 2006 that are public documents, and based on timing are infringement damages that Plaintiff could have claimed but for the fact that her patents were delayed.  Defendant Live Nation itemized revenues from the live recording venture with Apple's iTunes included direct transmissions to ticketholders and are significant.  Now, in the evolving market, consumer ticketing data is being sold to advertisers for targeted advertising contracts, substantial revenue from which is not shared with artists.

29.      Plaintiff has suffered astronomical damages from patent delay and from defendant Supple's unprivileged defamation by fraud and forgery of documents on behalf of the defendants and himself.  Plaintiff had to overhaul her ticketing management platforms and algorithms several times because defendants having gotten lead time to outsource her algorithms during extreme and prejudicial patent delay, was able to sign up her market customers and competitors.  Now that the State of New York admits it discards files after 5-7 years, ChatGPT is generating cascading orders based on the ordering deleting Plaintiff's good name in 2013 that never got hearings in the state or the district court.

## II. RICO CRIMES

30.      There is no dispute that defendants Live Nation and Ticketmaster via their defendant attorneys and Supple engaged in perjury, fraud, malicious frivolous litigation and in-court deceit and organized a conspiratorial enterprise to engage in acts in furtherance of a pattern of racketeering during Plaintiff's 15-year SDNY lawsuit. The plan was successful because

Plaintiff got no hearing on her patents, was denied patent discovery and conflicts of interest ordered by the Second Circuit (462 Fed. Appx 26) and her good name was deleted ex parte from the roster of attorneys, making it impossible for Plaintiff to reenter that court with the stellar record she had and deserves.

31. Per an order of the Appellate Division First Dept. entered in April 2016, Supple's conspiracy of crafting unserved documents also involved Plaintiff's early attorney in the SDNY lawsuit, Squitieri & Fearon, LLP. Plaintiff won binding arbitration on Cowan defendants breach of the of counsel contract with Squitieri's representation but suspiciously, no patent discovery on breach of retainer was allowed, and there is no order convening arbitration signed by the first Judge Jones on the docket. Supple had proffered crafted documents ex parte to get patent discovery stayed without legal justification in 2007 and 2007. No patent discovery was thereafter allowed when the order was reversed by the Second Circuit. Then when Plaintiff was abandoned as a PRO SE litigant, defendants were enabled to ride on the coattails of Supple's concealed to get the SDNY also deny a hearing on her patents for 13 years. SDNY judges and CE officers knew of Supple's concealed state post and knew that Plaintiff did not know. Now, it seems plausible that SDNY CE officers delayed notice to Plaintiff for 9 years until June 2022 to notice her of the deletion of her name sua sponte to prevent a lawsuit for wrongful state action until after the cause of action would expire. The issuance of the 566 continuation patent on August 2, 2022 after a huge prejudicial patent delay at the USPTO has now solves that problem..

32. The following letter was written to the SDNY CE Officers:

To the SDNY CE Office,
Attn: Chief Adm. Judge

Unfortunately for ___________, the Plaintiff's lawyer in the above-captioned SDNY litigation, the presiding Judge happens to be Chair the SDNY Attorney Disciplinary Committee and in a separate administrative capacity, supervises several SDNY Circuit Executives (CE) serving on that committee.

The real travesty and national import of the attorney's alleged ethics breach in using ChatGTP to generate his motions and opposition papers, is that the Judge did not read the briefs or catch that the attorney cited to non-existent cases. It was instead the attorney's adversary who reported alleged ethics violations to the judge.

I am an attorney admitted to practice law in California and before the Central District of California for 40 years. I hold US patents being infringed by many NY-based companies including Live Nation and MLB. I am limited to adjudicating my infringement cases before the SDNY against companies who reside in or do business in this district. The NYS bar is not required for listing on the SDNY roster of attorneys. *In re Gouiran,* 58 F. 3d 54 (2d Cir. 1995).

I have been litigating an infringement lawsuit against defendant Live Nation since 2006 and also seeking damages for unfair competition and for violations of the antitrust mandates signed by Live Nation as conditions of its merger with Ticketmaster in 2010.  In my case, Live Nation and its attorneys fraudulently swore under oath that Live Nation had "*no NY contacts*" to answer my claims. These acts of jurisdictional fraud would have been caught by Chat GPT.  Yet it is unbelievable that defendant Live Nation was granted sua sponte dismissal by a SDNY judge who left the case and court. The judge had stayed patent discovery without legal justification and arbitration was convened with no corresponding on the docket, that I won. Then a magistrate left the case and the court when I won remand from the Second Circuit in 2012.  On remand my infringement complaint date-stamped and filed in 2010 had been deleted from the SDNY docket after it was printed in the appendix filed before the Second Circuit. A better use of Chat GTP would be to let the platform serve as a bot judge to decide motions filed in district court.

To demonstrate the huge potential prejudice and damages I suffered, members of the Judge's Circuit Executive office called me ten years after the fact in June 2022 to notice that in 2012 my adversary, attorney for Live Nation and or common attorneys in a NYC IP law firm, was unlawfully dually serving on the attorney grievance committee for the State of NY and proffered crafted documents ex parte to judges, magistrate and to SDNY CE officers under the Judge's supervision. The result was that in 2013, CE officers unlawfully deleted my good name from the roster of attorneys without notice, hearing or due process of law.

The acts of SDNY CE officers defy mandates of the US Supreme Court since 1871. *Bradley v. Fisher*, 80 US 335 (1871). I was never notified, and the case has lasted 16 years. The Judge was an administrative supervisor of those CE officers, and apparently as in the cited case, no officer of the SDNY under the supervision of the Judge researched the documents proffered ex parte by my adversary. The judges in my case never granted me a hearing on my patents or the patent discovery ordered by the Second Circuit in 2012.

I hope SDNY CE officers are using Chat GPT to determine the appropriate sanction and discipline for this lawyer.

Amy R. Weissbrod
President LIVE-Fi ®Technologies, LLC

33.     Supple's crafted documents included n order purportedly signed ex parte in 2012 without notice when the First Dept. has no jurisdiction over Plaintiff in the capacity of an attorney. Documents thus far discovered include a 2009 photocopied petition purporting to contain the signature of 2002 AGC Chief Counsel Paul Curran who was dead in 2007. In 2017, Plaintiff filed a state mandamus petition to compel production of Supple crafted documents and the complete state files (132-2017).  The petition was transferred sua sponte to the 2d  Dept. based on admitted conflicts of interest of First Dept. justices in 2018 (01366-2018) and has remained adjudicated for 6 years.  In the meantime, the sua sponte transfer order is on interlocutory appeal to the NY Court of Appeal also seeking mandamus relief to vacate  the crafted documents.

34.     The SDNY magistrate, the next judge and SDNY Circuit Executive administrative officers got the crafted documents and some of the notes from Supple's ex parte

sessions with Magistrate were found in the state files.  It seems that Supple was shuffling crafted and unserved papers back and forth between two courts. The magistrate told Plaintiff in open court on January 3, 2013 to "*leave Supple's clients alone*" and did not record the hearing.  Then Magistrate did not sign Plaintiff's application for signed subpoenas to compel production of Cowan's withheld patent filings from the USPTO. Plaintiff's motion was discovered ripped out of the binders in the SDNY file room.  Then, in the face of Plaintiff's otherwise proper motion for recusal in 2014, magistrate left the case and the court. The next Judge Schofield presiding in 2015 ordered that Plaintiff pay $10,000 into the SDNY for a special patent master who was never hired.  There is no ground for that order.  It took 3 years to get the money refunded.  The judge also refused to disqualify Supple and defendant H&C mandated by NY statutes (JL Part 1240.6d). Instead, the judge continued to allow Supple to engage in frivolous and fraudulent litigation and entertained a summary judgment motion in 2017 when 50 genuine issues of fact existed and no discovery had been allowed. Plaintiff's ECF filing privileges were also revoked ex parte without notice. Both the magistrate and the judge knew that Plaintiff's good name had already been deleted by the CE officers yet neither notified Plaintiff and had more than ample opportunity to do so.

35.     Because Supple's crafted documents proffered during ex parte sessions were the cause in fact of adverse orders and clear abuses of discretion, the court was required to recuse itself and abort entry of orders.  *Liljeberg v. Health Services Acquisition Corp*., 486 US 847 (1988).  The court never recused itself. When Plaintiff filed the appropriate motion, it was never adjudicated to prevent an order from which to appeal or get mandamus relief.  Supple as a concealed NYS AGC attorney bequeathed with a duty to help aggrieved clients get remedial help from the state against their lawyers, engaged in abuse of litigation privilege and breached Plaintiff's attorney client privilege ex parte to three courts. Supple is also believed to have removed from the state files the ethics complaints against the Cowan defendants because as counsel to Cowan lawyers in the SDNY, he had duties in conflict with those owed to Plaintiff, see that the files were never ordered produced. They would have been incriminating to the Cowan patent lawyers, associates and managing partners.

36.     Based on the fraudulent jurisdictional papers filed before Judge Jones in 2008, defendant Live Nation was improperly sua sponte dismissed without patent discovery and no

adjudication of Plaintiff's infringement complaint. No motion that adversely implicates the constitutional rights of a litigant can be entered sua sponte. *Link v. Wabash R. R. Co.*, 370 US 626 (1962) Plaintiff's reconsideration motion and motion to vacate after Plaintiff's infringement complaint was date stamped, filed by the court on April 22, 2010 and printed at pp. 671, et seq. of Vol. III of the Appendix filed with the Second Circuit was also never adjudicated. The infringement complaint had suspiciously disappeared from the SDNY file room and from the docket on remand in 2012.

37. The real shocker came in June, 2022 when SDNY Circuit Executive (CE) administrators conceded that Plaintiff's good name was in fact deleted ex parte from the roster of SDNY attorneys without notice or hearing. The deletion of Plaintiff's name defies her most basic constitutional rights guaranteed by the Fifth Amendment. *Bradley v. Fisher*, 80 US 335 (1871). Only one bar is required for SDNY listing and it need not be NYS. *In re Gouiran*, 58 F. 3d 54 (2d Cir 1995)[12] The deletion of Plaintiff's name now explains how Plaintiff never got patent discovery or a hearing on her patents.

38. Cowan defendants must be severely sanctioned. They knew full well that Plaintiff was not admitted to practice law in NYS and that knowledge was imputed to Supple and defendant H&C. The failure to notify Plaintiff prevented Plaintiff from seeking an earlier mandamus order to abort Supple's release of per se defamatory information and privileged communications during a patent case from the Federal Circuit. Mandamus orders were properly granted in aid of its exclusive jurisdiction in patent cases. *Spalding Sports Worldwide v. Wilson*, 203 F. 3d 800 (Fed. Cir.2000); *Von Bulow v. Von Bulow*, 811 F. 2d 136 (1987)

39. The Federal Circuit has been petitioned to grant mandamus relief to retroactively disqualify the court and the judges and vacate orders and transfer the litigation.

## III. STATEMENT OF THE CASE

40. This action seeks treble damages and damages jointly and severally against the

[12] After the NYS Statewide Hearings on Attorney Discipline were convened in 2016, Judiciary Law Part 1240 added JL Part 1240.6d that "no attorney serving on the state AGC when a complaint against an attorney is filed, can accept the retainer of the reported attorney in a lawsuit filed by the client".

named defendants Live Nation, Inc., Ticketmaster, LLC, Live Nation Entertainment, Inc., MLB/MLB Advanced Media, Instant Live Concerts, LLC, Mike Gordon as agent for Phish/PhishLIVE,, Cowan Liebowitz & Latman, PC, Baker Botts, LLP and Hinshaw & Culbertson, LLP (employer of NYS AGC attorney Richard Supple), for infringement of patents, aiding and abetting infringement, willful infringement, damages for unfair competition, Clayton antitrust merger violations, boycotting of Plaintiff's patents, aiding and abetting wrongful state action, and treble damages based on defendants' organization and acts undertaken in furtherance of a RICO  patent fraud conspiracy aimed at defrauding Plaintiff, SDNY Circuit Executives, two SDNY judges and a magistrate to prevent Plaintiff from getting a hearing on her US  patents before the district court for 13 years.  Plaintiff claims the statutes of limitations must be tolled on tort, fraud and wrongful state action claims based on malicious and conspiratorial acts including crimes that were undertaken by the defendants to keep their elaborate racketeering scheme concealed.

41.     Defendants Live Nation, Instant Live Concerts and Ticketmaster are alleged to have also engaged in false advertising, monopolistic practices in defiance of the 2010 DOJ consent decree and competitive impact statement, boycotting of Plaintiff's patents, and unfair competition in violation of state and federal statutes. Attorney defendants are contended to have engaged in unprivileged defamation, abuse of litigation privilege, boycotting, frivolous litigation, continuing attorney in-court fraud and deceit and aiding and abetting wrongful state action by court officers.  [13] [14] Plaintiff seeks punitive damages against all defendants in the discretion of the court.  Defendant H&C's Supple is the common thread who rode on the coattails of his concealed state post to craft and proffer fraudulent and forged documents to SDNY judges and administrative officers, knowing full well that those documents had never been produced in favor of Plaintiff by the State and never got hearing in the State in violation of Plaintiff's constitutional rights.  [15]

---

[13] *Edelman Combs & Latturner v. Hinshaw & Culbertson,* 338 Ill. App. 3d 156 (2003)

[14] *Amalfitano v. Rosenberg*, 12 NY 3 8 (2009); 533 F. 3d 117 (2d Cir 2007)

[15] NY's Judiciary Law (JL) Part 1240.18

42. Seven agencies of NYS also became enabled to violate the Takings and Just Compensation Clauses of the Fifth Amendment and outsourced Plaintiff's patented algorithms and platforms alone and with venture partners without paying Plaintiff. Those agencies include NYS Thruway, EZ-Pass, NYS Police, the Port Authority of NY and NJ, and NYS Office of Court Administration. Plaintiff suffered and continues to suffer manifest injustice, and irreparable damage her patent business, otherwise stellar professional reputation and career, and was forced to forfeit her strict liability patent recoveries from five named defendants in the lawsuit. Special damages are properly awarded with punitive damages.

43. Plaintiff's patents disclose the priority essential algorithms for ticketing management in the United States. SDNY was wrongfully induced not to grant discovery ordered by the 2d Circuit in 2012 or adjudicate any motions filed by Plaintiff on remand. The acts of the sitting judges and magistrate defy Plaintiff's right to equal protection of the court's non-delegable administrative duties and protocols. Another ticketing inventor was allowed to adjudicate a third patent in the SDNY after two previous patents were invalidated by the ED Tex. Plaintiff got no hearing on her patents whatsoever. *Bytemark v. Xerox*, 342 F. Supp. 3d 492 (SDNY 2018). 2022 WL 94859 (SDNY 2022)(PG). Each new issued patent entitled Plaintiff to vacate a previous order or judgment. *Metzler Investments Gmbh v. Chipotle Mexican Grill*, 970 F. 3d 133 (2d Cir 2020); see also *Grant Williams v. Citicorp*., 659 F. 3d 208 (2d Cir 2011).

44. Plaintiff further alleges that the cessation of adjudicatory duties by the SDNY when judges had a duty to act in a patent litigation, warrants mandamus relief from the Federal Circuit. It is now being investigated whether the failure to adjudicate Plaintiff's motions was dictated by SDNY CE administrative officers to prevent entry of an order that could only have been appealed to the Federal Circuit in aid of its exclusive appellate jurisdiction in patent cases. By failing to adjudicate motions, Plaintiff was also denied notice of her right to move for mandamus and injunctive relief earlier when on remand since 2012 Supple was breaching Plaintiff's attorney client privilege in ex parte sessions and conversations on behalf of the Cowan defendants and himself to judges in three courts. *Spalding Sports Worldwide v. Wilson*, 203 F. 3d 800 (Fed Cir. 2000); *Von Bulow v. Von Bulow*, 811 F. 2d 136 (1987).

45. The right to a hearing on issued US patents is guaranteed by the Fifth Amendment of the United States Constitution. Congress has the exclusive power to regulate patents within

the body of the Constitution, Art. 8.

46. Defendants also conspired to prevent Plaintiff from getting patent discovery. Patent discovery was unlawfully stayed sua sponte in 2007 by same judge who sua sponte granted defendant Live Nation's fraudulent jurisdictional motion to dismiss under Rule 12(b). No order that adversely implicates the constitutional rights of a litigant, especially a pro se US patentee, is properly entered sua sponte. *Link v. Wabash R. R. Co*., 370 US 626 (1962).

47. The facts against the Cowan defendants are undisputed. The Cowan defendants offered Plaintiff a patent retainer under false pretenses seeking an investment in Plaintiff's formal applications in exchange for patent work. This retainer is unlawful in NYS. *Buechel v. Rhodes*, 285 AD 2d 274 (AD 1st Dept. 1999). Cowan defendants failed to disclose that it already harbored conflicts of interest with defendants Live Nation, subsidiary Instant Live Concerts, Mike Gordon of Phish and its principal trademark client, Major League Baseball (MLB)/MLB Advanced Media. At the same time, the Cowan defendants offered Plaintiff a one-year of counsel arrangement also under false pretenses to get access to her formal patent drafts, clients and contact lists. The communications and documents transferred for the limited assessment of a retainer are privileged and were stated to be privileged. Cowan defendants wanted Plaintiff to refer patent clients from California to get more patent billings after they lost their two rainmaking partners Michael Wolfson and William Dippert. **Cowan defendants signed the of counsel agreement after reviewing the confidential formal patent drafts and paid Plaintiff's bar dues to the State Bar of California in 2002, knowing full well that Plaintiff was not admitted in NYS.** That knowledge is imputed to defendant H&C and Supple and proves that Supple as a dual and concealed officer of the State, engaged in Plaintiff's retaliatory harassment in the total absence of jurisdiction which are acts are not protected by immunity. *Forrester v. White*, 484 US 219 (1988) Then Supple organized a conspiratorial enterprise to prevent a hearing on Plaintiff's patents in the district court by proffering crafted documents he manufactured in the State. Defendants' acts in consort aided and abetted infringement by the defendant companies and other companies in the district and elsewhere, and statutes of limitation endure for the full term of patent. 35 USC §271, 284, 285, 286.

48. Cowan defendants revoked their signed of counsel contract in 4 months after the firm got access to Plaintiff's formal draft patent applications, clients and contact lists and copied

those documents into the firm's database.

49. NYS's attorney grievance committee (AGC) officers and individual members of the Office of the NYS Attorney General who have a duty to defend AGC attorneys and justices, planted Supple as a state leak in the SDNY lawsuit and upon belief the judges and CE officers knew this. This is how Supple was not disqualified in defiance of NY statutes and allowed to continue to engage in frivolous fraudulent litigation. JL Part 1240.6d.

50. Plaintiff is not admitted to practice law in NYS. Plaintiff is listed as voluntarily resigned/retired by the Third Dept. in Albany, NY since 1998 and her resignation was accepted by two state officers Dan Brennan and Denise Rajpal. Plaintiff has these documents; but the state claims it destroyed theirs. So what? Supple's documents that must be ordered produced by this Court from defendant H&C were crafted as a faux pretext to make it appear as if Plaintiff maintained a law office in the First Dept. in 2012 that never existed so that jurisdiction, that also never existed in favor of the First Dept; would be conferred.

51. However, because admission to the bar in NY is not a prerequisite to SDNY listing on the attorney roster, SDNY CE officers are not saved. Because Plaintiff is admitted in another state, she was entitled to maintain roster listing based on another bar admission and was entitled to notice and due process prior to her listing being deleted. *Bradley v. Fisher*, 80 US 335 (1871); *In re Gouiran*, 58 F. 3d 54 (2d Cir. 1995).

52. The USPTO patent and inventorship files withheld by the Cowan defendants are federally mandated and pertain to Plaintiff's federally protected property rights in her patents. They were required to be ordered compelled from the Cowan patent practitioners by the state AGC officers as part of official state duties and by staff attorneys working with Supple under preempting federal mandates. Art. 6. Cl. 2 US Constitution; *Virginia Office of Protection and Advocacy v. Stewart*, 563 US 247 (2011)(Scalia, J.) Plaintiff had an absolute due process right and statutory right to seek mandatory production of her complete state files *before* any crafted order was signed ex parte, particular when there was no jurisdiction in favor of the First Dept. that purported signed the document. JL Part 1240.7. Plaintiff was denied both her constitutional and statutory rights. Moreover, Supple serving as a concealed AGC officer at times relevant, had a duty to see that Plaintiff's patent files were compelled from the Cowan defendants. The

files were not only not compelled but were removed from the AGC by Supple. Plaintiff never got a response to her ethics complaint. Supple had a conflicting vested interest to see that those files were never compelled by the State against the Cowan defendants, by the SDNY or by the USPTO Office of Enrollment and Discipline (OED). *Ulico v. Wilson Elser, Moskowitz Edelman and Dicker,* 56 AD 3d 1 (AD 1st Dept. 2008). Plaintiff is now seeking the files from the Commissioner of Patents.

53.     The facts concerning intentional torts of the Cowan defendants before the USPTO are undisputed. Cowan defendants never filed Plaintiff's formal applications in ticketing management after offering Plaintiff an illegal retainer in NYS and never filed Plaintiff's schematics, drawings, specifications and algorithms that were sufficient to be filed "as is". Instead, in 2002-3 the Cowan defendants filed defective 2-3-page excerpts and then abandoned the defective filings admitting to a conflict of interest to the USPTO. Cowan defendants also filed unilateral withdrawal forms and entered non-existent contact information. Unilateral withdrawal was denied twice in 2003 and 2007. Then the Cowan defendants failed to withdraw the holdings of abandonment losing Plaintiff 3 US applications and a PCT and valuable priority dates.

54.     Plaintiff contends the USPTO OED was required to compel the withheld files. 37 CFR 2.10, 2.19, 10.66, 11.116, 1.36, 1.324; 35 USC 256. However, Plaintiff's motions seeking signed subpoenas from the Magistrate against the USPTO General Counsel James Payne were never signed and ripped out of the SDNY file room. Cowan failures to withdraw the holdings of abandonment should have been cited and fined by the OED. The USPTO Commissioner of Patents did open an investigation in 2005 after three of Plaintiff's US applications and one PCT were forfeited. The Commissioner advised Plaintiff that her applications would be taken out of the queue for prosecution in due course, delaying the first office action over 7 years when the deadline is 14 months. *Wyeth v. Kappos,* 591 F. 3d 1364 (Fed. Cir. 2010) Some of that lost time and lost time of the continuation patent that issued in 2022 is the subject of an application for patent term adjustment; and according to the USPTO, only the overlap not attributable to attorney misconduct qualifies for extension.

55.     In addition, pursuant to the signed of counsel contract that Cowan defendants breached in just four months, Plaintiff did refer one patent client from California, Legend Films

of San Diego that had a signed contract with Plaintiff to pay 3% of the stock at founder's level for Plaintiff's start-up services since 1999. Cowan defendants knew of the contract. Yet defendants unlawfully took certain of Plaintiff's editing algorithms from Plaintiff's documents it photocopied without Plaintiff's knowledge or consent, and inserted what turned out to be patentable algorithms for content editing into Legend's application. Legend had in fact accepted a fee for investment patent retainer from the Cowan defendants. With the insertion of Plaintiff's algorithms, Legend was granted a PCT patent on February 20, 2007 (7181081), coincidentally the second date the Cowan defendants filed a unilateral withdrawal form from Plaintiff's patent retainer. Plaintiff was never paid her stock when Legend was sold with its patents in 2013, defining a further cause of action for non-joinder. 35 USC §256, 37 CFR 1.324. Plaintiff's claims seeking $330,000 plus interest for non-joinder and tortious interference were pleaded with specificity in the date stamped SDNY complaints and never giving hearing. *Carter v. ALK Holdings*, 605 F. 3d 1319 (Fed. Cir.2010)

56.      In addition, in defiance of NYS ethics statutes, Supple and H&C were not disqualified by the SDNY judge. See, NY's Judiciary Law Part 1240.6d, 1240.18. Instead, defendant Supple was permitted to continue to file frivolous and fraudulent motions including for summary judgment in 2017 when more than 50 genuine issues of fact remained open and no patent or conflict of interest discovery ordered by the Second Circuit had been allowed. (462 Fed. Appx. 26) Plaintiff cross-motion for summary judgment was sua sponte denied on admitted ground that her infringement and non-joinder complaint was never given a hearing.

57.      The same third judge ordered that Plaintiff pay $10,000 into the SDNY Cashier for a special patent master who was never hired. The judge dismissed the malpractice cause of action against the Cowan defendants based on a 3-year statutes of limitations, when there was no malpractice. The judge applied some ludicrous calculation to dismiss the malpractice claims, but the fraudulent breach of fiduciary duty and non-joinder that have a six-year statute were never heard. Plaintiff's claims for aiding and abetting infringement and patent delay, however, endure for the full term of patent and each new patent constituted newly discovered evidence sufficient to vacate a prior order or judgment. Rule 60(b); *Metzler Investments Gmbh v. Chipotle Mexican Grill*, 970 F. 3d 133 (2d Cir; 2020).

58.      In 2007, defendant Live Nation outsourced Plaintiff's patents in a joint venture

with Apple iTunes.  In 2008, Apple Inc. copied Plaintiff's inventions in ticketing management by filing a competing application and writing claims for the iOS operating system.  Apple was denied a patent for 8 years, and Plaintiff's patents pending were cited by examiners as prior art.

## IV.  JURISDICTION

59.     Jurisdiction of the federal courts is invoked under Title 35 of the United States Code seeking infringement aiding and abetting infringement and willful infringement of Plaintiff's US ticketing management patents[16] [35 USC §§271, 284, 285, 286]; damages for defendants' acts in furtherance of a RICO conspiratorial enterprise and pattern of racketeering in violation of 18 USC§ 1962.

60.     Federal jurisdiction is further invoked based on defendants' infringement of Plaintiff's US copyrights TXu001265644 [17 USC §1 et seq.].  As against defendants Live Nation Entertainment, Inc., Live Nation and Ticketmaster, Plaintiff seeks damages for violations of the Clayton Antitrust Act and the Lanham Act [15 USC §§12-17, 1125]; damages for violations of federal unfair competition laws, continued defiance of the signed antitrust merger mandates undertaken against Plaintiff and Plaintiff's company LIVE-Fi ®Technologies, LLC [17] and boycotting Plaintiff and her patents while infringing Plaintiff's patents.

61.     Plaintiff also seeks 42 USC §1983, 1985, 1988 damages, attorneys' fees and costs for aiding and abetting wrongful state action by court officers of the SDNY and NYS.

62.     Plaintiff further seeks state damages under the pendent jurisdiction of the federal courts pursuant to 28 USC §1367 for defendants' acts of defamation, breach of contract, breach of litigation privilege, breach of attorney client privilege, violations of the state unfair competition laws, attorney conflicts of interest, tortious interference, and for attorney in-court fraud and deceit.  *Mindy's Cosmetics v. Dakar,* 611 F. 3d 590 (9th Cir 2010); *Amalfitano v. Rosenberg*, 12 NY3d 8 (2009); 533 F. 3d 117 (2d Cir 2007). Plaintiff seeks punitive damages in

---

[16] Gurvey US  Patents 11403566, D647910S and 7603321 (August 2, 2022, November 1, 2011, October 13, 2009). US Copyright Registration TXu001265644.

[17] *US v. Ticketmaster and Live Nation*, 2010 WL 975407, 975408 (DDC January 25, 2010) (Amendment Judgment with entry of sanctions DDC January 8, 2020).

the discretion of the court.

63. Venue is proper in the Central District of California pursuant to 28 USC §1291 because three of the infringing defendants reside in or do business in the district, are infringing Petitioner's patents and copyrights in the district, violating the antitrust laws and engaging in violations of the state unfair competition laws, and continuing to withhold ticketing data proscribed by the competitive impact statement as conditions of merger between defendants Ticketmaster and Live Nation. Defendants Live Nation, Instant Live Concerts and MLB outsourced Plaintiff's proprietary algorithms and split infringement by the doctrine of equivalents with venture partners Apple, Inc. iTunes and Tickets.com, respectively, also in California.

## V. OPERATIVE ESTALBISHED PRECEDENTS

64. In support of this Complaint, the following undisputed established facts are relevant:

(1) Defendant Live Nation Entertainment via merged partner defendant Ticketmaster was criminally prosecuted by the US Attorney for the EDNY for placing spiders on competitors' website to steal ticketing data for its own use and database (*US v. Ticketmaster*, 21cv22, 24 (EDNY 2021), proving jurisdictional fraud in Plaintiff's SDNY lawsuit denying contacts with NYS to dodge liability for strict liability claims, unfair competition and serious crimes;

(2) Defendant Ticketmaster continue to withhold ticketing data from Plaintiff to prevent Plaintiff from conducting non-ticketing businesses at defendant Live Nation's dominant share of event venues in violation of the consent decree and competitive impact statement signed on January 25, 2010 and in defiance of the extended mandates and sanctions iterated in an Amended Judgment entered by the Dept. of Justice on January 8, 2020;

(3) Plaintiff's claims set forth in an infringement complaint date stamped and filed on April 22, 2010 against the named defendants with a Rule 60(b) motion to vacate a Rule 12(b) improper sua sponte dismissal of defendant Live Nation based on fraudulent jurisdictional papers were printed in Vol. III of pp. 671, of the Appendix to the first appeal (2d Cir 09-2185;10-4111),

and had been mysteriously removed from the SDNY docket and SDNY consideration by the time of remand in 2012 and were never adjudicated. Anza Technology v. Mushkin, 934 F.3d 1349 (Fed. Cir. 2019).

(4) Since 2017, the SDNY has been hearing an infringement and tortious interference lawsuit brought by another ticketing patentee whose two earlier patents were previously invalidated by the ED Tex., demonstrating that Plaintiff was denied equal protection and constitutional access to the SDNY and that defendants aided and abetted wrongful state action. [Bytemark v. Xerox, 2022 WL 94859 (SDNY 2022) (PG)]. Metzler Investments Gmbh v. Chipotle Mexican Grill, 970 F. 3d 133 (2d Cir 2020); Blum v. Yaretsky, 457 US 991 (1982).

(5) Plaintiff and defendants Live Nation and MLB's common defendant attorneys at defendant Cowan Liebowitz & Latman including Midge Hyman and Simon Gerson organized other companies using the Cowan office address at 1133 Avenue of the Americas, and those companies are contended infringers of Plaintiff's patents. [18]

(6) In 2013, Plaintiff's good name was deleted from the SDNY roster of attorneys by SDNY CE officers without notice, hearing or due process of law in violation of Plaintiff's constitutional rights guaranteed by the Fifth Amendment and mandates of the US Supreme Court, based on ex parte proffers from Plaintiff's adversary, Richard Supple, dually serving a concealed attorney for NYS. The crafted were never compelled by the State of NY in response to Plaintiff's applications and never got hearing in the State. NY's Judiciary Law Part 1240.7.

(7) There is no final order from the State of NY on a single order that Supple crafted and allegedly got signed ex parte by a former AGC judge in 2012 because the crafted order drafted by signed without jurisdiction over Plaintiff is on appeal to the NY Court of Appeals, SSD 8, and was transferred sua sponte to the Third Dept. for adjudication. 23-cv-0534 (3d Dept. 2023). That order is contended fraudulent, has zero to do with Plaintiff's absolute right to get hearings on her patents from a district court.

(8) Seven agencies of the State of NY have taken Plaintiff's patents in defiance of the

---

[18] Front Row Technologies v Major League Baseball/MLB Advanced Media and the Glenn Beck Program, 2012 WL 6736301 (D. M. Mex 2012).

Takings and Just Compensation Clauses of the Fifth Amendment and have not paid Plaintiff.

## VI.   GOVERNING STATE STATUTES

65.      The law was changed in 2016-2018 to preclude lawyers serving on the NYS attorney grievance committees (AGC ) from accepting the defense of a reported attorney if the client sues the attorney before a court of competent jurisdiction and the AGC lawyer was serving when the complaint against the lawyer was filed, processed or otherwise adjudicated.  JL Part 1240, Part 1240.6d; See, *Anderson v. First Dept. Attorney Disciplinary Committee, State of NY*, 614 F. Supp. 2d 404 (SDNY 2009)(Headnotes, 15, 16);  *Esposito v. State of NY*, 2007 WL 3523910 (SDNY 2007); updated lawsuit, *Esposito v. Willy Gary*, 2018 WL 11245 (SDNY)(PG).

66.      AGC officers and clerks in NYS have been cited by the federal district courts for conflict of interest violations and retaliating against citizens who pursue federally protected rights and interests before NY tribunals that threaten to expose the state's defiance of preempting federal statutes that govern those lawsuits.  See e.g., *Sultzer v Pierce*, 85 CV 0591 (CES)(SDNY 1985); *Sultzer v. Battery Park City Authority*, Supreme Court of NY, NY County, Index No. 13906 (violation of HUD mandates and federally protected property rights of HUD tenants).

67.      In 2016, the Appellate Division found in an order that Supple had crafted unserved documents and inserted them into state files and got the help of Plaintiff's 2006 SDNY attorney, Squitieri & Fearon, LLP. The Appellate Division First Dept. is alleged to have violated Plaintiff's constitutional rights by failing to adjudicate a mandamus petition to get access to the crafted documents and corrupted files and to vacate a crafted order that Supple supposedly got signed ex parte in 2012 without jurisdiction over Plaintiff, and without production of all relevant state files in advance.  *Gurvey v. Acosta*, 132-2017. That petition was transferred sua sponte to the Second Dept. based on admitted conflict of interest harbored by First Dept. justices who admitted to ex parte conversations with Supple where it remains unadjudicated for 6 years. (01366-2018).

68.      Shockingly, in his concealed state AGC post, Supple removed the  patent practitioner ethics complaints duly filed against the defendant Cowan lawyers from the state's consideration.  Other crafted documents since discovered appended to his crafted order were purportedly signed in 2009 and 2012 by Paul Curran, a former AGC chief counsel who left the

First Dept. AGC in 2002 and was dead of cancer in 2007. No current member of the AGC signed these documents. Other documents falsely say that Plaintiff maintains a law office at PO Box 1523 in Lower Manhattan. No such law office ever existed. Plaintiff has the documents but the State contends it discards files after 7 years. Upon belief, one Chat GPT order was recently generated in the state.

69. Plaintiff's 2013 SDNY motion seeking signed subpoenas against the USPTO General Counsel and Office of Enrollment and Discipline to produce the USPTO files being withheld by the Cowan defendants, were ripped out of the SDNY file room and never signed by magistrate. However, Magistrate's notes from ongoing unlawful ex parte conversations with Supple since 2012 were found in SDNY CE files and in one state file.

70. Plaintiff is on excellent standing before both the State Bar of California and CD District since 1979 and **is not admitted in NYS**[19] because her voluntary retirement and resignation was accepted by state officers Dan Brennan and Denise Rajpal in 1998. Plus, Third Dept. and NYS Attorney Membership screens listed Plaintiff as voluntarily retired in 1998 and no dues were charged to Plaintiff's account after 1999. Ergo, this is why the Cowan defendants paid Plaintiff's bar dues to California in 2002. For the time she was admitted, 1985-1998, Plaintiff attended medical school in NY as a disabled student and then graduate school in Boston.

71. Only one bar admission is required for attorney listing by the SDNY and it need not be NYS. *In re Gouiran*, 58 F. 3d 54 (2d Cir. 1995). Ergo, with no jurisdiction over Plaintiff, the acts of wrongful state action by Supple as agents for defendants Live Nation, Cowan defendants and defendant H&C are not protected by immunity and the intentional failure to serve Plaintiff with notice tolls prevailing statutes based on fraud. The laws of NYS require that the complete relevant state files to be produced in favor of any attorney before any AGC order is entered. The statutes were defied, no files were produced and Plaintiff got no hearing. NY's Judiciary Law Part 1240.7; See also *Wilcox v. Supreme Council of Royal Arcanum*, 210 NY 370

[19] In 1998, Appellate Division Third Dept. and NYS Attorney Membership officers Dan Brennan and Denise Rajpal accepted Plaintiff's voluntary retirement and resignation from the NY Bar, that was temporarily granted by the Third Dept. in 1985 when Plaintiff's was attending graduate school at Columbia University.

(1914) that orders entered by administrative or judicial officers without jurisdiction are not protected by immunity and must be vacated as an administrative duty of the entering tribunal.

72. Plaintiff's damages from the RICO patent fraud scandal include 17 years of lost patent term during which time defendants boycotted Plaintiff but were using her algorithms alone and with venture partners to generate considerable extra revenue from concerts, entertainment and sports. The State of NY is now also using the patents without payment for joint ventures in sports betting, All patent claims were anticipated by defendants and pleaded with specificity in the early operative SDNY complaints. They were required to be given hearings under the Fifth Amendment. *Anza Technology v. Mushkin* 934 F. 3d 1349 (Fed. Cir. 2019). Each new patent provided legal justification to vacate SDNY orders under FRCP Rules 59e and 60(b) *Metzler Investments Gmbh v. Chipotle Mexican Grill*, 970 F. 3d 133 (2d Cir 2020); see also *Grant Williams v. Citicorp*., 659 F. 3d 208 (2d Cir 2011).

73. Cowan defendants receiving copies of Plaintiff's draft formal patent applications in confidence to assess a retainer agreement, told Plaintiff her applications created "quite a buzz". Cowan then breached Plaintiff's attorney client privilege by giving non-lawyers access to her patent drafts including to defendant Mike Gordon of Phish. Then both Cowan and Supple as Cowan defendants' agent breached Plaintiff's attorney client privilege to three courts in ex parte meetings and concealed those meetings to prevent Plaintiff from seeking mandamus relief to prevent release of confidential communications and get earlier recusal of the magistrate. *Spalding Sports Worldwide v. Wilson*, 203 F. 3d 800 (Fed Cir. 2000); *Von Bulow v. Von Bulow*, 811 F. 2d 136 (2d Cir. 1987).

74. Cowan defendants are also liable to Plaintiff for patent non-joinder torts. These claims accrued for a minimum six-year term after the date Legend was issued a patent on February 20, 2007. They arise under the patent laws and must be adjudicated in the district court. 35 USC§ 256, 37 CFR 1.36, 1.3243. Plaintiff's damage claims were pleaded with specificity in the infringement complaints date stamped on 2010 and 2014 and were never given hearing. *Carter v. ALK Holdings*, 605 F. 3df 1319 (Fed. Cir. 2010).

75. The Cowan defendants are liable for strict liability aiding and abetting infringement by its clients with whom conflicts were admitted to exist and for non-joinder torts

in favor of Legend Films. See also, *Mindy's Cosmetics v. Dakar*, 611 F. 3d 590 (9th Cir. 2010)

76. In Case No. 2020-1620 by order entered June 23, 2020, the Federal Circuit held that the Second Circuit abused discretion in adjudicating a previous appeal under the exclusive appellate jurisdiction of the Federal Circuit. Thereafter, Plaintiff's 2023 infringement complaint based on issuance of the extremely delayed August 2, 2022 continuation patent (11403566) was again denied hearing by the SDNY judge; and the complaint was returned without adjudication.

77. Since 2007 for 16 years, defendant Live Nation reported significant revenues from live recording, merchandise and direct marketing sales including customized recordings direct to ticketholders to the Securities and Exchange Commission and IRS.

78. The August 2, 2022 continuation patent issued to Plaintiff was anticipated in the early operative complaint. All three patents remain in full force and effect

**VII. PATENT FACTS**

79. Plaintiff is the sole-named inventor of standard essential patented algorithms for ticketing management in the United States. The patents include apparatuses, methods, platforms and screen analytics. The patents should have issued in 2006 as required by Federal Circuit mandates [20]but for the bad faith, conflict of interest and abandonment torts undertaken by the Cowan Liebowitz & Latman defendants including concealing conflicts of interest with other larger clients who had interest in the subject matter before Plaintiff's patent retainer was offered and accepted.

80. Plaintiff's US patents and copyrights enable authenticated interaction by ticketholders and viewers with live events and streams from mobile devices and from networked intelligent terminals. The mobile display is transformed into a portable remote control whereat automated authentication of ticketing and viewer data expedites processing of interactive user commands in real time. These may include by way of example commands to order transmissions or purchase event content or customized content, to interact with the show, to place a bet,

[20] *Wyeth v. Kappos*. 591 F. 3d 1364 (Fed. Cir. 2010)

interact with messages, promotions and announcements, to play interactive games, to vote, rate and enable uploads, downloads and processing of event content and other users' generated content, fulfill orders and to create customized copyrightable derivative works for retransmission and sale.  This is not meant to be an exhaustive list. The system works as well for hospital emergency room records, as it does for photos of cars going through tollbooths and for concert selections, conference presentations, notes, and sports stills.  The system is operably connected to an editor apparatus and data center optimally located at the venue, fulfillment center or broadcaster. The systems also enable interaction and engagement with sponsor promotions, ads and messages as packaged with broadcast content.  The term "user" is defined to include a ticketholder, an event viewer over mobile or electronic screens, a registrant, an interactive gamer, a sub-distributor of the content or replay of the content, or the orderee for a placed bet (that suffices as a ticket when receipted)

81.     The three patents thus far issued and others still pending, also disclose the essential algorithms to conduct new forms of non-ticketing businesses and overlay games, game shows and competitions including conferences where audience members can ask questions online; or where audience members and off site viewers can upload content for interactive play.

82.     The patents function by increasing the content associated with an event and by enabling authenticated interaction with all content created as packaged transmitted from the time a ticket is issued.  Gurvey US Patents 11403566 (the "566 patent"), D647910S (the "910" patent) and 7603321 (the "321 patent) issued on August 2, 2022, November 1, 2011 and October 13, 2009 disclose apparatuses, platforms that enable production of copyrightable derivative works in close to real time inclusive of user generated interactive content uploaded during the event.

83.     Unilateral abandonment of a USPTO-filed application is a  ploy used by patent lawyers seeking to obtain maximum billings from larger clients who have an interest in disclosures invented by smaller or micro entity clients.  A lawyer's abandonment torts before the USPTO will necessarily cut into the 20-year term of patent that begins to run on the date of filing.  If a delayed patent does issue, the inventor will be permitted to file a latent claim for patent term adjustment, wherein the client must show that the USPTO was at fault for the delay. If the attorney is at fault, the adjustment time awarded by the USPTO will be calculated by overlap and the extension allowable will be reduced pro rata. *Wyeth v. Kappos*, 519 F. 3d 1364

(Fed Cir. 2010) If the client does not achieve a patent, however, most claims for malpractice or breach of fiduciary duty will already have run the clock by the time the client is noticed, giving a windfall to the lawyer.  When patents don't issue, delay damage claims are required to be adjudicated in the state court unless there is an independent basis for federal jurisdiction because claims for malpractice and breach of fiduciary do not arise under the patent laws.  *Gunn v. Minton*, 133 S. Ct. 1059 (USSC Tex.2013)(Roberts J.); *NeuroRepair v. Nath Law Group*, 781 F. 3d 1340 (Fed Cir. 2015).

84.     A registered practitioner's act of bad faith or fraudulent failure to disclose conflicts of interest at the time of retainer will elevate to a claim of aiding and abetting infringement if and when a delayed patent does issue.  Aiding and abetting infringement is a strict liability claim only justiciable in the federal district court for the full term of patent and for which an issued patent is a prerequisite for recovery of damages. *Uni-Systems v. USTA*, 350 F. Supp. 2d 143 (EDNY 2018)

85.      Because the maximum time for issuance of an office action is 14 months and for an issued patent 3 years post filing and plaintiff did achieve issued patents, the Cowan defendants are liable for loss of 3/8 term of Plaintiff's first patent and at the same time, and are jointly and severally liable for the revenues generated during the lead time that its other defendant client were able to outsource Plaintiff's algorithms alone and with venture partners.

86.     Live Nation defendants are liable for strict liability willful infringement treble damages. 35 USC §284

87.     In 2016, Plaintiff was asked to be a presenter at the NY Statewide Attorney Disciplinary Committee hearings on the issue of patent practitioner ethics violations and on the duty of state officers to comply with preempting federal statutory mandates when receiving a disciplinary grievance against a patent attorney. It was at those hearings that Plaintiff discovered that Supple was a concealed NYS AGC attorney and had been planted into the lawsuit to sabotage her interests.

## VIII. DEFENDANTS LIVE NATION AND TICKETMASTER'S CONTINUING ANTITRUST VIOLATIONS

88. Testimony at the January 24, 2023 Senate Judiciary Committee (SJC) hearings convened in support of a bipartisan Congressional petition that the DOJ break up defendant Ticketmaster and Live Nation provided clear and unequivocal evidence of illegal tying. Any Ticketmaster-serviced venue not continuing to sign long-term contracts will be denied access to Live Nation's top caliber artists and promoted tours; and artists not allowing use of defendant's Ticketmaster system will be denied venue performance contracts by defendant Live Nation in violation of 15 USC§§ 12-17.

89. As conditions of the merger and to prevent a vertically integrated behemoth from controlling all fields of revenue from live concerts and sports, defendant Ticketmaster was to divest itself of its Host and Paciolan software and make that software to other venue owners including AEG/Anschutz Entertainment Group and Comcast. In addition, defendants Ticketmaster and Live Nation were ordered to abort withholding of ticketing data from companies and individuals seeking to enter Live Nation's dominant share of event venues to conduct non-ticketing businesses or perform expanded ticketing services for defendant Live Nation's artists.

90. In its 2018 Complaint filed against Prestige Entertainment West[21], Ticketmaster admitted as follows:

> "Ticketmaster LLC is a Virginia limited liability company with its principal place of business in Los Angeles California. The sole member of Ticketmaster LLC is [defendant herein] Live Nation Entertainment, Inc., a Delaware corporation with its principal place of business in Beverly Hills, California". [Defendant Ticketmaster merged with defendant Live Nation on January 25, 2010]
>
> "User accounts serve as a form of password protection against unauthorized access to Ticketmaster's information and tickets. When creating an account, a user must create a password that is necessary for future access to the account. Each time a user creates or later uses an account and password, the user agrees, inter alia, to comply with the Terms

[21] 2018 WL 5668633 (CD CA 2018)

Of Use (TOU) to gain access to some of Ticketmaster's event information and ticket buying capability…

"Ticketmaster's website is part of a carefully crafted business model that integrates other services and features into the ticketing purchasing process. Ticketmaster designed its website and mobile app so that users will follow certain steps. In other words, users will view predetermined pages in the process of requesting and purchasing tickets. Based on this expected flow of traffic Ticketmaster places advertisements on its website for various services in an effort to increase revenues." (Emphasis added.) [22] [23]

.

91. By defendant Live Nation's own admission, the dominant share of venues serviced by Ticketmaster comprises 88% of the live event arenas in the United States. By Ticketmaster's own admission in other law suits, customer data is used to enable non-ticketing revenues. Ergo, the merged entity continues to illegally tie ticketing platforms with access to quality acts and content in violation of the Sherman and Clayton Antitrust Acts, 15 USC 1, 12-17. Moreover, the merged entity is expanding into non-ticketing businesses by selling customer ticketing data. Contrary to Ticketmaster's frivolous arguments and press releases, there is no copyright protection in favor of Ticketmaster in customer ticket data as justification not to share ticketing data as the mandates require. See, Competitive Impact Statement 2010 WL 975408 (DDC January 25, 2010); *Ticketmaster v. Tickets.com*, 2003 WL 21406489 (CD Cal, 2003).

92. On average, only 60% of available tickets to all live music concerts are sold on an annual basis. This is the result of the high fees the merged entity allows Ticketmaster to continue to impose on the tickets it sells and releases.

93. Notwithstanding the public's general aversion and bad feelings about

---

[22] A US patent acquired by defendant Live Nation to compete with Plaintiff's proprietary technology and with defendant Ticketmaster was invalidated by the USPTO in 2007 (Griner, 6614729). .

[23] Certain Cowan defendants also defied USPTO conflicts of interest mandates and engaged in non-joinder torts by filing fraudulent declarations of inventorship appended to the PCT application for Legend Films. 35 USC§ 256, 37 CFR 2.10, 2.19, 10.66, 11.116, 1.36, 1.324. These acts of non-joinder arise under the patent laws and were never given hearing by the SDNY. *Carter v. ALK Holdings*, 603 F. 3d 1319 (Fed Cir. 2010).

Ticketmaster because of astronomically outlandish service fees, Ticketmaster as merged party of defendant Live Nation has continued to flourish by using duress if venues do not sign Ticketmaster's long-term exclusive dealing contracts with concert venue operators and continue in those contracts.  As a quid pro quo, defendant Live Nation does threaten that its roster of major featured artists and acts promoted by defendant Live Nation will be withheld from venues that do not sign and continue with Ticketmaster's contracts. The merged entity, therefore, continues to illegally tie performance access with ticketing data. That data is now used to sell exclusive targeted advertising contracts to sponsors and brands revenue from which - contrary to Berchtold's testimony on January 24, 2023 - is not shared with artists.

94.     Defendant Live Nation also continues to attempt destroy competition by tying undesired services to services and/or markets in which it has market power; and engaging in unfair and anticompetitive acts aimed at eliminating and/or minimizing all rivals and competitors (including Plaintiff and her company, LIVE-Fi ®Technologies, LLC). Defendant Live Nation continues to exclude Plaintiff and her proprietary technology from its Ticketmaster-served venues and defendant Live Nation's dominant share of owed and serviced venues and is withholding the ticketing data from its events and tours.

95.     Defendant Live Nation's dominance was greatly strengthened, enhanced and expanded by the merger with Ticketmaster that has become the largest concert promotion company in the world.  In the United States alone, defendant Live Nation controls more than 85% of the concert promotion services market. Defendant Live Nation promoted 87 % of the top 25 global tours in 2019 before the pandemic. As a result of the merger, Ticketmaster became enabled to use defendant Live Nation's market power (with Live Nation's active assistance and support, and under its direction and control) to enhance and expand its own market power.

96.     Even before the two companies combined, defendant Live Nation sought to compete with Ticketmaster and reduce the latter's market power in concert venue ticketing services. At the time, defendant Live Nation owned or controlled numerous major concert venues in the United States including in NYC contrary to its fraudulent motions filed in this lawsuit that it had "no NY contacts". The events defendant Live Nation promoted represented

over 70% of all United States major live music concerts staged at arenas. In an effort to break Ticketmaster's monopoly power in concert venue ticketing, defendant Live Nation imported its own concert venue ticketing service from CTS Eventim from Germany in 2007 for both its venues and for other Ticketmaster-serviced venues and began to compete directly against Ticketmaster in that space. Attempting to coverup its monopolistic practices, its new EVP Regulatory Affairs Dan Wall posted in *Pollstar* that the Eventim system "did not work". So what? Non-functionality does not negate Plaintiff's right to recover treble damages against the behemoth and its venture partners for willful infringement of Plaintiff's patents, unfair competition and continued defiance of the merger mandates.

97. In NY and the tri-state area including at the Meadowlands, now Met-Life Stadium, the merged entity also continued to willfully infringe Plaintiff's US patents while boycotting Plaintiff and her proprietary technology from defendants' venues to conduct non-ticketing businesses, in violation of the Donnelly Act, NY General Business Law, §340-347.

98. Defendant Live Nation also unlawfully has attempted to monopolize other non-ticketing fields related to concerts. For example, in its current music industry model, confidential user data is then re-sold to generate supplementary revenues <u>not shared with artists</u> including to sponsors. The exclusive ad contracts are interfering with Plaintiff and other rival companies' right to make deals with international brands to finance non-ticketing businesses to generate additional revenues related to concerts, sports and other events. Many brands have noticed that their exclusive contracts with the merged entity precludes them from signing agreements with other non-ticketing businesses.

## IX. DAMAGES FROM AIDING AND ABETTING WRONGFUL STATE ACTION

99. Plaintiff is the sole named inventor of standard essential patents for ticketing management in the United States - 7603321 (October 13 2009); D647910S (November 1, 2011), 11403566 (August 2, 2022) and the owner of US Copyrights: TXu001265644. Plaintiff's patents include schematics, drawings, algorithms, software, hardware, location-based machines, and screen display analytics that necessarily must be used in any ticketing management

application. Four delayed patents in the portfolio remain pending at the USPTO. The August 2, 2022 patent, 11403566, is a continuation of the 7603321 patent with the remainder of claims that should have issued no later than October 13, 2009 but for the conflict of interest and abandonment torts undertaken before the USPTO committed by the Cowan defendants since 2003 and associated crimes, fraud and deceit undertaken by their defense attorney Richard Supple. By law, Supple and defendant H&C were never allowed to accept the Cowan firm's SDNY retainer. Judiciary Law Part 1240.6d.

100. Plaintiff's US patents disclose standard essential algorithms for ticketing management. In totality, they were delayed almost 17 years at the USPTO and have gotten 0 hearings by the SDNY. The patents remain current. Plaintiff's patents include 11403566 (August 2, 2022), D647910S (November 1, 2011) and 7603321 (October 13, 2009) and US Copyright Registration TXu001265644. The issued claims in all three delayed patents were anticipated in the early operative complaints and in defiance of Federal Circuit law, none were granted hearing by the SDNY in 13 years in violation of Plaintiff's constitutional rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution. *Anza Technology v. Mushkin*, 934 F. 3d 1349 (Fed. Cir. 2019); see *also Metzler Investments GMBH v. Chipotle Mexican Grill*, 970 F. 3d 133 (2d Cir. 2020); *Grant Williams v. Citicorp*. 659 F. 3d 208 (2d Cir. 2011); *Bytemark v. Xerox*, 342 F. Supp. 3d 496 (SDNY 2018), 2022 WL 94859 (SDNY 2022).

101. A hearing on Plaintiff's patents by a district court in which infringer defendants reside or do business is a constitutional right guaranteed by United States Constitution, acts of Congress and the Fifth Amendment. There is no such thing as laches. *Ibid. SCA Hygiene Products Aktiebolag v. First Quality Baby Products*, 137 S. Ct. 954 (2017

102. Because Plaintiff's first infringement complaint filed in 2010 was based on the first delayed patent claims that issued in 2009, the continuation patent granting the remainder of closed owed, that issued in 2022 should be given hearing based on the standard of infringement in effect in 2010. The calculation of damages is based on use, manufacture and importation commencing 6 years retroactive to the date the first complaint was filed and date stamped, April

22, 2010. _SCA Hygiene Products Aktiebolag v. First Quality Baby Products_, 137 S. Ct. 954
(2017).

103.     Seven agencies of the State of New York being representing by the same AG
officers aiding and abetting Supple and his AGC staff attorneys, argued that they were allowed to
violate the Takings and Just Compensation Clauses and take Plaintiff's patents without payment
because Plaintiff did not state an accrual date in her state complaint.  No accrual date can be
charged against an inventor per the US Supreme Court and there is no such thing as laches. _SCA
Hygiene Products Aktiebolag v. First Quality Baby Products_, 137 S. Ct. 954 (2017).

## X.    BULLET SUMMARY OF LITIGATION FACTS IN SUPPORT OF ALL CLAIMS

104.    The following established facts and claims are properly considered by this Court:

(1) That fraudulent jurisdictional affidavits were filed by defendant Live Nation fraudulently
swearing under oath that defendant had "_no NY contacts_" to answer for infringement of
Plaintiffs' patents, Clayton antitrust violations, unfair competition and wrongful state action
by its lawyers..

(2) That Baker Botts, Hinshaw & Culbertson (H&C), Supple and defendant Cowan Liebowitz &
Latman as agent-attorneys representing defendant Live Nation (with H&C and Supple also
unlawfully representing the Cowan defendants) engaged in frivolous and fraudulent
litigation, organized a RICO conspiratorial enterprise and engaged in crimes and in-court
fraud and deceit in furtherance of a agreement to delay Plaintiff's patents before the USPTO,
cut Plaintiff out of the live concert and sports markets, boycott Plaintiff's patents from
defendant's dominant share of serviced concert arenas, prevent Plaintiff from conducting
non-ticketing businesses at defendants' dominant share of owned and serviced venues, and to
prevent Plaintiff from getting discovery and a hearing on antitrust, infringement, unfair
competition and breach of patent retainer claims in the SDNY action.

(3) That Supple of H&C as agent for both Cowan and Live Nation defendants, was dually

serving as a concealed attorney and agent for the NYS attorney grievance committee (AGC") and breached fiduciary duties owed to Plaintiff and Plaintiff's attorney client privilege in violation of rights owed to Plaintiff jointly and severally by Cowan defendants and Supple;

(4) That based on ex parte proffer of crafted documents from Supple that received no state hearing, SDNY CE officers breached purely administrative duties owed to Plaintiff by deleting her good name from the roster of SDNY in violation of due process and constitutional rights guaranteed by the Fifth and Fourteenth Amendment. *Bradley v. Fisher*, 80 US 335 (1871); *Bytemark v. Xerox*, 342 F. Supp. 3d 492 (SDNY 2018); *Anza Technology v. Mushkin*, 934 F. 3d 1349 (Fed Cir. 2019); *Amalfitano v. Rosenberg,* 12 NY 3d 8 (2009); *cert. granted*, 533 F. 3d 117 (2d Cir 2007); *Erickson v. Pardus*, 551 US 89 (2007). The deletion of Plaintiff name in 2013 is why Plaintiff was denied hearings on her patents and patent discovery ordered by the Second Circuit in 2012.

(5) That the SDNY court must be disqualified and orders vacated since at least remand from the 2d Circuit in 2012. *Liljeberg v. Health Services Acquisition Corp*., 486 US 847 (1988).

(6) That NY law requires vacatur of any crafted order Supple got signed ex parte without jurisdiction over Plaintiff, without prior production of Plaintiff's state files as an administrative non-judicial duty. and that any crafted order that is on appeal is not final to allow collateral estoppel application by another court. *Wilcox v. Supreme Council of Royal Arcanum*, 210 NY 370 (1914)

(7) That Plaintiff is entitled to injunctive relief to order defendant Ticketmaster to cease withholding ticketing data to prevent Plaintiff from conducting non-ticketing businesses at defendant Live Nation's dominant share of event venues.

(8) That Plaintiff is entitled to production of all of Supple and H&C's files and state files corrupted by Supple.

(9) That Plaintiff is entitled to recover damages under federal and state unfair competition laws against defendants in this court for continuing defiance of prevailing statutes and damages

for strict liability infringement, aiding and abetting infringement and willful infringement of Plaintiff's patents;

(10)    Supple's acts in consort on behalf of the Cowan and Live Nations defendants in consort with AGC state officers and SDNY CE administrative officers are actionable as wrongful state action.

(11)    Defendants are jointly and severally liable for special damages based on unprivileged defamation of Plaintiff that caused damages to patent business, career, professional reputation, and emotional well being.

(12)    That defendant Live Nation's participation in its attorneys' RICO fraud enterprise, false advertising and boycotting Plaintiff's patents, and defendant Ticketmaster's withholding of ticketing data, entitle Plaintiff to recover unfair competition damages under federal and state law.

(13)    That defendants  have had adequate notice of violations of federal infringement statutes; and

(14)    The conspiratorial acts engaged in by the defendants including acts of concealment of crimes and proffer of crafted ex parte documents to magistrate, judges and CE officers are heinous, egregious and shock the conscience, are sufficient to toll the prevailing statutes of limitation and merit the maximum sanctions and punitive allowable by law.

## XI.  COUNTS

105.    **COUNT ONE –** Infringement of US Patent Nos. 7603321, D647910S, 11403566 against all named defendants seeking strict liability damages beginning six years retroactive from April 22, 2010 under the standard of infringement in effect in 2010.  35 USC §271, 284, 285, 206.

106.    **COUNT TWO** – Aiding and abetting infringement of US Patent Nos. 7603321; D647910S and 11403566 against all named defendants alone and with venture partners including by the doctrine of equivalents and seeking strict liability damages beginning six years retroactive from April 22,  2010 under the standard of infringement in effect in 2010. 35 USC §271, 284, 285, 206.

107.    **COUNT THREE** – Willful Infringement of US Patent Nos. 7603321; D647910S and 11403566 against defendants Live Nation, Instant Live Concerts, LLC and Mike Gordon of Phish and seeking treble strict liability damages beginning six years retroactive to April 22, 2010 under the standard of infringement in effect in 2010. 35 USC§ 284

108.    **COUNT FOUR** – RICO conspiracy against defendants Live Nation, Cowan Liebowitz & Latman, Live Nation Entertainment, Inc., Ticketmaster, LLC, Instant Live Concerts, LLC, Hinshaw & Culbertson, Baker Botts, back to 2008 for engaging in acts in furtherance of an elaborate conspiratorial enterprise and pattern of racketeering organized by and participated in by defendants, their employees, agents and attorneys aimed at preventing Plaintiff from getting patent discovery and a hearing on all patent and unfair competition, conflict of interest claims before the SDNY.

109.    **COUNT FIVE** – Damages against defendants Live Nation, Ticketmaster and Live Nation Entertainment for continuing defiance of the merger consent decree and competitive impact statement, engaging in Clayton Act unfair competition and continuing monopolistic practices in violation of federal and state law and withholding ticketing data to prevent Plaintiff from conducting non-ticketing businesses at defendants owned and serviced event venues.

110.    **COUNT SIX** - The bad faith acts in which defendants misappropriated Plaintiff's labors and expenditures, constitute unfair competition under federal law and state law warranting damages. Defendants' practice of the claims of the patents-in-suit and their unauthorized use of patented applications and continued unlawful withholding of ticketing data have been undertaken unlawfully with affirmative acts of boycotting Plaintiff out of defendants' dominant share of event venues to conduct non-ticketing businesses and at venues not owned by defendants.

111.    **COUNT SEVEN** – Damages for unlawful boycotting of Plaintiff and Plaintiff's company LIVE-Fi ®Technologies against defendant Live Nation, Ticketmaster, Instant Live Concerts, LLC and MLB and treble damages for precluding Plaintiff from entering the merged entity's dominant share of event venues.

112.    **COUNT EIGHT**  Aiding and abetting wrongful state action against defendants H&C via Supple, Cowan Leibowitz & Latman via unprivileged defamation, aiding and abetting crimes in confidential court files, and inducing wrongful state action by judges, magistrates and administrative officers of the state and federal courts in New York to deprive Plaintiff of constitutional access to the courts when defendants knew there was no jurisdiction to abuse process against Plaintiff, and no justification to prevent district court hearings on Plaintiff's patents.

113.    **COUNT NINE** – That all named defendants account for and hold in constructive trust to pay over to Plaintiff and otherwise disgorge all revenues and profits derived by defendants from their individual and collective infringements, unfair competition, and other misconduct as alleged in the Complaint.

114.  **COUNT TEN** – That all named defendants account for all ticketholders and ticket purchasers who ordered live recordings emanating from defendants staged concerts, tours, sports, and sports betting events since 2004 and for whom ticketing data was used to authenticate orders.

115:  **COUNT ELEVEN**:  That all named defendants account for all ticketholders and ticket purchasers who ordered merchandise associated with defendants staged concerts, tours, sports and sports betting events since 2004 and for whom ticketing data was used to authenticate orders.

116.    **COUNT TWELVE:**  Defendants H&C via Supple and Cowan Liebowitz & Latman engaged in Plaintiff's unprivileged defamation, abuse of process frivolous litigation, breach of attorney client privilege, conflict of interest and abandonment torts before the USPTO, attorney in court fraud and deceit, and crimes in state and federal files causing damages to

Plaintiff's patents, term of patent, professional reputation, career, patent recoveries, patent business, ability to make a living, and caused serious injuries to Plaintiff's physical and emotional health.

117.    **COUNT THIRTEEN** – Defendants Live Nation, Instant Live Concerts, and Cowan Liebowitz & Latman engaged in infringement and aiding and abetting infringement of Plaintiff's patents with venture partner Apple, Inc., and by the doctrine of equivalents infringed Plaintiff's US patents in that venture and aided and abetted infringement by other companies.

118. **COUNT FOURTEEN** – Defendant Cowan Liebowitz & Latman and its attorneys engaged in fraudulent breach of fiduciary duty, breach of Plaintiff's attorney client privilege, breached Plaintiff's patent retainer agreement, of counsel agreement, engaged in non-joinder torts and tortiously interfered with Plaintiff's contract with Legend Films.

119. **COUNT FIFTEEN:**  Defendants H&C via Supple engaged in crimes in state and federal district court files and abuse of process without jurisdiction over Plaintiff, and engaged in Plaintiff's unprivileged defamation which such defamatory statements were understood by others, were published, were used to enter cascading orders and caused serious damages to Plaintiff's recovery rights the SDNY lawsuit and in other lawsuits.

120. **COUNT SIXTEEN:**  –  Defendants H&C via Supple and Cowan defendants engaged in crimes of retaliatory harassment of Plaintiff that deprived Plaintiff of constitutional access to the SDNY and to the state courts of NY and to other courts.

121. **COUNT SEVENTEEN:**  That the Court grant mandamus relief against defendant H&C's to produce Supple's complete NYS and USPTO files, notes, memoranda from ex parte conversations or meetings with judges, magistrate ad SDNY CE officers, related to claims in this action and as to those documents claimed to be privileged set forth the source and nature of the privilege claimed.

122. **COUNT EIGHTEEN:** That the Court order Rule 11 sanctions against all defendants Live Nation, Baker Botts, Cowan Liebowitz & Latman and Hinshaw & Culbertson via Supple or engaging in frivolous, and fraudulent litigation in the SDNY lawsuit.

123. **COUNT NINETEEN**: That the Court issue punitive damages against all defendants, in the maximum amount permitted by law.

124. **COUNT TWENTY**: That the court grant Plaintiff's attorney's fees and costs to bring and prosecute this action.

125. **COUNT TWENTY-ONE**: That the Court order that defendants pay Plaintiff the costs of this action, appeals, USPTO delay and prosecution costs, costs to defend against defendants' state and SDNY corruption, together with reasonable attorneys' fees, costs and disbursements in accordance with federal and state law including but not limited as authorized by 35 USC 271, 17 USC Sections 505, 1203; and NY's Judiciary Law Part 1240.6d, 1240.7, 1240.18.

126. **COUNT TWENTY-TWO**: That the Court award to Plaintiff liquidated, compensatory, statutory and punitive damages for attorney in-court fraud and deceit against the named attorney defendants and attorneys of record before the USPTO and four state and federal tribunals.

127: **COUNT TWENTY-THREE:** That the Court award to Plaintiff damages for intentional infliction of emotional distress and physical injuries emanating from defendants' unfair competition, abuse of process, boycotting, defamation and engaging frivolous, fraudulent litigation.

128. **COUNT TWENTY-FOUR**: That the Court award to Plaintiff such other and further relief in law and equity as the Court deems just and equitable.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff/US Patentee, Amy R. Weissbrod, a/k/a Amy Weissbrod Gurvey prays for relief and declaratory determinations, as follows:

A. That Plaintiff is the owner of all right, title, and interest in and to US Patent Nos. 7603321, D647910S, 11403566 together with all rights of recovery under such patents for past and future infringement thereof.

B. That Plaintiff is the owner of all right, title, and interest in and to US Copyright TXu001265644, together with all rights of recovery under such copyrights for past and future infringement thereof;

C. Awarding to Plaintiff damages caused by defendants' joint and several infringements of the patents and copyrights in A. and B. including an assessment of pre-judgment and post-judgment interest and costs, and an award of supplemental damages for any continuing post-verdict infringement up until entry of the final Judgment with an accounting.

D. Determining that the defendants' infringements have been willful and said damages must be trebled pursuant to 35 USC §284.

E. Entering a permanent injunction against defendants, their officers, employees, attorneys, clients, all parent and subsidiary corporations and affiliates, their assigns and successors in interest, and those persons in active concert or participation with any of them who receive notice of the injunction, enjoining them from continuing acts of infringement of the Patents-in-Suit and copyrights including without limitation, from continuing to make, use, sell and/or offer for sale products that infringe Plaintiff's patents and copyrights.

F. Granting an award of damages adequate to compensate Plaintiff for defendants' acts of unfair competition in violation of federal and state law, violations of the consent decree and competitive impact statement that governs defendant Live Nation's merger with Ticketmaster since 2010, and boycotting Plaintiff from defendants owned and serviced venues, together with prejudgment and post-judgment interest, attorneys' fees and costs.

G. Granting an award of treble damages adequate to compensate Plaintiff for defendants' willful infringement of the patents in suit and for organizing and participating in acts in furtherance of RICO conspiratorial fraud and pattern of racketeering as executed by defendants, their agents and attorneys of record, together with prejudgment and post-judgment interest and costs.

H. Granting an award of damages adequate to compensate Plaintiff for defendants' unfair competition in violation of federal and state laws, together with prejudgment and post-judgment interest and costs.

I. Granting an award of damages adequate to compensate Plaintiff for defendants' defamation, breach of attorney client privilege, wrongful state action, abuse of process, abuse of litigation privilege, frivolous litigation, in-court fraud and deceit, together with prejudgment and post-judgment interest and costs.

J. Determining that this is an exceptional case such that and Plaintiff is granted costs, expenses and reasonable attorney's fees pursuant to 35 USC §285  and costs to reverse delay damages to Plaintiff, Plaintiff's career, reputation, health, patent and business caused by defendants' bad faith, abandonment and conflict of interest torts before the USPTO, fraud, RICO violations and crimes in court files.

K. That the Court award punitive damages to Plaintiff owing for the willful, wanton, and malicious nature of defendants' acts.

L. That the Court determine that Supple and defendant Hinshaw & Culbertson were required to withdraw from representing the Cowan defendants back to 2008 and award damages based on entry of adverse court orders after withdrawal was mandatory.

M. Finding that defendants were responsible for the SDNY removing Plaintiff's good name from the roster of SDNY attorneys and award Plaintiff damages caused by the deletion of Plaintiff's name and cascading orders entered based on the deletion of Plaintiff's name.

N. That the Court compel discovery in this action on all claims in this Complaint, compel Cowan defendants to produce their responses to ethics complaints filed against them by Plaintiff, and compel production of Plaintiff's complete state files entered, crafted corrupted by Supple as agent for defendant H&C, Cowan defendants and defendant Live Nation.

O. That the Court determine order that Supple as an agent of H&C and dually serving as a NYS court officer and attorney violated Plaintiff's constitutional rights and aided and abetted violations of Plaintiff's constitutional rights by state and federal court judicial officers and administrative officers.

P. That the Court award to Plaintiff such other and further relief as the Court may deem just and proper.

## XIII. DEMAND FOR JURY TRIAL

In accordance with FRCP Rule 38(b), Plaintiff hereby demands a trial by jury for all issues triable by jury.

## XIV. VERIFICATION

Plaintiff certifies that the statements made in this Amended Complaint are true and as to those statements made upon information and belief, they are true based on the files maintained by the United States Dept. of Justice, the United States Patent and Trademark Office, the NYS Court of Appeals, the NYS Appellate Division First and Second Departments, the US Court of Appeals for the Second Circuit and the US District Courts for the SDNY and EDNY.

Dated: May 30, 2023
Princeton, NJ

/amygurvey/

AMY R. GURVEY

CERTIFICATE OF SERVICE

Petitioner/Plaintiff US Patentee Amy R. Gurvey, an attorney admitted to practice law in California, certifies that on June 2, 2023 she served a true and accurate copy of a Petition Seeking a Writ of Mandamus entitled “In re Amy R. Gurvey” filed at the US Court of Appeals for the Federal Circuit upon the following attorneys of record for the named parties in the underlying SDNY patent infringement lawsuit, 06cv1202:

M. Michael Furman
Furman, Kornfeld and Brennan
61 Broadway 26th Fl
New York, NY 10006

Hinshaw & Culbertson, LLP
800 Third Avenue Suite 1300
New York, NY 10022

Greenberg & Traurig, LLP
54 State Street 6th Fl
Albany, New Yori, 12207

cc: SDNY Pro Se Office
500 Pearl Street
New York, NY 10007
Attn: Chambers Hon. Lorna G. Schofield

/amygurvey/

_______________________________

AMY R. GURVEY

US007603321B2

(12) **United States Patent**
**Gurvey**

(10) **Patent No.: US 7,603,321 B2**
(45) **Date of Patent: Oct. 13, 2009**

(54) **ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS**

(76) Inventor: **Amy R. Gurvey**, 315 Highland Ave., Upper Montclair, NJ (US) 07043

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/253,912**

(22) Filed: **Oct. 18, 2005**

(65) **Prior Publication Data**

US 2006/0173701 A1 Aug. 3, 2006

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/442,468, filed on May 20, 2003.

(60) Provisional application No. 60/382,710, filed on May 22, 2002, provisional application No. 60/382,949, filed on May 24, 2002, provisional application No. 60/619,754, filed on Oct. 18, 2004.

(51) **Int. Cl.**
***G06Q 99/00*** (2006.01)

(52) **U.S. Cl.** ............................ **705/65**; 705/50; 705/64; 705/52; 726/26

(58) **Field of Classification Search** ............ 705/50-59; 369/1; 726/26

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,825,876 A * 10/1998 Peterson, Jr. ................ 705/52
6,614,729 B2 * 9/2003 Griner et al. .................. 369/1
2001/0018660 A1 * 8/2001 Sehr ............................ 705/5
2002/0199198 A1 * 12/2002 Stonedahl .................... 725/86
2003/0023564 A1 * 1/2003 Padhye et al. ................. 705/54
2003/0097307 A1 * 5/2003 Greene ........................ 705/26
2004/0137929 A1 * 7/2004 Jones et al. ................. 455/517
2008/0133416 A1 * 6/2008 Rhoads ........................ 705/51

OTHER PUBLICATIONS

"Broadway Television Network Selects On.2.com to Poer Video-On-Demand Webcasts of Broadway Shows", Jun. 15, 2000.*

* cited by examiner

*Primary Examiner*—Jalatee Worjloh
(74) *Attorney, Agent, or Firm*—Allan Chan; Allan Chan & Assoc

(57) **ABSTRACT**

The present disclosure provides a method and system of electronically associating one or any combination of the production, balancing, editing, transmission, distribution and sale of live event "Recordings" with the sale of a "ticket" [defined to include any entrance payment/receipt, (tournament) entrance fee or logged placed bet] to or during the event, such that both or either of a ticket purchaser and/or non-ticket purchaser are able to automatically acquire a Recording or participate in interactive offerings related to the event by means of [optional] authenticated retrieval systems at a terminal device when connected to the Internet or wireless network. A method for electronically converting a balanced audience feed to the value for optimal Recording balance is also disclosed for optional integration. Distribution and/or retrieval of a Recording by patrons, non-attendee purchasers and/or licensees may occur when the Recording is embodied in a fixed medium of expression and/or when the Recording is in digital or other encoded format.

**10 Claims, 9 Drawing Sheets**





OVERALL SYSTEM SCHEMATIC
10
TICKET-BUYER
TICKET-BUYER
TICKET-BUYER
"TICKET" -SELLER LOCATIONS (ALSO INCLUDES TOURNAMENT ENTRANCE FEES AND/OR BETS ON AND/OR OFF SITE)
14
VENUES AND/OR
19
ON-SITE EDITING OF PROGRAM CONTENT
16
DIGITAL RECORDING
12
ADDITIONAL RECORDING BUYERS SECURED TRANSACTIONS (INCLUDING CREDIT CARD)
INTERNET
400
DISTRIBUTION (OPTIONAL ELECTRONIC AUTHENTICATION) FIG. 5
· BULK BURNING OF STANDARD CDs, DVDs, ETC
· KIOSK BURNING ON DEMAND
· KIOSK USB DOWNLOAD
· TABLE SALE/ DIRECT HANDOUT
18
FIREWALL
30
ACCOUNTING INFORMATION
100
DATA CENTER FIG.2
MANUFACTURING INSTRUCTIONS
31
OFF-SITE MANUFACTURING FIG 4
MANUFACTURING
PACKAGING
300
20
FEES & ROYALTIES
22
ACCOUNTING
FIREWALL
26
DISTRIBUTION
28
RECORDING RECIPIENTS
· LOCATION BASED KIOSKS (ON AND OFF SITE)
· HOME ELECTRONIC
· HOME MAIL
· ON SITE TABLE/HANDOUT
24
PARTNERS
PARTNERS
PARTNERS
REVENUE PARTICIPANTS

FIG. 1

U.S. Patent Oct. 13, 2009 Sheet 2 of 9 US 7,603,321 B2

TRANSACTION PROCESSING
PURCHASE TRANSACTION
110
RECEIVE TRANSACTION DATA FROM TICKET-SELLER
112
IS TRANSACTION VALID?
NO
114
REJECT TRANSACTION
100
POST TRANSACTION TO CENTRAL DATABASE
116
JOURNAL TRANSACTION FOR BACKUP
UPDATE ONLINE STATISTICS FOR WWW PAGES
118
END
AFTER EVENT
120
PRODUCE MEDIA AND SHIPPING LABELS
122
TRANSMIT MANUFACTURING SPECIFICATIONS TO FULFILLMENT CENTER
UPDATE ONLINE STATISTICS FOR WWW PAGES
124
END
FINAL EVENT ACCOUNTING
COMPUTE FINAL ACCOUNTING INFORMATION FOR EVENT
126
128
GENERATE REQUIRED REPORTS
24
TRANSMIT REPORTS AND PAYMENTS TO PARTNERS
CLEANUP CENTRAL DATABASE
100
END

FIG. 2A

FIG. 2B

FIG. 2C



Internet Processing
200
Receive Internet Request
210
Is this a "special login request?"
No
212
Public Site
Display information on available event recordings
214
Process purchase transactions entered on web site
216
Validate login
218
Partner login
220
Registered buyer login
222
Partner Site
Allow partners access to data on event status, orders, fees and royalties
224
Buyer Site
Allow buyers to check on order status, change order quantity or shipping address
100
Update Central Database if necessary
100
Update Central Database if necessary

FIG. 3



Manufacturing Process
After event
300
Receipt of Performance Data Stream
122
Receipt of media labels, address labels and manufacturing instructions
310
Editing of Data Stream
312
Preparation of media master
314
324
Optional encryption and unique watermarking of copy
Print Produc-tion Report
316
Burning of media
100
318
Application of label and packaging
Update Central Data-base
320
Shipping
322
Yes
More?
No
end

FIG. 4



DISTRIBUTION
19
ON SITE EDITING OF PROGRAM CONTENT
400
EDITED "TRACKS" STORED FOR RECORDING
401
BULK CD/DVD/ETC BURNER SYSTEM (NON-INCREMENTAL)
410
KIOSK(S) (BURNING AND PACKAGING OPTIONAL) POINT-OF-SALE CD/DVD/USB ETC.
420
Wi-Fi for "Live-Fi" AND OTHER WIRELESS TRANSMISSION
IPOD
CELL PHONE
PDA
430
HOME DELIVERY (ELECTRONIC OR MAIL)
402
ON-SITE SALE
RECORD ACCOUNTING INFORMATION
30

FIG. 5

SAMPLE LOCATION-BASED TERMINALS
VENUES, ATMs, SHOPPING MALLS, AIRPORTS
INSERT TICKET OR CREDIT CARD
OPTIONAL DISC RELEASE
USB PORT
SAMPLE LARGE VENUE TERMINALS
INSTALLATION IN LOBBIES OR COMMON AREAS NEAR CONCESSIONS
INSTALLATION ALSO AT OFF-SITE MALLS, AIRPORTS, RETAIL OUTLETS, ATM/BANKS

FIG. 6A

U.S. Patent Oct. 13, 2009 Sheet 7 of 9 US 7,603,321 B2

INSERT
UNUSED
PORTION
OF TICKET
INSERT
CREDIT
CARD
RECEIPT
OPTIONAL
DISC RELEASE
FUNCTION
SAMPLE
(SMALL)
VENUE LOBBY
RECORDING
ORDERING
TERMINAL
USB
PORT
SAMPLE
CHILD
STOOL

FIG. 6B



LARGE VENUE TURNSTILE TERMINAL
MONITOR
SCREEN
MONITOR
SCREEN
DISC-PENSARY DISC RELEASE

FIG. 6C



ORDERS RECORDINGS
INTERACTS WITH EVENT
ENABLED CHAIR
TICKET INSERTION
CREDIT CARD SWIPE
RECEIPT
TICKET OR CREDIT CARD, ETC.
COFFEE HOUSES
CLUBS, BARS,
RESTAURANTS
USB PORT
LIVE VENUE TABLE
FOR ELECTRONIC ORDERING
DISC RELEASE
RECORDING OR DISC ORDERING AND....
GLOBAL ADVERTISEMENT (ICONS)
ELECTRONIC
ORDER FOOD, DRINK
& RECORDINGS
RATE
CONCERT
OR TALENT
INTERACTIVE
RESPONSE

FIG. 6D

# ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS

## RELATED APPLICATIONS

This application is a continuation-in-part of application Ser. No. 10/442,468 filed May 20, 2003 which claims the benefit of U.S. Provisional Application No. 60/382,710 filed May 22, 2002 and U.S. Provisional Application No. 60/382,949 filed May 24, 2002, all incorporated herein by reference. This application also claims priority to provisional application Ser. No. 60/619,754 filed Oct. 18, 2004.

## FIELD OF INVENTION

This invention pertains to a system and method of producing and distributing recordings of live performances.

## BACKGROUND OF THE INVENTION

The advent of the digital age has demonstrated that any content or event (including live as performed content) that can be recorded and transformed into "bits" is a valuable, marketable commodity. In the past, major studios, record labels and production companies controlled what live content would be produced for distribution to the public. Except for live or tape-delayed grandiose television/cable productions, certain news coverage and special radio broadcasts, the live experience was limited to ticket holders/audience members.

Now, however, live content is inexpensive to digitally record. Virtually any lay personal can create a quality digital live recording of any event of public or private interest on simple equipment and then upload the recording over a telecommunications network. Such upload will result in free content ownership not only for the recorder, but also for any other interested user. Telecom-connected third parties can then, for example, burn their own CD's on home components or store the content onto a hand held music player. Once the recording is uploaded, then, it is game for others to copy and own it without payment.

The unauthorized digital transmission and retransmission Peer to Peer ("PtoP") or Business to Business ("BtoB") of pre-recorded studio titles, albums, and other derivative tie-in merchandise over the Internet since 1998 has virtually crippled the music industry. "Wi-Fi" now enables hook up to the Internet without a wire. Podcasts carried through Wi-Fi or satellite radio may not be far off. Clipcasts (transmissions of content to mobile phones) will shortly follow.

In spite of the spiraling decline in retail CD sales since 1998, the live concert market is surging. Concert ticket prices have skyrocketed. Coincident market penetration of hand-held music players has necessitated a change within the music industry from an album to a singles oriented business model and the proliferation of on-line subscription services. With use of the instant disclosure, it is anticipated that concerts and recording from live events as well as interactive tournaments will be coveted by consumers and subscription services that reach the global audience.

In spite of this, to date, the full recording impulse buying potential of the live concert audience remains untapped. Concert hall shops still only offer an artist's pre-released studio product usually only in CD disc form and not the performance

just attended. At the core are the continuing limitations on technology, the huge cost of recording and packaging productions for immediate on site and multi-media delivery, and the monetary and time constraints including for onsite personnel and staff needed for quality mastering and editing. In addition, for more grandiose live productions that feature multiple performers and whole orchestras, there is an impasse among the creative factions as to the proper royalties payable upon release. Musicians' unions and performing rights societies that collect royalties on behalf of composers and publishers contend that a digital encoded recording transmission over any telecommunications network is a separate "performance" triggering additional payments.

For these reasons, a necessary premise of the instant disclosure is that any viable market solution for live recording release must be inextricably associated with full royalty accounting, rights clearance and the equitable allocation of recording revenues among all those involved in production of the live event. The royalty accounting systems revealed in this disclosure do just this and will be independently licensed by the inventor for the management and administration of concert venues around the world.

At the same time, the present invention foresees that heightening anti-terrorism security systems are shortly to be installed by law or electively in public venues—newly constructed and existing—including Olympic sports arenas, international concert halls and airports. DNA fingerprint systems will be enabled to read the iris of an entrant's eye thumb print, etc., upon ingress or egress from and through the instant disclosure, can be simultaneously used at a venue to process audience recording orders separate from ticketing information.

The present invention further anticipates that with the advent of increasing bandwidth, live events, tournaments and performances as they are recorded and packaged will be electronically transmitted to businesses and computer users with increasing speed. This will help raise the market value of the live recording that is expected to surge immediately after the event ends particularly if it is publicized with pre-event ads issued, ordered and placed by the producers.

The instant disclosure is also premised on the fact that ticket holders will demonstrate a high proclivity for impulse buys if recordings are offered for sale immediately after final curtain at the hosting venue itself. In addition, it is anticipated that even greater sales will result if audience members and global non-audience fans can select their respective preferred means of retrieval. The instant disclosure predicts that adoring fans—regardless of geographic location—will always covet a complete repertoire particularly of a unique or special event. And while the CD is on its way out, for established patrons of the classical arts, it is still very much the preferred recording format.

The current trend in the music and entertainment industries is toward online subscription services. Web sites like iTunes, MSN, CNN, Yahoo, Amazon, AOL and Napster now offer content of all kinds—music, films, TV shows, sports replays, news clips and stock quotes for a fixed fee per month. Some of these sites are contracting with telecom companies to effect content delivery to cell phones. The recent institution of podcasts demonstrates that these sites will also offer live events, single titles and other tie-in merchandise like posters, T-shirts and pin-ups if packaging can be expedited and delivery effected BtoB or PtoP. They will also offer interactive gaming, response options and tournaments that are related to a live event.

Just by way of example—what if the global advertising campaign for release of a new "Harry Potter" book or movie

was associated with an online tournament or offer? What if the coveted prize was an authenticated J. K. Rowling autographed poster? Further, what if the Indianapolis 500 could be instantaneously virtualized such that both audience members and interested fans from around the globe could steer their own cars along with the pack? In each instance, the global response would be huge. Fans would flock to any one or combination of location-based enabled intelligent terminals or enter from hand-held devices, home computers land and mobile phones thereby maximizing the geographic influence and market power of even a local event.

## BRIEF DESCRIPTION AND SUMMARY OF THE INVENTION

Methods, systems and intelligent apparatuses[1] are disclosed for the immediate multimedia and electronic global ordering, sale, management, and authenticated distribution of live event content recordings by all means of delivery, transmission and retrieval now known or hereafter devised both on and off site from where the live event takes place. Methods and systems are also disclosed for the global solicitation and processing of authenticated electronic responses at live talent competitions, sporting events, and interactive games including from worldwide non-audience participants through enabled devices.

[1](individually claimed but enabled to be integrated)

With respect to distribution of live music, entertainment and event "Recordings" (as herein defined), the methods and systems disclosed reveal means that expedite and associate necessary and value added steps in the production, packaging, broadcasting and administration process. These include: (i) association of recording orders to ticket sales, subscriptions and/or uniquely identifying information of the holder including credit card number, phone/mobile phone number, subscription or podcast address, for example; (ii) methods for content mastering, balancing and editing; (iii) methods for splicing and packaging single titles, action stills and other unique derivative works; (iv) methods for creating director's cuts, "best of" versions and other derivative works; (v) methods for automated copyright accounting including calculation of statutory and contractual royalties from the point of every sale; (vi) integration of standard content security systems [e.g., encryption, watermarking and digital rights management ("DRM")]; (vii) integration of new venue anti-terrorism security systems; and (viii) solicitation and processing of recording orders from non-audience purchasers using any uniquely identifying information that helps directs transmission of content including, without limitation, home or mobile phone number, URL, e-mail or street address, credit card or banking number, personal account, podcast or satellite radio account, Blackberry or text messaging account, Social Security Number, date of birth, mother's maiden name, and most significantly, a DNA fingerprint.

In the sports and gaming field, entrant's fees and bets placed are to be used in this disclosure in lieu of or in addition to "tickets".

The disclosed systems and methods are optimally and immediately designed for use by classical artists, unsigned talent, "E-label" bands, their producers and arts institutions that are permitted to release live recordings without additional clearances. These groups need strong promotional tools and established distribution channels to test the market for new titles and contemporary works.

The instant invention will allow for the economical production, packaging and multi-media distribution of any live event recording no matter how small (recitals, benefits and special performances, for example) that with the previous art were not made available for release because it was not cost effective to do so at low sales volumes. This content was therefore previously "lost" after performance and could not be re-enjoyed by members of the public at large.

The systems disclosed are also designed for use by interactive game, sports television, film and convergence producers to assist with the solicitation and tabulation of audience and non-audience responses. Such responses serve to expand the types of entertainment experiences offered to the public and geographic influence and promotional value of a particular competition or event.

In addition, the systems are designed for podcast and satellite radio producers, suppliers and consumers who offer and covet audio programming for downloading onto computers or portable music players.

By the means herein described secured and authenticated ordering, packaging, delivery and retrieval of any live performance or event can be effected anywhere in the world at cost low enough to make it economically feasible even at low volumes. This includes release of a recording immediately at the hosting venue as soon as the event ends.

With the instant disclosure, packaging will be in either fixed or encoded format with delivery over any available telecommunications network, by hand or regular mail. By such means, audience members can order recordings either pre-concert with their tickets or after in any desired format including standard CD format by onsite handout or mail or by using a venue-based intelligent terminal, a portable hand-held music, media player, Blackberry or other test messaging device, a land line, mobile phone, other wireless device, or a home computer. With the instant disclosure, non-audience members can independently order the performance or a derivative recording and their orders will be integrated with those from ticket holders.

The present disclosure further describes independent methods that immediately account for and calculate all statutory and contractual royalties due upon release from each point of sale such that the job and expense of payment administration is removed form those individuals and entities authorized to release recordings. For ticket holders, concert venues and arts institutions, this would also include calculation of bonus or promotional discounts if recordings are purchased in advance with tickets or subscriptions. More importantly, the disclosed accounting methods are independent and provide a quick, easy and foolproof method for ensuring proper rights clearances and the equitable allocation of recording revenues among all associated with the live event. These systems will be independently licensed to concert and sports venues around the world.

The instant disclosure further provides wholly independent but integrated means for digitally mastering and balancing live recordings via storage of a plurality of content analysis algorithms that analyze and manipulate audio information with our without video in a database and/or on a "live" basis as additional information is received.

By the means disclosed, a flexible multimedia information analysis apparatus stores a database that includes both audio and video information. At the same time, also stored are a plurality of content analysis algorithms for analyzing the digital information, which can be manipulated by a mouse. A selected algorithm can then be used to analyze and edit the audio, video or audiovideo data including on a "live" basis as additional information is received. Further content analysis algorithms can be applied in tandem to manipulate the information including splicing out singles titles from a whole concert, for example. By such means, digitized readings that

are optimal for audience listening and enjoyment can be automatically converted to optimal readings for a selected recording format. In addition, the disclosed methods will assist in the incorporation of additional content (narration tracks, for example), to produce further purchase options for the consumer including derivative works, "best of", director's cut versions and event-related stills, posters, pin-ups, artist bios, karaoke insertions and playbills. These systems are optionally enabled to be associated with ticketing and independently with non-audience orders. They can also process single title and derivate "best of" and director's cuts orders that incorporate supplementary material, including narration tracks, for example, in addition to whole concerts as performed, from any purchaser.

The present disclosure provides additional means for integrating anti-terrorism security systems anticipated to be installed at large sports/Olympic arenas, concert halls, auditoriums and public venues, e.g., airports and shopping malls and to take positive supplementary advantage of these systems by using them to order recordings.

It provides supplemental means for integrating standard content security methods including encryption, watermarking and DRM that track a recording as it is transmitted to an end user PtoP or BtoB. It further describes integrated systems for soliciting and processing audience and non-audience response information (also optionally associated with ticketing, subscriptions and podcast information) to allow for new forms of live interactive entertainment at a particular venue. The responses tabulated by the present invention will include ratings of live competitions without the need for open telephone land lines and will allow for the staging of both real and virtual competitions.

If betting is to be permitted, the systems further describe means of blocking responses from territories where gaming for profit is not permitted by law.

Finally the instant disclosure reveals the inventor's creative designs for venue and public space intelligent terminals that include without limitation, enabled audience seats/chairs, enabled security turnstiles, recording ordering kiosks targeted for arts institutions (lobbies and promenades), and enabled computerized tables that are to be installed at showcase cafes, clubs and gaming bistros. All terminals permit hook up of hand-held music players to USB or equivalent portals, USB keys, etc., take food and beverage orders, and pay checks and parking fees electronically. They also allow the purchaser to order and buy a recording in any desired format with a designated means of retrieval.

For example, a purchaser-ticket holder can insert the unused portion of the audience ticket or swipe a credit card to order a recording for home mail or computer delivery, to start an onsite disc engraving, release an already engraved disc from a machine, or enable immediately hook up of a hand-held music player. In addition, the terminals authorize transmission of follow-up and demographic information back to the recording purchaser, tournament/competition participant, or other individual/entity authorized to receive the information collected at the time of ticket issuance or recording sale.

The present invention discloses methods, systems and apparatuses that electronically associate any one or combination of the global ordering, authentication, sale, recording, production, mastering/balancing/editing, single title splicing, packaging, transmission, distribution, engraving, optional tracking, protection, and retrieval of "live event 'Recordings'" (as herein defined) with the sale of an event ticket, subscription order and/or other uniquely identifying information of a recording purchaser such as credit card number, phone/mobile phone number or Internet subscription

account. In the case of live sports competitions and tournaments when gambling is or may be permitted, the present invention alternatively associates live event recordings with entrance fees and/or placed bets in lieu of or in addition to "tickets" and describes integrated methods that block out responses from territories were gaming for profit is not permitted by law.

The present disclosure reveals wholly separate but optionally integrated methods for processing worldwide live Recording orders that are independent of ticketing.

It further reveals integrated systems for ordering and/or delivering the live Recordings in any format including, by way of example, by hard mail, e-mail, over the Internet, to home and portable computers, hand-held music/media players, cellular phones, text messaging devices, podcast addresses and new Wi-Fi devices.

In addition, the instant disclosure reveals independent mastering, balancing, editing and splicing methods that assign numerical values to console and instrument feeds. As herein disclosed, a flexible multimedia information analysis apparatus stores a database that includes both audio and video information including the transposed console and instrument readings. At the same time, also stored are a plurality of content analysis algorithms for analyzing the digital information, which can be manipulated by a mouse. A selected algorithm can then be used to analyze and edit the audio, video or audiovideo data including on a "live" basis as additional information is received. Further content analysis algorithms can be applied in tandem to manipulate the information including splicing out singles titles from a whole concert, and packaging additional derivative tie-in merchandise.

Further, the instant disclosures describes systems and methods that allow both ticket holders and non-audience members to electronically rate and/or participate in a live staged event over any telecommunications network. The disclosed systems optionally authenticate entries and responses with ticketing or other uniquely identifying information that assists with directing transmission of the content.

Finally, the instant disclosure reveals the inventor's patented designs for intelligent terminals that take recording orders, are enabled to release recordings in fixed and unfixed formats and reroute authorized information back to the purchaser. These are targeted for arts institutions, hosting venues and public and private spaces including airports, banks and shopping malls.

Definitions

"Recording" or "Live Recording" as used in the present disclosure is defined to mean any audio, video, or audiovisual material or data based on signals or content emanating, derived from or representative of the live event or any part thereof, or an occurrence pre or post event that is related to it including, without limitation, as it is packaged for sale and distribution in any medium.

Without limitation, Recordings may contain/include as examples: audio, music, video, audiovideo, concert feed, recital, sports competition (baseball game, soccer tournament, etc.), stageplay or showcase presentation, press interview, mime production, literary work, theme park amusement, arcade tournament, game, videogame, display, art exhibition, artwork, autograph, photograph, clip, still, spoken dialogue, soliloquy, reading, lectures, speeches, seminars, classes and sermons, etc.

Typically, a "Recording" is stored, thereafter balanced, edited or otherwise revised in digital, analog or other format, and transmitted by a means of distribution e.g., broadcast signal, radio, over-the-air television, scrambled signal, cable,

Internet, text messager, podcast, satellite radio broadcast, clipcast, regular mail, hand delivery, wire, cellular/wireless (so-called "Wi-Fi"), or by any other means now known or to be hereafter devised.

At some time, a "Recording" may become embodied or stored on a fixed, tangible medium of expression such as film, VCR tape, optical disc (CD, DVD, dual disc, etc.), magnetic cassette, reel-to-reel, LP, local or remote hard drive, mobile music player, or other storage medium, etc., or alternatively may be received, displayed, stored and re-performed without physical embodiment. For purposes of this disclosure, Recordings will be receivable in either a fixed medium of expression or unfixed format by a third-party to include without limitation a consumer, purchaser, third-party seller or licensee in analog or digital format [digital data (if necessary). Notwithstanding the foregoing, nothing contained herein is meant to limit the scope of the inventor's claims should other recording formats be made available in the future.

Retrieval of a Recording in any format for purposes of this disclosure will occur on or off site from where the live event takes place including, without limitation, immediately after the event ends at enabled location-based intelligent terminals/kiosks, home terminals (a home PC, media player, Web TV, etc. ), portable personal devices (hand-held music/media players, Blackberry or other text messaging device, e.g.,), from a third-party distributor such as an online subscription service, producer or podcaster and on mobile phones. To the extent that order and/or retrieval of a Recording is to be over a telephone wire, cable or cellular telephone or any telecommunications network, the instant disclosure is deemed to work with or incorporate any phone number, address, or other uniquely identifying data including without limitation, a DNA fingerprint, URL, e-mail, podcast or satellite radio address, mobile phone or other account number that assists in directing transmission of the content.

Utility

The utility of the present disclosure is apparent. The systems, individually and collectively, are designed:

(i) For use by arts institutions, performing artists and their production teams, sports organizations, concert venues, and public and private spaces (airports, shopping malls, banks, etc.) to offer a one-stop shop for the worldwide ordering, packaging and/or release of live content recordings in all media;

(ii) To provide new forms of interactive live entertainment experiences in close proximity and time with a live event, regardless of the geographical location of the interested consumer;

(iii) For use by arts institutions, performing artists and producers to assist in the immediate on and off site release of live event recordings;

(iv) To associate recording orders with ticket sales thereby allowing authentication and authenticated retrieval of recordings transmitted and released on and off site;

(v) To allow recordings to be ordered from the time of first ticket issuance thereby offering promotional bonuses and discounts to venue subscribers and global fans;

(vi) To provide a true litmus and market indicator of new talent, a contemporary composer, composition, title or premiered work both from audience members and from the non-attending global market;

(vii) To afford artists and producers additional feedback on an event and optional demographic information on recording purchasers in all media and territories, if authorized;

(viii) To ensure rights clearance and the foolproof equitable allocation of recording revenues in all media;

(ix) To assist with all newly instituted means of audio, video and audiovideo content ordering and transmission methods (including podcasting, for example);

(x) To anticipate heightened anti-terrorism security measures incorporated within public and private venues and to take positive advantage of those systems by using them to assist with the ordering of recordings;

(xi) To record, capture and distribute otherwise lost live content including of smaller, local events that traditionally would not have been released to the mass media or the public at large and with the prior arts, were never capable of being enjoyed by those who were not in actual attendance (either locally or around the world).

Using the instant disclosure virtually all live content can be now be efficiently and effectively preserved, packaged, automatically accounted for and immediately offered for distribution to the adoring audience as well as to fans worldwide. Audience members can now fulfill their need for instant gratification and at cost low enough to make it economical even at low volumes. Ticket holders can either order recordings pre-concert or immediately after it ends at venue-based intelligent terminals, or in the alternative, retrieve and take home a recording in one of several formats right then and there. In addition, those who did attend the event as well as to those who did not, can now own copies virtually in minutes. Discounted recordings can be offered as added perks associated with subscriptions and early ticket purchasers. Those who pre-buy can also be offered the added benefit of the right to receive promo information on future events and releases. After the performance or event, Recordings can also be bought at any intelligent terminal installed at the venue or other public spaces that include airports, shopping malls, retail outlets and banks. In addition, any interested purchaser can order a recording from a home computer, land line, cellular telephone, Blackberry, text messager or other enabled hand-held device by using a credit card of other unique identifying information of the purchaser including an online subscription account number or mobile phone.

To benefit from the instant disclosure are all parties involved in production of both the Recording and the live event as well as adoring fans that always covets a complete repertoire and new entertainment options Aside from added revenues, the artists and copyright holders can now have access to what in hindsight proved to be a great or unique performance. And the public at large gets the option to expand its listening library of a favorite artist.

By the means herein described, for the first time, Recordings can be offered for sale by any known means from the time of first ticket issuance.

When physical discs are ordered at any location-based terminal, the systems are designed to work with the latest capacity standard CDR engraving technology (whether incremental or non-incremental) either to start the engraving of a disc or in the alternative, to release an already burned disc or the signaled information embodying same. If a particular venue elects to install a combination ordering and disc engraving intelligent terminal, with CDR technology now between 40× and 52×, this will allow for authenticated release of even disc formatted Recordings to authorized retrievers immediately at the venue after final curtain. Audience members who have CD players in their cars can then re-experience a concert on the way home.

Global orders from those who did not attend the event can likewise be independently and immediately fulfilled by integration of appropriate systems. This will serve to maximize

the market potential and promotional value of the event regardless of the geographic location of the purchaser.

Artists and composers who premier new works at a recital in a smaller locale will realize the added benefit of having these works optimally and quickly marketed particularly if they were not selected for release by a recording label. New bands and other "start-up" talent are likewise afforded the means to get their material immediately out into the marketplace and receive rapid feedback on their original compositions in actual dollars.

With increasing advents in technology that continue to compress the time and physical space needed to record and transmit audience responses to a live event, it is anticipated that at some time in the future, the present disclosure will allow for tabulation of on and off site ratings and responses as well as the public's participation in staged tie-in tournaments including from hand-held devices and cellular telephones. As the interactive response time becomes smaller and smaller over time with increasing bandwidth, both audience spectators and non-attending fans should be able to participate in virtually automatic ratings both from their venues seats and from enabled home computers, hand-held devices and cellular telephones.

The current trend towards reality television demonstrates that interactive viewing is a coveted by the entertainment industry. Shows like Fox's "American Idol" have already proven that there is a premium on interactive response programming because it performs advance market research on new talent. Moreover, because the major TV program suppliers and producers are no longer willing to pay a sitcom star $1 million per episode, there is increasing demand for less expensive distributable content of any kind particularly that which can be distributed to wireless telephones. This trend will continue to grow as more interactive television, radio devices and offerings (now including podcasts and clipcasts) penetrate the marketplace and the viewing audience can more easily fast forward through a sponsor's commercials.

Submitted for separate patent protection is the inventor's original intelligent terminal designs including, without limitation, those in the form of an enabled venue audience seat, an enabled venue turnstile, an enabled eating or beverage table and chair, and an expanded ATM ordering kiosk targeted for public spaces, concert venues, airports, banks, malls and retail stores. The table terminals are seen for installation in the next wave of restaurants/media clubs/gaming cafes/coffeehouses, etc. They are designed to take food and beverage orders and pay checks and parking electronically without a human waiter or waitress in addition to fulfilling Recording orders. The turnstile version is expected to be a big seller as tightened security systems at Olympic stadiums, venues and airports are installed including those that read DNA fingerprints of audience entrants.

All terminals will incorporate credit card and smart card swipes, rating/interactive systems, disc dispensaries, USB and equivalent portals for hook up of music players and storage devices, all of which are electronically authenticated and linked to entrance tickets, seat assignments, food and beverage checks, a cellular phone number, URL, e-mail, podcast address, other account, or other identifying information of the purchaser.

The systems herein disclosed are further enabled to process special purchase orders. For example, individual titles (singles) from a live performance with or without accompanying video will be spliced out, specially formatted, accounted for at competitive pricing on the order of $1.00 per title and offered for sale over the Internet for storage on hand held music players. Live singles will also be offered for sale on Internet subscription services along with event-related interactive games and tournaments. Also to be made available are director's cuts, narrated tracks, "best of" selections from a particular artist's tour and personalized compilations inclusive of audience noise, monologues, artist soliloquies and narration tracks.

All Recordings especially the spliced singles tracks—expected to be a big Internet seller—can be optionally watermarked, encrypted and protected with available DRM systems by integrating standard methods. These new live sound recordings of even old titles are expected to compete with the pre-released digital studio recordings that are now being freely shared over the Internet and crippling the recording industry. The inventor believes release of live singles presents one means to reverse spiraling losses attributable to the unauthorized sharing of digital files over the Internet in that it will offer alternative and fresh versions of a favorite artist's titles. Integration of screened video feeds after digitization present an inexpensive means to produce music video downloads at much lower cost that can be transmitted to cellular phones.

The inventor's disclosed accounting systems are key to keeping administration costs low. They are enabled to automatically calculate the statutory and contractual royalties payable to all involved in production of the live event and its Recordings. Labels, managers and producers can select any accounting format compatible with their current systems. Each participant's confidential accounting statements will be available 24/7 by secured key over the Internet and will offer information from every point of sale. Singles delivered to a cellular telephone will be accounted for by these same systems.

B. History of the Field

Historically, live entertainment events when recorded for live or tape-delay distribution to the mass media were relatively expensive productions. They were designed with high quality processes and formatted to meet broadcast standards. Originally, live recordings were made on film and/or tape but are now recorded by digital technology, and often with modest equipment. Now, even with advents in technology, tie-in merchandise like T-shirts, autographed pin-ups and cups that are being offered for sale to the public in on-site venue stores and retail outlets are generic, i.e., they do not to relate to or symbolize the specific event attended.

In the traditional music industry business model, live performance revenues were reserved in standard label contracts by the artist for their own exploitation. This meant that venues, event producers and promoters made their revenues only from audience ticket sales, commissions from on-site concession and sales of tie-in merchandise as related to the artist's reserved rights, and the artist's label did not share in these sales.

Conversely, the decision as to whether to release an audio or audiovideo recording of the live performance remained in the exclusive control of the artist's record label. Because the costs associated with broadcast-quality productions were so high and there was an additional concern that new releases might interfere with stable revenue streams from previously released whole albums, very few live events were made available for home release including for those who did not attend the live performance. The on-site stores at the Continental Arena at the Meadlowlands, Tanglewood or the Metropolitan Opera, for example, sell only the artists' pre-recorded studio albums, not the CD of the performance actually attended.

In a similar fashion, concerts in smaller municipalities or those given by new, unsigned bands just building a following, solo recitals of classical artists, local stage productions, sport-

ing competitions like horse racing, NASCAR and major/minor league baseball, educational seminars, speeches, etc., have almost never been produced for the mass media or home distribution. The live experience has been limited to the actual audience and spectators, i.e., those lucky enough to get "tickets". One exception is OTB where the live event is televised in specific networked locations for the benefit of all who place bets.

Basic recordings were, however, made of most live performances and sporting events, using simple equipment of modest quality, for reference, study or promotional purposes. Additionally, the press would cover highlights of certain local events (college competitions, e.g.) and archive footage for future stories or ancillary licensing. In the sports field, this business model works because once a competition is over, most of the commercial value of the event is lost.

Such is not the same for the music industry, however. When a great performance or concert has taken place, in hindsight the entire world may relish the chance to see it and even own it.

But even in the music business, tie-in videogames never became a standard part of the business model because of the limitations on technology and the prohibitive costs of production. With the instant disclosure, however, this will change. Any concert can now be the focus of an interactive promotional campaign that is tied to ticket sales and subscriptions. Certainly this advertising strategy is a lot cheaper and will expand geographic interest in the event.

What does this mean in dollars? In a nutshell, it means that with the prior art, most live events—even unique and quality performances and competitions as they continued to be staged around the globe everyday—had the fate of becoming "lost content". Live events are still not being exploited to their maximum potential because the systems in place were designed only to generate revenue from ticket sales and keep venue revenue sources separate from those belonging to the record labels.

In the music field, starting March, 2003 ten months after the preliminary application for the instant disclosure was filed, a handful of disc burning concerns attempted non-automated, non-authenticated physical CD handouts at small performing venues by incrementally transferring single titles onto a master as they were tracked. These companies conceded that with this method they could not fulfill the Recording demand of a large concert audience or any immediate outside orders.

In addition, standard CDR burning technology is now available at 30×-52× (one CD in little over a minute) even for home components. With standard technology as it may be updated, the on-site methods and systems disclosed herein do not require incremental track transfer to cut disc compression and duplication time (for those that want discs) and thereby can satisfy any size audience as well as outside orders all at the same time.

With the increasing costs of TV programming and the trend towards reality TV, basic digital recordings are now recognized as valuable, marketable content. Now, depending on the particular event, even the most basic recording can increase in value over time. TV shows and theatrical films like "American Idol", "The Apprentice" and "The Truman Show" demonstrate just how valuable even raw content has become. The announcement heard at the beginning of virtually every live event that cameras and recording devices are strictly prohibited, is definitive proof of the value of live Recordings even if they are not optimum quality.

With fast-forwarding options becoming more prevalent on home media players that bypass commercial advertisements, networks are no longer willing to pay a sitcom star $1 million per episode as they did in the final seasons of "Friends". In January, 2004, Mezzo-soprano Marilyn Horne told a seminar class that she was only able to incorporate a particular song on her 70th Birthday Album because it had been unlawfully recorded at a concert by an audience pirate. Norah Jones' early primitive recording sessions in solitude are now extremely valuable as background material not only for her own albums but also for the hot selling DVD releases of the Grammy Awards.

The analysis is no different for professional and amateur sports. Wouldn't at least some fans still want to watch Don Larsen's perfect game or receive a clip from a Yankee rally during the post-season superimposed on a T-shirt or autographed poster? If a fan didn't tape a game he attended, isn't it also likely that he may still want to buy a copy for reference or study?

In the music field, statistics show that many find live or "recorded as live" concerts far more satisfying than highly edited and planned "studio" recordings. The audience cheers, applause and artist monologues make the live recording far more exciting and have not been shown to cut into revenues generated by the original album.

Also, fans of an artist usually also covet a complete repertoire. In July, 2004, Business Week reported that 20-30% of an attending audience will order a CD of a concert attended on their way out the door. Whether that should be a physical engraved disc, a download direct to an iPOD or an order for home delivery is a decision this inventor will leave to the purchasers and venue owners to decide for themselves. Both are claimed in this disclosure.

Master classes, seminars and lectures by an adored artist also have inherent value.

And how many unsigned bands have downloaded their original material in hopes that get one of the "illegal" file sharing companies to pick it up even for listening by pirating teenagers? New acts will do almost anything to get free publicity. Now many avoid signing with a label because it has become increasingly clear that the labels are no longer in optimal control of the buying market.

It is not unusual that a great talent, artist, contemporary composer, or ensemble of great talents may appear or premiere works in a unique performance as in a benefit concert, gala, limited tour or opening and/or perform in a smaller market for a particular function or celebration. Many view the failure to offer these concerts as depriving the public of an artist's complete repertoire and/or interfering with a new artist's right to publicity. The May 15, 1999 Carnegie Hall recital of the "New Goldberg Variations" performed by cellist Yo-Yo Ma with a single piano accompanist is such an example. Royalties and guild residuals would have been minimal for release of this recital because a full orchestra was not involved. Yet it was never released by SONY Classical. Why not?

Renee Fleming and Ruth Ann Swenson, now probably the most marketed American sopranos in the world, formerly appeared on the 1998 program of the Marilyn Horne "New Artist Series" at Carnegie Hall. International classical music fans as well as patrons and subscribers would love to own a copy of this event. Yet the union and creative factions there continue to wrangle over royalties, regardless of the value of the recording.

C. Utility/Marketability

That there is a clear positive market for live recordings, even if of less than optimal quality, therefore, is a given. The proof can be found in the "warning" message to the audience

heard before virtually every live performance or professional sports competition informing patrons that recording is illegal and strictly forbidden. Only in the rarer instances when the artist, celebrity or producer has already licensed grander broadcast rights for live or tape delay production will the basic digital recording serve less than an absolute useful purpose, but as demonstrated above, a commercial purpose nonetheless even if only to fulfill tie-in merchandise orders.

Start-up bands are in desperate need of fast and efficient distribution channels for their original material in hopes of discovery. Now, even many veteran artists elect to negotiate with labels and concert venues so that they can offer their live performance recordings for sale in multiple formats.

Within the artistic community are certain rules and mores that using the prior art prevented capitalization of the live content market when the preliminary application for the instant disclosure was first filed in 2002. As aforementioned, the major labels and producers own the exclusive rights to the releases of their signed and featured artists including live performances. Moreover, the standard artist-label contract usually prohibits distribution of a recording without the artist's prior approval. Whether a label may have negotiated an "out clause" for live concert feeds must be analyzed on a case-by-case basis, another expensive administrative hassle for the label.

The only present exception is in the field of classical music because studio releases have never sold as well. Because of this, for the last few years, classical artists have been given "out clauses" to release their live recordings that were not given any artists five years ago. But even with these new contracts, the labels have remained reluctant to share of any part of live Recording sales with the hosting venues because they in turn do not participate in ticket and concession revenues. To help solve the impasse and the continuing decline of the recording industry, both parties along with musicians' unions, performing rights societies and digital rights management organizations may now have to negotiate if they want to keep consumers happy and keep pace with advents in technology.

While in the past the labels feared that new live releases would interfere with their long-standing relationships with retailers and in turn stable revenue streams from classic prerecorded albums, they affirmatively avoided placing competing releases including live sound recordings into the marketplace. Now, with disc retailers becoming less significant with the marked increase in free digital file sharing and paid downloads to hand-held music players, these prior concerns have no rational basis in dollars.

Royalties, however, remain especially high upon ancillary release of a concert when a full orchestra is involved particularly in a top union house. Royalty payments are a sticky negotiation point for every grandiose music special packaged for multi-media release. Union engineering contracts make live production costs even more prohibitive at certain major venues like Carnegie Hall. Now we have podcasts and clipcasts where audio programs classically carried only on radio are made available via special software for download to home computers and mobile phones.

Special live concerts broadcast from a Wi-Fi hotspot is almost certain to become the next genre of podcast series and quality systems of management and administration as presented in the instant disclosure will be sorely needed. Whether a digital transmission is a "performance" as defined in the US Copyright Act, will not ultimately prevent a buy-out price per event by each of creative factions. Even other administrative nightmares like paying mechanical royalties when a concert is to include material composed by an individual other than the featured artist or one signed to a different label, are managed by the instant invention.

In 2002, when the preliminary application for the instant disclosure was filed, the news from the Recording Industry was unanimous that labels and copyright holders were avidly searching for new ways to replenish recording revenues lost to Internet piracy and file sharing. Motion picture studios also reported becoming increasingly concerned about digital piracy of theatrical films. The answer, as proven by the subsequent exponential surge in ticket sales and new forms of interactive entertainment, may well be active pursuit of the live content market with implementation of the systems herein disclosed.

Statistics continue to confirm that a significant number of concert goers (20%-30% +) will buy a Recording of an attended event if delivery can be expedited. Further statistics show that there is a premium on being able to offer instant gratification to an audience on the way out of the venue. A higher percentage will purchase if a preferred method of retrieval can be designated. A cup or T-shirt is far less attractive than the performance itself. The instant disclosure provides the most comprehensive recording purchase options to the consumer. In addition, the venue selects whether the inventor's intelligent terminals installed onsite will offer authenticated recording ordering, encoded delivery to handheld devices and also actual CD burning and engraving.

In sports, the videogame industry is itself a multi-billion dollar business. Interactive game(s) are a natural supplement order for a sports entry ticket. If fans in the audience and elsewhere could all participate in a staged virtual tournaments related in time and space to the live competition, the promotional value could be huge. The end result would be broadened geographic interest even in a local event and a ring side seat on a cell phone.

A sport celebrity's and/or artist's pin-ups, posters and T-shirts sell extremely well and may even appreciate over time. Making a still or autographed photograph of a shortstop's great play immediately available would be a certain "hit" almost like catching a foul ball in the stands. All such orders are most efficiently fulfilled when linked to ticketing operations.

The present invention and disclosure conquers these and many other problems traditionally associated with the immediate marketing of live event Recordings. These include but are not limited to:

The technological and speed limitations on on-site live recording ordering, balancing/editing, fulfillment, physical disc engraving and authorized retrieval of the live content in fixed, analog, digital and/or other encoded format;

The cost of manually gathering the information associated with the sale(s);

The huge prototype costs including costs of on-site intelligent terminals;

The technological limitations on authentication;

The technological limitations on editing and balancing;

Integration of technology that ensures confidentiality to purchasers;

Integration of technology that ensures protection of the live content;

The lack of systems that associate mobile phone and other electronic live recording orders with ticketing and/or immediate and subsequent live sales around the world;

The lack of systems that integrate all recording orders pre and post event in all media;

The job of securing clearances of all parties necessary to effect live recording release

The job of securing the artist's prior approval to the live release particularly if required by contract;

The cost of separately producing and advertising;

The cost of high engineering fees particularly in union houses;

The cost of the residuals and both statutory and contractual royalties owing to all performers, copyright holders and participants upon ancillary distribution;

The cost and clearances required for multimedia of recording delivery including Wi-Fi, satellite radio, podcasting and clip casting;

The overhead of music and live recording publishing administration;

The overhead of royalty accounting including calculation of participations, copyright royalties and payments to guilds and performing rights societies, and generation of statements as may be audited;

The cost of litigation and insuring against it particularly in the gray area of digital distribution;

The cost of updating to keep pace with advents in technology;

The costs of servicing all systems, terminals and equipment;

The loss of impulse business if the customer has to wait a long time to receive a Recording or tie-in merchandise from the event;

The technology and speed limitations of already attempted methods of onsite disc burning because the customer must wait for discs to be balanced, edited, burned and physically handed out, rendering the tried methods insufficient to accommodate a large concert or sports audience;

Potential losses from unauthorized uploads and digital piracy of the live content including from a previous performance during a particular tour;

The technology limitation on integration of all methods and systems needed for financial success; and

The lack of systems that organize and process demographic information from purchasers so that future events and releases can be better marketed while still maintaining the confidentiality of those purchasers who so designate;

The cost of insurance to guard against infringement and misappropriation.

## SUMMARY OF THE INVENTION

The instant disclosure presents novel, useful and unobvious systems, methods and intelligent apparatuses that efficiently, quickly and economically capture and exploit otherwise lost live content. Methods, systems and intelligent apparatuses are disclosed for the immediate multimedia and electronic global ordering, sale, management, and authenticated distribution of live event content recordings by all means of delivery, transmission and retrieval now known or hereafter devised both on and off site from where the live event takes place. Methods and systems are also disclosed for the global solicitation and processing of authenticated electronic responses at live talent competitions, sporting events, and interactive games including from worldwide non-audience participants through enabled devices.

With respect to distribution of live music, entertainment and event "Recordings" (as herein defined), the methods and systems disclosed reveal means that expedite and associate necessary and value added steps in the production, packaging, broadcasting and administration process. These include: (i) association of recording orders to ticket sales, subscriptions, podcast address and/or uniquely identifying information given by the holder at the time of issuance; (ii) methods for content mastering, balancing and editing; (iii) methods for splicing and packaging single titles, action stills and other unique derivative works; (iv) methods for creating director's cuts, "best of" versions and other derivative works; (v) methods for automated copyright accounting including calculation of statutory and contractual royalties from the point of every sale; (vi) integration of standard content security systems [e.g., encryption, watermarking and digital rights management ("DRM")]; (vii) integration of new venue anti-terrorism security systems; and (viii) solicitation and processing of recording orders from non-audience purchasers using any uniquely identifying information that helps directs transmission of content including, without limitation, home or mobile phone number, URL, e-mail or street address, credit card or banking number, personal account, podcast or satellite radio account, Social Security Number, date of birth, mother's maiden name, and most significantly, a DNA fingerprint.

In the sports and gaming field, entrant's fees and bets placed are to be used in this disclosure in lieu of or in addition to "tickets".

The systems disclosed include but are not limited to coupling "ticket" sales with orders for event content Recordings that also specify the preferred method and/or location of retrieval and can be optionally authenticated and/or protected by the integrated methods herein described. They describe wholly new ticketing/ordering operating systems that can be integrated including without limitation an interface to work with existing ticketing software (even when orders are placed over a phone) which converts the ticketing data into a readable language, XML for example, thereby creating an overlay and allowing for the authentication of information already input. Such coordinate systems equally apply to data input for tournament entrance fees or placed bets as well as or in lieu of "tickets". They further apply to methods authenticating orders to delivery codes including assigned land lines, cellular telephone numbers, URL's, e-mail, text messaging, subscription, podcast and clipcast accounts, DNA fingerprints or any other uniquely identifying information that directs transmission of the content. The term "Tickets" and as used in the instant disclosure, therefore, relates not only to the entrance receipt resulting from the ticket sale transaction but also to tournament entrance fees, bets placed or other information of the ordering or receiving terminal including as example a land or cellular phone number which can be authenticated and/or receipted to uniquely identify the buyer/placer by any electronic or other means now known or hereafter devised.

The present invention incorporates systems and methods of assigning numerical values to live audience feeds and then converting the digital reading(s) balanced for an audience to those for a CD track mix.

The present invention incorporates methods for placing special orders for audio-balanced, spliced, edited and other derivative event Recordings including without limitation single music tracks with our without accompanying video including without limitation from installed video screens at the event, those with and without audience noise and/or artist monologues, sports highlights, "best of" compilations, director's cuts, narration tracks, photographs, stills and tie in merchandise, posters, pin-ups, T-shirts, cups, celebrity endorsed games or videogames, etc.,—and associating these with the "ticketing" and other systems herein disclosed.

The present invention also incorporates systems wherein the purchaser is given the option to receive promotional material for other subsequent event announcements and merchandise.

With the systems herein disclosed, purchase and retrieval of Recordings embodied in a fixed tangible medium of expression (CD, DVD, VCR tape, etc.), or in non-fixed analog, digital or other signaled format may take place at the venue itself, at location based intelligent terminal kiosks including enabled tables at eateries, coffee houses and showcases and terminals at any other location including airports, malls, and retail stores, at an ATM machine, or at a home personal computer, cellular telephone or other apparatus.

Further disclosed are independent methods and systems for processing outside orders for the live events Recordings from those who did not attend the event and/or who have no access to on-site points of sale. These orders may be placed over the Internet, by regular land line or wireless phone number that pursuant to the instant disclosure may be linked herein to the ticketing operations.

The instant disclosure presents a technological solution to deter the unauthorized sale and/or upload of shared digital files by offering downloaders fresh content of featured artists to compete with their previous studio Recordings that are now being shared for free and crippling the Recording industry.

The present invention discloses integrated methods and systems for prompt, accurate and virtually automatic calculation and payment of statutory, guild and contractual royalties to copyright holders and participants alike by managing accounting from the point and moment of sales. This allows for the immediate equitable allocation of revenues and the tremendous lowering of the overall costs of production and distribution. Disclosed is a system for protected key access by all copyright holders to their royalty accounts and demographic information to the extent that purchasers authorized its disclosure.

The present invention is a complete system and method providing a legal, efficient way to maximize the revenue and the promotional value of the live event, track the content sales, gather the required information and transmit that information to all parties involved in the production, manufacture and fulfillment of sales as well as to those entitled to share in revenues and at cost low enough to make it practical even at low volumes.

Equally important, by returning control of content releases to the copyright holders (which in turn will allow for the offer of discount and promotional tie-in pricing concurrent with ticket sales), the present invention will serve to encourage new and established talent to remain within the structure of the existing system, thereby providing a win-win-solution to all—studios, labels, and participants alike.

Further, the present disclosure offers the public the opportunity for instant gratification and impulse buys at comparatively lower cost to the suppliers without the need for "hand out" sales or additional sales personnel.

The system incorporates rating and interactive systems to enhance the live experience and its geographic influence and also to allow for participation staged tournaments and contests by ticket holders and non-audience members alike.

Optionally, Recordings including single tracks may be separately encrypted, watermarked, formatted and/or rendered destructible by known industry means, integrated with other systems described and offered to consumers over the Internet for a download fee and transfer to hand held players.

Other special purchase orders including "best of" compilations, director's cuts and narration track versions are anticipated to be especially attractive when multiple performances of a live event take place at the same or different venues, as during a revival or artist's concert tour. To the extent that pre-event disc production may incorporate already approved performances of certain titles from a prior concert of a current tour, the systems integrate those balanced, edited and production systems as well.

Separate integrated methods and systems are disclosed for automated mastering and editing including digitizing console and instrument feeds through the use of algorithms. These systems and other editing and disc burning/engraving technology that may currently exist or hereafter be devised, are described as to be integrated with the ticketing and Recording ordering systems herein described and/or the system as a whole.

In total, these methods individually and collectively comprise the collection and input of purchaser information starting optimally at the time of first ticket sales, the optional integration and processing of mastering, editing and digitized balancing data, and secured transmittal of that information to all parties responsible for the fulfillment, manufacture and distribution of the Recordings, as well as to those entitled to payment by statute or contract.

In the instance where the Recordings are to be delivered by immediate and/or electronic transmission directly at the venue or devices including a land or cellular telephone or other enabled appliance, methods and systems of authentication of the ticket holder's or outside purchaser's information including his assigned phone/cellular numbers, e-mail address and/or bank account are incorporated and disclosed to ensure authenticated delivery to the proper party at the time and/or location of retrieval. Integration of standard secured credit card technologies will allow on and off site sales at any enabled terminal location including without limitation at a home computer or cellular telephone to all who did not pre-buy Recordings. All purchasers and can elect to receive promotional information for upcoming releases, games and other live events. In the systems disclosed, the buyer/orderer will maintain the right to have such information transmitted to the copyright owners as part of an overall demographic package or to keep such information confidential.

Optionally to be added to the system are integrated methods to handle the purchase and/or license of grander scale broadcast productions and home distribution versions. For those cases where the pre-approval of the artists is required prior to release of a Recording, integrated are disclosed systems to block sales until and only if such consent is secured.

Systems for audience participation and ratings, videogame or interactive tournament play or live content merchandise auctions or stock markets, can be optionally integrated into the systems disclosed to enhance the complete live experience and encourage participation by spectators and non-audience members alike.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts an overall schematic or block diagram of a system constructed in accordance with the present invention.

FIGS. **2**A-C depict the transaction flow including processing and administration of Recording orders—claimed both from ticket holders and independently from non-ticket holders—payments and accountings to all copyright holders and participants (or "partners").

FIG. **3** shows a flow chart for processing transactions and information requests.

FIG. **4** depicts the method and system of manufacturing/fulfillment including orders for complete, spliced or special purchase Recordings including derivative or edited versions, singles tracks and personalized compilations in fixed, encoded and any other format.

FIG. **5** depicts the methods and systems of On and Off-Site Production and Distribution and authenticated retrieval associated with identifying ticketing information and other uniquely identifying information of a Recording purchaser. FIG. **6**(*a*)-(*d*) depict the inventor's original intelligent terminal designs separately submitted for patent protection.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

While the instant invention is susceptible of embodiment in many different forms, there is shown in the drawings and herein described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered an exemplification of the principles of the invention and is not intended to limit the principles or scope of the invention to the embodiment.

As is now standard in the industry and in referring to FIG. **1**, the system architecture of the preferred embodiment of the present invention is implemented using a Data Center, a plurality of venues using standard point of sale equipment and a plurality of terminals. The Data Center is in communication with each venue and each purchaser or licensee terminal through the Internet or any wireless application. The terminal can be any device through which a user can access a Website, e.g., a personal computer, a personal digital assistant, an Internet-through-television device, a cellular telephone, or any type of many available wireless devices available in the market, or any updates as may now or hereafter be devised.

Referring to FIG. **1**, the Data Center (**100**) preferably comprises database servers (**100**A), Web servers (**100**B), a load balancing router (**100**C) and a firewall (**18**) connected to the Internet. The firewall (**18**) receives messages from the Internet (**19**) and forwards the messages to the load balancing router (**100**C) and likewise receives messages from the load balancing router (**100**C) and forwards them to the Internet (**19**) or other similar distributed computer network. The firewall (**18**) preferably performs a number of filtering functions and network address translations in order to safeguard the Data Center from unauthorized access. The firewall (**18**) also preferably encrypts and/or watermarks the message using known public key/private key encryption and standard methods and may also integrate Digital Rights Management ("DRM") tracking. The load balancing router (**100**C) forwards messages received from the firewall (**18**) to one of the plurality of Web servers (**100**B). The load balancing router (**100**C) also forwards messages received from the Web servers (**100**B) to the firewall (**18**) for transmission to other sites through the Internet (**19**). In this manner, the load balancing router (**100**C) distributes tasks to be performed to one of the plurality of Web servers (**100**B) in order to distribute processing demands. The Web servers (**100**B) access the database servers (**100**A) to retrieve and store information in response to received messages from the terminals (not shown). The database servers (**100**A) store data tables which contain information about various venues, events, accounting, royalties payable, fixed payment allocations, ticket resources, ticketing software, user rules, ticket status, ticket holders and tournament entrance fees and bets placed (if applicable).

An end user (**10**) can access the Data Center (**100**) by using a standard Web browser on a terminal (not shown). However, non-standard, custom software can also be implemented or Web browser software on the wireless device such as a personal digital assistant or cellular telephone. Terminals can log into the Data Center (**100**) to view events which will take place in the future, purchase tickets, allow patrons to access Recordings from the just-completed live event (**212**), interact to rate a new act or the event itself, and/or to buy interactive games to participate in the event itself or in staged tournaments with other users or spectators (**10**).

Moreover, other information including user roles, options for Recording retrieval including location, means of retrieval and incorporating burning, engraving, mastering balancing, editing technology as may now exist or hereafter be devised including through the use of algorithms as herein disclosed, may be implemented. Choices may include venue, management, artist, record label, team owner, event management, ticket buyer/ancillary purchaser, retrieval immediately at venue by CD or DVD, or for delivery by digital transmission/USB port at a location based kiosk, at home by mail of by home computer access, on a cellular telephone, or those that order derivative works or elect to input other demographic information for dissemination, i.e., 'best of' versions, director's cut, narration tracks, and requesting upload of demographic information and promos for upcoming events and other releases, etc. (**214**).

More particularly, referring to FIG. **1**, the system further includes one or more entertainment venues (**14**), a fulfillment or manufacturing center (**300**), a plurality of information fee recipients (**24**) and a plurality of Recording recipients (**28**). The transaction flow is depicted in FIGS. **2**A-C.

The ticket buyer makes a purchase transaction in step (**600**). During this step, the ticket buyer (**10**) is presented with the option of pre-buying a tie-in Recording. The price of the Recording is added to the price of his ticket purchase to the live event (or other logged entrance fee or bet). In the event the purchaser desires to retrieve his Recording at the venue immediately upon completion of the performance (or prior to in the case of interactive games), standard authentication methods may be employed, including, but not limited to, bar coding and/or information authentication.

The ticket seller (**11**), who is already making various allocations for taxes, fees, etc., from the gross receipts, treats the price of the value added Recording similarly. He subtracts his fee, whether fixed or contingent (his incentive to provide this service), and forwards the remainder to the Recording supplier (Recording-seller). Because this is still a single transaction, with the ticket serving as the customer's receipt, the added cost is minimal.

The ticket seller at locations (**11**) transmits the transaction data over a PC or other standard point-of-sale equipment well known in the art (not shown), which includes the information gathered from the charge card transaction, which identifies the buyer and specifies the address (the charge card address or other address selected by the buyer (**10**)) to which the Recording is to be sent, to the Data Center (**100**) (step **610**). This transmission is done in real time, through the Internet (**19**), using industry standard protocols such as XML and is properly secured using one of many industry standard encryption methods.

Upon receipt at the Data Center (**100**), the transaction information is immediately loaded into the master system database (**100**A). The database system is capable of Recording a multitude of transactions involving a multitude of events simultaneously, while at the same time providing all of the required reporting and processing functions and maintaining both the physical and logical security of the information which is critical to the successful implementation of the method.

The preferred embodiment preferably uses an industry standard database system, e.g., Oracle, Microsoft SQL Server, IBM DB2, XML, etc., which is scalable, and of an

industry standard set of server hardware, which is also scalable to ensure that it can handle whatever transaction load is required.

In step (**612**) the Data Center (**100**) checks if the transaction is valid. Invalid transactions are discarded (step **614**). In step (**615**) the Data Center transaction is posted with database (**100**A). In step (**616**) the transaction is backed up. Next, various data files containing statistical information are updated in the data base (**100**A) to reflect the latest transaction(s) (step **618**).

As indicated above, the Data Center (**100**) also encompasses a series of Web servers (**100**B) providing as Web sites and/or Web services points of access for various interested parties to retrieve information required for their operation. FIG. **2**B shows the process for generating the Recordings in fixed media of expression (CD, DVD, e.g.) on site using a suitable Recording subsystem (**15**) (FIG. **1**). During or immediately after the event, the Recording subsystem (**15**) generates a Recording on an appropriate medium using preferably non-incremental methods. In the alternative, Recordings are available to be retrieved on or off site through enabled terminals in digital format through USB port or other methods including hook-up of iPODs and other storage devices, also authenticated using cellular telephones and Internet subscription accounts. Booklets (if any) are prepared for the buyer together with labels that are affixed to the Recording (step **620**). The completed Recording is delivered to the buyer (step **621**). In step **622** the manufacturing details are sent to the Data Center (**100**) and fulfillment center for accounting and statistical analysis. Using this data, in step **624** various statistical data bases are updated with the latest transaction(s). FIG. **2**C illustrates the final accounting process. In step **626** the transactions for the event are reconciled and finalized. In step **628** reports are generated. In step **630** the reports and payments to various partners are calculated and transmitted. In step **632** temporary data in the central data base (**100**) are cleaned out and the central data base is readied for the next event.

As discussed above, and illustrated in FIG. **1** if a user or buyer wants to take home or receive a live Recording directly at the venue upon completion of the event, standard authentication methods, including but not limited to bar coding, may be used. Referring to FIG. **5**, the Recordings from the editor apparatus (**19**) are stored as tracks on servers (**402**). Next, the Recordings are transmitted or "burned" on site by updated non-incremental CDR technology generating media (**401**) in bulk. The media (**401**) (that may include DVDs. CDs, etc.) are sold to either users or buyers (**10**), who have prepaid for the media when they bought their tickets, or alternatively to buyers (**10**A) who have not prepaid and pay for the media at a subsequent time including at the end of the event. The bulk Recordings (**401**) may be sold by a clerk (**403**).

Alternatively, however, a kiosk or other enabled terminal (**410**) is provided that receives the Recording data from servers (**402**). The kiosk (**410**) is an automated kiosk, "vending machine" or enabled table in a nightclub/eatery that either burns or spits out a Recording on demand when presented with authenticating information that may be information on the ticket itself and/or prerecords the tracks on a selected media and provides labels, booklets and other materials associated therewith. The media and associated item(s) are then dispensed when the user/attendee inserts his ticket or inputs other identifying authentication information into the kiosk (**410**.) Alternatively, the kiosk receives the ticket or other input information from the user/orderer and, in response, starts the burning of the media or takes order for the mailing or desired home electronic retrieval. In this configuration, the user may be given the choice of customizing his Recording by selecting specific portions or songs of the event that should be burned on the media, their sequence, etc. or may even order "singles". This will be the preferred method if a kiosk is in the form of a patron's audience chair, table or seat at an eatery, nightclub or showcase. Orders can also be taken at enabled turnstiles or ATM machines at banks, airports, malls and other public venues.

A user (**10**A) who has not prepaid for the Recording may also obtain one using the kiosk (**410**) and charging the purchase to his credit card or by using other payment means.

The kiosk (**410**) may also deliver a Recording as a data file that becomes available for downloading by the user (to a PDA, IPOD or other similar device) through a data port (such as USB port) on the kiosk (**410**).

Finally, after the event is finished, the Recording can be delivered or distributed electronically as a digital file to the home (**420**) of the user and the point of sale site (**400**) may be bypassed. Communications between the various elements of the systems can be implemented over wired or wireless networks. Typical wireless networks that may be employed include Wi-Fi, Bluetooth, etc.

The ticket/Recording buyer (**10**) can from any terminal, for example, check on the status of his order and perform a limited range of functions, such as changing the delivery address for his order, order additional Recordings, or order that promo information of upcoming concerts and other future releases be sent to him.

Similarly, the entertainment companies and record labels can, for example, check, in real time, to see how many Recordings for their artist have been requested and sold for any event, track the royalty and other payments through the system, and, for example, receive survey responses from those who elected to participate in "new band" ratings. If the buyer opts to allow dissemination of other demographic information including, for example, his order for promos, tickets for upcoming events or releases and other merchandise, the system will accommodate those requests. By integrated methods and systems, it will also allow for ordering and purchase of "best of" releases, director's cuts, narration tracks, and single tracks and compilations emanating from the live event.

The Data Center (**100**) maintains security and confidentiality through the system. The entertainment entities and "Partners" are issued specific password credentials which are authenticated through standard industry techniques (**218**). In the case of the ticket/Recording buyer, his ticket number along with information not printed on the ticket, such as his billing address or other identifying information (mother's maiden name, e.g.) is used for verification before he can gain access to the privileged areas of the processing Web site.

As shown in FIG. **1**, in addition to users or buyers (**10**), other entities may also have access to the Data Center (**100**), including revenue participants (**24**) that may include several Partners. In addition, specialized servers may also be provided as part of the system. For example, server (**20**) is used to determine fees and royalties for the various Partners (**24**). The server (**22**) provides standard accounting services. These servers can communicate with each other and with other components of the system through standardized networks, such as Internet (**19**).

Of course, the whole purpose of the system is to manage ordering, packaging and multi-media distribution of live event recordings and to organize and run new types of live events at venues (**19**) including those to be constructed with new technology regardless of whether they have outside ticketing service companies or their own and help take maximize

advantage of the impulse buying potential of the adoring audience and fans. As part of this process, buyers (**10**) can receive or buy Recordings of the event and other items associated with the event. These materials are available immediately at a point of sale station (or store) (**400**), as discussed in detail below and shown in FIG. **5**. The event is recorded and edited by on-site editing equipment (**19**) to provide the immediate Recording at a station (**400**). Non-incremental or other burning technology compatible with updated standard CDR technology is preferentially to be used.

In addition, or alternatively, the event is recorded by digital Recording equipment **16**. The recorded data inclusive of mastering, editing and balancing data is then sent to an offsite manufacturing site (**300**) where the Recordings are generated (on CDs, DVDs and other similar media) and then packaged and distributed to the users (**10**), as discussed in more detail below and illustrated in FIG. **4**. Manufacturing instructions (**31**) to both sites [.e. station (**400**) and manufacturing site (**300**)] are provided by the Data Center (**100**). Moreover, the Data Center (**100**) receives inventory and accounting information (**30**) from both sites.

Details of how requests for transactions and information are handled by the Data Center (**100**) are provided in FIG. **3**. A request is received by the Data Center (**100**) in step (**200**) via the Internet. In step (**210**) a check is performed to determine if the request is a special request for information (available only to certain subscribers and partners). If it is not, then in step (**212**) information is retrieved and sent to the requester indicating what services are available, including lists of future events for which tickets, Recordings, and/or other items can be purchased. Lists of other items related, for example, to Recordings from past events, may also be displayed. In step (**214**) a request for tickets, Recordings or other items is received from a user (**10**). The request is processed, the user (**10**) is issued a ticket and the resulting transaction is processed as described in the flow charts of FIGS. **2A-2C**.

If in step (**210**) a special request is identified, then in step (**216**), the requester is asked to provide a password and the password is validated. If the requester is identified in step (**218**), then in step (**222**) he is directed to a special partner web site where he can access data on various events, including their status, number of orders for received for the events, fees collected, royalties due to the partner, etc. In step (**223**), data related to the partners is updated in the Data Center (**100**), if necessary.

If the requester is identified as a registered buyer, then in step (**220**) the buyer logs in and is directed to a buyer site in step **224**. At this site, the buyer is allowed to check on the status of his order, he is allowed to change his order, provide information for shipping, etc. The information or changes entered by the registered buyer is stored in the Data Center (**100**) in step (**226**).

After a particular event has concluded, the Data Center sends to the fulfillment house (**122**) information specifying the number of complete and derivative or special order Recordings (**120**) to produce and the addresses to which those designated to be mailed, should be mailed.

Off site Recording is performed by manufacturing station or site (**400**). As shown in FIG. **4**, after the event, the performance data is received in step (**310**). This data may be streamed or may be sent electronically in a batch. Alternatively, the data may be recorded on a data storage medium and sent to site (**300**).

In step (**312**) the data is edited. Editing may optionally incorporate the disclosed method of digitized conversion from an audience balanced to disc balanced reading. In step (**314**) the data is prepared for Recording on a master. In step (**314**) the data is optionally encrypted, and, if desired, a unique watermark is added for copy protection. In step (**316**) multiple copies are made from the master by burning or other means. In step (**318**) labels are applied to the media and the labeled media is boxed and packaged together with other materials, such as booklets, pictures, etc. In step (**320**) the packaged media are shipped.

In step (**322**) additional copies of the Recordings are made, if necessary. In step (**324**) a production document is generated. In step (**326**) the data files at the Data Center (**100**) are updated to reflect the Recording produced and shipped.

The Data Center **100** also handles all tasks of reporting and accounting for copyright, and other participants and generates detailed statements and accounts including the amounts of statutory and contractual royalties (**20**).

To summarize, a Recording of a live event or any part of a live event (including spliced, edited and/or derivative special order versions thereof) is ordered before, during or after the event by a buyer who has attended the event or by a non-attendant buyer by any available means including, but not limited to, by using an appropriate Website or enabled hand-held device including a cellular telephone.

While the specific embodiments have been illustrated and described, numerous modifications come to mind without significantly departing from the spirit of the invention and the scope of protection is only limited by the scope of the accompanying claims.

I claim:

**1**. An apparatus to facilitate the purchase of customizable event or venue content by a person during a live event or immediately following such live event over a computer network comprising:

a. at least one data center connected to the network said data center comprising a database for storing live event purchase transaction data;

b. At least one recording subsystem connected to said at least one data center for recording at least a portion of said live event;

c. At least one editor apparatus connected to a remote user terminal through said network for receiving the recorded live event from the recording subsystem and a user selection request for event content, and for editing the recorded live event based on the selection request; and,

d. said at least one remote terminal further comprising means for connecting to said data center via said network, receiving means for receiving said requested event content from the editor apparatus, downloading means for downloading said requested event content onto a user media device, means for providing the live purchase event transaction data and selection means for transmitting the selection request.

**2**. The apparatus of claim **1** wherein the live event is any one of concert, recital, tour, stage, musical play, sports event, conference, symposium, showcase, comedy revue, screening, exhibition, demonstration, opening, travel, skit, tournament, speech, convention, address, seminar, class, lecture, or sermon.

**3**. The apparatus of claim **1** wherein the customizable event or venue content is a portion of audio, video, images or a combination thereof emanating from said event.

**4**. The apparatus of claim **1** wherein the customizable event or venue content is packaged with other venue or sponsor offerings.

**5**. The apparatus of claim **4** wherein in addition to customizable event or venue content, offerings may be made in conjunction comprising: single titles, "best of tour", director's cuts, narrations tracks, photos, action stills, or pin-ups.

6. The apparatus of claim 1 wherein the computer network is at least one of wired or wireless telecommunications network.

7. The apparatus of claim 1 wherein the live event purchase transaction data is at least one of bets placed, investments, ticketing data, electronic ticketing data, orders for event associated electronic displays, orders for ads, orders placed in response to ads associated with the event, orders to receive recordings or live event and venue content, orders to realize promotional benefits associated with the event offered by its producers, sponsors and distributors, featured artists, celebrities or participants, orders for event content, or orders for offerings unrelated to the event.

8. The apparatus of claim 1 wherein the editor apparatus is connected to a fulfillment center's database.

9. The apparatus of claim 1 wherein the editor apparatus is connected to a telecommunications carrier's database.

10. The apparatus of claim 1 wherein the user media device is at least one of cell phone, personal digital assistant, handheld device, enabled hospitality or conference table, enabled audience or airline chair/seat, enabled turnstile, or enabled gate.

* * * * *

US00D647910S

(12) **United States Design Patent**
**Gurvey**

(10) **Patent No.: US D647,910 S**
(45) **Date of Patent: ** *Nov. 1, 2011**

(54) **USER INTERFACE FOR A PORTION OF A DISPLAY SCREEN TARGETED FOR LIVE EVENTS OR TRAVEL**

(76) Inventor: **Amy R. Gurvey**, Coconut Creek, FL (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(**) Term: **14 Years**

(21) Appl. No.: **29/310,547**

(22) Filed: **Aug. 25, 2008**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/788,314, filed on Apr. 19, 2007, and a continuation-in-part of application No. 11/612,854, filed on Dec. 19, 2006, and a continuation-in-part of application No. 11/253,912, filed on Oct. 18, 2005, now Pat. No. 7,603,321, and a continuation-in-part of application No. 10/442,468, filed on May 20, 2003.

(51) **LOC (9) Cl.** .................................................. **32-00**
(52) **U.S. Cl.** ...................................................... **D14/485**
(58) **Field of Classification Search** ......... D14/485–495; D18/24–33; D19/6, 52; D20/11; D21/324–333; 715/700–867, 973–977; 345/757, 782, 848, 345/852, 850, 809, 837, 798, 752, 163, 156, 345/537, 474, 836, 419, 649, 656, 659, 426, 345/427, 582, 428, 440, 660, 634, 902, 418, 345/629, 700, 744, 747, 473; 705/10, 5; 709/223

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,760,773 | A * | 6/1998 | Berman et al. | 715/808 |
| 5,973,686 | A * | 10/1999 | Shimogori | 715/746 |
| 6,232,970 | B1 * | 5/2001 | Bodnar et al. | 715/708 |
| D477,828 | S * | 7/2003 | Ferguson et al. | D14/486 |
| D480,092 | S * | 9/2003 | Kreikemeier et al. | D14/486 |
| 6,731,308 | B1 * | 5/2004 | Tang et al. | 715/751 |
| 6,750,881 | B1 * | 6/2004 | Appelman | 715/733 |
| D495,715 | S * | 9/2004 | Gildred | D14/486 |
| D533,559 | S * | 12/2006 | Seo et al. | D14/485 |
| 7,171,622 | B2 * | 1/2007 | Bhogal | 715/730 |
| D540,336 | S * | 4/2007 | Kim et al. | D14/485 |
| D553,145 | S * | 10/2007 | Kim | D14/486 |
| D555,661 | S * | 11/2007 | Kim | D14/486 |
| D557,268 | S * | 12/2007 | Fletcher | D14/485 |
| D570,368 | S * | 6/2008 | Ligameri et al. | D14/489 |
| D573,153 | S * | 7/2008 | Roever et al. | D14/488 |
| D576,634 | S * | 9/2008 | Clark et al. | D14/485 |
| D582,928 | S * | 12/2008 | Blankenship et al. | D14/485 |
| D595,728 | S * | 7/2009 | Scheibe et al. | D14/486 |
| D598,929 | S * | 8/2009 | Bhat et al. | D14/486 |
| 2007/0271527 | A1 * | 11/2007 | Paas et al. | 715/810 |
| 2008/0141154 | A1 * | 6/2008 | Balassanian | 715/769 |

* cited by examiner

*Primary Examiner* — Susan Moon Lee
(74) *Attorney, Agent, or Firm* — Allan Chan; Allan Chan and Associates

(57) **CLAIM**

I claim the ornamental design for a user interface for a portion of a display screen targeted for live events or travel, as shown and described.

**DESCRIPTION**

The FIGURE is a front view of a user interface for a portion of a display screen targeted for live events or travel showing my new design.

The broken line showing of an electronic device is shown for environmental purposes only and is not claimed. Only what is contained within the solid lined frame is claimed.

**1 Claim, 1 Drawing Sheet**

BEETHOVEN'S "PASTORAL"
, CONDUCTOR
HALL
Sat Nov 18 2006 08:00pm
ORCH G 102 $75.00

US011403566B2

(12) **United States Patent**
**Gurvey**

(10) **Patent No.:** **US 11,403,566 B2**
(45) **Date of Patent:** ***Aug. 2, 2022**

(54) **ELECTRONIC TICKET MANAGEMENT AND LIVE EVENT MAXIMIZATION SYSTEM COUPLING EVENT TICKETING, ADMISSION DATA AND PLACED BETS, ACCESSIBLE FROM USER DEVICES AND LOCATION BASED INTELLIGENT APPARATUS MACHINES**

(76) Inventor: **Amy R. Gurvey**, Upper Montclair, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/587,759**

(22) Filed: **Oct. 11, 2009**

(65) **Prior Publication Data**

US 2018/0114147 A1 Apr. 26, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 11/253,912, filed on Oct. 15, 2005, now Pat. No. 7,603,321, which is a (Continued)

(51) **Int. Cl.**
***G06Q 10/02*** (2012.01)
***G06Q 20/04*** (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***G06Q 10/02*** (2013.01); ***G06Q 20/045*** (2013.01); ***G06Q 20/367*** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,614,729 B2 * | 9/2003 | Griner | G11B 27/002 | 369/1 |
| 6,650,903 B2 * | 11/2003 | Inselberg | G06Q 30/0242 | 455/3.06 |
| 6,920,428 B2 * | 7/2005 | Greene | G06Q 20/20 | 705/16 |
| 7,363,497 B1 * | 4/2008 | Ferguson | G10L 19/018 | 704/E19.009 |
| 7,945,935 B2 * | 5/2011 | Stonedahl | G06Q 30/0601 | 725/86 |

(Continued)

*Primary Examiner* — Scott A Zare

(57) **ABSTRACT**

The present disclosure provides a ticketing management system accessible by apparatus terminals (separately claimed). Disclosed is a system and method of electronically associating one or any combination of the production, packaging, order, transmission and distribution of live and event content "Recordings" with issuance or sale of a "ticket" or other event viewing rights ["ticket" defined to include any admission/registration data, payment, receipt, tournament entrance fee or logged placed bet] such that both an audience ticket holder and a non-ticketed holder such as a viewer or end user are able to automatically acquire a Recording and get other benefits separate from admission or viewing from and delivered to a terminal when connected to the Internet or other network. The systems disclosed also allow for authenticated event interaction to generate more content into the system. Distribution and/or retrieval of Recordings may occur when the Recordings are embodied in a fixed medium of expression, in digital format or other encoded format.

**5 Claims, 21 Drawing Sheets**



**Related U.S. Application Data**

continuation-in-part of application No. 10/442,468, filed on May 20, 2003, now abandoned.

(60) Provisional application No. 60/619,754, filed on Oct. 18, 2004, provisional application No. 60/382,949, filed on May 24, 2002, provisional application No. 60/382,710, filed on May 22, 2002.

(51) **Int. Cl.**
***G06Q 20/36*** (2012.01)
***G06Q 20/38*** (2012.01)
***G06Q 30/00*** (2012.01)

(52) **U.S. Cl.**
CPC ....... ***G06Q 20/3674*** (2013.01); ***G06Q 20/382*** (2013.01); ***G06Q 30/00*** (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2001/0018660 | A1* | 8/2001 | Sehr | G06Q 10/02 705/5 |
| 2002/0029381 | A1* | 3/2002 | Inselberg | G06Q 30/0242 725/9 |
| 2002/0077712 | A1* | 6/2002 | Safaei | G06Q 50/34 700/93 |
| 2002/0107016 | A1* | 8/2002 | Hanley | G06Q 30/06 455/3.04 |
| 2002/0199198 | A1* | 12/2002 | Stonedahl | G06Q 30/0601 725/86 |
| 2003/0097307 | A1* | 5/2003 | Greene | G06Q 20/20 705/26.1 |
| 2003/0135464 | A1* | 7/2003 | Mourad | G06F 16/958 707/E17.116 |
| 2005/0289338 | A1* | 12/2005 | Stadlman | G06Q 30/06 713/153 |

* cited by examiner



Overall System Schematic
10
10
10
"Ticket"-seller Locations
(placed bets, financial data (Fig. 2)
user preferences and authorizations)
19
Internet
18
Firewall
Accounting Information
30
100
Data Center
Figs. 2, 3, 4
20
Fees & Royalties
22
Accounting
Firewall
18
Internet
24
Partners
Partners
Partners
Revenue Participants
Venues
Ticket Issuer
Viewing Rights Station
Event Location
14
14
AND/OR
16
On-site editing of program content
Digital Recording
400
Distribution
FIG. 8
Sponsor Content
Digital Recording
Editor Apparatus
Manufacturing Instructions
31
Cell phone
26
Distribution
28
Recording recipients
Ticket Holders, Viewers, Users (10)
Location based kiosks Figs. 6A-6P
Home electronic
Home mail
On site terminal/kiosk

FIG. 1

Transaction Processing
Purchase transaction
110
Receive transaction data from ticket-seller
112
Is transaction valid?
114
Reject transaction
100
Post transaction to DataCenter
116
Journal transaction for backup
118
Update online statistics
end
FIG. 2A
RECORD EVENT
120
Package Event with Sponsor Ads
122
User Selections, Preferences Authorizations
Update statistics and DataCenter
124
end
FIG. 2B
Final event accounting
Compute final accounting information for event
126
128
24
Generate required reports
Transmit reports and payments to partners
Cleanup Central Database
100
FIG. 2C
end



Internet Processing
200
Receive Internet Request
212
210
No
Public Site
Display information on events and user generated content
Is this a "special login request?"
214
216
Validate login
Process purchase transactions entered on web site
218
Partner login
Registered user login
220
222
Partner Site
Partner's Access Event and Sponsor Orders
Buyer Site
Allow user to check order status, change selection request
224
100
Update DataCenter if necessary
Update DataCenter if necessary
100

FIG. 3

Manufacturing Process
All events
300
122
Receipt of transmission instructions and fulfillment
Receipt of Data Streams
310
Editing of Data Streams
312
Preparation of media masters
314
Optional encryption and unique watermarking of copy
324
316
User Selection Requests
Print production report
100
318
Sponsor brand package & digital distribution
Update DataCenter
320
Transmit
end
322
More?

FIG. 4



DISTRIBUTION
19
ON SITE EDITING OF PROGRAM CONTENT
400
EDITED "TRACKS" STORED FOR RECORDING
401
BULK CD/DVD/ETC BURNER SYSTEM (NON-INCREMENTAL)
410
KIOSK(S) (BURNING AND PACKAGING OPTIONAL) POINT-OF-SALE CD/DVD/USB ETC.
420
Wi-Fi for "Live-Fi" AND OTHER WIRELESS TRANSMISSION
IPOD
CELL PHONE
PDA
430
HOME DELIVERY (ELECTRONIC OR MAIL)
402
ON-SITE SALE
RECORD ACCOUNTING INFORMATION
30

FIG. 5

SAMPLE LOCATION-BASED TERMINALS
VENUES, ATMs, SHOPPING MALLS, AIRPORTS
INSERT TICKET OR CREDIT CARD
OPTIONAL DISC RELEASE
USB PORT
SAMPLE LARGE VENUE TERMINALS
INSTALLATION IN LOBBIES OR COMMON AREAS NEAR CONCESSIONS
INSTALLATION ALSO AT OFF-SITE MALLS, AIRPORTS, RETAIL OUTLETS, ATM/BANKS

FIG. 6A



INSERT UNUSED PORTION OF TICKET
INSERT CREDIT CARD RECEIPT
OPTIONAL DISC RELEASE FUNCTION
SAMPLE
(SMALL) VENUE LOBBY
RECORDING ORDERING TERMINAL
USB PORT
SAMPLE CHILD STOOL

FIG. 6B



LARGE VENUE
TURNSTILE TERMINAL
DISC-PENSARY
DISC RELEASE
MONITOR
MONITOR
SCREEN
SCREEN

FIG. 6C



ELECTRONIC ORDER FOOD, DRINK & RECORDINGS
GLOBAL ADVERTISEMENT (ICONS)
TICKET OR CREDIT CARD, ETC.
LIVE VENUE TABLE FOR ELECTRONIC ORDERING
COFFEE HOUSES CLUBS, BARS, RESTAURANTS
USB PORT
DISC RELEASE
ORDERS RECORDINGS INTERACTS WITH EVENT
RATE CONCERT OR TALENT INTERACTIVE RESPONSE
RECORDING OR DISC ORDERING AND...
ENABLED CHAIR TICKET INSERTION CREDIT CARD SWIPE RECEIPT

FIG. 6D



ENABLED AUDIENCE SEATING
INSERT UNUSED 1/2 OF TICKET OR TICKET DATA, SEAT OR CREDIT CARD
DISC-PENSARY DISC RELEASE
DISC- ORDERING DISPLAY WITH or WITHOUT DISC-PENSARY ALSO RATE CONCERT OR PERFORMANCE WITH INTERACTIVE SYSTEMS
(REAR OF AUDIENCE SEATS FACING STAGE)

FIG. 6E

ENABLED AUDIENCE OR AIRLINE SEAT

LARGE AUDIENCE SEATING TERMINALS



ALTERNATIVE AISLE DISC RELEASE

FIG. 6F



CLUB/COFFEEHOUSE TERMINALS
ENABLED AUDIENCE SEATING
HANGING VIDEO MONITOR OF PERFORMANCE
ELECTRONIC ORDER FOOD, DRINK & RECORDINGS
GLOBAL ADVERTISEMENT (ICONS)
TICKET OR CREDIT CARD, ETC.
RATE CONCERT OR TALENT INTERACTIVE RESPONSE
LIVE VENUE TABLE FOR ELECTRONIC ORDERING
COFFEE HOUSES CLUBS, BARS, RESTAURANTS
ORDERS RECORDINGS INTERACTS WITH EVENT
USB PORT
ENABLED CHAIR TICKET INSERTION CREDIT CARD SWIPE RECEIPT
DISC RELEASE
RECORDING OR DISC ORDERING AND...

FIG. 6G



BIRDSEYE VIEW
CLUB/COFFEEHOUSE RESTAURANT
TABLE TOP COMPUTER SCREEN
ORDER FOOD DRINK
MENU
OPTIONS
INSERT TICKET
INSERT
CREDIT CARD
RECEIPT
RATE PERFORMANCE
ORDER RECORDINGS
MEANS OF DELIVERY
ADVERTISING
SPACE FOR SALE
ADVERTISING
SPACE FOR SALE
OPTIONAL DISC OR USB PORT
RECORDING RELEASE ON BASE

FIG. 6H



ORDER FOOD DRINK
MENU OPTIONS
INSERT TICKET
INSERT CREDIT CARD
RECEIPT
RATE PERFORMANCE
ORDER RECORDINGS
MEANS OF DELIVERY
ADVERTISING SPACE FOR SALE
ADVERTISING SPACE FOR SALE
TABLE TOP ORDERING
ENABLED DISC TABLE TOP BIRDs EYEVIEW

FIG. 6I



ENABLED AUDIENCE OR AIRLINE SEAT
INTERACTIVE CAPABILITY
PC OR MOBILE PHONE DEVICE

FIG. 6J

STAGE FOR PERFORMANCE OR CONFERENCE
WITH ENABLED SEATS



FIG.6K



SCREENED VIDEOGAME OR BILLIARDS
IMPLEMENTED INTO POINT GRAPHICS
PDA
Cell phone
TICKET OR CREDIT CARD, ETC.
INPUT INFORMATION
LIVE VENUE TABLE

FIG. 6L

PAYS CHECKS AND PARKING

INPUT BY TABLE KEYPAD OR CELL PHONE DEVICE



SCREENED VIDEOGAME TABLE

AUTOMATED FOOD, BEVERAGE ORDERS

FIG. 6M



AUTOMATED VIDEOGAME
TALENT CLUB OR EATERY
INPUT BY CELLULAR PHONE DEVICES
SCREEN EVENT CLIPS
STATS
PROCESS INFO OF
PARTICIPANTS
CONNECT OFF SITE
PARTICIPANTS
PDA
Cell phone
CAR, INTERNET,
PHONE, PC
CONNECT FROM OFF SITE

FIG. 6N



GLOBAL NETWORKED CONFERENCES
PHONE INTERACTION
LOCATION BASED TERMINAL
SCREEN EVENT CLIPS
INPUT STATS
INPUT TICKET
OR PASS INFO
INTERACT
OPTIONAL
RECORDING RELEASE
USB PORT OR DISC
NETWORK TABLES
AUTOMATED FOOD
BEVERAGES,
CHECK OUT

FIG. 60



OUTSIDE TERMINAL LOG-IN TO EVENT
INSERT UNUSED PORTION PAPER TICKET
TO ORDER RECORDING
INPUT DATA

FIG. 6P

# ELECTRONIC TICKET MANAGEMENT AND LIVE EVENT MAXIMIZATION SYSTEM COUPLING EVENT TICKETING, ADMISSION DATA AND PLACED BETS, ACCESSIBLE FROM USER DEVICES AND LOCATION BASED INTELLIGENT APPARATUS MACHINES

## RELATED APPLICATIONS

This application is a continuation of application Ser. No. 11/253,912 which claims the benefit of continuation-in-part of application Ser. No. 10/442,468 filed May 20, 2003 which claims the benefit of U.S. Provisional Application No. 60/382,710 filed May 22, 2002 and U.S. Provisional Application No. 60/382,949 filed May 24, 2002, all incorporated herein by reference. This application also claims priority to provisional application Ser. No. 60/619,754 filed Oct. 18, 2004.

## FIELD OF INVENTION

This invention pertains to a system and method of producing and distributing recordings of live performances.

## BACKGROUND OF THE INVENTION

The advent of the digital age has demonstrated that any content or event (including live as performed content) that can be recorded and transformed into "bits" is a valuable, marketable commodity. In the past, major studios, record labels and production companies controlled what live content would be produced for distribution to the public. Except for live or tape-delayed grandiose television/cable productions, certain news coverage and special radio broadcasts, the live experience was limited to ticket holders/audience members.

Now, however, live content is inexpensive to digitally record. Virtually any lay personal can create a quality digital live recording of any event of public or private interest on simple equipment and then upload the recording over a telecommunications network. Such upload will result in free content ownership not only for the recorder, but also for any other interested user. Telecom-connected third parties can then, for example, burn their own CD's on home components or store the content onto a hand held music player. Once the recording is uploaded, then, it is game for others to copy and own it without payment.

The unauthorized digital transmission and retransmission Peer to Peer ("PtoP") or Business to Business ("BtoB") of pre-recorded studio titles, albums, and other derivative tie-in merchandise over the Internet since 1998 has virtually crippled the music industry. "Wi-Fi" now enables hook up to the Internet without a wire. Podcasts carried through Wi-Fi or satellite radio may not be far off. Clipcasts (transmissions of content to mobile phones) will shortly follow.

In spite of the spiraling decline in retail CD sales since 1998, the live concert market is surging. Concert ticket prices have skyrocketed. Coincident market penetration of hand-held music players has necessitated a change within the music industry from an album to a singles oriented business model and the proliferation of on-line subscription services. With use of the instant disclosure, it is anticipated that concerts and recording from live events as well as interactive tournaments will be coveted by consumers and subscription services that reach the global audience.

In spite of this, to date, the full recording impulse buying potential of the live concert audience remains untapped. Concert hall shops still only offer an artist's pre-released studio product usually only in CD disc form and not the performance just attended. At the core are the continuing limitations on technology, the huge cost of recording and packaging productions for immediate on site and multimedia delivery, and the monetary and time constraints including for onsite personnel and staff needed for quality mastering and editing. In addition, for more grandiose live productions that feature multiple performers and whole orchestras, there is an impasse among the creative factions as to the proper royalties payable upon release. Musicians' unions and performing rights societies that collect royalties on behalf of composers and publishers contend that a digital encoded recording transmission over any telecommunications network is a separate "performance" triggering additional payments.

For these reasons, a necessary premise of the instant disclosure is that any viable market solution for live recording release must be inextricably associated with full royalty accounting, rights clearance and the equitable allocation of recording revenues among all those involved in production of the live event. The royalty accounting systems revealed in this disclosure do just this and will be independently licensed by the inventor for the management and administration of concert venues around the world.

At the same time, the present invention foresees that heightening anti-terrorism security systems are shortly to be installed by law or electively in public venues—newly constructed and existing—including Olympic sports arenas, international concert halls and airports. DNA fingerprint systems will be enabled to read the iris of an entrant's eye thumb print, etc., upon ingress or egress from and through the instant disclosure, can be simultaneously used at a venue to process audience recording orders separate from ticketing information.

The present invention further anticipates that with the advent of increasing bandwidth, live events, tournaments and performances as they are recorded and packaged will be electronically transmitted to businesses and computer users with increasing speed. This will help raise the market value of the live recording that is expected to surge immediately after the event ends particularly if it is publicized with pre-event ads issued, ordered and placed by the producers.

The instant disclosure is also premised on the fact that ticket holders will demonstrate a high proclivity for impulse buys if recordings are offered for sale immediately after final curtain at the hosting venue itself. In addition, it is anticipated that even greater sales will result if audience members and global non-audience fans can select their respective preferred means of retrieval. The instant disclosure predicts that adoring fans—regardless of geographic location—will always covet a complete repertoire particularly of a unique or special event. And while the CD is on its way out, for established patrons of the classical arts, it is still very much the preferred recording format.

The current trend in the music and entertainment industries is toward online subscription services. Web sites like iTunes, MSN, CNN, Yahoo, Amazon, AOL and Napster now offer content of all kinds—music, films, TV shows, sports replays, news clips and stock quotes for a fixed fee per month. Some of these sites are contracting with telecom companies to effect content delivery to cell phones. The recent institution of podcasts demonstrates that these sites will also offer live events, single titles and other tie-in merchandise like posters, T-shirts and pin-ups if packaging

can be expedited and delivery effected BtoB or PtoP. They will also offer interactive gaming, response options and tournaments that are related to a live event.

Just by way of example—what if the global advertising campaign for release of a new "Harry Potter" book or movie was associated with an online tournament or offer? What if the coveted prize was an authenticated J. K. Rowling autographed poster? Further, what if the Indianapolis 500 could be instantaneously virtualized such that both audience members and interested fans from around the globe could steer their own cars along with the pack? In each instance, the global response would be huge. Fans would flock to any one or combination of location-based enabled intelligent terminals or enter from hand-held devices, home computers land and mobile phones thereby maximizing the geographic influence and market power of even a local event.

## BRIEF DESCRIPTION AND SUMMARY OF THE INVENTION

Methods, systems and intelligent apparatuses.sup.1 are disclosed for the immediate multimedia and electronic global ordering, sale, management, and authenticated distribution of live event content recordings by all means of delivery, transmission and retrieval now known or hereafter devised both on and off site from where the live event takes place. Methods and systems are also disclosed for the global solicitation and processing of authenticated electronic responses at live talent competitions, sporting events, and interactive games including from worldwide non-audience participants through enabled devices. .sup.1 (individually claimed but enabled to be integrated)

With respect to distribution of live music, entertainment and event "Recordings" (as herein defined), the methods and systems disclosed reveal means that expedite and associate necessary and value added steps in the production, packaging, broadcasting and administration process. These include: (i) association of recording orders to ticket sales, subscriptions and/or uniquely identifying information of the holder including credit card number, phone/mobile phone number, subscription or podcast address, for example; (ii) methods for content mastering, balancing and editing; (iii) methods for splicing and packaging single titles, action stills and other unique derivative works; (iv) methods for creating director's cuts, "best of" versions and other derivative works; (v) methods for automated copyright accounting including calculation of statutory and contractual royalties from the point of every sale; (vi) integration of standard content security systems [e.g., encryption, watermarking and digital rights management ("DRM")]; (vii) integration of new venue anti-terrorism security systems; and (viii) solicitation and processing of recording orders from non-audience purchasers using any uniquely identifying information that helps directs transmission of content including, without limitation, home or mobile phone number, URL, e-mail or street address, credit card or banking number, personal account, podcast or satellite radio account, Blackberry or text messaging account, Social Security Number, date of birth, mother's maiden name, and most significantly, a DNA fingerprint.

In the sports and gaming field, entrant's fees and bets placed are to be used in this disclosure in lieu of or in addition to "tickets".

The disclosed systems and methods are optimally and immediately designed for use by classical artists, unsigned talent, "E-label" bands, their producers and arts institutions that are permitted to release live recordings without additional clearances. These groups need strong promotional tools and established distribution channels to test the market for new titles and contemporary works.

The instant invention will allow for the economical production, packaging and multi-media distribution of any live event recording no matter how small (recitals, benefits and special performances, for example) that with the previous art were not made available for release because it was not cost effective to do so at low sales volumes. This content was therefore previously "lost" after performance and could not be re-enjoyed by members of the public at large.

The systems disclosed are also designed for use by interactive game, sports television, film and convergence producers to assist with the solicitation and tabulation of audience and non-audience responses. Such responses serve to expand the types of entertainment experiences offered to the public and geographic influence and promotional value of a particular competition or event.

In addition, the systems are designed for podcast and satellite radio producers, suppliers and consumers who offer and covet audio programming for downloading onto computers or portable music players.

By the means herein described secured and authenticated ordering, packaging, delivery and retrieval of any live performance or event can be effected anywhere in the world at cost low enough to make it economically feasible even at low volumes. This includes release of a recording immediately at the hosting venue as soon as the event ends.

With the instant disclosure, packaging will be in either fixed or encoded format with delivery over any available telecommunications network, by hand or regular mail. By such means, audience members can order recordings either pre-concert with their tickets or after in any desired format including standard CD format by onsite handout or mail or by using a venue-based intelligent terminal, a portable hand-held music, media player, Blackberry or other test messaging device, a land line, mobile phone, other wireless device, or a home computer. With the instant disclosure, non-audience members can independently order the performance or a derivative recording and their orders will be integrated with those from ticket holders.

The present disclosure further describes independent methods that immediately account for and calculate all statutory and contractual royalties due upon release from each point of sale such that the job and expense of payment administration is removed form those individuals and entities authorized to release recordings. For ticket holders, concert venues and arts institutions, this would also include calculation of bonus or promotional discounts if recordings are purchased in advance with tickets or subscriptions. More importantly, the disclosed accounting methods are independent and provide a quick, easy and foolproof method for ensuring proper rights clearances and the equitable allocation of recording revenues among all associated with the live event. These systems will be independently licensed to concert and sports venues around the world.

The instant disclosure further provides wholly independent but integrated means for digitally mastering and balancing live recordings via storage of a plurality of content analysis algorithms that analyze and manipulate audio information with our without video in a database and/or on a "live" basis as additional information is received.

By the means disclosed, a flexible multimedia information analysis apparatus stores a database that includes both audio and video information. At the same time, also stored are a plurality of content analysis algorithms for analyzing the digital information, which can be manipulated by a

mouse. A selected algorithm can then be used to analyze and edit the audio, video or audiovideo data including on a "live" basis as additional information is received. Further content analysis algorithms can be applied in tandem to manipulate the information including splicing out singles titles from a whole concert, for example. By such means, digitized readings that are optimal for audience listening and enjoyment can be automatically converted to optimal readings for a selected recording format. In addition, the disclosed methods will assist in the incorporation of additional content (narration tracks, for example), to produce further purchase options for the consumer including derivative works, "best of", director's cut versions and event-related stills, posters, pin-ups, artist bios, karaoke insertions and playbills. These systems are optionally enabled to be associated with ticketing and independently with non-audience orders. They can also process single title and derivate "best of" and director's cuts orders that incorporate supplementary material, including narration tracks, for example, in addition to whole concerts as performed, from any purchaser.

The present disclosure provides additional means for integrating anti-terrorism security systems anticipated to be installed at large sports/Olympic arenas, concert halls, auditoriums and public venues, e.g., airports and shopping malls and to take positive supplementary advantage of these systems by using them to order recordings.

It provides supplemental means for integrating standard content security methods including encryption, watermarking and DRM that track a recording as it is transmitted to an end user PtoP or BtoB. It further describes integrated systems for soliciting and processing audience and non-audience response information (also optionally associated with ticketing, subscriptions and podcast information) to allow for new forms of live interactive entertainment at a particular venue. The responses tabulated by the present invention will include ratings of live competitions without the need for open telephone land lines and will allow for the staging of both real and virtual competitions.

If betting is to be permitted, the systems further describe means of blocking responses from territories where gaming for profit is not permitted by law.

Finally the instant disclosure reveals the inventor's creative designs for venue and public space intelligent terminals that include without limitation, enabled audience seats/chairs, enabled security turnstiles, recording ordering kiosks targeted for arts institutions (lobbies and promenades), and enabled computerized tables that are to be installed at showcase cafes, clubs and gaming bistros. All terminals permit hook up of hand-held music players to USB or equivalent portals, USB keys, etc., take food and beverage orders, and pay checks and parking fees electronically. They also allow the purchaser to order and buy a recording in any desired format with a designated means of retrieval.

For example, a purchaser-ticket holder can insert the unused portion of the audience ticket or swipe a credit card to order a recording for home mail or computer delivery, to start an onsite disc engraving, release an already engraved disc from a machine, or enable immediately hook up of a hand-held music player. In addition, the terminals authorize transmission of follow-up and demographic information back to the recording purchaser, tournament/competition participant, or other individual/entity authorized to receive the information collected at the time of ticket issuance or recording sale.

The present invention discloses methods, systems and apparatuses that electronically associate any one or combination of the global ordering, authentication, sale, recording, production, mastering/balancing/editing, single title splicing, packaging, transmission, distribution, engraving, optional tracking, protection, and retrieval of "live event 'Recordings'" (as herein defined) with the sale of an event ticket, subscription order and/or other uniquely identifying information of a recording purchaser such as credit card number, phone/mobile phone number or Internet subscription account. In the case of live sports competitions and tournaments when gambling is or may be permitted, the present invention alternatively associates live event recordings with entrance fees and/or placed bets in lieu of or in addition to "tickets" and describes integrated methods that block out responses from territories were gaming for profit is not permitted by law.

The present disclosure reveals wholly separate but optionally integrated methods for processing worldwide live Recording orders that are independent of ticketing.

It further reveals integrated systems for ordering and/or delivering the live Recordings in any format including, by way of example, by hard mail, e-mail, over the Internet, to home and portable computers, hand-held music/media players, cellular phones, text messaging devices, podcast addresses and new Wi-Fi devices.

In addition, the instant disclosure reveals independent mastering, balancing, editing and splicing methods that assign numerical values to console and instrument feeds. As herein disclosed, a flexible multimedia information analysis apparatus stores a database that includes both audio and video information including the transposed console and instrument readings. At the same time, also stored are a plurality of content analysis algorithms for analyzing the digital information, which can be manipulated by a mouse. A selected algorithm can then be used to analyze and edit the audio, video or audiovideo data including on a "live" basis as additional information is received. Further content analysis algorithms can be applied in tandem to manipulate the information including splicing out singles titles from a whole concert, and packaging additional derivative tie-in merchandise.

Further, the instant disclosures describes systems and methods that allow both ticket holders and non-audience members to electronically rate and/or participate in a live staged event over any telecommunications network. The disclosed systems optionally authenticate entries and responses with ticketing or other uniquely identifying information that assists with directing transmission of the content.

Finally, the instant disclosure reveals the inventor's patented designs for intelligent terminals that take recording orders, are enabled to release recordings in fixed and unfixed formats and reroute authorized information back to the purchaser. These are targeted for arts institutions, hosting venues and public and private spaces including airports, banks and shopping malls.

## Definitions

"Recording" or "Live Recording" as used in the present disclosure is defined to mean any audio, video, or audiovisual material or data based on signals or content emanating, derived from or representative of the live event or any part thereof, or an occurrence pre or post event that is related to it including, without limitation, as it is packaged for sale and distribution in any medium.

Without limitation, Recordings may contain/include as examples: audio, music, video, audiovideo, concert feed, recital, sports competition (baseball game, soccer tourna-

ment, etc.), stageplay or showcase presentation, press interview, mime production, literary work, theme park amusement, arcade tournament, game, videogame, display, art exhibition, artwork, autograph, photograph, clip, still, spoken dialogue, soliloquy, reading, lectures, speeches, seminars, classes and sermons, etc.

Typically, a "Recording" is stored, thereafter balanced, edited or otherwise revised in digital, analog or other format, and transmitted by a means of distribution e.g., broadcast signal, radio, over-the-air television, scrambled signal, cable, Internet, text messager, podcast, satellite radio broadcast, clipcast, regular mail, hand delivery, wire, cellular/wireless (so-called "Wi-Fi"), or by any other means now known or to be hereafter devised.

At some time, a "Recording" may become embodied or stored on a fixed, tangible medium of expression such as film, VCR tape, optical disc (CD, DVD, dual disc, etc.), magnetic cassette, reel-to-reel, LP, local or remote hard drive, mobile music player, or other storage medium, etc., or alternatively may be received, displayed, stored and re-performed without physical embodiment. For purposes of this disclosure, Recordings will be receivable in either a fixed medium of expression or unfixed format by a third-party to include without limitation a consumer, purchaser, third-party seller or licensee in analog or digital format [digital data (if necessary). Notwithstanding the foregoing, nothing contained herein is meant to limit the scope of the inventor's claims should other recording formats be made available in the future.

Retrieval of a Recording in any format for purposes of this disclosure will occur on or off site from where the live event takes place including, without limitation, immediately after the event ends at enabled location-based intelligent terminals/kiosks, home terminals (a home PC, media player, Web TV, etc.), portable personal devices (hand-held music/media players, Blackberry or other text messaging device, e.g.,), from a third-party distributor such as an online subscription service, producer or podcaster and on mobile phones. To the extent that order and/or retrieval of a Recording is to be over a telephone wire, cable or cellular telephone or any telecommunications network, the instant disclosure is deemed to work with or incorporate any phone number, address, or other uniquely identifying data including without limitation, a DNA fingerprint, URL, e-mail, podcast or satellite radio address, mobile phone or other account number that assists in directing transmission of the content.

Utility

The utility of the present disclosure is apparent. The systems, individually and collectively, are designed:

(i) For use by arts institutions, performing artists and their production teams, sports organizations, concert venues, and public and private spaces (airports, shopping malls, banks, etc.) to offer a one-stop shop for the worldwide ordering, packaging and/or release of live content recordings in all media;

(ii) To provide new forms of interactive live entertainment experiences in close proximity and time with a live event, regardless of the geographical location of the interested consumer;

(iii) For use by arts institutions, performing artists and producers to assist in the immediate on and off site release of live event recordings;

(iv) To associate recording orders with ticket sales thereby allowing authentication and authenticated retrieval of recordings transmitted and released on and off site;

(v) To allow recordings to be ordered from the time of first ticket issuance thereby offering promotional bonuses and discounts to venue subscribers and global fans;

(vi) To provide a true litmus and market indicator of new talent, a contemporary composer, composition, title or premiered work both from audience members and from the non-attending global market;

(vii) To afford artists and producers additional feedback on an event and optional demographic information on recording purchasers in all media and territories, if authorized;

(viii) To ensure rights clearance and the foolproof equitable allocation of recording revenues in all media;

(ix) To assist with all newly instituted means of audio, video and audiovideo content ordering and transmission methods (including podcasting, for example);

(x) To anticipate heightened anti-terrorism security measures incorporated within public and private venues and to take positive advantage of those systems by using them to assist with the ordering of recordings;

(xi) To record, capture and distribute otherwise lost live content including of smaller, local events that traditionally would not have been released to the mass media or the public at large and with the prior arts, were never capable of being enjoyed by those who were not in actual attendance (either locally or around the world).

Using the instant disclosure virtually all live content can be now be efficiently and effectively preserved, packaged, automatically accounted for and immediately offered for distribution to the adoring audience as well as to fans worldwide. Audience members can now fulfill their need for instant gratification and at cost low enough to make it economical even at low volumes. Ticket holders can either order recordings pre-concert or immediately after it ends at venue-based intelligent terminals, or in the alternative, retrieve and take home a recording in one of several formats right then and there. In addition, those who did attend the event as well as to those who did not, can now own copies virtually in minutes. Discounted recordings can be offered as added perks associated with subscriptions and early ticket purchasers. Those who pre-buy can also be offered the added benefit of the right to receive promo information on future events and releases. After the performance or event, Recordings can also be bought at any intelligent terminal installed at the venue or other public spaces that include airports, shopping malls, retail outlets and banks. In addition, any interested purchaser can order a recording from a home computer, land line, cellular telephone, Blackberry, text messager or other enabled hand-held device by using a credit card of other unique identifying information of the purchaser including an online subscription account number or mobile phone.

To benefit from the instant disclosure are all parties involved in production of both the Recording and the live event as well as adoring fans that always covets a complete repertoire and new entertainment options Aside from added revenues, the artists and copyright holders can now have access to what in hindsight proved to be a great or unique performance. And the public at large gets the option to expand its listening library of a favorite artist.

By the means herein described, for the first time, Recordings can be offered for sale by any known means from the time of first ticket issuance.

When physical discs are ordered at any location-based terminal, the systems are designed to work with the latest capacity standard CDR engraving technology (whether incremental or non-incremental) either to start the engraving

of a disc or in the alternative, to release an already burned disc or the signaled information embodying same. If a particular venue elects to install a combination ordering and disc engraving intelligent terminal, with CDR technology now between 40.times. and 52.times., this will allow for authenticated release of even disc formatted Recordings to authorized retrievers immediately at the venue after final curtain. Audience members who have CD players in their cars can then re-experience a concert on the way home.

Global orders from those who did not attend the event can likewise be independently and immediately fulfilled by integration of appropriate systems. This will serve to maximize the market potential and promotional value of the event regardless of the geographic location of the purchaser.

Artists and composers who premier new works at a recital in a smaller locale will realize the added benefit of having these works optimally and quickly marketed particularly if they were not selected for release by a recording label. New bands and other "start-up" talent are likewise afforded the means to get their material immediately out into the marketplace and receive rapid feedback on their original compositions in actual dollars.

With increasing advents in technology that continue to compress the time and physical space needed to record and transmit audience responses to a live event, it is anticipated that at some time in the future, the present disclosure will allow for tabulation of on and off site ratings and responses as well as the public's participation in staged tie-in tournaments including from hand-held devices and cellular telephones. As the interactive response time becomes smaller and smaller over time with increasing bandwidth, both audience spectators and non-attending fans should be able to participate in virtually automatic ratings both from their venues seats and from enabled home computers, hand-held devices and cellular telephones.

The current trend towards reality television demonstrates that interactive viewing is a coveted by the entertainment industry. Shows like Fox's "American Idol" have already proven that there is a premium on interactive response programming because it performs advance market research on new talent. Moreover, because the major TV program suppliers and producers are no longer willing to pay a sitcom star $1 million per episode, there is increasing demand for less expensive distributable content of any kind particularly that which can be distributed to wireless telephones. This trend will continue to grow as more interactive television, radio devices and offerings (now including podcasts and clipcasts) penetrate the marketplace and the viewing audience can more easily fast forward through a sponsor's commercials.

Submitted for separate patent protection is the inventor's original intelligent terminal designs including, without limitation, those in the form of an enabled venue audience seat, an enabled venue turnstile, an enabled eating or beverage table and chair, and an expanded ATM ordering kiosk targeted for public spaces, concert venues, airports, banks, malls and retail stores. The table terminals are seen for installation in the next wave of restaurants/media clubs/ gaining cafes/coffeehouses, etc. They are designed to take food and beverage orders and pay checks and parking electronically without a human waiter or waitress in addition to fulfilling Recording orders. The turnstile version is expected to be a big seller as tightened security systems at Olympic stadiums, venues and airports are installed including those that read DNA fingerprints of audience entrants.

All terminals will incorporate credit card and smart card swipes, rating/interactive systems, disc dispensaries, USB and equivalent portals for hook up of music players and storage devices, all of which are electronically authenticated and linked to entrance tickets, seat assignments, food and beverage checks, a cellular phone number, URL, e-mail, podcast address, other account, or other identifying information of the purchaser.

The systems herein disclosed are further enabled to process special purchase orders. For example, individual titles (singles) from a live performance with or without accompanying video will be spliced out, specially formatted, accounted for at competitive pricing on the order of $1.00 per title and offered for sale over the Internet for storage on hand held music players. Live singles will also be offered for sale on Internet subscription services along with event-related interactive games and tournaments. Also to be made available are director's cuts, narrated tracks, "best of" selections from a particular artist's tour and personalized compilations inclusive of audience noise, monologues, artist soliloquies and narration tracks.

All Recordings especially the spliced singles tracks—expected to be a big Internet seller—can be optionally watermarked, encrypted and protected with available DRM systems by integrating standard methods. These new live sound recordings of even old titles are expected to compete with the pre-released digital studio recordings that are now being freely shared over the Internet and crippling the recording industry. The inventor believes release of live singles presents one means to reverse spiraling losses attributable to the unauthorized sharing of digital files over the Internet in that it will offer alternative and fresh versions of a favorite artist's titles. Integration of screened video feeds after digitization present an inexpensive means to produce music video downloads at much lower cost that can be transmitted to cellular phones.

The inventor's disclosed accounting systems are key to keeping administration costs low. They are enabled to automatically calculate the statutory and contractual royalties payable to all involved in production of the live event and its Recordings. Labels, managers and producers can select any accounting format compatible with their current systems. Each participant's confidential accounting statements will be available 24/7 by secured key over the Internet and will offer information from every point of sale. Singles delivered to a cellular telephone will be accounted for by these same systems.

B. History of the Field

Historically, live entertainment events when recorded for live or tape-delay distribution to the mass media were relatively expensive productions. They were designed with high quality processes and formatted to meet broadcast standards. Originally, live recordings were made on film and/or tape but are now recorded by digital technology, and often with modest equipment. Now, even with advents in technology, tie-in merchandise like T-shirts, autographed pin-ups and cups that are being offered for sale to the public in on-site venue stores and retail outlets are generic, i.e., they do not to relate to or symbolize the specific event attended.

In the traditional music industry business model, live performance revenues were reserved in standard label contracts by the artist for their own exploitation. This meant that venues, event producers and promoters made their revenues only from audience ticket sales, commissions from on-site concession and sales of tie-in merchandise as related to the artist's reserved rights, and the artist's label did not share in these sales.

Conversely, the decision as to whether to release an audio or audiovideo recording of the live performance remained in

the exclusive control of the artist's record label. Because the costs associated with broadcast-quality productions were so high and there was an additional concern that new releases might interfere with stable revenue streams from previously released whole albums, very few live events were made available for home release including for those who did not attend the live performance. The on-site stores at the Continental Arena at the Meadlowlands, Tanglewood or the Metropolitan Opera, for example, sell only the artists' pre-recorded studio albums, not the CD of the performance actually attended.

In a similar fashion, concerts in smaller municipalities or those given by new, unsigned bands just building a following, solo recitals of classical artists, local stage productions, sporting competitions like horse racing, NASCAR and major/minor league baseball, educational seminars, speeches, etc., have almost never been produced for the mass media or home distribution. The live experience has been limited to the actual audience and spectators, i.e., those lucky enough to get "tickets". One exception is OTB where the live event is televised in specific networked locations for the benefit of all who place bets.

Basic recordings were, however, made of most live performances and sporting events, using simple equipment of modest quality, for reference, study or promotional purposes. Additionally, the press would cover highlights of certain local events (college competitions, e.g.) and archive footage for future stories or ancillary licensing. In the sports field, this business model works because once a competition is over, most of the commercial value of the event is lost.

Such is not the same for the music industry, however. When a great performance or concert has taken place, in hindsight the entire world may relish the chance to see it and even own it.

But even in the music business, tie-in videogames never became a standard part of the business model because of the limitations on technology and the prohibitive costs of production. With the instant disclosure, however, this will change. Any concert can now be the focus of an interactive promotional campaign that is tied to ticket sales and subscriptions. Certainly this advertising strategy is a lot cheaper and will expand geographic interest in the event.

What does this mean in dollars? In a nutshell, it means that with the prior art, most live events—even unique and quality performances and competitions as they continued to be staged around the globe everyday—had the fate of becoming "lost content". Live events are still not being exploited to their maximum potential because the systems in place were designed only to generate revenue from ticket sales and keep venue revenue sources separate from those belonging to the record labels.

In the music field, starting March, 2003 ten months after the preliminary application for the instant disclosure was filed, a handful of disc burning concerns attempted non-automated, non-authenticated physical CD handouts at small performing venues by incrementally transferring single titles onto a master as they were tracked. These companies conceded that with this method they could not fulfill the Recording demand of a large concert audience or any immediate outside orders.

In addition, standard CDR burning technology is now available at 30.times.-52.times. (one CD in little over a minute) even for home components. With standard technology as it may be updated, the on-site methods and systems disclosed herein do not require incremental track transfer to cut disc compression and duplication time (for those that want discs) and thereby can satisfy any size audience as well as outside orders all at the same time.

With the increasing costs of TV programming and the trend towards reality TV, basic digital recordings are now recognized as valuable, marketable content. Now, depending on the particular event, even the most basic recording can increase in value over time. TV shows and theatrical films like "American Idol", "The Apprentice" and "The Truman Show" demonstrate just how valuable even raw content has become. The announcement heard at the beginning of virtually every live event that cameras and recording devices are strictly prohibited, is definitive proof of the value of live Recordings even if they are not optimum quality.

With fast-forwarding options becoming more prevalent on home media players that bypass commercial advertisements, networks are no longer willing to pay a sitcom star $1 million per episode as they did in the final seasons of "Friends". In January, 2004, Mezzo-soprano Marilyn Horne told a seminar class that she was only able to incorporate a particular song on her 70.sup.th Birthday Album because it had been unlawfully recorded at a concert by an audience pirate. Norah Jones' early primitive recording sessions in solitude are now extremely valuable as background material not only for her own albums but also for the hot selling DVD releases of the Grammy Awards.

The analysis is no different for professional and amateur sports. Wouldn't at least some fans still want to watch Don Larsen's perfect game or receive a clip from a Yankee rally during the post-season superimposed on a T-shirt or autographed poster? If a fan didn't tape a game he attended, isn't it also likely that he may still want to buy a copy for reference or study?

In the music field, statistics show that many find live or "recorded as live" concerts far more satisfying than highly edited and planned "studio" recordings. The audience cheers, applause and artist monologues make the live recording far more exciting and have not been shown to cut into revenues generated by the original album.

Also, fans of an artist usually also covet a complete repertoire. In July, 2004, Business Week reported that 20-30% of an attending audience will order a CD of a concert attended on their way out the door. Whether that should be a physical engraved disc, a download direct to an iPOD or an order for home delivery is a decision this inventor will leave to the purchasers and venue owners to decide for themselves. Both are claimed in this disclosure.

Master classes, seminars and lectures by an adored artist also have inherent value.

And how many unsigned bands have downloaded their original material in hopes that get one of the "illegal" file sharing companies to pick it up even for listening by pirating teenagers? New acts will do almost anything to get free publicity. Now many avoid signing with a label because it has become increasingly clear that the labels are no longer in optimal control of the buying market.

It is not unusual that a great talent, artist, contemporary composer, or ensemble of great talents may appear or premiere works in a unique performance as in a benefit concert, gala, limited tour or opening and/or perform in a smaller market for a particular function or celebration. Many view the failure to offer these concerts as depriving the public of an artist's complete repertoire and/or interfering with a new artist's right to publicity. The May 15, 1999 Carnegie Hall recital of the "New Goldberg Variations" performed by cellist Yo-Yo Ma with a single piano accompanist is such an example. Royalties and guild residuals would have been minimal for release of this recital because

a full orchestra was not involved. Yet it was never released by SONY Classical. Why not?

Renee Fleming and Ruth Ann Swenson, now probably the most marketed American sopranos in the world, formerly appeared on the 1998 program of the Marilyn Home "New Artist Series" at Carnegie Hall. International classical music fans as well as patrons and subscribers would love to own a copy of this event. Yet the union and creative factions there continue to wrangle over royalties, regardless of the value of the recording.

C. Utility/Marketability

That there is a clear positive market for live recordings, even if of less than optimal quality, therefore, is a given. The proof can be found in the "warning" message to the audience heard before virtually every live performance or professional sports competition informing patrons that recording is illegal and strictly forbidden. Only in the rarer instances when the artist, celebrity or producer has already licensed grander broadcast rights for live or tape delay production will the basic digital recording serve less than an absolute useful purpose, but as demonstrated above, a commercial purpose nonetheless even if only to fulfill tie-in merchandise orders.

Start-up bands are in desperate need of fast and efficient distribution channels for their original material in hopes of discovery. Now, even many veteran artists elect to negotiate with labels and concert venues so that they can offer their live performance recordings for sale in multiple formats.

Within the artistic community are certain rules and mores that using the prior art prevented capitalization of the live content market when the preliminary application for the instant disclosure was first filed in 2002. As aforementioned, the major labels and producers own the exclusive rights to the releases of their signed and featured artists including live performances. Moreover, the standard artist-label contract usually prohibits distribution of a recording without the artist's prior approval. Whether a label may have negotiated an "out clause" for live concert feeds must be analyzed on a case-by-case basis, another expensive administrative hassle for the label.

The only present exception is in the field of classical music because studio releases have never sold as well. Because of this, for the last few years, classical artists have been given "out clauses" to release their live recordings that were not given any artists five years ago. But even with these new contracts, the labels have remained reluctant to share of any part of live Recording sales with the hosting venues because they in turn do not participate in ticket and concession revenues. To help solve the impasse and the continuing decline of the recording industry, both parties along with musicians' unions, performing rights societies and digital rights management organizations may now have to negotiate if they want to keep consumers happy and keep pace with advents in technology.

While in the past the labels feared that new live releases would interfere with their long-standing relationships with retailers and in turn stable revenue streams from classic pre-recorded albums, they affirmatively avoided placing competing releases including live sound recordings into the marketplace. Now, with disc retailers becoming less significant with the marked increase in free digital file sharing and paid downloads to hand-held music players, these prior concerns have no rational basis in dollars.

Royalties, however, remain especially high upon ancillary release of a concert when a full orchestra is involved particularly in a top union house. Royalty payments are a sticky negotiation point for every grandiose music special packaged for multi-media release. Union engineering contracts make live production costs even more prohibitive at certain major venues like Carnegie Hall. Now we have podcasts and clipcasts where audio programs classically carried only on radio are made available via special software for download to home computers and mobile phones.

Special live concerts broadcast from a Wi-Fi hotspot is almost certain to become the next genre of podcast series and quality systems of management and administration as presented in the instant disclosure will be sorely needed. Whether a digital transmission is a "performance" as defined in the US Copyright Act, will not ultimately prevent a buy-out price per event by each of creative factions. Even other administrative nightmares like paying mechanical royalties when a concert is to include material composed by an individual other than the featured artist or one signed to a different label, are managed by the instant invention.

In 2002, when the preliminary application for the instant disclosure was filed, the news from the Recording Industry was unanimous that labels and copyright holders were avidly searching for new ways to replenish recording revenues lost to Internet piracy and file sharing. Motion picture studios also reported becoming increasingly concerned about digital piracy of theatrical films. The answer, as proven by the subsequent exponential surge in ticket sales and new forms of interactive entertainment, may well be active pursuit of the live content market with implementation of the systems herein disclosed.

Statistics continue to confirm that a significant number of concert goers (20%-30%+) will buy a Recording of an attended event if delivery can be expedited. Further statistics show that there is a premium on being able to offer instant gratification to an audience on the way out of the venue. A higher percentage will purchase if a preferred method of retrieval can be designated. A cup or T-shirt is far less attractive than the performance itself. The instant disclosure provides the most comprehensive recording purchase options to the consumer. In addition, the venue selects whether the inventor's intelligent terminals installed onsite will offer authenticated recording ordering, encoded delivery to hand-held devices and also actual CD burning and engraving.

In sports, the videogame industry is itself a multi-billion dollar business. Interactive game(s) are a natural supplement order for a sports entry ticket. If fans in the audience and elsewhere could all participate in a staged virtual tournaments related in time and space to the live competition, the promotional value could be huge. The end result would be broadened geographic interest even in a local event and a ring side seat on a cell phone.

A sport celebrity's and/or artist's pin-ups, posters and T-shirts sell extremely well and may even appreciate over time. Making a still or autographed photograph of a shortstop's great play immediately available would be a certain "hit" almost like catching a foul ball in the stands. All such orders are most efficiently fulfilled when linked to ticketing operations.

The present invention and disclosure conquers these and many other problems traditionally associated with the immediate marketing of live event Recordings. These include but are not limited to: The technological and speed limitations on on-site live recording ordering, balancing/editing, fulfillment, physical disc engraving and authorized retrieval of the live content in fixed, analog, digital and/or other encoded format; The cost of manually gathering the information associated with the sale(s); The huge prototype costs including costs of on-site intelligent terminals; The technological

limitations on authentication; [0102] The technological limitations on editing and balancing; [0103] Integration of technology that ensures confidentiality to purchasers; [0104] Integration of technology that ensures protection of the live content; [0105] The lack of systems that associate mobile phone and other electronic live recording orders with ticketing and/or immediate and subsequent live sales around the world; [0106] The lack of systems that integrate all recording orders pre and post event in all media; [0107] The job of securing clearances of all parties necessary to effect live recording release [0108] The job of securing the artist's prior approval to the live release particularly if required by contract; [0109] The cost of separately producing and advertising; [0110] The cost of high engineering fees particularly in union houses; The cost of the residuals and both statutory and contractual royalties owing to all performers, copyright holders and participants upon ancillary distribution; The cost and clearances required for multimedia of recording delivery including Wi-Fi, satellite radio, podcasting and clip casting; The overhead of music and live recording publishing administration; The overhead of royalty accounting including calculation of participations, copyright royalties and payments to guilds and performing rights societies, and generation of statements as may be audited; The cost of litigation and insuring against it particularly in the gray area of digital distribution; The cost of updating to keep pace with advents in technology; The costs of servicing all systems, terminals and equipment; The loss of impulse business if the customer has to wait a long time to receive a Recording or tie-in merchandise from the event; The technology and speed limitations of already attempted methods of onsite disc burning because the customer must wait for discs to be balanced, edited, burned and physically handed out, rendering the tried methods insufficient to accommodate a large concert or sports audience; Potential losses from unauthorized uploads and digital piracy of the live content including from a previous performance during a particular tour; The technology limitation on integration of all methods and systems needed for financial success; and The lack of systems that organize and process demographic information from purchasers so that future events and releases can be better marketed while still maintaining the confidentiality of those purchasers who so designate; The cost of insurance to guard against infringement and misappropriation.

## SUMMARY OF THE INVENTION

The instant disclosure presents novel, useful and unobvious systems, methods and intelligent apparatuses that efficiently, quickly and economically capture and exploit otherwise lost live content. Methods, systems and intelligent apparatuses are disclosed for the immediate multimedia and electronic global ordering, sale, management, and authenticated distribution of live event content recordings by all means of delivery, transmission and retrieval now known or hereafter devised both on and off site from where the live event takes place. Methods and systems are also disclosed for the global solicitation and processing of authenticated electronic responses at live talent competitions, sporting events, and interactive games including from worldwide non-audience participants through enabled devices.

With respect to distribution of live music, entertainment and event "Recordings" (as herein defined), the methods and systems disclosed reveal means that expedite and associate necessary and value added steps in the production, packaging, broadcasting and administration process. These include: (i) association of recording orders to ticket sales, subscriptions, podcast address and/or uniquely identifying information given by the holder at the time of issuance; (ii) methods for content mastering, balancing and editing; (iii) methods for splicing and packaging single titles, action stills and other unique derivative works; (iv) methods for creating director's cuts, "best of" versions and other derivative works; (v) methods for automated copyright accounting including calculation of statutory and contractual royalties from the point of every sale; (vi) integration of standard content security systems [e.g., encryption, watermarking and digital rights management ("DRM")]; (vii) integration of new venue anti-terrorism security systems; and (viii) solicitation and processing of recording orders from non-audience purchasers using any uniquely identifying information that helps directs transmission of content including, without limitation, home or mobile phone number, URL, e-mail or street address, credit card or banking number, personal account, podcast or satellite radio account, Social Security Number, date of birth, mother's maiden name, and most significantly, a DNA fingerprint.

In the sports and gaming field, entrant's fees and bets placed are to be used in this disclosure in lieu of or in addition to "tickets".

The systems disclosed include but are not limited to coupling "ticket" sales with orders for event content Recordings that also specify the preferred method and/or location of retrieval and can be optionally authenticated and/or protected by the integrated methods herein described. They describe wholly new ticketing/ordering operating systems that can be integrated including without limitation an interface to work with existing ticketing software (even when orders are placed over a phone) which converts the ticketing data into a readable language, XML for example, thereby creating an overlay and allowing for the authentication of information already input. Such coordinate systems equally apply to data input for tournament entrance fees or placed bets as well as or in lieu of "tickets". They further apply to methods authenticating orders to delivery codes including assigned land lines, cellular telephone numbers, URL's, e-mail, text messaging, subscription, podcast and clipcast accounts, DNA fingerprints or any other uniquely identifying information that directs transmission of the content. The term "Tickets" and as used in the instant disclosure, therefore, relates not only to the entrance receipt resulting from the ticket sale transaction but also to tournament entrance fees, bets placed or other information of the ordering or receiving terminal including as example a land or cellular phone number which can be authenticated and/or receipted to uniquely identify the buyer/placer by any electronic or other means now known or hereafter devised.

The present invention incorporates systems and methods of assigning numerical values to live audience feeds and then converting the digital reading(s) balanced for an audience to those for a CD track mix.

The present invention incorporates methods for placing special orders for audio-balanced, spliced, edited and other derivative event Recordings including without limitation single music tracks with our without accompanying video including without limitation from installed video screens at the event, those with and without audience noise and/or artist monologues, sports highlights, "best of" compilations, director's cuts, narration tracks, photographs, stills and tie in merchandise, posters, pin-ups, T-shirts, cups, celebrity endorsed games or videogames, etc., —and associating these with the "ticketing" and other systems herein disclosed.

The present invention also incorporates systems wherein the purchaser is given the option to receive promotional material for other subsequent event announcements and merchandise.

With the systems herein disclosed, purchase and retrieval of Recordings embodied in a fixed tangible medium of expression (CD, DVD, VCR tape, etc.), or in non-fixed analog, digital or other signaled format may take place at the venue itself, at location based intelligent terminal kiosks including enabled tables at eateries, coffee houses and showcases and terminals at any other location including airports, malls, and retail stores, at an ATM machine, or at a home personal computer, cellular telephone or other apparatus.

Further disclosed are independent methods and systems for processing outside orders for the live events Recordings from those who did not attend the event and/or who have no access to on-site points of sale. These orders may be placed over the Internet, by regular land line or wireless phone number that pursuant to the instant disclosure may be linked herein to the ticketing operations.

The instant disclosure presents a technological solution to deter the unauthorized sale and/or upload of shared digital files by offering downloaders fresh content of featured artists to compete with their previous studio Recordings that are now being shared for free and crippling the Recording industry.

The present invention discloses integrated methods and systems for prompt, accurate and virtually automatic calculation and payment of statutory, guild and contractual royalties to copyright holders and participants alike by managing accounting from the point and moment of sales. This allows for the immediate equitable allocation of revenues and the tremendous lowering of the overall costs of production and distribution. Disclosed is a system for protected key access by all copyright holders to their royalty accounts and demographic information to the extent that purchasers authorized its disclosure.

The present invention is a complete system and method providing a legal, efficient way to maximize the revenue and the promotional value of the live event, track the content sales, gather the required information and transmit that information to all parties involved in the production, manufacture and fulfillment of sales as well as to those entitled to share in revenues and at cost low enough to make it practical even at low volumes.

Equally important, by returning control of content releases to the copyright holders (which in turn will allow for the offer of discount and promotional tie-in pricing concurrent with ticket sales), the present invention will serve to encourage new and established talent to remain within the structure of the existing system, thereby providing a win-win-solution to all—studios, labels, and participants alike.

Further, the present disclosure offers the public the opportunity for instant gratification and impulse buys at comparatively lower cost to the suppliers without the need for "hand out" sales or additional sales personnel.

The system incorporates rating and interactive systems to enhance the live experience and its geographic influence and also to allow for participation staged tournaments and contests by ticket holders and non-audience members alike.

Optionally, Recordings including single tracks may be separately encrypted, watermarked, formatted and/or rendered destructible by known industry means, integrated with other systems described and offered to consumers over the Internet for a download fee and transfer to hand held players.

Other special purchase orders including "best of" compilations, director's cuts and narration track versions are anticipated to be especially attractive when multiple performances of a live event take place at the same or different venues, as during a revival or artist's concert tour. To the extent that pre-event disc production may incorporate already approved performances of certain titles from a prior concert of a current tour, the systems integrate those balanced, edited and production systems as well.

Separate integrated methods and systems are disclosed for automated mastering and editing including digitizing console and instrument feeds through the use of algorithms. These systems and other editing and disc burning/engraving technology that may currently exist or hereafter be devised, are described as to be integrated with the ticketing and Recording ordering systems herein described and/or the system as a whole.

In total, these methods individually and collectively comprise the collection and input of purchaser information starting optimally at the time of first ticket sales, the optional integration and processing of mastering, editing and digitized balancing data, and secured transmittal of that information to all parties responsible for the fulfillment, manufacture and distribution of the Recordings, as well as to those entitled to payment by statute or contract.

In the instance where the Recordings are to be delivered by immediate and/or electronic transmission directly at the venue or devices including a land or cellular telephone or other enabled appliance, methods and systems of authentication of the ticket holder's or outside purchaser's information including his assigned phone/cellular numbers, e-mail address and/or bank account are incorporated and disclosed to ensure authenticated delivery to the proper party at the time and/or location of retrieval. Integration of standard secured credit card technologies will allow on and off site sales at any enabled terminal location including without limitation at a home computer or cellular telephone to all who did not pre-buy Recordings. All purchasers and can elect to receive promotional information for upcoming releases, games and other live events. In the systems disclosed, the buyer/orderer will maintain the right to have such information transmitted to the copyright owners as part of an overall demographic package or to keep such information confidential.

Optionally to be added to the system are integrated methods to handle the purchase and/or license of grander scale broadcast productions and home distribution versions. For those cases where the pre-approval of the artists is required prior to release of a Recording, integrated are disclosed systems to block sales until and only if such consent is secured.

Systems for audience participation and ratings, videogame or interactive tournament play or live content merchandise auctions or stock markets, can be optionally integrated into the systems disclosed to enhance the complete live experience and encourage participation by spectators and non-audience members alike.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts an overall schematic or block diagram of a system constructed in accordance with the present invention.

FIGS. **2**A-C depict the transaction flow including processing and administration of Recording orders—claimed both from ticket holders and independently from non-ticket

holders—payments and accountings to all copyright holders and participants (or "partners").

FIG. **3** shows a flow chart for processing transactions and information requests.

FIG. **4** depicts the method and system of manufacturing/fulfillment including orders for complete, spliced or special purchase Recordings including derivative or edited versions, singles tracks and personalized compilations in fixed, encoded and any other format.

FIG. **5** depicts the methods and systems of On and Off-Site Production and Distribution and authenticated retrieval associated with identifying ticketing information and other uniquely identifying information of a Recording purchaser.

FIG. **6**(*a*)-(*p*) depict the inventor's original intelligent terminal designs separately submitted for patent protection.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

While the instant invention is susceptible of embodiment in many different forms, there is shown in the drawings and herein described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered an exemplification of the principles of the invention and is not intended to limit the principles or scope of the invention to the embodiment.

As is now standard in the industry and in referring to FIG. **1**, the system architecture of the preferred embodiment of the present invention is implemented using a Data Center, a plurality of venues using standard point of sale equipment and a plurality of terminals. The Data Center is in communication with each venue and each purchaser or licensee terminal through the Internet or any wireless application. The terminal can be any device through which a user can access a Website, e.g., a personal computer, a personal digital assistant, an Internet-through-television device, a cellular telephone, or any type of many available wireless devices available in the market, or any updates as may now or hereafter be devised.

Referring to FIG. **1**, the Data Center (**100**) preferably comprises database servers, Web servers, a load balancing router and a firewall (**18**) connected to the Internet (**19**). The firewall (**18**) receives messages from the Internet (**19**) and forwards the messages to the load balancing router and likewise receives messages from the load balancing router and forwards them to the Internet (**19**) or other similar distributed computer network. The firewall (**18**) preferably performs a number of filtering functions and network address translations in order to safeguard the Data Center from unauthorized access. The firewall (**18**) also preferably encrypts and/or watermarks the message using known public key/private key encryption and standard methods and may also integrate Digital Rights Management ("DRM") tracking. The load balancing router forwards messages received from the firewall (**18**) to one of the plurality of Web servers. The load balancing router also forwards messages received from the Web servers to the firewall (**18**) for transmission to other sites through the Internet. In this manner, the load balancing router distributes tasks to be performed to one of the plurality of Web servers in order to distribute processing demands. The Web servers access the database servers (**100**) to retrieve and store information in response to received messages from the terminals (not shown). The database servers store data tables which contain information about various venues, events, accounting, royalties payable, fixed payment allocations, ticket resources, ticketing software, user rules, ticket status, ticket holders and tournament entrance fees and bets placed (if applicable).

An end user (**10**) can access the Data Center (**100**) by using a standard Web browser on a terminal (not shown). However, non-standard, custom software can also be implemented or Web browser software on the wireless device such as a personal digital assistant or cellular telephone. Terminals (**10**, FIGS. **6**A-P) can log into the Data Center (**100**) to view events which will take place in the future and purchase tickets, allow patrons to access Recordings from the just-completed live event, interact to rate a new act or the event itself, and/or to buy interactive games to participate in the event itself or is staged tournaments with other users or spectators.

Moreover, other information including user roles, options for Recording retrieval including location, means of retrieval and incorporating burning, engraving, mastering balancing, editing technology as may now exist or hereafter devised including through the use of algorithms as herein disclosed, may be implemented. Choices may include venue, management, artist, record label, team owner, event management, ticket buyer/ancillary purchaser, retrieval immediately at venue by CD or DVD, or for delivery by digital transmission/USB port at a location-based kiosk, at home by mail or by home computer access, on a cellular telephone, or those that order derivative works or elect to input other demographic information for dissemination, i.e., 'best of' versions, director's cuts, narration tracks, and request upload of demographic information and promos for upcoming events and other releases, etc.

More particularly, referring to FIG. **1**, the system further includes one or more entertainment venues (**14**), a fulfillment or manufacturing center (FIG. **4**), a plurality of information fee recipients (**24**) and a plurality of Recording recipients (**28**). The transaction flow is depicted in FIGS. **2**A-C.

A ticket buyer makes a purchase transaction in step (**110**). See FIG. **2**A. During this step, the ticket buyer (**10**) is presented with the option of pre-buying a tie-in Recording. The price of the Recording is added to the price of his ticket purchase to the live event (or other logged entrance fee or bet). In the event the purchaser desires to retrieve his Recording at the venue immediately upon completion of the performance (or prior to in the case of interactive games), standard authentication methods may be employed, including, but not limited to, bar coding and or information authentication.

The ticket seller, who is already making various allocations for taxes, fees, etc., from the gross receipts, treats the price of the value added Recording similarly. He subtracts his fee, whether fixed or contingent (his incentive to provide this service), and forwards the remainder to the Recording supplier (Recording-seller). Because this is still a single transaction, with the ticket serving as the customer's receipt, the added cost is minimal.

The ticket seller at locations transmits the transaction data over a PC or other standard point-of-sale equipment well known in the art (not shown), which includes the information gathered from the charge card transaction, which identifies the buyer and specifies the address (the charge card address or other address selected by the buyer (**10**)) to which the Recording is to be sent, to the Data Center (**100**). This transmission is done in real time, through the Internet (**19**), using industry standard protocols such as XML and is properly secured using one of many industry standard encryption methods.

Upon receipt at the Data Center (**100**), the transaction information is immediately loaded into the master system database. The data base system is capable of Recording a multitude of transactions involving a multitude of events simultaneously, while at the same time providing all of the required reporting and processing functions and maintaining both the physical and logical security of the information which is critical to the successful implementation of the method.

The preferred embodiment preferably uses an industry standard database system, e.g., Oracle, Microsoft SQL Server, IBM DB2, XML, etc., which is scalable, and of an industry standard set of server hardware, which is also scalable to ensure that it can handle whatever transaction load is required.

In step (**112**) the Data Center (**100**) checks if the transaction is valid. Invalid transactions are discarded (step **114**). In step (**100**) the Data Center transaction is posted with database. In step (**116**) the transaction is backed up. Next, various data files containing statistical information are updated in the data base (**100**) to reflect the latest transaction(s) (step **118**).

As indicated above, the Data Center also encompasses a series of Web servers providing as Web sites and/or Web services points of access for various interested parties to retrieve information required for their operation. FIG. **2**B shows the process for generating the Recordings in fixed media of expression (CD, DVD, USB, e.g.) on site using a suitable Recording subsystem including at location-based kiosks and terminals. (FIG. **1**, **28**). During or immediately after the event, the Recording subsystem generates a Recording on an appropriate medium using preferably non-incremental methods. In the alternative, Recordings are available to be retrieved on or off site through enabled terminals in digital format through USB port or other methods including hook-up of media players and other storage devices, also authenticated using cellular telephones and Internet subscription accounts. Booklets (if any) are prepared for the buyer together with labels that are affixed to the Recording.

The completed Recording is delivered to the buyer. Finally, the manufacturing and fulfillment details are sent to the Data Center (**100**) and fulfillment center for accounting and statistical analysis. Using this data, various statistical data bases are updated with the latest transaction(s). FIG. **2**C illustrates the final accounting process. Thereafter, the transactions for the event are reconciled and finalized and reports are generated. The reports and payments to various partners are calculated and transmitted. In In the last step temporary data in the central data base is cleaned out and the central data base is readied for the next event.

As discussed above and illustrated in FIG. **1**, if a user or buyer wants to take home or receive a live Recording directly at the venue upon completion of the event, standard authentication methods, including but not limited to bar coding, may be used. Referring to FIG. **5**, the Recordings from the editor apparatus are stored as tracks on servers. Next, the Recordings are transmitted or "burned" on site by updated non-incremental CDR technology generating media (**401**) in bulk. The media (**401**) (that may include DVDs, CDs, etc.) are sold by either users or buyers (**10**), who have prepaid for the media when they bought their tickets, or alternatively to buyers (**10**) who have not prepaid and pay for the media at a subsequent time including at the end of the event. The bulk Recordings (**401**) may be sold by a clerk (**402**).

Alternatively, however, a kiosk or other enabled terminal (**410**, FIGS. **6**A-P) receives the Recording data from servers. FIG. **5**. The kiosk (**410**, FIGS. **6**A-P) is an automated kiosk, "vending machine" or enabled table in a nightclub/eatery that either burns or spits out a Recording on demand when presented with authenticating information that may be information on the ticket itself and/or prerecords the tracks on a selected media and provides labels, booklets and other materials associated therewith. The media and associated item(s) are then dispensed when the user/attendee inserts his ticket or inputs other identifying authentication information into the kiosk (**410**.) Alternatively, the kiosk receives the ticket or other input information from a user and, in response, starts the burning of the media or takes order for the mailing or desired home electronic retrieval. In this configuration, the user may be given the choice of customizing his Recording by selecting specific portions or songs of the event that should be burned on the media, their sequence, etc. or may even order "singles". This will be the preferred method if a kiosk is in the form of a patron's audience chair, table or seat at an eatery, nightclub or showcase.

Orders can also be taken at enabled turnstiles or ATM machines at banks, airports, malls and other public venues. (FIGS. **6** A-P).

A user (**10**) who has not prepaid for the Recording may also obtain one using a kiosk and charging the purchase to his credit card or by using other payment means.

The kiosk (FIG. **5**, **410**) may also deliver a Recording as a data file that becomes available for downloading by the user (to a PDA, IPOD or other similar device) through a data port (such as USB port) on the kiosk (**410**).

Finally, after the event is finished, the Recording can be delivered or distributed electronically as a digital file to the home computer of the user and the point-of-sale site may be bypassed. Communications between the various elements of the systems can be implemented over wired or wireless networks. Typical wireless networks that may be employed include Wi-Fi, Bluetooth, etc.

The ticket/Recording buyer (**10**) can from any terminal, for example, check on the status of his order and perform a limited range of functions, such as changing the delivery address for his order, order additional Recordings, or order that promo information of upcoming concerts and other future releases be sent to him.

Similarly, the entertainment companies and record labels can, for example, check, in real time, to see how many Recordings for their artist have been requested and sold for any event, track the royalty and other payments through the system, and, for example, receive survey responses from those who elected to participate in "new band" ratings. If the buyer opts to allow dissemination of other demographic information including, for example, his order for promos, tickets for upcoming events or releases and other merchandise, the system will accommodate those requests. By integrated methods and systems, it will also allow for ordering and purchase of "best of" releases, director's cuts, narration tracks, and single tracks and compilations emanating from the live event.

The Data Center (**100**) maintains security and confidentiality through the system. The entertainment entities and "Partners" are issued specific password credentials which are authenticated through standard industry techniques (FIG. **3**, **218**). In the case of the ticket/Recording buyer, his ticket number along with information not printed on the ticket, such as his billing address or other identifying information

(mother's maiden name, e.g.) is used for verification before he can gain access to the privileged areas of the processing Web site.

As shown in FIG. **1**, in addition to users or buyers (**10**), other entities may also have 10 access to the Data Center (**100**), including revenue participants (**24**) that may include several Partners. In addition, specialized servers may also be provided as part of the system. For example, server (**20**) is used to determine fees and royalties for the various Partners (**24**). The server (**22**) provides standard accounting services. These servers can communicate with each other and with other components of the system through standardized networks, such as Internet (**19**).

Of course, the whole purpose of the system is to manage ordering, packaging and multimedia distribution of live event recordings and to organize and run new types of live events at venues including those to be constructed with new technology regardless of whether they have outside ticketing service companies or their own and help take maximize advantage of the impulse buying potential of the adoring audience and fans. As part of this process, buyers (**10**) can receive or buy Recordings of the event and other items associated with the event. These materials are available immediately at a point of sale station (or store) (**402**), as discussed in detail below and shown in FIG. **5**. The event is recorded and edited by on-site editing equipment (FIG. **5**) to provide the immediate Recording at a station (**402**). Non-incremental or other burning technology compatible with updated standard CDR technology is preferentially to be used.

In addition, or alternatively, the event is recorded by digital Recording equipment **16**. The recorded data inclusive of mastering, editing and balancing data is then sent to an offsite manufacturing site (**300**) where the Recordings are generated (on CDs, DVDs and other similar media) and then packaged and distributed to the users (**10**), as discussed in more detail below and illustrated in FIG. **4**. Manufacturing instructions (**31**) to both sites [i.e., station (FIG. **5**) and manufacturing site (**300**)] are provided by the Data Center (**100**). Moreover, the Data Center (**100**) receives inventory and accounting information (**22**) from both sites.

Details of how requests for transactions and information are handled by the Data Center (**100**) are provided in FIG. **3**. A request is received by the Data Center (**100**) in step (**200**) via the Internet. In step (**210**) a check is performed to determine if the request is a special request for information (available only to certain subscribers and partners). If it is not, then in step (**212**) information is retrieved and sent to the requester indicating what services are available, including lists of future events for which tickets, Recordings, and/or other items can be purchased. Lists of other items related, for example, to Recordings from past events, may also be displayed. In step (**214**) a request for tickets, Recordings or other items is received from a user (**10**). The request is processed, the user (**10**) is issued a ticket and the resulting transaction is processed as described in the flow charts of FIGS. **2A-2C**.

If in step (**210**) a special request is identified, then in step (**216**), the requester is asked to provide a password and the password is validated. If the requester is identified in step (**218**), then in step (**222**) he is directed to a special partner web site where he can access data on various events, including their status, number of orders for received for the events, fees collected, royalties due to the partner, etc. Subsequently, data related to the partners is updated in the Data Center (**100**), if necessary.

If the requester is identified as a registered buyer, then in step (**220**) the buyer logs in and is directed to a buyer site in step **224**. At this site, the buyer is allowed to check on the status of his order, he is allowed to change his order, provide information for shipping, etc. The information or changes entered by the registered buyer is stored in the Data Center (**100**).

After a particular event has concluded, the Data Center sends to the fulfillment house (**122**) information specifying the number of complete and derivative or special order Recordings (**120**) to produce and the addresses to which those designated to be mailed, should be mailed.

Off-site Recording is performed by manufacturing station or site (FIG. **1**, **400**). As shown in FIG. **4**, after the event, the performance data is received in step (**300**). This data may be streamed or may be sent electronically in a batch. Alternatively, the data may be recorded on a data storage medium and sent to site.

In step (**310**) the data is edited. Editing may optionally incorporate the disclosed method of digitized conversion from an audience balanced to disc balanced reading. In step (**312**) the data is prepared for Recording on a master. In step (**314**) the data is optionally encrypted, and, if desired, a unique watermark is added for copy protection. In step (**316**) multiple copies are made from the master by burning or other means. In step (**318**) labels are applied to the media and the labeled media is boxed and packaged together with other materials, such as booklets, pictures, etc. In step (**320**) the packaged media are shipped.

In step (**322**) additional copies of the Recordings a re made, if necessary. In step (**324**) a production document is generated. In step (**326**) the data files at the Data Center (**100**) are updated to reflect the Recording produced and shipped.

The Data Center **100** also handles all tasks of reporting and accounting for copyright, and other participants and generates detailed statements and accounts including the amounts of statutory and contractual royalties (**20**).

To summarize, a Recording live event or any part of a live (including spliced, edited and/or derivative special order versions thereof) is ordered before, during or after the buy a buyer who has attended the event or by a non-attendant buyer by any available means including, but not limited to, by using an appropriate Website or enabled hand-held device including a cellular telephone.

While the specific embodiments have been illustrated and described, numerous modifications come to mind without significantly departing from the spirit of the invention and the scope of protection is only limited by the scope of the accompanying claims.

I claim:

**1**. A method of providing content and additional benefits to ticketholders and event registrants separate from admission to an event, comprising: providing a data center, the data center comprising database servers that are in communication with a customer terminal and a ticket issuer point-of-sale terminal;

storing venue data, event data, accounting data, and ticketholder and registrant information in data tables stored within the database servers;

providing the customer terminal access to the data center to purchase or order tickets, place bets, view and order additional events, order event content recordings and other offered benefits;

selling or issuing via the ticket issuer point-of-sale terminal, a ticket or other transaction receipt to a customer or user, wherein the ticket or other transaction receipt

enables a right to attend the event, place a bet or otherwise participate in the event, experience the event, and get transmission of content related to the event and other offered benefits;

receiving by the ticket seller point-of-sale terminal, during or after the purchase of the ticket to attend the event or experience the event, a transaction from the user or customer to order at least one of a content recording and other event benefits, and storing transaction data related to the transaction, wherein the transaction data includes user or customer information, the ticket information, or placed bet information;

transmitting, by the ticket issuer point-of-sale terminal, the transaction data to the data center, wherein the transmitted transaction data includes the user or customer information, the ticket information, or placed bet information;

upon the data center receiving the transaction data, the data center recording the transaction data, including the user and customer information, the ticket information, the placed bet information, or other order and registration information into the data tables stored within the database servers of the data center;

recording at least a portion of the event as packaged for distribution using an audio recorder, a video recorder or both;

generating a digital recording of at least a portion of the event or the event as packaged and storing the digital recording in the data center on a non-transitory computer readable medium;

receiving at the datacenter or at a location-based networked kiosk, from the user or customer using the customer terminal or the location-based kiosk, the user or customer information, the ticket information, or the placed bet information to authenticate the user or customer;

authenticating, by either the datacenter or the location based networked kiosk, the user or customer using the user or customer information, placed bet information or other transaction data or ticket information received at the datacenter or at the location-based kiosk;

upon authenticating the user or customer, distributing to the user or customer either (1) the digital recording or (2) a receipt to redeem other benefits, in accordance with a retrieval method chosen by the user or customer.

**2**. The method of claim **1** where the location-based kiosk is any one of an ATM kiosk, a mobile phone, an enabled audience seat, an enabled turnstile, or an enabled hospitality table.

**3**. An apparatus for providing content and additional benefits to ticket holders, event registrants, customers and those placing bets at an event separate from addition to the event, comprising:

a data center comprising database servers that are in communication with a customer terminal and ticket issuer point-of-sale terminals;

wherein the data center is configured to store venue data, event data, accounting data, and ticketholder and registrant information in data tables stored within the database servers;

wherein the data center is configured to provide the customer terminal access to the data center to purchase or order tickets, place bets, view and order additional events, order event content recordings and other offered benefits;

a ticket issuer point-of-sale terminal configured to sell or issue a ticket or other transaction receipt to a customer or user, wherein the ticket or other transaction receipt enables a right to attend the event, place a bet or otherwise participate in the event, experience the event, and get transmission of content related to the event and other offered benefits;

the ticket seller point-of-sale terminal configured to:

receive during or after the purchase of the ticket to attend the event or experience the event, a transaction from the user or customer to order at least one of a content recording and other event benefits, and storing transaction data related to the transaction, wherein the transaction data includes user or customer information, the ticket information, or placed bet information;

transmit the transaction data to the data center, wherein the transmitted transaction data includes the user or customer information, the ticket information, or placed bet information;

the data center configured to:

upon receiving the transaction data, recording the transaction data, including the user and customer information, the ticket information, the placed bet information, or other order and registration information into the data tables stored within the database servers of the data center;

an audio recorder, video recorder, or both an audio recorder and video recorder configured to record at least a portion of the event as packaged for distribution;

an editing computer comprising editing software for generating a digital recording of at least a portion of the event or the event as packaged and storing the digital recording in the data center on a non-transitory computer readable medium;

the datacenter further configured to:

receive from the user or customer using the customer terminal or the location-based kiosk, the user or customer information, the ticket information, or the placed bet information to authenticate the user or customer;

authenticate the user or customer using the user or customer information, placed bet information or other transaction data or ticket information received at the data center or at the location-based kiosk;

upon authenticating the user or customer, distributing to the user or customer either (1) the digital recording or (2) a receipt to redeem other benefits, in accordance with a retrieval method chosen by the user or customer.

**4**. The apparatus claim **3**, wherein the location-based kiosk is any one of an ATM kiosk, a mobile phone, an enabled audience seat, an enabled turnstile, a conference table, or an enabled hospitality table.

**5**. The apparatus of claim **3**, wherein the editing computer is operably connected to the data center and to a customer or user terminal for editing the recorded event as packaged for distribution in response to user or customer selection requests.

* * * * *



*www.live-fi.com*
*amyg@live-fi.com*

March 8, 2023

Owen Kendler, Esq.
United States Dept. of Justice
Antitrust Media & Entertainment Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
cc: John R. Read, Litigation Section III

Re: Criminal Complaint against Live Nation Entertainment merged with Ticketmaster, Inc. and Live Nation attorneys-agents, Hinshaw & Culbertson, LLP, Richard Supple, Cowan Liebowitz & Latman, PC, Baker Botts, LLP.

A NYC RICO corruption enterprise also involved SDNY Circuit Executive Officers David Friedland and Julie Allsman, SDNY Magistrate Henry Pitman, Administrative SDNY Judges Colleen McMahon, and Laura Taylor Swain, Judge LeShann DeArcy Hall (EDNY) and NYS Officer Jorge Dopico, Assistant Attorney General Michael Berg and former Justice Luis Gonzalez. All were working with Richard Supple, a former partner at Hinshaw & Culbertson who was a concealed officer for the State of NY.

Dear Mr. Kendler:

LIVE-Fi®s criminal antitrust, RICO and retaliation complaint is a follow-up to LIVE-Fi®'s comments opposing the merger of Ticketmaster and Live Nation that was selected for posting by the DOJ Media & Entertainment Antitrust Division as "E" in March 2010 (attached). I am the sole name inventor of LIVE-Fi® patents considered essential patents for ticketing management in the United States. My patent continue to be willfully infringed by the merged entity Live Nation Entertainment since 2009. In 13 years, I never got a hearing on infringement or willful infringement claims in any NY court.

LIVE-Fi® claims evidence of a conspiratorial enterprise in NYC and NYS enabled by USPTO IP and defense lawyers at Cowan Liebowitz & Latman and Hinshaw & Culbertson aimed at preventing me from enforcing my issued US ticketing management patents before the federal district courts in NYC against Cowan clients Live Nation and MLB/MLB Advanced Media. Richard Supple a former partner at Hinshaw & Culbertson has been unlawfully defending both the Cowan Liebowitz & Latman law firm and Live Nation, while dually serving as a concealed NYS

officer on the First Dept. attorney grievance panel and aide to former Justice Luis Gonzalez since 2000. Cowan lawyers were reported to the panel by the undersigned for serious USPTO practitioner violations related to conflicts of interests. Cowan harbored serious conflicts with clients Live Nation and MLB/MLB Advanced Media. Cowan lawyers, concealing the conflicts, offered me an illegal retainer to invest in my patent applications that I declined, (*Buechel v. Rhodes*, 285 AD 2d 274 (AD 1st Dept. 1999), abandoned my patents applications and failed to withdraw the holdings of abandonment, losing me three patent applications, valuable priority dates and delaying issuance of my first patents 8 and 9 years. (US Patent Nos 7603321; D647910S)

The USPTO is obligated to give an inventor an office action in 14 months and issue a patent in 3 years in the aftermath of *Wyeth v. Kappos*, 591 F. 3d 11364 (Fed. Cir. 2010). This is because the term of patent protection was changed in the 1990s from 17 yrs post issuance to 20 yrs from the date of application. The change in law unfairly allows practitioners harboring conflicts of interest with multiple clients to file defective applications for smaller clients, abandon the applications to delay prosecution to favor a larger patent client with deeper pockets, and cut deeply into the term of patent protection for the smaller client.

USPTO officers are not permitted to grant unilateral withdrawal to attorneys harboring conflicts of interest. But in my case, the USPTO did. This occurred four times with four prosecution attorneys including the Cowan lawyers, Allan Chan, Richard Fish and Charles Ruggiero. Hinshaw & Culbertson former attorney Richard Supple was unlawfully serving as a concealed member of the NYS attorney grievance panel at all times relevant. After the Cowan defendants were reported for USPTO ethics violations including withholding my federally mandated patent files in violation of 37 CFR 2.10, 2.19, 10.66, 11.116, Supple was caught entering and corrupting both SDNY litigation files and state grievance panel files and shuffling forged and unserved documents between them.

In addition, Supple was engaging in ex parte conversations with a former SDNY magistrate Henry Pitman, no longer serving, and with SDNY Circuit Executive Officers, David Friedland and Julie Allsman. Somehow, my infringement complaint docketed and date stamped by the SDNY on April 22, 2010 was deleted sua sponte and vanished from the docket. I lost my first attorney, O. Lee Squitieri, who claimed the case was "rigged". After I won a pro se appeal before the 2d Circuit in 2012, 462 Fed. Appx. 26 (2d Cir. 2012), on remand the magistrate had been newly appointed to preside without a supervising judge, I was denied a replacement infringement complaint to replace the complaint that was criminally deleted form the docket, and I was denied patent discovery ordered by the Second Circuit. A new Judge Lorna Schofield was appointed after Pitman left the case and the court, ordered me to pay $10,000 into the SDNY Cashier for a special patent master, never hired that master and it took 2 ½ years to get the money refunded.

In May 2022, 10 months ago, I was notified for the first time that my good name had been removed by the SDNY CE officers from the roster of attorneys after consult with Pitman based

on Pitman's ex parte conversations with Supple. My name was removed allegedly in 2012, when the case was remanded from the 2d Circuit without notice hearing or due process of law. Only one bar is required for SDNY listing and it need not be New York, *In re Gouiran*, 58 F. 3d 54 (2d Cir. 1995). I am in excellent standing at the State Bar of California since 1979 and retired in NY in 1998 from the Third Dept. when I was attending medical school. My resignation was accepted by the Third Dept. and appears on the computer screens in Third Dept. attorney membership.

However, since 2016, the First Dept. where Supple was working and entering and corruption files by inserting forged and unserved documents, has refused my mandamus petitions to produce my complete state files corrupted by Supple that would include the USPTO conflict of interest complaints against the Cowan lawyers. NY's Judiciary Law Part 1240.6d precluded Supple from appearing for the Cowan lawyers in the SDNY lawsuit. Supple and Hinshaw & Culbertson appeared as defense attorney for Live Nation. The Cowan lawyers could have been held strictly liable for contributory infringement by Live Nation. Live Nation somehow got dismissed sua sponte based on fraudulent jurisdictional papers filed by Baker Botts, Hinshaw & Culbertson and three employees that it had "no NY contacts" to answer for infringement of LIVE-Fi™ patents.

Supple got assistance from NYS grievance panel attorney Jorge Dopico and an Asst. AG, Michael Berg. Thus far discovered in my confidential files is a forged petition purportedly signed in 2009 by 2002 grievance panel chief, Paul Curran, Esq., who left the panel in 2002 and was dead of cancer in 2007. In addition, there are multiple sworn documents I never signed claiming that I have a law office in NYC at PO Box 1523, NY. This office was fabricated. I never had such an office. I was a World Trade Center victim in 2001, was already granted retirement by the Third Dept. in 1999, and that was my temporary PO Box when my residence building was damaged during the tragic events of 9-11-01. I was forced to evacuate for several months to a hotel in Times Square and move to NJ.

Live Nation's merged partner Ticketmaster Inc. was criminally prosecuted in 2021 by the US Attorney for the EDNY. 2021-CR -22, 24 (EDNY).

Both the EDNY and SDNY however, denied me a hearing on Live Nation Entertainment's willful infringement of my US ticketing management patents and contributory infringement by its agents, attorneys and venture partners for 13 years since 2010. 35 USC §§271, 284, 285, 286.

Seven agencies of the State of NY have also taken my patents in violation of the 5th Amendment's Just Compensation Clause. 35 USC 271(h). That matter is now before the NY Court of Appeals and is believed to have been enabled by the corruption undertaken by Supple and DoPico at the grievance panel. A former grievance panel presiding justice, Hon. Luis Gonzalez, was Supple's immediate supervisor and without notice, hearing or due process, inserted a six month sanction into my stellar record also in 2012 the same time the case was remanded to the SDNY from the 2d Circuit. Of course, this order was inserted ex parte by

Supple to falsely discredit me, when there never was jurisdiction over me in favor of the First Dept. There is no immunity available to state officers for targeting an individual without jurisdiction. Here the corrupted files remain unlawfully withheld in violation of due process and Judiciary law Part 1240.7.

Corruption was found against Supple by the Appellate Division ordered entered April 21, 2016. However, the First Dept. refuses to produce my complete files because Justice Gonzalez was implicated. My mandamus petition filed in the First Dept. in 2017 (13277-17) was transferred to the Second Dept. in 2018 (01366-2018) and has sat in that court for five years.

In the meantime, the EDNY Judge LE Shann DeArcy Hall, being petitioned in 19 cv 4739 (LDH) to compel my federally mandated USPTO patent files, and the state files corrupted by Supple by shuffling papers from the SDNY lawsuit, has refused me orders. Assistant AG Michael Berg also had the Attorney Membership office in NYS insert a permanent notation different from that which appears on the Third Dept. computer screens ("Retired"). To demonstrate fraud and RICO conspiracy, I was charged no dues by NYS since 1998.

The matter is now pending before the NY Court of Appeals. The NY Court of Claims continues to deny me taking and infringement damages for 10 years. Seven agencies of NY are using my patents without payment since 2011 in violation of the Fifth Amendment. Based on the 11th Amendment, I cannot sue the State of NY in the federal court. In the meantime, no court in NY will hear my complaint against Live Nation for antitrust violations and willful infringement.

Thank you for your consideration to this updated RICO corruption complaint.

Very sincerely,

Amy R. Weissbrod JD MPH

917-733-9981



RECEIVED

MAR 2 3 2010

LITIGATION III, ANTITRUST DIV.
U.S. DEPT. OF JUSTICE

LIVE-FI™
TECHNOLOGIES INC.

www.live-fi.com
(917) 733-9981

March 18, 2010

**FEDERAL EXPRESS**
Hon. Rosemary M. Collyer
US District Court
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

cc: John R. Read, Chief
US Dept. of Justice
Litigation III Section
450 Fifth Street, NW Suite 4000
Washington, DC 20540

cc: Cong. Rick Baucher
Chair, Telecommunications Committee
US House of Representatives

cc: Steve Waldman, FCC Deputy Commissioner

cc: Cong. Ed Markey
Former Chair, Telecommunications Committee

Re: Comments to Competitive Impact Statement of January 25, 2010
Ticketmaster and Live Nation, Inc. Merger USDC Dist. of Col. No. 1:10-CV-00139

Dear Judge Collyer:

In accordance with the Justice Dept.'s January 25, 2010 Competitive Impact Statement ("CIS") inviting comments within sixty (60) days to the Court's revised order re the prospective merger between defendants Ticketmaster and Live Nation, Inc., as Inventor and President of an early stage live event digital distribution company, LIVE-FI™ Technologies, LLC with its first US patents issued on October 13, 2009 (US Patent No. 7,603, 321) (**Exhibit 1**), I respectfully submit on behalf of LIVE-FI™, the public and other entities similarly situated, "inadequacy" and material omission objections to the order. It is contended that if the CIS is adopted in its present form without further revision, it will have a significant anti-competitive impact on the future of all live industries including music, sports, gaming and education contrary to the public interest in violation of the Tunney Act, 15 USC §§ 16(b)-(h).

Most respectfully, LIVE-FI™ has three primary concerns with the CIS as published:

(1) The Court has omitted all discussion of the negative anticompetitive impact the merger will have upon live event and recording distribution particularly electronic broadcasts and transmissions that are the future of the converging TV and mobile markets. As *admitted* in Live Nation's own papers and press releases, monopolization of the domestic and international concert market has been one of the company's primary objectives since it was formed in 2005. (See **Exhibit 2** and pp. 3 *infra*). There exists an inherent danger from a merged entity that will be, <u>all at the same time</u>, a promoter, majority venue owner for concerts and sports, label for performing artists, and the owner of ticketing and mobile ticketing systems, venue contracts and

ticketholder lists from 80% of US venues going back 25 years. As this Court correctly found, Live Nation already owns some 80-100 US venues and 30 in foreign territories. Ticketmaster's lists will now give the merged entity the added unfair advantage to promote and fulfill consumer electronic requests for live concerts and sports merchandise throughout the world even for artists and celebrities not represented by Live Nation but who are appearing at venues that deploy Ticketmaster systems;

(2) The Court wrongly assumes at pp. 7 that the merged entity will have no significant impact on small companies. As such, it speaks only to the ticket pricing interests of large promoters and venues such as AEG and Comcast Spectator. This is contended prejudicial error. The Court's most recent revised solution that mandates giving AEG access to Ticketmaster's systems and divests Ticketmaster of its Paciolan venue software in favor of Comcast-Spectator, presents a source of even greater concern for small entities. This is because the result will be a larger number of public concert and sports venues with access to the same basic ticketing, mobile ticketing operating systems including interfaces without equal access given to small companies, making the field even harder for smaller technology firms to penetrate; and

(3) The Court has failed to adopt explicit protocols and safeguards to ensure that private litigants and smaller entities maintain equal and fair access to the Courts to protect their rights and remedies against the individual defendants and the merged entity. This is the Court's stated objective in Section IV.

In fact, Live Nation and its former parent Clear Channel Entertainment, Inc., a division of Clear Channel Communications, Inc. have a long history of defrauding private litigants before the Courts that must not be overlooked and most respectfully, should be investigated by this Court prior to adoption of a final plan. Live Nation's practice for years has been to *falsely deny under oath all contacts with individual States* to avoid jurisdiction to answer for anticompetitive misconduct.

In particular, I draw this Court's attention to the appended untruthful papers sworn to under oath in 2006 and 2008 by defendant Live Nation and their Baker Botts attorneys in an antitrust case before Southern District of New York [Case No. 06-CV-1202 (BSJ) (SDNY)]. Live Nation, Clear Channel, and their attorneys falsely *deny under oath all contacts with New York State* (**Exhibit 3**).

As this Court correctly found and contrary to these sworn papers, Live Nation owns many New York venues including House of Blues, Jones Beach Amphitheatre, Blue Note, and at times relevant, 24 major radio stations in the tri-state area including WLTW-Lite 106.7 FM. Live Nation filed similar untruthful papers before other tribunals in lawsuits brought by private litigants. (**Exhibit 4**)

In addition, just prior to Live Nation's acquisition of Clear Channel's new affiliate Instant Live Concerts in 2005, Live Nation, *admittedly* sought to monopolize live concert distribution. In 2004, Live Nation acquired a third party inventor's patent called "Griner" (US Patent No. 6,614,729). Griner discloses only a single operating system that affixes tracks on a master

recording as individual selections are being performed during a concert as but one method to expedite distribution of onsite concert CD's.

Yet, immediately after acquiring Griner, Live Nation issued a series of false press releases throughout the US and the world that it owned a *monopoly* on distributing live concert recordings. (**Exhibit 5**). Live Nation's clear intent and ensuing practice was to prevent smaller recording companies from accompanying artists into its venues to achieve unfair market penetration of its recording distribution systems even at venues owned by others. This is, in part, how Live Nation attracted major artists such as Madonna, Jay-Z, Bono and Shakira, to leave their respective labels and sign with Live Nation in all fields during a time that the recording industry was vulnerable and experiencing plummeting CD sales from digital piracy of shared MP3 files over the Internet.

In 2005, LIVE-FI™ was itself denied access to Live Nation's venues. This was after LIVE-FI™'s USPTO unpublished provisional patent applications were believed to have been misappropriated to Live Nation through a New York intellectual property law firm representing LIVE-FI™ and Clear Channel simultaneously without disclosure. The misappropriation resulted in the formation Clear Channel's affiliate, Instant Live Concerts, LLC in 2003 by principals of Clear Channel Entertainment ("CCE"). Instant Live Concerts was subsequently acquired by Live Nation in 2005 after it was spun off from CCE and both remain headquartered at 9348 Civic Center Drive, Beverly Hills, CA.

Relevant here is that the New York Times article of May 5, 2003 that introduced Instant Live Concerts (**Exhibit 6**), also included sound bites from Irving Azoff, President of Front Line Management and now CEO of defendant Ticketmaster.

Now that live recording distribution has evolved into a digital rather than a hand-out business, Live Nation has continued to preclude LIVE-FI™ and other recording companies from its venues. If defendants' merger is approved without further revision, penetration of other company's technologies will be significantly impeded. This is because Ticketmaster's lists will afford Live Nation the ultimate advantages of controlling all of live concert promotion, venue entry access and event content distribution to the detriment of the public and all other entertainment companies.

In 2006, the press confirmed LIVE-FI™'s premise when it reported that Live Nation was in fact precluding smaller recording companies from accompanying artists to record concerts at its venues. At that time, Live Nation did not represent any artists or their recording rights.

In response, certain recording companies including DiscLive and Hyburn filed complaints against Live Nation and Clear Channel with the Electronic Frontier Foundation in San Francisco and were found to have meritorious claims. (**Exhibit 7**) Shortly thereafter, EFF invalided the Griner patent before the USPTO on other grounds, leaving Live Nation without a patent. This paved the way, as this Court correctly found, for Live Nation's 2006 alliance with German technology giant CTS Eventim and Clear Channel's other new subsidiary, Next Ticketing (**Exhibit 8**). This venture failed leading to Live Nation's more recent partnership with Ticketmaster (**Exhibit 9**).

**Live Nation's history of unfair and anticompetitive practices should now raise a red flag to this Court** on *the* most pressing antitrust issues potentially affecting the future of the entire music and sports industries.

Without speaking directly to the issues of live event and recording distribution, the Court, most respectfully, is doing the public a disservice.

The CIS as it stands does nothing to protect the interests of small recording and technology firms that have invested huge monies in development and may be able to compete with Live Nation and online subdistributors such as iTunes and Google to reverse the last ten years of industry losses emanating from digital piracy of MP3 files.

In summary, unless the Court mandates further revisions and sharing of assets with small companies, the pooling of the portfolio of powerful assets already controlled by Ticketmaster and Live Nation will enable the merged entity to unduly monopolize all of public access to concerts and events, majority lists of ticketholders and in turn, live recording distribution to those most likely to buy event recordings and podcasts. The end result will make it virtually impossible for new technology companies that have no equal access to Ticketmaster's operating systems to have a fair chance to compete.

Respectfully submitted,

Amy R. Gurvey
Inventor and President
LIVE-FI™ Technologies
amyg@live-fi.com
Ph: 917-733-9981

EXHIBIT 1



Case 1:10-cv-00135-RMC Document 13-5 Filed 06/29/10 Page 6 of 153

(12) **United States Patent**
**Gurvey**

(10) **Patent No.: US 7,603,321 B2**
(45) **Date of Patent: Oct. 13, 2009**

(54) **ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS**

(76) Inventor: **Amy R. Gurvey**, 315 Highland Ave., Upper Montclair, NJ (US) 07043

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/253,912**

(22) Filed: **Oct. 18, 2005**

(65) **Prior Publication Data**

US 2006/0173701 A1 Aug. 3, 2006

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/442,468, filed on May 20, 2003.

(60) Provisional application No. 60/382,710, filed on May 22, 2002, provisional application No. 60/382,949, filed on May 24, 2002, provisional application No. 60/619,754, filed on Oct. 18, 2004.

(51) **Int. Cl.**
*G06Q 99/00* (2006.01)

(52) **U.S. Cl.** ............................ **705/65**; 705/50; 705/64; 705/52; 726/26

(58) **Field of Classification Search** ............ 705/50–59; 369/1; 726/26
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,825,876 A * 10/1998 Peterson, Jr. ................ 705/52
6,614,729 B2 * 9/2003 Griner et al. ................ 369/1
2001/0018660 A1 * 8/2001 Sehr ........................ 705/5
2002/0199198 A1 * 12/2002 Stonedahl .................. 725/86
2003/0023564 A1 * 1/2003 Padhye et al. ............... 705/54
2003/0097307 A1 * 5/2003 Greene ..................... 705/26
2004/0137929 A1 * 7/2004 Jones et al. ................ 455/517
2008/0133416 A1 * 6/2008 Rhoads ...................... 705/51

OTHER PUBLICATIONS

"Broadway Television Network Selects On2.com to Poer Video-On-Demand Webcasts of Broadway Shows", Jun. 15, 2000.*

* cited by examiner

*Primary Examiner*—Jalatee Worjloh
(74) *Attorney, Agent, or Firm*—Allan Chan; Allan Chan & Assoc

(57) **ABSTRACT**

The present disclosure provides a method and system of electronically associating one or any combination of the production, balancing, editing, transmission, distribution and sale of live event "Recordings" with the sale of a "ticket" [defined to include any entrance payment/receipt, (tournament) entrance fee or logged placed bet] to or during the event, such that both or either of a ticket purchaser and/or non-ticket purchaser are able to automatically acquire a Recording or participate in interactive offerings related to the event by means of [optional] authenticated retrieval systems at a terminal device when connected to the Internet or wireless network. A method for electronically converting a balanced audience feed to the value for optimal Recording balance is also disclosed for optional integration. Distribution and/or retrieval of a Recording by patrons, non-attendee purchasers and/or licensees may occur when the Recording is embodied in a fixed medium of expression and/or when the Recording is in digital or other encoded format.

**10 Claims, 9 Drawing Sheets**





OVERALL SYSTEM SCHEMATIC
TICKET-BUYER
TICKET-BUYER
TICKET-BUYER
"TICKET" -SELLER LOCATIONS (ALSO INCLUDES TOURNAMENT ENTRANCE FEES AND/OR BETS ON AND/OR OFF SITE)
VENUES AND/OR
ON-SITE EDITING OF PROGRAM CONTENT
DIGITAL RECORDING
ADDITIONAL RECORDING BUYERS SECURED TRANSACTIONS (INCLUDING CREDIT CARD)
INTERNET
FIREWALL
ACCOUNTING INFORMATION
DISTRIBUTION (OPTIONAL ELECTRONIC AUTHENTICATION) FIG. 5
· BULK BURNING OF STANDARD CDs, DVDs, ETC
· KIOSK BURNING ON DEMAND
· KIOSK USB DOWNLOAD
· TABLE SALE/ DIRECT HANDOUT
DATA CENTER FIG.2
MANUFACTURING INSTRUCTIONS
OFF-SITE MANUFACTURING FIG 4
MANUFACTURING
PACKAGING
FEES & ROYALTIES
ACCOUNTING
FIREWALL
DISTRIBUTION
RECORDING RECIPIENTS
INTERNET
· LOCATION BASED KIOSKS (ON AND OFF SITE)
· HOME ELECTRONIC
· HOME MAIL
· ON SITE TABLE/HANDOUT
PARTNERS
PARTNERS
PARTNERS
REVENUE-PARTICIPANTS
10
10
10
14
14
19
16
12
400
18
30
100
31
300
20
22
18
26
28
24

FIG. 1



U.S. Patent Oct. 13, 2009 Sheet 2 of 9 US 7,603,321 B2

TRANSACTION PROCESSING
PURCHASE TRANSACTION
110
RECEIVE TRANSACTION DATA FROM TICKET-SELLER
112
IS TRANSACTION VALID?
NO
114
REJECT TRANSACTION
100
116
POST TRANSACTION TO CENTRAL DATABASE
JOURNAL TRANSACTION FOR BACKUP
UPDATE ONLINE STATISTICS FOR WWW PAGES
118
END
AFTER EVENT
120
122
PRODUCE MEDIA AND SHIPPING LABELS
TRANSMIT MANUFACTURING SPECIFICATIONS TO FULFILLMENT CENTER
UPDATE ONLINE STATISTICS FOR WWW PAGES
124
END
FINAL EVENT ACCOUNTING
COMPUTE FINAL ACCOUNTING INFORMATION FOR EVENT
126
128
24
GENERATE REQUIRED REPORTS
TRANSMIT REPORTS AND PAYMENTS TO PARTNERS
CLEANUP CENTRAL DATABASE
100
END

FIG. 2A

FIG. 2B

FIG. 2C



Internet Processing
200
Receive Internet Request
210
Is this a "special login request?"
No
212
Public Site
Display information on available event recordings
214
Process purchase transactions entered on web site
216
Validate login
218
Partner login
220
Registered buyer login
222
Partner Site
Allow partners access to data on event status, orders, fees and royalties
224
Buyer Site
Allow buyers to check on order status, change order quantity or shipping address
100
Update Central Database if necessary
100
Update Central Database if necessary

FIG. 3

Manufacturing Process
After event
300
Receipt of Performance Data Stream
122
Receipt of media labels, address labels and manufacturing instructions
310
Editing of Data Stream
312
Preparation of media master
314
324
Optional encryption and unique watermarking of copy
Print Production Report
316
Burning of media
100
318
Application of label and packaging
Update Central Database
320
Shipping
322
Yes
More?
No
end

FIG. 4



DISTRIBUTION
19
ON SITE EDITING OF PROGRAM CONTENT
400
EDITED "TRACKS" STORED FOR RECORDING
401
BULK CD/DVD/ETC BURNER SYSTEM (NON-INCREMENTAL)
410
KIOSK(S) (BURNING AND PACKAGING OPTIONAL) POINT-OF-SALE CD/DVD/USB ETC.
420
Wi-Fi for "Live-Fi" AND OTHER WIRELESS TRANSMISSION
IPOD
CELL PHONE
PDA
430
HOME DELIVERY (ELECTRONIC OR MAIL)
402
ON-SITE SALE
RECORD ACCOUNTING INFORMATION
30

FIG. 5

SAMPLE LOCATION-BASED
TERMINALS

VENUES, ATMs, SHOPPING MALLS, AIRPORTS



INSERT
TICKET
OR
CREDIT CARD

OPTIONAL
DISC
RELEASE

USB
PORT

SAMPLE LARGE VENUE TERMINALS

INSTALLATION IN LOBBIES OR
COMMON AREAS NEAR CONCESSIONS

INSTALLATION ALSO AT OFF-SITE
MALLS, AIRPORTS, RETAIL OUTLETS,
ATM/BANKS

FIG. 6A



INSERT
UNUSED
PORTION
OF TICKET

INSERT
CREDIT
CARD
RECEIPT

OPTIONAL
DISC RELEASE
FUNCTION

SAMPLE

(SMALL)
VENUE LOBBY

RECORDING
ORDERING
TERMINAL

USB
PORT

SAMPLE
CHILD
STOOL

FIG. 6B



LARGE VENUE
TURNSTILE TERMINAL
MONITOR
SCREEN
MONITOR
SCREEN
DISC-PENSARY
DISC RELEASE

FIG. 6C



ORDERS RECORDINGS
INTERACTS WITH EVENT
ENABLED CHAIR
TICKET INSERTION
CREDIT CARD SWIPE
RECEIPT
TICKET OR CREDIT CARD, ETC.
COFFEE HOUSES
CLUBS, BARS,
RESTAURANTS
USB PORT
GLOBAL ADVERTISEMENT (ICONS)
LIVE VENUE TABLE
FOR ELECTRONIC ORDERING
DISC RELEASE
RECORDING OR DISC ORDERING AND....
ELECTRONIC
ORDER FOOD, DRINK
& RECORDINGS
RATE
CONCERT
OR TALENT
INTERACTIVE
RESPONSE

FIG. 6D

# ELECTRONIC SYSTEM AND METHOD COUPLING LIVE EVENT TICKETING AND INTERACTIVE ENTRIES WITH THE SALE, DISTRIBUTION AND TRANSMISSION OF EVENT RECORDINGS, MASTERING SYSTEM AND INTELLIGENT TERMINAL DESIGNS

## RELATED APPLICATIONS

This application is a continuation-in-part of application Ser. No. 10/442,468 filed May 20, 2003 which claims the benefit of U.S. Provisional Application No. 60/382,710 filed May 22, 2002 and U.S. Provisional Application No. 60/382,949 filed May 24, 2002, all incorporated herein by reference. This application also claims priority to provisional application Ser. No. 60/619,754 filed Oct. 18, 2004.

## FIELD OF INVENTION

This invention pertains to a system and method of producing and distributing recordings of live performances.

## BACKGROUND OF THE INVENTION

The advent of the digital age has demonstrated that any content or event (including live as performed content) that can be recorded and transformed into "bits" is a valuable, marketable commodity. In the past, major studios, record labels and production companies controlled what live content would be produced for distribution to the public. Except for live or tape-delayed grandiose television/cable productions, certain news coverage and special radio broadcasts, the live experience was limited to ticket holders/audience members.

Now, however, live content is inexpensive to digitally record. Virtually any lay personal can create a quality digital live recording of any event of public or private interest on simple equipment and then upload the recording over a telecommunications network. Such upload will result in free content ownership not only for the recorder, but also for any other interested user. Telecom-connected third parties can then, for example, burn their own CD's on home components or store the content onto a hand held music player. Once the recording is uploaded, then, it is game for others to copy and own it without payment.

The unauthorized digital transmission and retransmission Peer to Peer ("PtoP") or Business to Business ("BtoB") of pre-recorded studio titles, albums, and other derivative tie-in merchandise over the Internet since 1998 has virtually crippled the music industry. "Wi-Fi" now enables hook up to the Internet without a wire. Podcasts carried through Wi-Fi or satellite radio may not be far off. Clipcasts (transmissions of content to mobile phones) will shortly follow.

In spite of the spiraling decline in retail CD sales since 1998, the live concert market is surging. Concert ticket prices have skyrocketed. Coincident market penetration of handheld music players has necessitated a change within the music industry from an album to a singles oriented business model and the proliferation of on-line subscription services. With use of the instant disclosure, it is anticipated that concerts and recording from live events as well as interactive tournaments will be coveted by consumers and subscription services that reach the global audience.

In spite of this, to date, the full recording impulse buying potential of the live concert audience remains untapped. Concert hall shops still only offer an artist's pre-released studio product usually only in CD disc form and not the performance just attended. At the core are the continuing limitations on technology, the huge cost of recording and packaging productions for immediate on site and multi-media delivery, and the monetary and time constraints including for onsite personnel and staff needed for quality mastering and editing. In addition, for more grandiose live productions that feature multiple performers and whole orchestras, there is an impasse among the creative factions as to the proper royalties payable upon release. Musicians' unions and performing rights societies that collect royalties on behalf of composers and publishers contend that a digital encoded recording transmission over any telecommunications network is a separate "performance" triggering additional payments.

For these reasons, a necessary premise of the instant disclosure is that any viable market solution for live recording release must be inextricably associated with full royalty accounting, rights clearance and the equitable allocation of recording revenues among all those involved in production of the live event. The royalty accounting systems revealed in this disclosure do just this and will be independently licensed by the inventor for the management and administration of concert venues around the world.

At the same time, the present invention foresees that heightening anti-terrorism security systems are shortly to be installed by law or electively in public venues—newly constructed and existing—including Olympic sports arenas, international concert halls and airports. DNA fingerprint systems will be enabled to read the iris of an entrant's eye thumb print, etc., upon ingress or egress from and through the instant disclosure, can be simultaneously used at a venue to process audience recording orders separate from ticketing information.

The present invention further anticipates that with the advent of increasing bandwidth, live events, tournaments and performances as they are recorded and packaged will be electronically transmitted to businesses and computer users with increasing speed. This will help raise the market value of the live recording that is expected to surge immediately after the event ends particularly if it is publicized with pre-event ads issued, ordered and placed by the producers.

The instant disclosure is also premised on the fact that ticket holders will demonstrate a high proclivity for impulse buys if recordings are offered for sale immediately after final curtain at the hosting venue itself. In addition, it is anticipated that even greater sales will result if audience members and global non-audience fans can select their respective preferred means of retrieval. The instant disclosure predicts that adoring fans—regardless of geographic location—will always covet a complete repertoire particularly of a unique or special event. And while the CD is on its way out, for established patrons of the classical arts, it is still very much the preferred recording format.

The current trend in the music and entertainment industries is toward online subscription services. Web sites like iTunes, MSN, CNN, Yahoo, Amazon, AOL and Napster now offer content of all kinds—music, films, TV shows, sports replays, news clips and stock quotes for a fixed fee per month. Some of these sites are contracting with telecom companies to effect content delivery to cell phones. The recent institution of podcasts demonstrates that these sites will also offer live events, single titles and other tie-in merchandise like posters, T-shirts and pin-ups if packaging can be expedited and delivery effected BtoB or PtoP. They will also offer interactive gaming, response options and tournaments that are related to a live event.

Just by way of example—what if the global advertising campaign for release of a new "Harry Potter" book or movie

was associated with an online tournament or offer? What if the coveted prize was an authenticated J. K. Rowling autographed poster? Further, what if the Indianapolis 500 could be instantaneously virtualized such that both audience members and interested fans from around the globe could steer their own cars along with the pack? In each instance, the global response would be huge. Fans would flock to any one or combination of location-based enabled intelligent terminals or enter from hand-held devices, home computers land and mobile phones thereby maximizing the geographic influence and market power of even a local event.

## BRIEF DESCRIPTION AND SUMMARY OF THE INVENTION

Methods, systems and intelligent apparatuses[1] are disclosed for the immediate multimedia and electronic global ordering, sale, management, and authenticated distribution of live event content recordings by all means of delivery, transmission and retrieval now known or hereafter devised both on and off site from where the live event takes place. Methods and systems are also disclosed for the global solicitation and processing of authenticated electronic responses at live talent competitions, sporting events, and interactive games including from worldwide non-audience participants through enabled devices.

[1](individually claimed but enabled to be integrated)

With respect to distribution of live music, entertainment and event "Recordings" (as herein defined), the methods and systems disclosed reveal means that expedite and associate necessary and value added steps in the production, packaging, broadcasting and administration process. These include: (i) association of recording orders to ticket sales, subscriptions and/or uniquely identifying information of the holder including credit card number, phone/mobile phone number, subscription or podcast address, for example; (ii) methods for content mastering, balancing and editing; (iii) methods for splicing and packaging single titles, action stills and other unique derivative works; (iv) methods for creating director's cuts, "best of" versions and other derivative works; (v) methods for automated copyright accounting including calculation of statutory and contractual royalties from the point of every sale; (vi) integration of standard content security systems [e.g., encryption, watermarking and digital rights management ("DRM")]; (vii) integration of new venue anti-terrorism security systems; and (viii) solicitation and processing of recording orders from non-audience purchasers using any uniquely identifying information that helps directs transmission of content including, without limitation, home or mobile phone number, URL, e-mail or street address, credit card or banking number, personal account, podcast or satellite radio account, Blackberry or text messaging account, Social Security Number, date of birth, mother's maiden name, and most significantly, a DNA fingerprint.

In the sports and gaming field, entrant's fees and bets placed are to be used in this disclosure in lieu of or in addition to "tickets".

The disclosed systems and methods are optimally and immediately designed for use by classical artists, unsigned talent, "E-label" bands, their producers and arts institutions that are permitted to release live recordings without additional clearances. These groups need strong promotional tools and established distribution channels to test the market for new titles and contemporary works.

The instant invention will allow for the economical production, packaging and multi-media distribution of any live event recording no matter how small (recitals, benefits and

special performances, for example) that with the previous art were not made available for release because it was not cost effective to do so at low sales volumes. This content was therefore previously "lost" after performance and could not be re-enjoyed by members of the public at large.

The systems disclosed are also designed for use by interactive game, sports television, film and convergence producers to assist with the solicitation and tabulation of audience and non-audience responses. Such responses serve to expand the types of entertainment experiences offered to the public and geographic influence and promotional value of a particular competition or event.

In addition, the systems are designed for podcast and satellite radio producers, suppliers and consumers who offer and covet audio programming for downloading onto computers or portable music players.

By the means herein described secured and authenticated ordering, packaging, delivery and retrieval of any live performance or event can be effected anywhere in the world at cost low enough to make it economically feasible even at low volumes. This includes release of a recording immediately at the hosting venue as soon as the event ends.

With the instant disclosure, packaging will be in either fixed or encoded format with delivery over any available telecommunications network, by hand or regular mail. By such means, audience members can order recordings either pre-concert with their tickets or after in any desired format including standard CD format by onsite handout or mail or by using a venue-based intelligent terminal, a portable hand-held music, media player, Blackberry or other test messaging device, a land line, mobile phone, other wireless device, or a home computer. With the instant disclosure, non-audience members can independently order the performance or a derivative recording and their orders will be integrated with those from ticket holders.

The present disclosure further describes independent methods that immediately account for and calculate all statutory and contractual royalties due upon release from each point of sale such that the job and expense of payment administration is removed form those individuals and entities authorized to release recordings. For ticket holders, concert venues and arts institutions, this would also include calculation of bonus or promotional discounts if recordings are purchased in advance with tickets or subscriptions. More importantly, the disclosed accounting methods are independent and provide a quick, easy and foolproof method for ensuring proper rights clearances and the equitable allocation of recording revenues among all associated with the live event. These systems will be independently licensed to concert and sports venues around the world.

The instant disclosure further provides wholly independent but integrated means for digitally mastering and balancing live recordings via storage of a plurality of content analysis algorithms that analyze and manipulate audio information with our without video in a database and/or on a "live" basis as additional information is received.

By the means disclosed, a flexible multimedia information analysis apparatus stores a database that includes both audio and video information. At the same time, also stored are a plurality of content analysis algorithms for analyzing the digital information, which can be manipulated by a mouse. A selected algorithm can then be used to analyze and edit the audio, video or audiovideo data including on a "live" basis as additional information is received. Further content analysis algorithms can be applied in tandem to manipulate the information including splicing out singles titles from a whole concert, for example. By such means, digitized readings that

are optimal for audience listening and enjoyment can be automatically converted to optimal readings for a selected recording format. In addition, the disclosed methods will assist in the incorporation of additional content (narration tracks, for example), to produce further purchase options for the consumer including derivative works, "best of", director's cut versions and event-related stills, posters, pin-ups, artist bios, karaoke insertions and playbills. These systems are optionally enabled to be associated with ticketing and independently with non-audience orders. They can also process single title and derivate "best of" and director's cuts orders that incorporate supplementary material, including narration tracks, for example, in addition to whole concerts as performed, from any purchaser.

The present disclosure provides additional means for integrating anti-terrorism security systems anticipated to be installed at large sports/Olympic arenas, concert halls, auditoriums and public venues, e.g., airports and shopping malls and to take positive supplementary advantage of these systems by using them to order recordings.

It provides supplemental means for integrating standard content security methods including encryption, watermarking and DRM that track a recording as it is transmitted to an end user PtoP or BtoB. It further describes integrated systems for soliciting and processing audience and non-audience response information (also optionally associated with ticketing, subscriptions and podcast information) to allow for new forms of live interactive entertainment at a particular venue. The responses tabulated by the present invention will include ratings of live competitions without the need for open telephone land lines and will allow for the staging of both real and virtual competitions.

If betting is to be permitted, the systems further describe means of blocking responses from territories where gaming for profit is not permitted by law.

Finally the instant disclosure reveals the inventor's creative designs for venue and public space intelligent terminals that include without limitation, enabled audience seats/chairs, enabled security turnstiles, recording ordering kiosks targeted for arts institutions (lobbies and promenades), and enabled computerized tables that are to be installed at showcase cafes, clubs and gaming bistros. All terminals permit hook up of hand-held music players to USB or equivalent portals, USB keys, etc., take food and beverage orders, and pay checks and parking fees electronically. They also allow the purchaser to order and buy a recording in any desired format with a designated means of retrieval.

For example, a purchaser-ticket holder can insert the unused portion of the audience ticket or swipe a credit card to order a recording for home mail or computer delivery, to start an onsite disc engraving, release an already engraved disc from a machine, or enable immediately hook up of a hand-held music player. In addition, the terminals authorize transmission of follow-up and demographic information back to the recording purchaser, tournament/competition participant, or other individual/entity authorized to receive the information collected at the time of ticket issuance or recording sale.

The present invention discloses methods, systems and apparatuses that electronically associate any one or combination of the global ordering, authentication, sale, recording, production, mastering/balancing/editing, single title splicing, packaging, transmission, distribution, engraving, optional tracking, protection, and retrieval of "live event 'Recordings'" (as herein defined) with the sale of an event ticket, subscription order and/or other uniquely identifying information of a recording purchaser such as credit card number, phone/mobile phone number or Internet subscription account. In the case of live sports competitions and tournaments when gambling is or may be permitted, the present invention alternatively associates live event recordings with entrance fees and/or placed bets in lieu of or in addition to "tickets" and describes integrated methods that block out responses from territories were gaming for profit is not permitted by law.

The present disclosure reveals wholly separate but optionally integrated methods for processing worldwide live Recording orders that are independent of ticketing.

It further reveals integrated systems for ordering and/or delivering the live Recordings in any format including, by way of example, by hard mail, e-mail, over the Internet, to home and portable computers, hand-held music/media players, cellular phones, text messaging devices, podcast addresses and new Wi-Fi devices.

In addition, the instant disclosure reveals independent mastering, balancing, editing and splicing methods that assign numerical values to console and instrument feeds. As herein disclosed, a flexible multimedia information analysis apparatus stores a database that includes both audio and video information including the transposed console and instrument readings. At the same time, also stored are a plurality of content analysis algorithms for analyzing the digital information, which can be manipulated by a mouse. A selected algorithm can then be used to analyze and edit the audio, video or audiovideo data including on a "live" basis as additional information is received. Further content analysis algorithms can be applied in tandem to manipulate the information including splicing out singles titles from a whole concert, and packaging additional derivative tie-in merchandise.

Further, the instant disclosures describes systems and methods that allow both ticket holders and non-audience members to electronically rate and/or participate in a live staged event over any telecommunications network. The disclosed systems optionally authenticate entries and responses with ticketing or other uniquely identifying information that assists with directing transmission of the content.

Finally, the instant disclosure reveals the inventor's patented designs for intelligent terminals that take recording orders, are enabled to release recordings in fixed and unfixed formats and reroute authorized information back to the purchaser. These are targeted for arts institutions, hosting venues and public and private spaces including airports, banks and shopping malls.

Definitions

"Recording" or "Live Recording" as used in the present disclosure is defined to mean any audio, video, or audiovisual material or data based on signals or content emanating, derived from or representative of the live event or any part thereof, or an occurrence pre or post event that is related to it including, without limitation, as it is packaged for sale and distribution in any medium.

Without limitation, Recordings may contain/include as examples: audio, music, video, audiovideo, concert feed, recital, sports competition (baseball game, soccer tournament, etc.), stageplay or showcase presentation, press interview, mime production, literary work, theme park amusement, arcade tournament, game, videogame, display, art exhibition, artwork, autograph, photograph, clip, still, spoken dialogue, soliloquy, reading, lectures, speeches, seminars, classes and sermons, etc.

Typically, a "Recording" is stored, thereafter balanced, edited or otherwise revised in digital, analog or other format, and transmitted by a means of distribution e.g., broadcast signal, radio, over-the-air television, scrambled signal, cable,

Internet, text messager, podcast, satellite radio broadcast, clipcast, regular mail, hand delivery, wire, cellular/wireless (so-called "Wi-Fi"), or by any other means now known or to be hereafter devised.

At some time, a "Recording" may become embodied or stored on a fixed, tangible medium of expression such as film, VCR tape, optical disc (CD, DVD, dual disc, etc.), magnetic cassette, reel-to-reel, LP, local or remote hard drive, mobile music player, or other storage medium, etc., or alternatively may be received, displayed, stored and re-performed without physical embodiment. For purposes of this disclosure, Recordings will be receivable in either a fixed medium of expression or unfixed format by a third-party to include without limitation a consumer, purchaser, third-party seller or licensee in analog or digital format [digital data (if necessary). Notwithstanding the foregoing, nothing contained herein is meant to limit the scope of the inventor's claims should other recording formats be made available in the future.

Retrieval of a Recording in any format for purposes of this disclosure will occur on or off site from where the live event takes place including, without limitation, immediately after the event ends at enabled location-based intelligent terminals/kiosks, home terminals (a home PC, media player, Web TV, etc. ), portable personal devices (hand-held music/media players, Blackberry or other text messaging device, e.g.,), from a third-party distributor such as an online subscription service, producer or podcaster and on mobile phones. To the extent that order and/or retrieval of a Recording is to be over a telephone wire, cable or cellular telephone or any telecommunications network, the instant disclosure is deemed to work with or incorporate any phone number, address, or other uniquely identifying data including without limitation, a DNA fingerprint, URL, e-mail, podcast or satellite radio address, mobile phone or other account number that assists in directing transmission of the content.

Utility

The utility of the present disclosure is apparent. The systems, individually and collectively, are designed:

(i) For use by arts institutions, performing artists and their production teams, sports organizations, concert venues, and public and private spaces (airports, shopping malls, banks, etc.) to offer a one-stop shop for the worldwide ordering, packaging and/or release of live content recordings in all media;

(ii) To provide new forms of interactive live entertainment experiences in close proximity and time with a live event, regardless of the geographical location of the interested consumer;

(iii) For use by arts institutions, performing artists and producers to assist in the immediate on and off site release of live event recordings;

(iv) To associate recording orders with ticket sales thereby allowing authentication and authenticated retrieval of recordings transmitted and released on and off site;

(v) To allow recordings to be ordered from the time of first ticket issuance thereby offering promotional bonuses and discounts to venue subscribers and global fans;

(vi) To provide a true litmus and market indicator of new talent, a contemporary composer, composition, title or premiered work both from audience members and from the non-attending global market;

(vii) To afford artists and producers additional feedback on an event and optional demographic information on recording purchasers in all media and territories, if authorized;

(viii) To ensure rights clearance and the foolproof equitable allocation of recording revenues in all media;

(ix) To assist with all newly instituted means of audio, video and audiovideo content ordering and transmission methods (including podcasting, for example);

(x) To anticipate heightened anti-terrorism security measures incorporated within public and private venues and to take positive advantage of those systems by using them to assist with the ordering of recordings;

(xi) To record, capture and distribute otherwise lost live content including of smaller, local events that traditionally would not have been released to the mass media or the public at large and with the prior arts, were never capable of being enjoyed by those who were not in actual attendance (either locally or around the world).

Using the instant disclosure virtually all live content can be now be efficiently and effectively preserved, packaged, automatically accounted for and immediately offered for distribution to the adoring audience as well as to fans worldwide. Audience members can now fulfill their need for instant gratification and at cost low enough to make it economical even at low volumes. Ticket holders can either order recordings pre-concert or immediately after it ends at venue-based intelligent terminals, or in the alternative, retrieve and take home a recording in one of several formats right then and there. In addition, those who did attend the event as well as to those who did not, can now own copies virtually in minutes. Discounted recordings can be offered as added perks associated with subscriptions and early ticket purchasers. Those who pre-buy can also be offered the added benefit of the right to receive promo information on future events and releases. After the performance or event, Recordings can also be bought at any intelligent terminal installed at the venue or other public spaces that include airports, shopping malls, retail outlets and banks. In addition, any interested purchaser can order a recording from a home computer, land line, cellular telephone, Blackberry, text messager or other enabled hand-held device by using a credit card of other unique identifying information of the purchaser including an online subscription account number or mobile phone.

To benefit from the instant disclosure are all parties involved in production of both the Recording and the live event as well as adoring fans that always covets a complete repertoire and new entertainment options Aside from added revenues, the artists and copyright holders can now have access to what in hindsight proved to be a great or unique performance. And the public at large gets the option to expand its listening library of a favorite artist.

By the means herein described, for the first time, Recordings can be offered for sale by any known means from the time of first ticket issuance.

When physical discs are ordered at any location-based terminal, the systems are designed to work with the latest capacity standard CDR engraving technology (whether incremental or non-incremental) either to start the engraving of a disc or in the alternative, to release an already burned disc or the signaled information embodying same. If a particular venue elects to install a combination ordering and disc engraving intelligent terminal, with CDR technology now between 40× and 52×, this will allow for authenticated release of even disc formatted Recordings to authorized retrievers immediately at the venue after final curtain. Audience members who have CD players in their cars can then re-experience a concert on the way home.

Global orders from those who did not attend the event can likewise be independently and immediately fulfilled by integration of appropriate systems. This will serve to maximize

the market potential and promotional value of the event regardless of the geographic location of the purchaser.

Artists and composers who premier new works at a recital in a smaller locale will realize the added benefit of having these works optimally and quickly marketed particularly if they were not selected for release by a recording label. New bands and other "start-up" talent are likewise afforded the means to get their material immediately out into the marketplace and receive rapid feedback on their original compositions in actual dollars.

With increasing advents in technology that continue to compress the time and physical space needed to record and transmit audience responses to a live event, it is anticipated that at some time in the future, the present disclosure will allow for tabulation of on and off site ratings and responses as well as the public's participation in staged tie-in tournaments including from hand-held devices and cellular telephones. As the interactive response time becomes smaller and smaller over time with increasing bandwidth, both audience spectators and non-attending fans should be able to participate in virtually automatic ratings both from their venues seats and from enabled home computers, hand-held devices and cellular telephones.

The current trend towards reality television demonstrates that interactive viewing is a coveted by the entertainment industry. Shows like Fox's "American Idol" have already proven that there is a premium on interactive response programming because it performs advance market research on new talent. Moreover, because the major TV program suppliers and producers are no longer willing to pay a sitcom star $1 million per episode, there is increasing demand for less expensive distributable content of any kind particularly that which can be distributed to wireless telephones. This trend will continue to grow as more interactive television, radio devices and offerings (now including podcasts and clipcasts) penetrate the marketplace and the viewing audience can more easily fast forward through a sponsor's commercials.

Submitted for separate patent protection is the inventor's original intelligent terminal designs including, without limitation, those in the form of an enabled venue audience seat, an enabled venue turnstile, an enabled eating or beverage table and chair, and an expanded ATM ordering kiosk targeted for public spaces, concert venues, airports, banks, malls and retail stores. The table terminals are seen for installation in the next wave of restaurants/media clubs/gaming cafes/coffeehouses, etc. They are designed to take food and beverage orders and pay checks and parking electronically without a human waiter or waitress in addition to fulfilling Recording orders. The turnstile version is expected to be a big seller as tightened security systems at Olympic stadiums, venues and airports are installed including those that read DNA fingerprints of audience entrants.

All terminals will incorporate credit card and smart card swipes, rating/interactive systems, disc dispensaries, USB and equivalent portals for hook up of music players and storage devices, all of which are electronically authenticated and linked to entrance tickets, seat assignments, food and beverage checks, a cellular phone number, URL, e-mail, podcast address, other account, or other identifying information of the purchaser.

The systems herein disclosed are further enabled to process special purchase orders. For example, individual titles (singles) from a live performance with or without accompanying video will be spliced out, specially formatted, accounted for at competitive pricing on the order of $1.00 per title and offered for sale over the Internet for storage on hand held music players. Live singles will also be offered for sale on Internet subscription services along with event-related interactive games and tournaments. Also to be made available are director's cuts, narrated tracks, "best of" selections from a particular artist's tour and personalized compilations inclusive of audience noise, monologues, artist soliloquies and narration tracks.

All Recordings especially the spliced singles tracks—expected to be a big Internet seller—can be optionally watermarked, encrypted and protected with available DRM systems by integrating standard methods. These new live sound recordings of even old titles are expected to compete with the pre-released digital studio recordings that are now being freely shared over the Internet and crippling the recording industry. The inventor believes release of live singles presents one means to reverse spiraling losses attributable to the unauthorized sharing of digital files over the Internet in that it will offer alternative and fresh versions of a favorite artist's titles. Integration of screened video feeds after digitization present an inexpensive means to produce music video downloads at much lower cost that can be transmitted to cellular phones.

The inventor's disclosed accounting systems are key to keeping administration costs low. They are enabled to automatically calculate the statutory and contractual royalties payable to all involved in production of the live event and its Recordings. Labels, managers and producers can select any accounting format compatible with their current systems. Each participant's confidential accounting statements will be available 24/7 by secured key over the Internet and will offer information from every point of sale. Singles delivered to a cellular telephone will be accounted for by these same systems.

B. History of the Field

Historically, live entertainment events when recorded for live or tape-delay distribution to the mass media were relatively expensive productions. They were designed with high quality processes and formatted to meet broadcast standards. Originally, live recordings were made on film and/or tape but are now recorded by digital technology, and often with modest equipment. Now, even with advents in technology, tie-in merchandise like T-shirts, autographed pin-ups and cups that are being offered for sale to the public in on-site venue stores and retail outlets are generic, i.e., they do not to relate to or symbolize the specific event attended.

In the traditional music industry business model, live performance revenues were reserved in standard label contracts by the artist for their own exploitation. This meant that venues, event producers and promoters made their revenues only from audience ticket sales, commissions from on-site concession and sales of tie-in merchandise as related to the artist's reserved rights, and the artist's label did not share in these sales.

Conversely, the decision as to whether to release an audio or audiovideo recording of the live performance remained in the exclusive control of the artist's record label. Because the costs associated with broadcast-quality productions were so high and there was an additional concern that new releases might interfere with stable revenue streams from previously released whole albums, very few live events were made available for home release including for those who did not attend the live performance. The on-site stores at the Continental Arena at the Meadlowlands, Tanglewood or the Metropolitan Opera, for example, sell only the artists' pre-recorded studio albums, not the CD of the performance actually attended.

In a similar fashion, concerts in smaller municipalities or those given by new, unsigned bands just building a following, solo recitals of classical artists, local stage productions, sport-

ing competitions like horse racing, NASCAR and major/minor league baseball, educational seminars, speeches, etc., have almost never been produced for the mass media or home distribution. The live experience has been limited to the actual audience and spectators, i.e., those lucky enough to get "tickets". One exception is OTB where the live event is televised in specific networked locations for the benefit of all who place bets.

Basic recordings were, however, made of most live performances and sporting events, using simple equipment of modest quality, for reference, study or promotional purposes. Additionally, the press would cover highlights of certain local events (college competitions, e.g.) and archive footage for future stories or ancillary licensing. In the sports field, this business model works because once a competition is over, most of the commercial value of the event is lost.

Such is not the same for the music industry, however. When a great performance or concert has taken place, in hindsight the entire world may relish the chance to see it and even own it.

But even in the music business, tie-in videogames never became a standard part of the business model because of the limitations on technology and the prohibitive costs of production. With the instant disclosure, however, this will change. Any concert can now be the focus of an interactive promotional campaign that is tied to ticket sales and subscriptions. Certainly this advertising strategy is a lot cheaper and will expand geographic interest in the event.

What does this mean in dollars? In a nutshell, it means that with the prior art, most live events—even unique and quality performances and competitions as they continued to be staged around the globe everyday—had the fate of becoming "lost content". Live events are still not being exploited to their maximum potential because the systems in place were designed only to generate revenue from ticket sales and keep venue revenue sources separate from those belonging to the record labels.

In the music field, starting March, 2003 ten months after the preliminary application for the instant disclosure was filed, a handful of disc burning concerns attempted non-automated, non-authenticated physical CD handouts at small performing venues by incrementally transferring single titles onto a master as they were tracked. These companies conceded that with this method they could not fulfill the Recording demand of a large concert audience or any immediate outside orders.

In addition, standard CDR burning technology is now available at 30×-52× (one CD in little over a minute) even for home components. With standard technology as it may be updated, the on-site methods and systems disclosed herein do not require incremental track transfer to cut disc compression and duplication time (for those that want discs) and thereby can satisfy any size audience as well as outside orders all at the same time.

With the increasing costs of TV programming and the trend towards reality TV, basic digital recordings are now recognized as valuable, marketable content. Now, depending on the particular event, even the most basic recording can increase in value over time. TV shows and theatrical films like "American Idol", "The Apprentice" and "The Truman Show" demonstrate just how valuable even raw content has become. The announcement heard at the beginning of virtually every live event that cameras and recording devices are strictly prohibited, is definitive proof of the value of live Recordings even if they are not optimum quality.

With fast-forwarding options becoming more prevalent on home media players that bypass commercial advertisements, networks are no longer willing to pay a sitcom star $1 million per episode as they did in the final seasons of "Friends". In January, 2004, Mezzo-soprano Marilyn Horne told a seminar class that she was only able to incorporate a particular song on her 70th Birthday Album because it had been unlawfully recorded at a concert by an audience pirate. Norah Jones' early primitive recording sessions in solitude are now extremely valuable as background material not only for her own albums but also for the hot selling DVD releases of the Grammy Awards.

The analysis is no different for professional and amateur sports. Wouldn't at least some fans still want to watch Don Larsen's perfect game or receive a clip from a Yankee rally during the post-season superimposed on a T-shirt or autographed poster? If a fan didn't tape a game he attended, isn't it also likely that he may still want to buy a copy for reference or study?

In the music field, statistics show that many find live or "recorded as live" concerts far more satisfying than highly edited and planned "studio" recordings. The audience cheers, applause and artist monologues make the live recording far more exciting and have not been shown to cut into revenues generated by the original album.

Also, fans of an artist usually also covet a complete repertoire. In July, 2004, Business Week reported that 20-30% of an attending audience will order a CD of a concert attended on their way out the door. Whether that should be a physical engraved disc, a download direct to an iPOD or an order for home delivery is a decision this inventor will leave to the purchasers and venue owners to decide for themselves. Both are claimed in this disclosure.

Master classes, seminars and lectures by an adored artist also have inherent value.

And how many unsigned bands have downloaded their original material in hopes that get one of the "illegal" file sharing companies to pick it up even for listening by pirating teenagers? New acts will do almost anything to get free publicity. Now many avoid signing with a label because it has become increasingly clear that the labels are no longer in optimal control of the buying market.

It is not unusual that a great talent, artist, contemporary composer, or ensemble of great talents may appear or premiere works in a unique performance as in a benefit concert, gala, limited tour or opening and/or perform in a smaller market for a particular function or celebration. Many view the failure to offer these concerts as depriving the public of an artist's complete repertoire and/or interfering with a new artist's right to publicity. The May 15, 1999 Carnegie Hall recital of the "New Goldberg Variations" performed by cellist Yo-Yo Ma with a single piano accompanist is such an example. Royalties and guild residuals would have been minimal for release of this recital because a full orchestra was not involved. Yet it was never released by SONY Classical. Why not?

Renee Fleming and Ruth Ann Swenson, now probably the most marketed American sopranos in the world, formerly appeared on the 1998 program of the Marilyn Horne "New Artist Series" at Carnegie Hall. International classical music fans as well as patrons and subscribers would love to own a copy of this event. Yet the union and creative factions there continue to wrangle over royalties, regardless of the value of the recording.

C. Utility/Marketability

That there is a clear positive market for live recordings, even if of less than optimal quality, therefore, is a given. The proof can be found in the "warning" message to the audience

heard before virtually every live performance or professional sports competition informing patrons that recording is illegal and strictly forbidden. Only in the rarer instances when the artist, celebrity or producer has already licensed grander broadcast rights for live or tape delay production will the basic digital recording serve less than an absolute useful purpose, but as demonstrated above, a commercial purpose nonetheless even if only to fulfill tie-in merchandise orders.

Start-up bands are in desperate need of fast and efficient distribution channels for their original material in hopes of discovery. Now, even many veteran artists elect to negotiate with labels and concert venues so that they can offer their live performance recordings for sale in multiple formats.

Within the artistic community are certain rules and mores that using the prior art prevented capitalization of the live content market when the preliminary application for the instant disclosure was first filed in 2002. As aforementioned, the major labels and producers own the exclusive rights to the releases of their signed and featured artists including live performances. Moreover, the standard artist-label contract usually prohibits distribution of a recording without the artist's prior approval. Whether a label may have negotiated an "out clause" for live concert feeds must be analyzed on a case-by-case basis, another expensive administrative hassle for the label.

The only present exception is in the field of classical music because studio releases have never sold as well. Because of this, for the last few years, classical artists have been given "out clauses" to release their live recordings that were not given any artists five years ago. But even with these new contracts, the labels have remained reluctant to share of any part of live Recording sales with the hosting venues because they in turn do not participate in ticket and concession revenues. To help solve the impasse and the continuing decline of the recording industry, both parties along with musicians' unions, performing rights societies and digital rights management organizations may now have to negotiate if they want to keep consumers happy and keep pace with advents in technology.

While in the past the labels feared that new live releases would interfere with their long-standing relationships with retailers and in turn stable revenue streams from classic prerecorded albums, they affirmatively avoided placing competing releases including live sound recordings into the marketplace. Now, with disc retailers becoming less significant with the marked increase in free digital file sharing and paid downloads to hand-held music players, these prior concerns have no rational basis in dollars.

Royalties, however, remain especially high upon ancillary release of a concert when a full orchestra is involved particularly in a top union house. Royalty payments are a sticky negotiation point for every grandiose music special packaged for multi-media release. Union engineering contracts make live production costs even more prohibitive at certain major venues like Carnegie Hall. Now we have podcasts and clipcasts where audio programs classically carried only on radio are made available via special software for download to home computers and mobile phones.

Special live concerts broadcast from a Wi-Fi hotspot is almost certain to become the next genre of podcast series and quality systems of management and administration as presented in the instant disclosure will be sorely needed. Whether a digital transmission is a "performance" as defined in the US Copyright Act, will not ultimately prevent a buy-out price per event by each of creative factions. Even other administrative nightmares like paying mechanical royalties when a concert is to include material composed by an individual other than the featured artist or one signed to a different label, are managed by the instant invention.

In 2002, when the preliminary application for the instant disclosure was filed, the news from the Recording Industry was unanimous that labels and copyright holders were avidly searching for new ways to replenish recording revenues lost to Internet piracy and file sharing. Motion picture studios also reported becoming increasingly concerned about digital piracy of theatrical films. The answer, as proven by the subsequent exponential surge in ticket sales and new forms of interactive entertainment, may well be active pursuit of the live content market with implementation of the systems herein disclosed.

Statistics continue to confirm that a significant number of concert goers (20%-30% +) will buy a Recording of an attended event if delivery can be expedited. Further statistics show that there is a premium on being able to offer instant gratification to an audience on the way out of the venue. A higher percentage will purchase if a preferred method of retrieval can be designated. A cup or T-shirt is far less attractive than the performance itself. The instant disclosure provides the most comprehensive recording purchase options to the consumer. In addition, the venue selects whether the inventor's intelligent terminals installed onsite will offer authenticated recording ordering, encoded delivery to handheld devices and also actual CD burning and engraving.

In sports, the videogame industry is itself a multi-billion dollar business. Interactive game(s) are a natural supplement order for a sports entry ticket. If fans in the audience and elsewhere could all participate in a staged virtual tournaments related in time and space to the live competition, the promotional value could be huge. The end result would be broadened geographic interest even in a local event and a ring side seat on a cell phone.

A sport celebrity's and/or artist's pin-ups, posters and T-shirts sell extremely well and may even appreciate over time. Making a still or autographed photograph of a shortstop's great play immediately available would be a certain "hit" almost like catching a foul ball in the stands. All such orders are most efficiently fulfilled when linked to ticketing operations.

The present invention and disclosure conquers these and many other problems traditionally associated with the immediate marketing of live event Recordings. These include but are not limited to:

- The technological and speed limitations on on-site live recording ordering, balancing/editing, fulfillment, physical disc engraving and authorized retrieval of the live content in fixed, analog, digital and/or other encoded format;
- The cost of manually gathering the information associated with the sale(s);
- The huge prototype costs including costs of on-site intelligent terminals;
- The technological limitations on authentication;
- The technological limitations on editing and balancing;
- Integration of technology that ensures confidentiality to purchasers;
- Integration of technology that ensures protection of the live content;
- The lack of systems that associate mobile phone and other electronic live recording orders with ticketing and/or immediate and subsequent live sales around the world;
- The lack of systems that integrate all recording orders pre and post event in all media;
- The job of securing clearances of all parties necessary to effect live recording release

The job of securing the artist's prior approval to the live release particularly if required by contract;

The cost of separately producing and advertising;

The cost of high engineering fees particularly in union houses;

The cost of the residuals and both statutory and contractual royalties owing to all performers, copyright holders and participants upon ancillary distribution;

The cost and clearances required for multimedia of recording delivery including Wi-Fi, satellite radio, podcasting and clip casting;

The overhead of music and live recording publishing administration;

The overhead of royalty accounting including calculation of participations, copyright royalties and payments to guilds and performing rights societies, and generation of statements as may be audited;

The cost of litigation and insuring against it particularly in the gray area of digital distribution;

The cost of updating to keep pace with advents in technology;

The costs of servicing all systems, terminals and equipment;

The loss of impulse business if the customer has to wait a long time to receive a Recording or tie-in merchandise from the event;

The technology and speed limitations of already attempted methods of onsite disc burning because the customer must wait for discs to be balanced, edited, burned and physically handed out, rendering the tried methods insufficient to accommodate a large concert or sports audience;

Potential losses from unauthorized uploads and digital piracy of the live content including from a previous performance during a particular tour;

The technology limitation on integration of all methods and systems needed for financial success; and

The lack of systems that organize and process demographic information from purchasers so that future events and releases can be better marketed while still maintaining the confidentiality of those purchasers who so designate;

The cost of insurance to guard against infringement and misappropriation.

## SUMMARY OF THE INVENTION

The instant disclosure presents novel, useful and unobvious systems, methods and intelligent apparatuses that efficiently, quickly and economically capture and exploit otherwise lost live content. Methods, systems and intelligent apparatuses are disclosed for the immediate multimedia and electronic global ordering, sale, management, and authenticated distribution of live event content recordings by all means of delivery, transmission and retrieval now known or hereafter devised both on and off site from where the live event takes place. Methods and systems are also disclosed for the global solicitation and processing of authenticated electronic responses at live talent competitions, sporting events, and interactive games including from worldwide non-audience participants through enabled devices.

With respect to distribution of live music, entertainment and event "Recordings" (as herein defined), the methods and systems disclosed reveal means that expedite and associate necessary and value added steps in the production, packaging, broadcasting and administration process. These include: (i) association of recording orders to ticket sales, subscriptions, podcast address and/or uniquely identifying information given by the holder at the time of issuance; (ii) methods for content mastering, balancing and editing; (iii) methods for splicing and packaging single titles, action stills and other unique derivative works; (iv) methods for creating director's cuts, "best of" versions and other derivative works; (v) methods for automated copyright accounting including calculation of statutory and contractual royalties from the point of every sale; (vi) integration of standard content security systems [e.g., encryption, watermarking and digital rights management ("DRM")]; (vii) integration of new venue anti-terrorism security systems; and (viii) solicitation and processing of recording orders from non-audience purchasers using any uniquely identifying information that helps directs transmission of content including, without limitation, home or mobile phone number, URL, e-mail or street address, credit card or banking number, personal account, podcast or satellite radio account, Social Security Number, date of birth, mother's maiden name, and most significantly, a DNA fingerprint.

In the sports and gaming field, entrant's fees and bets placed are to be used in this disclosure in lieu of or in addition to "tickets".

The systems disclosed include but are not limited to coupling "ticket" sales with orders for event content Recordings that also specify the preferred method and/or location of retrieval and can be optionally authenticated and/or protected by the integrated methods herein described. They describe wholly new ticketing/ordering operating systems that can be integrated including without limitation an interface to work with existing ticketing software (even when orders are placed over a phone) which converts the ticketing data into a readable language, XML for example, thereby creating an overlay and allowing for the authentication of information already input. Such coordinate systems equally apply to data input for tournament entrance fees or placed bets as well as or in lieu of "tickets". They further apply to methods authenticating orders to delivery codes including assigned land lines, cellular telephone numbers, URL's, e-mail, text messaging, subscription, podcast and clipcast accounts, DNA fingerprints or any other uniquely identifying information that directs transmission of the content. The term "Tickets" and as used in the instant disclosure, therefore, relates not only to the entrance receipt resulting from the ticket sale transaction but also to tournament entrance fees, bets placed or other information of the ordering or receiving terminal including as example a land or cellular phone number which can be authenticated and/or receipted to uniquely identify the buyer/placer by any electronic or other means now known or hereafter devised.

The present invention incorporates systems and methods of assigning numerical values to live audience feeds and then converting the digital reading(s) balanced for an audience to those for a CD track mix.

The present invention incorporates methods for placing special orders for audio-balanced, spliced, edited and other derivative event Recordings including without limitation single music tracks with our without accompanying video including without limitation from installed video screens at the event, those with and without audience noise and/or artist monologues, sports highlights, "best of" compilations, director's cuts, narration tracks, photographs, stills and tie in merchandise, posters, pin-ups, T-shirts, cups, celebrity endorsed games or videogames, etc.,—and associating these with the "ticketing" and other systems herein disclosed.

The present invention also incorporates systems wherein the purchaser is given the option to receive promotional material for other subsequent event announcements and merchandise.

With the systems herein disclosed, purchase and retrieval of Recordings embodied in a fixed tangible medium of expression (CD, DVD, VCR tape, etc.), or in non-fixed analog, digital or other signaled format may take place at the venue itself, at location based intelligent terminal kiosks including enabled tables at eateries, coffee houses and showcases and terminals at any other location including airports, malls, and retail stores, at an ATM machine, or at a home personal computer, cellular telephone or other apparatus.

Further disclosed are independent methods and systems for processing outside orders for the live events Recordings from those who did not attend the event and/or who have no access to on-site points of sale. These orders may be placed over the Internet, by regular land line or wireless phone number that pursuant to the instant disclosure may be linked herein to the ticketing operations.

The instant disclosure presents a technological solution to deter the unauthorized sale and/or upload of shared digital files by offering downloaders fresh content of featured artists to compete with their previous studio Recordings that are now being shared for free and crippling the Recording industry.

The present invention discloses integrated methods and systems for prompt, accurate and virtually automatic calculation and payment of statutory, guild and contractual royalties to copyright holders and participants alike by managing accounting from the point and moment of sales. This allows for the immediate equitable allocation of revenues and the tremendous lowering of the overall costs of production and distribution. Disclosed is a system for protected key access by all copyright holders to their royalty accounts and demographic information to the extent that purchasers authorized its disclosure.

The present invention is a complete system and method providing a legal, efficient way to maximize the revenue and the promotional value of the live event, track the content sales, gather the required information and transmit that information to all parties involved in the production, manufacture and fulfillment of sales as well as to those entitled to share in revenues and at cost low enough to make it practical even at low volumes.

Equally important, by returning control of content releases to the copyright holders (which in turn will allow for the offer of discount and promotional tie-in pricing concurrent with ticket sales), the present invention will serve to encourage new and established talent to remain within the structure of the existing system, thereby providing a win-win-solution to all—studios, labels, and participants alike.

Further, the present disclosure offers the public the opportunity for instant gratification and impulse buys at comparatively lower cost to the suppliers without the need for "hand out" sales or additional sales personnel.

The system incorporates rating and interactive systems to enhance the live experience and its geographic influence and also to allow for participation staged tournaments and contests by ticket holders and non-audience members alike.

Optionally, Recordings including single tracks may be separately encrypted, watermarked, formatted and/or rendered destructible by known industry means, integrated with other systems described and offered to consumers over the Internet for a download fee and transfer to hand held players.

Other special purchase orders including "best of" compilations, director's cuts and narration track versions are anticipated to be especially attractive when multiple performances of a live event take place at the same or different venues, as during a revival or artist's concert tour. To the extent that pre-event disc production may incorporate already approved performances of certain titles from a prior concert of a current tour, the systems integrate those balanced, edited and production systems as well.

Separate integrated methods and systems are disclosed for automated mastering and editing including digitizing console and instrument feeds through the use of algorithms. These systems and other editing and disc burning/engraving technology that may currently exist or hereafter be devised, are described as to be integrated with the ticketing and Recording ordering systems herein described and/or the system as a whole.

In total, these methods individually and collectively comprise the collection and input of purchaser information starting optimally at the time of first ticket sales, the optional integration and processing of mastering, editing and digitized balancing data, and secured transmittal of that information to all parties responsible for the fulfillment, manufacture and distribution of the Recordings, as well as to those entitled to payment by statute or contract.

In the instance where the Recordings are to be delivered by immediate and/or electronic transmission directly at the venue or devices including a land or cellular telephone or other enabled appliance, methods and systems of authentication of the ticket holder's or outside purchaser's information including his assigned phone/cellular numbers, e-mail address and/or bank account are incorporated and disclosed to ensure authenticated delivery to the proper party at the time and/or location of retrieval. Integration of standard secured credit card technologies will allow on and off site sales at any enabled terminal location including without limitation at a home computer or cellular telephone to all who did not pre-buy Recordings. All purchasers and can elect to receive promotional information for upcoming releases, games and other live events. In the systems disclosed, the buyer/orderer will maintain the right to have such information transmitted to the copyright owners as part of an overall demographic package or to keep such information confidential.

Optionally to be added to the system are integrated methods to handle the purchase and/or license of grander scale broadcast productions and home distribution versions. For those cases where the pre-approval of the artists is required prior to release of a Recording, integrated are disclosed systems to block sales until and only if such consent is secured.

Systems for audience participation and ratings, videogame or interactive tournament play or live content merchandise auctions or stock markets, can be optionally integrated into the systems disclosed to enhance the complete live experience and encourage participation by spectators and non-audience members alike.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts an overall schematic or block diagram of a system constructed in accordance with the present invention.

FIGS. 2A-C depict the transaction flow including processing and administration of Recording orders—claimed both from ticket holders and independently from non-ticket holders—payments and accountings to all copyright holders and participants (or "partners").

FIG. 3 shows a flow chart for processing transactions and information requests.

FIG. 4 depicts the method and system of manufacturing/fulfillment including orders for complete, spliced or special purchase Recordings including derivative or edited versions, singles tracks and personalized compilations in fixed, encoded and any other format.

FIG. 5 depicts the methods and systems of On and Off-Site Production and Distribution and authenticated retrieval associated with identifying ticketing information and other uniquely identifying information of a Recording purchaser. FIG. 6(*a*)-(*d*) depict the inventor's original intelligent terminal designs separately submitted for patent protection.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

While the instant invention is susceptible of embodiment in many different forms, there is shown in the drawings and herein described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered an exemplification of the principles of the invention and is not intended to limit the principles or scope of the invention to the embodiment.

As is now standard in the industry and in referring to FIG. **1**, the system architecture of the preferred embodiment of the present invention is implemented using a Data Center, a plurality of venues using standard point of sale equipment and a plurality of terminals. The Data Center is in communication with each venue and each purchaser or licensee terminal through the Internet or any wireless application. The terminal can be any device through which a user can access a Website, e.g., a personal computer, a personal digital assistant, an Internet-through-television device, a cellular telephone, or any type of many available wireless devices available in the market, or any updates as may now or hereafter be devised.

Referring to FIG. **1**, the Data Center (**100**) preferably comprises database servers (**100A**), Web servers (**100B**), a load balancing router (**100C**) and a firewall (**18**) connected to the Internet. The firewall (**18**) receives messages from the Internet (**19**) and forwards the messages to the load balancing router (**100C**) and likewise receives messages from the load balancing router (**100C**) and forwards them to the Internet (**19**) or other similar distributed computer network. The firewall (**18**) preferably performs a number of filtering functions and network address translations in order to safeguard the Data Center from unauthorized access. The firewall (**18**) also preferably encrypts and/or watermarks the message using known public key/private key encryption and standard methods and may also integrate Digital Rights Management ("DRM") tracking. The load balancing router (**100C**) forwards messages received from the firewall (**18**) to one of the plurality of Web servers (**100B**). The load balancing router (**100C**) also forwards messages received from the Web servers (**100B**) to the firewall (**18**) for transmission to other sites through the Internet (**19**). In this manner, the load balancing router (**100C**) distributes tasks to be performed to one of the plurality of Web servers (**100B**) in order to distribute processing demands. The Web servers (**100B**) access the database servers (**100A**) to retrieve and store information in response to received messages from the terminals (not shown). The database servers (**100A**) store data tables which contain information about various venues, events, accounting, royalties payable, fixed payment allocations, ticket resources, ticketing software, user rules, ticket status, ticket holders and tournament entrance fees and bets placed (if applicable).

An end user (**10**) can access the Data Center (**100**) by using a standard Web browser on a terminal (not shown). However, non-standard, custom software can also be implemented or Web browser software on the wireless device such as a personal digital assistant or cellular telephone. Terminals can log into the Data Center (**100**) to view events which will take place in the future, purchase tickets, allow patrons to access Recordings from the just-completed live event (**212**), interact to rate a new act or the event itself, and/or to buy interactive games to participate in the event itself or in staged tournaments with other users or spectators (**10**).

Moreover, other information including user roles, options for Recording retrieval including location, means of retrieval and incorporating burning, engraving, mastering balancing, editing technology as may now exist or hereafter be devised including through the use of algorithms as herein disclosed, may be implemented. Choices may include venue, management, artist, record label, team owner, event management, ticket buyer/ancillary purchaser, retrieval immediately at venue by CD or DVD, or for delivery by digital transmission/USB port at a location based kiosk, at home by mail of by home computer access, on a cellular telephone, or those that order derivative works or elect to input other demographic information for dissemination, i.e., 'best of' versions, director's cut, narration tracks, and requesting upload of demographic information and promos for upcoming events and other releases, etc. (**214**).

More particularly, referring to FIG. **1**, the system further includes one or more entertainment venues (**14**), a fulfillment or manufacturing center (**300**), a plurality of information fee recipients (**24**) and a plurality of Recording recipients (**28**). The transaction flow is depicted in FIGS. **2**A-C.

The ticket buyer makes a purchase transaction in step (**600**). During this step, the ticket buyer (**10**) is presented with the option of pre-buying a tie-in Recording. The price of the Recording is added to the price of his ticket purchase to the live event (or other logged entrance fee or bet). In the event the purchaser desires to retrieve his Recording at the venue immediately upon completion of the performance (or prior to in the case of interactive games), standard authentication methods may be employed, including, but not limited to, bar coding and/or information authentication.

The ticket seller (**11**), who is already making various allocations for taxes, fees, etc., from the gross receipts, treats the price of the value added Recording similarly. He subtracts his fee, whether fixed or contingent (his incentive to provide this service), and forwards the remainder to the Recording supplier (Recording-seller). Because this is still a single transaction, with the ticket serving as the customer's receipt, the added cost is minimal.

The ticket seller at locations (**11**) transmits the transaction data over a PC or other standard point-of-sale equipment well known in the art (not shown), which includes the information gathered from the charge card transaction, which identifies the buyer and specifies the address (the charge card address or other address selected by the buyer (**10**)) to which the Recording is to be sent, to the Data Center (**100**) (step **610**). This transmission is done in real time, through the Internet (**19**), using industry standard protocols such as XML and is properly secured using one of many industry standard encryption methods.

Upon receipt at the Data Center (**100**), the transaction information is immediately loaded into the master system database (**100A**). The database system is capable of Recording a multitude of transactions involving a multitude of events simultaneously, while at the same time providing all of the required reporting and processing functions and maintaining both the physical and logical security of the information which is critical to the successful implementation of the method.

The preferred embodiment preferably uses an industry standard database system, e.g., Oracle, Microsoft SQL Server, IBM DB2, XML, etc., which is scalable, and of an

industry standard set of server hardware, which is also scalable to ensure that it can handle whatever transaction load is required.

In step (612) the Data Center (100) checks if the transaction is valid. Invalid transactions are discarded (step 614). In step (615) the Data Center transaction is posted with database (100A). In step (616) the transaction is backed up. Next, various data files containing statistical information are updated in the data base (100A) to reflect the latest transaction(s) (step 618).

As indicated above, the Data Center (100) also encompasses a series of Web servers (100B) providing as Web sites and/or Web services points of access for various interested parties to retrieve information required for their operation. FIG. 2B shows the process for generating the Recordings in fixed media of expression (CD, DVD, e.g.) on site using a suitable Recording subsystem (15) (FIG. 1). During or immediately after the event, the Recording subsystem (15) generates a Recording on an appropriate medium using preferably non-incremental methods. In the alternative, Recordings are available to be retrieved on or off site through enabled terminals in digital format through USB port or other methods including hook-up of iPODs and other storage devices, also authenticated using cellular telephones and Internet subscription accounts. Booklets (if any) are prepared for the buyer together with labels that are affixed to the Recording (step 620). The completed Recording is delivered to the buyer (step 621). In step 622 the manufacturing details are sent to the Data Center (100) and fulfillment center for accounting and statistical analysis. Using this data, in step 624 various statistical data bases are updated with the latest transaction(s). FIG. 2C illustrates the final accounting process. In step 626 the transactions for the event are reconciled and finalized. In step 628 reports are generated. In step 630 the reports and payments to various partners are calculated and transmitted. In step 632 temporary data in the central data base (100) are cleaned out and the central data base is readied for the next event.

As discussed above, and illustrated in FIG. 1 if a user or buyer wants to take home or receive a live Recording directly at the venue upon completion of the event, standard authentication methods, including but not limited to bar coding, may be used. Referring to FIG. 5, the Recordings from the editor apparatus (19) are stored as tracks on servers (402). Next, the Recordings are transmitted or "burned" on site by updated non-incremental CDR technology generating media (401) in bulk. The media (401) (that may include DVDs. CDs, etc.) are sold to either users or buyers (10), who have prepaid for the media when they bought their tickets, or alternatively to buyers (10A) who have not prepaid and pay for the media at a subsequent time including at the end of the event. The bulk Recordings (401) may be sold by a clerk (403).

Alternatively, however, a kiosk or other enabled terminal (410) is provided that receives the Recording data from servers (402). The kiosk (410) is an automated kiosk, "vending machine" or enabled table in a nightclub/eatery that either burns or spits out a Recording on demand when presented with authenticating information that may be information on the ticket itself and/or prerecords the tracks on a selected media and provides labels, booklets and other materials associated therewith. The media and associated item(s) are then dispensed when the user/attendee inserts his ticket or inputs other identifying authentication information into the kiosk (410.) Alternatively, the kiosk receives the ticket or other input information from the user/orderer and, in response, starts the burning of the media or takes order for the mailing or desired home electronic retrieval. In this configuration, the user may be given the choice of customizing his Recording by selecting specific portions or songs of the event that should be burned on the media, their sequence, etc. or may even order "singles". This will be the preferred method if a kiosk is in the form of a patron's audience chair, table or seat at an eatery, nightclub or showcase. Orders can also be taken at enabled turnstiles or ATM machines at banks, airports, malls and other public venues.

A user (10A) who has not prepaid for the Recording may also obtain one using the kiosk (410) and charging the purchase to his credit card or by using other payment means.

The kiosk (410) may also deliver a Recording as a data file that becomes available for downloading by the user (to a PDA, IPOD or other similar device) through a data port (such as USB port) on the kiosk (410).

Finally, after the event is finished, the Recording can be delivered or distributed electronically as a digital file to the home (420) of the user and the point of sale site (400) may be bypassed. Communications between the various elements of the systems can be implemented over wired or wireless networks. Typical wireless networks that may be employed include Wi-Fi, Bluetooth, etc.

The ticket/Recording buyer (10) can from any terminal, for example, check on the status of his order and perform a limited range of functions, such as changing the delivery address for his order, order additional Recordings, or order that promo information of upcoming concerts and other future releases be sent to him.

Similarly, the entertainment companies and record labels can, for example, check, in real time, to see how many Recordings for their artist have been requested and sold for any event, track the royalty and other payments through the system, and, for example, receive survey responses from those who elected to participate in "new band" ratings. If the buyer opts to allow dissemination of other demographic information including, for example, his order for promos, tickets for upcoming events or releases and other merchandise, the system will accommodate those requests. By integrated methods and systems, it will also allow for ordering and purchase of "best of" releases, director's cuts, narration tracks, and single tracks and compilations emanating from the live event.

The Data Center (100) maintains security and confidentiality through the system. The entertainment entities and "Partners" are issued specific password credentials which are authenticated through standard industry techniques (218). In the case of the ticket/Recording buyer, his ticket number along with information not printed on the ticket, such as his billing address or other identifying information (mother's maiden name, e.g.) is used for verification before he can gain access to the privileged areas of the processing Web site.

As shown in FIG. 1, in addition to users or buyers (10), other entities may also have access to the Data Center (100), including revenue participants (24) that may include several Partners. In addition, specialized servers may also be provided as part of the system. For example, server (20) is used to determine fees and royalties for the various Partners (24). The server (22) provides standard accounting services. These servers can communicate with each other and with other components of the system through standardized networks, such as Internet (19).

Of course, the whole purpose of the system is to manage ordering, packaging and multi-media distribution of live event recordings and to organize and run new types of live events at venues (19) including those to be constructed with new technology regardless of whether they have outside ticketing service companies or their own and help take maximize

advantage of the impulse buying potential of the adoring audience and fans. As part of this process, buyers (10) can receive or buy Recordings of the event and other items associated with the event. These materials are available immediately at a point of sale station (or store) (400), as discussed in detail below and shown in FIG. 5. The event is recorded and edited by on-site editing equipment (19) to provide the immediate Recording at a station (400). Non-incremental or other burning technology compatible with updated standard CDR technology is preferentially to be used.

In addition, or alternatively, the event is recorded by digital Recording equipment 16. The recorded data inclusive of mastering, editing and balancing data is then sent to an offsite manufacturing site (300) where the Recordings are generated (on CDs, DVDs and other similar media) and then packaged and distributed to the users (10), as discussed in more detail below and illustrated in FIG. 4. Manufacturing instructions (31) to both sites [i.e. station (400) and manufacturing site (300)] are provided by the Data Center (100). Moreover, the Data Center (100) receives inventory and accounting information (30) from both sites.

Details of how requests for transactions and information are handled by the Data Center (100) are provided in FIG. 3. A request is received by the Data Center (100) in step (200) via the Internet. In step (210) a check is performed to determine if the request is a special request for information (available only to certain subscribers and partners). If it is not, then in step (212) information is retrieved and sent to the requester indicating what services are available, including lists of future events for which tickets, Recordings, and/or other items can be purchased. Lists of other items related, for example, to Recordings from past events, may also be displayed. In step (214) a request for tickets, Recordings or other items is received from a user (10). The request is processed, the user (10) is issued a ticket and the resulting transaction is processed as described in the flow charts of FIGS. 2A-2C.

If in step (210) a special request is identified, then in step (216), the requester is asked to provide a password and the password is validated. If the requester is identified in step (218), then in step (222) he is directed to a special partner web site where he can access data on various events, including their status, number of orders for received for the events, fees collected, royalties due to the partner, etc. In step (223), data related to the partners is updated in the Data Center (100), if necessary.

If the requester is identified as a registered buyer, then in step (220) the buyer logs in and is directed to a buyer site in step 224. At this site, the buyer is allowed to check on the status of his order, he is allowed to change his order, provide information for shipping, etc. The information or changes entered by the registered buyer is stored in the Data Center (100) in step (226).

After a particular event has concluded, the Data Center sends to the fulfillment house (122) information specifying the number of complete and derivative or special order Recordings (120) to produce and the addresses to which those designated to be mailed, should be mailed.

Off site Recording is performed by manufacturing station or site (400). As shown in FIG. 4, after the event, the performance data is received in step (310). This data may be streamed or may be sent electronically in a batch. Alternatively, the data may be recorded on a data storage medium and sent to site (300).

In step (312) the data is edited. Editing may optionally incorporate the disclosed method of digitized conversion from an audience balanced to disc balanced reading. In step (314) the data is prepared for Recording on a master. In step (314) the data is optionally encrypted, and, if desired, a unique watermark is added for copy protection. In step (316) multiple copies are made from the master by burning or other means. In step (318) labels are applied to the media and the labeled media is boxed and packaged together with other materials, such as booklets, pictures, etc. In step (320) the packaged media are shipped.

In step (322) additional copies of the Recordings are made, if necessary. In step (324) a production document is generated. In step (326) the data files at the Data Center (100) are updated to reflect the Recording produced and shipped.

The Data Center 100 also handles all tasks of reporting and accounting for copyright, and other participants and generates detailed statements and accounts including the amounts of statutory and contractual royalties (20).

To summarize, a Recording of a live event or any part of a live event (including spliced, edited and/or derivative special order versions thereof) is ordered before, during or after the event by a buyer who has attended the event or by a non-attendant buyer by any available means including, but not limited to, by using an appropriate Website or enabled hand-held device including a cellular telephone.

While the specific embodiments have been illustrated and described, numerous modifications come to mind without significantly departing from the spirit of the invention and the scope of protection is only limited by the scope of the accompanying claims.

I claim:

1. An apparatus to facilitate the purchase of customizable event or venue content by a person during a live event or immediately following such live event over a computer network comprising:

a. at least one data center connected to the network said data center comprising a database for storing live event purchase transaction data;

b. At least one recording subsystem connected to said at least one data center for recording at least a portion of said live event;

c. At least one editor apparatus connected to a remote user terminal through said network for receiving the recorded live event from the recording subsystem and a user selection request for event content, and for editing the recorded live event based on the selection request; and,

d. said at least one remote terminal further comprising means for connecting to said data center via said network, receiving means for receiving said requested event content from the editor apparatus, downloading means for downloading said requested event content onto a user media device, means for providing the live purchase event transaction data and selection means for transmitting the selection request.

2. The apparatus of claim 1 wherein the live event is any one of concert, recital, tour, stage, musical play, sports event, conference, symposium, showcase, comedy revue, screening, exhibition, demonstration, opening, travel, skit, tournament, speech, convention, address, seminar, class, lecture, or sermon.

3. The apparatus of claim 1 wherein the customizable event or venue content is a portion of audio, video, images or a combination thereof emanating from said event.

4. The apparatus of claim 1 wherein the customizable event or venue content is packaged with other venue or sponsor offerings.

5. The apparatus of claim 4 wherein in addition to customizable event or venue content, offerings may be made in conjunction comprising: single titles, "best of tour", director's cuts, narrations tracks, photos, action stills, or pin-ups.

6. The apparatus of claim 1 wherein the computer network is at least one of wired or wireless telecommunications network.

7. The apparatus of claim 1 wherein the live event purchase transaction data is at least one of bets placed, investments, ticketing data, electronic ticketing data, orders for event associated electronic displays, orders for ads, orders placed in response to ads associated with the event, orders to receive recordings or live event and venue content, orders to realize promotional benefits associated with the event offered by its producers, sponsors and distributors, featured artists, celebrities or participants, orders for event content, or orders for offerings unrelated to the event.

8. The apparatus of claim 1 wherein the editor apparatus is connected to a fulfillment center's database.

9. The apparatus of claim 1 wherein the editor apparatus is connected to a telecommunications carrier's database.

10. The apparatus of claim 1 wherein the user media device is at least one of cell phone, personal digital assistant, handheld device, enabled hospitality or conference table, enabled audience or airline chair/seat, enabled turnstile, or enabled gate.

* * * * *

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/29/10 Page 29 of 153

EXHIBIT 2

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 30 of 153

# UpFront

TOURING BY RAY WADDELL

## Clear Channel Spinoff Outlines New Structure

NASHVILLE—Clear Channel's soon to be spun off live entertainment division is starting to take shape, but several key questions remain about the new structure of the company, currently operating as CCE Spinco.

An internal memo, obtained by *Billboard* and first revealed Nov. 17 on billboard.biz, describes the new structure forged by Spinco CEO Michael Rapino in preparation for the division's upcoming public offering, believed to be set for some time before Christmas.

According to Rapino's memo, he has downsized CCE Spinco from 14 business units to six.

The new organization sees Spinco broken down into three divisions on the "content" side of the business: Global Music, Global Theatrical and SFX Sports. There also are three divisions on the "distribution" side: Global Venue Management & Sponsorships, Marketing and Interactive Technologies.

Charlie Walker, formerly COO of North American Music, has been named president of the North American Global Music division, which runs the various CCE local promoter divisions like Tea Party in Boston, Electric Factory in Philadelphia, Avalon in Los Angeles and Cellar Door in Detroit. All the local offices will operate as before, according to a source.

Motorsports continues to be run by president Charlie Mancuso, now reporting to Walker.

Additionally, Alan Ridgeway is promoted to CFO of Spinco. He most recently headed CCE's European Music division. Carl Pernow is president of international, and Thomas Johansson is chairman of international. David Ian is chairman of the Global Theatrical division.

Conspicuously absent from the memo is any mention of the future of Spinco's global touring division, TNA International and TNA president Arthur Fogel. As producer of such tours as this year's monster U2 Vertigo trek, TNA has been a cash cow for CCE since 2000. Fogel and TNA will likely play an even bigger role in the new company.

Also not mentioned is CCE's Exhibitions division.

But no divisions were "eliminated" per se, according to a source briefed on the memo. "Things that had been 'spun out,' like the theatrical productions unit, were folded back into the main division," the source tells *Billboard*. The source adds that no part of Spinco will be sold prior to the spinoff, and there are no plans to sell any core business.

On the distribution side, Bruce Eskowitz is president of the newly formed Global Venue Management & Sponsorships group, which oversees the 141 Spinco venues (mostly amphitheaters). Reporting to Eskowitz are executive VP of national sales Russell Wallach and executive VP of local sales and premium seats Maureen Ford.

Faisel Durrani will lead the Marketing division as president, clearly an area of focus for Rapino.

"At the core of everything we do is marketing," he says in the memo. "We have done a great job to date building strong divisional marketing teams to sell tickets. But whether I ask talent or members of our staffs what we need to do to help sell more tickets, I hear a similar theme—more national marketing partners to drive ticket sales, more national programs to drive venue programs and more consumer products to increase revenue."

Bryan Perez is president of the Interactive Technologies division, which will include the company's Instant Live and Next Ticketing operations.

Rapino says that during the past few months Spinco has "created a lean head office, based in Los Angeles. The corporate team is charged with managing the new public-company requirements that our new freedom and flexibility brings. It will also lead our strategic growth plan."

Regarding the recent layoffs and office closings, Rapino says in the memo, "The decision to eliminate positions is never an easy one, but the choice here was clear. We are committed to beginning life as an independent company in the strongest, most focused position and that includes having the courage to make tough decisions." ■■■

BY RAY WADDELL

# UMG Deal Should Boost Concert CD Business

## Label Is First Major To Sign Up With Clear Channel's Instant Live Service

Instant Live's "preferred provider" agreement with Universal Music Group should streamline the process for the company's acts to offer live CDs and downloads immediately following concerts.

The UMG deal with Instant Live is the first between a major label and a concert CD firm (billboard.biz, Sept. 26). Instant Live is the live-concert CD arm of Clear Channel Entertainment.

The agreement will be administered under eLabs, UMG's new-media division.

The deal is expected to open the door for smoother relationships between the traditional record business and concert CD providers. The concept was introduced by CCE in spring 2003.

"Now we have the stamp of approval from the world's largest record company and that means a lot to us," Instant Live GM Stephen Prendergast says.

Among the acts that have already offered Instant Live CDs are the Allman Brothers Band, the Black Crowes, Hall & Oates and developing bands like the Dears and the Decemberists.

Prendergast expects more to be onboard by next spring. "This is the end of the R&D period. Now we're turning this into a business," he says. "Profitability is within range. We think next year will be the year we get our head above water."

### BLUEPRINT OF A DEAL

Prendergast says UMG sees Instant Live as a revenue producer and a marketing opportunity for artists.

The agreement provides a blueprint for UMG's labels to customize Instant Live deals for each act. "Each label head can decide what terms best suit their client," Prendergast says. "A mature act like U2 would certainly require different terms and benefits than a new act."

Instant Live will act as a "service provider," Prendergast adds. "UMG will own the works, though we will have rights to them for a period of time."

The accounting details for live concert CDs are complicated. "There are a lot of people in the chain: the label, the artist, the venue, the union for the live recording, the musician's union, us," Prendergast says. "That's why it has taken us over two years to get to this point."

Under the blueprint, labels and artists get 30%-40% of a $25 Instant Live CD sale, which they typically split equally, according to Prendergast.

The remaining gross receipts are broken down as follows: 5%-10% to the venue, 10% for packaging, varying percentages for sales tax, shipping, production and transportation costs, and perhaps 20% to Instant Live, "if we're lucky," Prendergast says.

"It's not purely a financial play for us," he says. "It's a significant artist development play, to help us grow our relationships with the artists and the labels."

For the bands, Instant Live represents another revenue stream. "Nobody is going to retire on this, but it's an ancillary revenue stream we don't have to do anything for," Allman Brothers Band manager Bert Holman says. He notes that the group's Instant Live sales have not cannibalized other revenue. "Our merch holds steady," he says.

To reduce costs, Prendergast says Instant Live is moving toward a presale model where fans can buy CDs before the show. Eventually, Instant Live hopes to emphasize digital delivery.

"Next year, we're going to be looking at situations where people will be able to take their digital recorder, PDA or whatever that device may be, walk over to someone in the building and get a digital copy transferred to their device after the show and walk out in maybe 20-30 seconds."

The UMG/Instant Live deal will likely attract the attention of other majors, and gives Instant Live a leg up on its primary competitor, Disc Live.

"There are favored-nations provisions in this agreement so that we'll present similar terms and benefits to the others," Prendergast says. ••••

PRENDERGAST

$25

Price of an Instant Live CD, of which 30%-40% will be paid to labels and artists



JULY 12, 2004

UP FRONT

**Burning To Burn Instant CDs**

There's a battle brewing in concert halls across the U.S. Clear Channel Communications' (CCU) Instant Live unit records concerts and burns CDs for sale right after a show. But rivals in that nascent business fret that Clear Channel, which owns a substantial number of concert venues, will block the use of their services.

In a Mar. 31 e-mail obtained by *BusinessWeek*, Clear Channel Executive Vice-President Steven Simon wrote to Sami Valkonen, president of rival DiscLive: "DiscLive will not be permitted in our venues or at our shows." Valkonen confirmed the e-mail but declined comment. Another rival, Brady Lahr, president of Kufala Recordings, says his service was blocked at a July, 2003, show at a Los Angeles Clear Channel venue.

In an interview with *BusinessWeek*, Simon said that artists could choose any service. A Clear Channel spokesperson says the e-mail was sent because DiscLive did not make prior arrangements, and that it allows third parties at its venues. As for the Kufala allegation, "nobody knows what they're talking about."

Another concern: Clear Channel recently acquired a patent for Instant Live's technology. DiscLive and others argue that the patent ignores prior technology. On June 30, the Electronic Frontier Foundation said it will petition to revoke the patent as part of an effort to fight patents it believes are overly broad.

The instant-CD market is showing signs of life. Around 20% of concertgoers buy the $20 to $30 disks for acts such as Kiss and Jewel. And Clear Channel has a deal to sell its disks at music chains FYE, Virgin, and Tower Records. In the moribund music biz, that's a revenue stream worth fighting for.

*By Brian Hindo*

Copyright 2000-2004, by The McGraw-Hill Companies Inc. All rights reserved
Terms of Use Privacy Notice

BusinessWeek online

A Division of The McGraw-Hill Companies

FORMAT FOR PRINTING sponsored by

September 27, 2005

PERSONAL JOURNAL

# Bootlegs Go Corporate

## Record Companies Sell Instant Recordings of Concerts In Effort to Combat Piracy

**By ETHAN SMITH**
**Staff Reporter of THE WALL STREET JOURNAL**
*September 27, 2005; Page D1*

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Bootleg concert recordings are going legit.

The music industry has been fighting a losing battle against illegal recordings of live shows that circulate among fans. That fight is part of wider piracy problems the record labels blame for a steep decline in CD sales. But, now, some of the biggest music companies are betting on the unlikely solution of making and selling their own recordings of concerts, sometimes making them available just minutes after a performance ends.

The idea, which has been gaining momentum during the past year, took a leap forward yesterday when **Vivendi Universal** SA's Universal Music and Instant Live, owned by **Clear Channel Communications** Inc., announced a blanket licensing agreement that lays the groundwork for Instant Live to issue concert recordings by Universal recording artists -- provided the acts want to participate.

Other music companies are launching their own efforts. Sony BMG, a joint venture of **Sony** Corp. and Bertelsmann AG, operates a Web site called ShopBootlegs.com, which sells live recordings of a handful of its acts, including Tori Amos, Jeff Beck and Los Lonely Boys, for $6.98 to $13.98. A new venture backed by **Time Warner** Inc.'s AOL, XM Satellite Radio Holdings Inc. and Anschutz Entertainment Group Inc. launched last week and is set to broadcast concerts live on the Internet and through other channels.

That is on top of the efforts by individual bands like Pearl Jam, which has been selling live recordings for several years. This year the band has begun offering digital versions almost immediately after a show ends.

The new services are part of the music industry's efforts to pull itself out of the doldrums. The industry has



Case 1:10-cv-00159-RMC Document 13-5 Filed 06/29/10 Page 34 of 153

WireImage
George Clinton, whose recent concert was made available online

been battling declining sales since 1999. World-wide sales have fallen 13% in the past six years, to $32 billion. This year in the U.S., album sales are down by more than 8% compared with last year. That decline has been mitigated -- though far from offset entirely -- by the rapid growth in online sales of digital tracks through outlets like Apple Computer Inc.'s iTunes Music Store. In addition to selling tracks online, music companies have experimented with trying to give customers more for their money by packaging bonus DVDs with some CDs, or selling so-called DualDisc albums, which include video content on the reverse side of a standard CD.

Clear Channel's Instant Live was founded about two years ago; the company typically works with bands to record a series of concerts on a tour, quickly turning out 1,000 to 2,000 CDs that are sold to fans for $15 to $40 as they leave the venue. Those that aren't sold are distributed both online and through independent music stores, where they often are sold as collectibles.

Getty Images
Singer and songwriter Tori Amos plays the Carling Apollo Hammersmith on June 3 in London.

The service is still working out some kinks. Fans can pay ahead of time for a recording of a concert they are going to. But for now, it can be tough for fans to know if that option is available. The "Tour Dates" section of the Black Crowes' Web site, for instance, doesn't mention the Instant Live option. Fans have to go to the Instant Live site itself to find nearly a dozen coming dates by that band, for which they can preorder a CD.

At concerts themselves, Instant Live hangs signs and hands out fliers advertising the service. The discs are typically available for sale as quickly as six minutes after the end of a show, usually near the T-shirts and other souvenirs. Instant Live says it is working on an option to let fans prepay for an authorized "bootleg" when they buy their concert tickets. The company also plans to add a digital-download option.

Until now, Instant Live and its primary competitor, Immediatek Inc.'s DiscLive, have focused on a specific niche: acts that record for either small independent record labels or that have no record contract at all. They also have targeted bands with a following of hardcore fans who are likely to want recordings of multiple concerts. Those would include groups such as the Allman Brothers Band and the Black Crowes: The company has released recordings of more than two dozen shows by the Allmans alone.

The Universal licensing agreement, which removes a major logistical hurdle from the process of recording major-label acts, aims to expand the roster of artists that are likely to participate. That is because nearly all record contracts give the label exclusive rights to any recordings a band makes while under contract -- requiring complex negotiations to work out exceptions. Universal recently road-tested the concept with a 10-show run by a developing act called ...And You Will Know Us By the Trail of Dead.

Larry Kenswil, president of Universal's eLabs, the unit that is responsible for digital music and other new initiatives, says the new deal represents an important way to reach out to a "key group" of potential

customers: concertgoers who already have demonstrated a willingness to pay for music.

**BEYOND THE CONCERT T-SHIRT**

A handful of companies are offering authorized recordings of concerts, often available minutes after the show ends. Here are a few recent options:

| SITE | OFFERING | PRICE |
|---|---|---|
| InstantLive.com[1] | George Clinton/Funkadelic, Atlanta, 2004 | $16.00 |
| InstantLive.com[2] | The Black Crowes, San Francisco, 2005 | $26.00 |
| ShopBootlegs.com[3] | Tori Amos, Chicago, 2005 | $13.98 |
| DiscLive.com[4] | Billy Idol, Verona, N.Y., 2003 | $20.00 |

Nonetheless, it remains to be seen just how widely the new products are embraced -- both by fans and by artists. Some bigger acts, like Universal's U2, may not ever participate, given the more challenging task of distributing recordings to their large audiences. "When someone's doing a stadium show, getting these thousands and thousands of CDs ready and pressed at the end of a show -- the logistics would be much greater," says Mr. Kenswil.

Also, bands that are more particular about how they sound to fans, he adds, may not welcome live recordings that are mixed on the fly. Those can sound muddier than more painstaking productions, and can end up including blown notes or other mistakes.

Network Live, the venture backed by XM, AOL and AEG, aims to sell live music not directly to consumers, but to content distributors, including some of its backers. The company was launched last week with a Bon Jovi concert in New York City. Network Live licensed its feed for rebroadcast on AOL's music service and on XM satellite radio, and on television in foreign markets. The company also plans to beam concerts live to movie theaters in dozens of cities, where fans will be charged around $15 each, and is in the process of negotiating a domestic cable-television deal. Network Live plans to produce seven more concerts before the end of the year, including one next month by Green Day. Next year, says Chief Executive Kevin Wall, the company plans to carry about 70 concerts.

Even though Network Live's offerings are available without extra charge to AOL and XM users, Mr. Wall predicts his company's efforts won't cut into box-office revenues. "We really feel this is going to help drive concert ticket sales," says Mr. Wall, who in the past has served as the executive producer of the television broadcast of this year's Live8 concerts, and was involved in the broadcast of the Live Aid concert in 1985. That is because Network Live plans to broadcast concerts early in an artist's concert tour, which he says will serve as advertising for future dates.

**Write to** Ethan Smith at ethan.smith@wsj.com[5]

**URL for this article:**
http://online.wsj.com/article/0,,SB112777091132852489,00.html

Case 1:10-cv-00159-RMC Document 13-5 Filed 06/29/10 Page 36 of 153

FOR IMMEDIATE RELEASE
Contact: Pamela Fallon - 617-547-0620
Brian Lucas - Best Buy, 612-291-6131

# CLEAR CHANNEL ENTERTAINMENT LAUNCHES INSTANT LIVE IN BOSTON!

Boston, (May 5, 2003) -- For concert fans, the ability to capture and relive the excitement of a live performance immediately after the show has never been possible. Now, Clear Channel Entertainment makes the idea a reality with an innovative new program called Instant Live.

Instant Live offers fans the opportunity to purchase and walk away with a CD of the concert they just attended before they leave the venue. Clear Channel Entertainment recently introduced Instant Live at concerts in clubs in the Boston area. Fans who didn't make it to the concert or who don't buy the concert CD on site can buy Instant Live CDs at designated Boston area Best Buy stores, the exclusive retailer of Instant Live in Boston, and online at BestBuy.com beginning mid May.

"Instant Live is an exciting new project for us because it provides benefits for both the concert-goer and the artist," states Brian Becker, chairman and CEO of Clear Channel Entertainment. "Fans can get greater enjoyment from the concert experience with a recording of a performance they've just attended, and touring or emerging artists have the opportunity to extend their creative impact and strengthen their connection to the fans."

Clear Channel Entertainment is currently recording Instant Live CDs of select concerts in Boston, and CDs will be recorded and offered soon at select concert events across North America in advance of the program's national rollout.

"This is about more than just technology expanding our ability to bring live entertainment to music fans in new forms," adds Steve Simon, Instant Live project director and executive vice president at CCE. "We are leveraging technology, in this case with Instant Live, to improve the concert experience for fans and enhance the connection between them and their favorite artists."

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/29/10 Page 37 of 153

"One of our goals at Best Buy is to bring our customers exciting entertainment offerings, and Instant Live is an innovative way for us to do that," said Rick Soskin, vice president of business development for Best Buy. "With Instant Live, you never have to miss a concert again. Whether you buy the CD at the venue after the show or in one of our stores, you can enjoy the unique experience of live music over and over again."

Instant Live concerts are recorded using a combination of ambient microphones and feeds from the soundboard. The program employs state-of-the-art technology to duplicate, package and deliver CDs in as few as five minutes after a show. Fans are given the option of pre-ordering the CD when they purchase their concert tickets, purchasing the CD without a pre-order immediately following the performance, or going to Best Buy and buying the CD in the store.

Local radio stations WFNX FM and WXRV FM are excited by Instant Live CDs and the early response from fans. These stations have made commitments to play Instant Live tracks from local artists on their local music shows.

The Samples, 2 Skinnee J's, Jen Durkin and the Bomb Squad, Spookie Daly Pride, Hybrasil and Machinery Hall are the first to have CDs recorded and produced and sold through Instant Live.

###

**About Best Buy**
Best Buy Stores LP, owned and operated by Minneapolis-based Best Buy Co., Inc., is one of the nation's leading specialty retailers of technology and entertainment products and services. Best Buy was founded in St. Paul, Minn., in 1966. Best Buy Stores reach an estimated 300 million consumers per year through more than 500 retail stores in 48 states and online at BestBuy.com. For more information about Best Buy, visit the virtual pressroom at http://onlinepressroom.net/bestbuy.

BEST BUY

**Clear Channel Entertainment**, a leading producer and marketer of live entertainment events, is a subsidiary of Clear Channel Worldwide (NYSE: CCU) a global leader in the away-from-home advertising industry. Clear Channel Entertainment currently owns, operates and/or exclusively books approximately 130 live entertainment venues, including more than 100 in North America and 30 in Europe.

In 2002, more than 65 million people attended approximately 29,000 events promoted and/or produced by the company, including: Live music events; Broadway, West End and touring theatrical shows; family entertainment shows; and specialized sports and motor sports events. The company, which operates throughout North America, Europe, South

INSTANT
LIVE

ABOUT INSTANT LIVE
FUTURE SHOWS
PAST SHOWS
CUSTOMER SERVICE
HOME PAGE

DON'T MISS OUT
Stay on top the latest news from Instant Live.
Enter email address:

TALK TO US
We'd like to hear from you. Please email us your questions or comments.

black&copper design
Credits

Copyright © 2003 INSTANT LIVE

# TAKE THE SHOW HOME WITH YOU!

Instant Live records concerts and burns them to CD right at the show, so concert-goers are able to literally take the show home with them. Instant gratification.

Launched in February of 2003 in Boston, Instant Live will be expanding to cities across the country by year's end. An added feature will give fans the ability to pre-order Instant Live CDs when purchasing concert tickets. If you're the spontaneous type, Instant Live recordings will always be available for purchase right at the show.

Take a look at some of the great Instant Live recordings and keep checking back for new dates and new bands. Don't miss the Instant Live experience!

- Frequently Asked Questions

STEREO CONCERT RECOR

Skip navigation.

## Don't miss out.

Stay on top the latest news from Instant Live. Sign up right here!

Enter email address:

Send

## Talk to us.

We'd like to hear from you. Please email us your questions or comments.

# Take the show home with you!

Instant Live records concerts and burns them to CD right at the show, so concert-goers are literally to take the show home with them. Instant gratification.

For the busy fan unable to make it to the show, Instant Live CDs are also available at Best Buy stores and at BestBuy.com.

Launched in February in Boston, Instant Live will be expanding to cities across the country by year's end. An added feature will give fans the ability to pre-order Instant Live CDs when purchasing concert tickets. If you're the spontaneous type, Instant Live recordings will always be available for purchase right at the show.

Take a look at some of the great Instant Live recordings and keep checking back for new dates and new bands. Don't miss the Instant Live experience!

More about Instant Live.

## Latest Live!

Read the reviews and grab the CDs!

Kay Hanley – live at the Paradise, May 30, 2003.
Sean Kelly and The Samples – live at the Paradise, April 20, 2003.

Skip navigation.

## Don't miss out.

Stay on top the latest news from Instant Live. Sign up right here!

Enter email address:

Send

## Talk to us.

We'd like to hear from you. Please email us your questions or comments.

# Machinery Hall

## Paradise Rock Club, Boston, MA, February 27, 2003

Celebrating the release of their new CD "The Separation of Music and State," Machinery Hall took the stage at The Paradise in Boston to an enthusiastic crowd. The band focused on the new songs from the disc and threw in some MH classics at the end of the 2 hour set. Having host DJ Zsid from 92.5 The River and the Clear Channel Instant Live Recording crew on hand certainly added to the energy in the room... all in all a straight up, no nonsense show packed with trademark Machinery Hall songs and delivered with urgency and tenacity.

With the crisp and accurate mix taken directly from the sound board and ambient room mics, Instant Live was able to produce CDs of the performance. Fans only had to wait a few minutes before they

Table of Contents

## NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS

### NOTE 1 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Nature of Business*

Live Nation, Inc. (the "Company" or "Live Nation") was incorporated in Delaware on August 2, 2005 in preparation for the contribution and transfer by Clear Channel Communications, Inc. ("Clear Channel") of substantially all of its entertainment assets and liabilities to the Company (the "Separation"). The Company completed the Separation on December 21, 2005 and became a publicly traded company on the New York Stock Exchange trading under the symbol "LYV".

Prior to the Separation, Live Nation was a wholly owned subsidiary of Clear Channel. As part of the Separation, holders of Clear Channel's common stock received one share of Live Nation common stock for every eight shares of Clear Channel common stock.

Following the Separation, the Company reorganized its business units and the way in which these businesses are assessed and therefore changed its reportable segments, starting in 2006, to Events, Venues and Sponsorship, and Digital Distribution. The Events segment principally involves the promotion or production of live music shows, theatrical performances and specialized motor sports events as well as providing various services to artists. The Venues and Sponsorship segment principally involves the operation of venues and the sale of premium seats, national and local sponsorships and placement of advertising, including signage and promotional programs, and naming of subscription series and venues. The Digital Distribution segment principally involves the management of the Company's third-party ticketing relationships, in-house ticketing operations and online and wireless distribution activities, including the development of the Company's website. In addition, the Company has operations in the sports representation and other businesses.

*Seasonality*

Due to the seasonal nature of shows in outdoor amphitheaters and festivals, which primarily occur May through September, the Company experiences higher revenues during the second and third quarters. This seasonality also results in higher balances in cash and cash equivalents, accounts receivable, prepaid expenses, accrued expenses and deferred revenue during these quarters.

*Preparation of Interim Financial Statements*

The consolidated and combined financial statements included in this report have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and, in the opinion of management, include all adjustments (consisting of normal recurring accruals and adjustments necessary for adoption of new accounting standards) necessary to present fairly the results of the interim periods shown. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles in the United States have been condensed or omitted pursuant to such SEC rules and regulations. Management believes that the disclosures made are adequate to make the information presented not misleading. Due to seasonality and other factors, the results for the interim periods are not necessarily indicative of results for the full year. The financial statements contained herein should be read in conjunction with the consolidated and combined financial statements and notes thereto included in the Company's 2005 Annual Report on Form 10-K.

Table of Contents

NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS — (Continued)

During the third quarter of 2006, the Company recorded an impairment of certain venues which resulted in an increase in deferred tax assets for which the Company has recorded a valuation allowance. Accounting Principles Board Opinion No. 28, *Interim Financial Reporting*, pertaining to tax accounting for extraordinary, unusual, infrequently occurring and contingent items requires that the Company treat the impairment as a discrete item in the quarter. For the nine months ended September 30, 2006, the Company's effective tax rate was 95% as compared to an effective tax rate of 40% for the same period of the prior year. The Company's effective tax rate is higher than the U.S. statutory rate of 35% due primarily to nondeductible expenses, state income taxes, tax reserves and tax rate differences since a significant portion of the Company's earnings are subject to tax in countries other than the United States.

NOTE 11 — SEGMENT DATA

Following the Separation, the Company reorganized its business units and the way in which these businesses are assessed and therefore changed its reportable operating segments, starting in 2006, to Events, Venues and Sponsorship, and Digital Distribution. The Events segment principally involves the promotion or production of live music shows, theatrical performances and specialized motor sports events and provides various services to artists. The Venues and Sponsorship segment principally involves the operation of venues and the sale of premium seats, national and local sponsorships and placement of advertising, including signage and promotional programs, and naming of subscription series and venues. The Digital Distribution segment principally involves the management of the Company's third-party ticketing relationships, in-house ticketing operations and online and wireless distribution activities, including the development of the Company's website. Included in the Digital Distribution revenue below are revenues from ticket rebates earned on tickets sold through phone, outlet and internet, for events promoted by the Events segment. "Other" includes sports representation, as well as other business initiatives.

The Company has reclassified all periods presented to conform to the current period presentation. Revenue and expenses earned and charged between segments are eliminated in consolidation. Corporate expenses, interest income and expense, equity in earnings of nonconsolidated affiliates, minority interest expense (income), other expense (income) — net and income taxes are managed on a total company basis.

There are no customers that individually account for more than ten percent of the Company's consolidated and combined revenues in any year.

| *(in thousands)* | Events | Venues and Sponsorship | Digital Distribution | Other | Corporate | Eliminations | Consolidated and Combined |
|---|---|---|---|---|---|---|---|
| **Nine Months Ended September 30, 2006** | | | | | | | |
| Revenue | $2,076,199 | $ 468,614 | $ 71,062 | $ 30,013 | $ — | $ (6,302) | $2,639,586 |
| Direct operating expenses | 1,953,890 | 147,638 | 2,051 | 5,254 | — | (6,302) | 2,102,531 |
| Selling, general and administrative expenses | 170,467 | 185,930 | 10,219 | 17,799 | — | — | 384,415 |
| Depreciation and amortization | 9,772 | 80,724 | 395 | 709 | 2,287 | — | 93,887 |
| Loss (gain) on sale of operating assets | (1,733) | 1,369 | — | (11,108) | (29) | — | (11,501) |
| Corporate expenses | — | — | — | — | 22,942 | — | 22,942 |
| Operating income (loss) | $ (56,197) | $ 52,953 | $ 58,397 | $ 17,359 | $(25,200) | $ — | $ 47,312 |

**Table of Contents**

**Our Separation from Clear Channel**

We were formed through acquisitions of various entertainment businesses and assets by our predecessors. On August 1, 2000, Clear Channel Communications, Inc. ("Clear Channel") acquired our entertainment business. On August 2, 2005, we were incorporated in our current form as a Delaware corporation to own substantially all of the entertainment business of Clear Channel. On December 21, 2005, the separation of the business previously conducted by Clear Channel's live entertainment segment and sports representation business, now comprising our business, and the distribution by Clear Channel of all of our common stock to its shareholders, was completed in a tax free spin-off (the "Distribution" or the "Separation"). Following our separation from Clear Channel, we became a separate publicly traded company on the New York Stock Exchange trading under the symbol "LYV". In connection with the Separation, we issued, through one of our subsidiaries, $40 million of redeemable preferred stock, of which we received $20 million of the proceeds, and borrowed $325 million under a new credit agreement. We used the proceeds to repay $220 million of debt owed to Clear Channel and Clear Channel contributed to our capital the remaining balance owed them.

**Basis of Presentation**

Prior to the Separation, our combined financial statements include amounts that are comprised of businesses included in the consolidated financial statements and accounting records of Clear Channel, using the historical bases of assets and liabilities of the entertainment business. Management believes the assumptions underlying the combined financial statements are reasonable. However, the combined financial statements included herein may not reflect what our results of operations, financial position and cash flows would have been had we operated as a separate, stand-alone entity during the periods presented. As a result of the Separation, we recognized the par value and additional paid-in capital in connection with the issuance of our common stock in exchange for the net assets of Clear Channel's entertainment business contributed at that time, and we began accumulating retained earnings and currency translation adjustments upon completion of the Separation. Beginning on December 21, 2005, our consolidated financial statements include all accounts of Live Nation and our majority owned subsidiaries and also variable interest entities for which we are the primary beneficiary.

**Segment Overview**

Following the Separation and the reorganization of our business, we changed our reportable segments, starting in 2006, to Events, Venues and Sponsorship, and Digital Distribution. In addition, we have operations in the sports representation and other businesses which are included under "other". Previously, we operated in two reportable business segments: Global Music and Global Theater. In addition, previously included under "other" were our operations in the specialized motor sports, sports representation and other businesses. We have reclassified all periods presented to conform to the current period presentation.

*Events*

Our Events segment principally involves the promotion and/or production of live music shows, theatrical performances and specialized motor sports events in our owned and/or operated venues and in rented third-party venues. While our Events segment operates year-round, we experience higher revenues during the second and third quarters due to the seasonal nature of shows at our outdoor amphitheaters and international festivals, which primarily occur May through September.

As a promoter or presenter, we typically book performers, arrange performances and tours, secure venues, provide for third-party production services, sell tickets and advertise events to attract audiences. We earn revenues primarily from the sale of tickets and pay performers under one of several formulas, including a fixed guaranteed amount and/or a percentage of ticket sales or show profits. For each event, we either use a venue we own or operate, or rent a third-party venue. Revenues are generally related to the

number of events, volume of ticket sales and ticket prices. Event costs, included in direct operating expenses, such as artist and production service expenses, are typically substantial in relation to the revenues. As a result, significant increases or decreases in promotion revenue do not typically result in comparable changes to operating income. In the case of our amphitheaters, our Events segment typically experiences losses related to the promotion of the event. These losses are generally offset by the

## Table of Contents

ancillary and sponsorship profits generated by our Venues and Sponsorship segment and the ticket rebates recorded in our Digital Distribution segment.

As a producer, we generally hire artistic talent, develop sets and coordinate the actual performances of the events. We produce tours on a global, national and regional basis. We generate revenues by sharing in a percentage of event or tour profits primarily related to the sale of tickets, merchandise and event and tour sponsorships. These production revenues are generally related to the size and profitability of the production. Artist and production costs, included in direct operating expenses, are typically substantial in relation to the revenues. As a result, significant increases or decreases in revenue related to these productions do not typically result in comparable changes to operating income.

In addition to the above, we provide various services to artists including marketing, advertising production services, merchandise distribution and DVD/CD production and distribution.

To judge the health of our Events segment, management primarily monitors the number of confirmed events in our network of owned and third-party venues, talent fees, average paid attendance and advance ticket sales. In addition, because a significant portion of our events business is conducted in foreign markets, management looks at the operating results from our foreign operations on a constant dollar basis.

*Venues and Sponsorship*

Our Venues and Sponsorship segment primarily involves the management and operation of our owned and/or operated venues and the sale of various types of sponsorships and advertising.

As a venue operator, we contract primarily with our Events segment to fill our venues and we provide operational services such as concessions, merchandising, parking, security, ushering and ticket-taking. We generate revenues primarily from the sale of food and beverages, parking, premium seating and venue sponsorships. In our amphitheaters, the sale of food and beverages is outsourced and we receive a share of the net revenues from the concessionaire which is recorded in revenue with no significant direct operating expenses associated with it.

We actively pursue the sale of national and local sponsorships and placement of advertising, including signage and promotional programs, and naming of subscription series. Many of our venues also have venue naming rights sponsorship programs. We believe national sponsorships allow us to maximize our network of venues and to arrange multi-venue branding opportunities for advertisers. Our national sponsorship programs have included companies such as American Express, Anheuser Busch and Verizon. Our local and venue-focused sponsorships include venue signage, promotional programs, on-site activation, hospitality and tickets, and are derived from a variety of companies across various industry categories.

To judge the health of our Venues and Sponsorship segment, management primarily reviews the number of events at our owned and/or operated venues, attendance, food and beverage sales per attendee, premium seat sales and corporate sponsorship sales. In addition, because a significant portion of our venues and sponsorship business is conducted in foreign markets, management looks at the operating results from our foreign operations on a constant dollar basis.

*Digital Distribution*

Our Digital Distribution segment is creating the new internet and digital platform for Live Nation. This segment is involved in managing our third-party ticketing relationships, in-house ticketing operations and online and wireless distribution activities, including the development of our website. This segment derives the majority of its revenues from ticket rebates earned on tickets sold through phone, outlet and internet, for events promoted or presented by our Events segment. The sale of the majority of these tickets is outsourced with our share of ticket rebates recorded in revenue with no significant direct operating

EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY R. GURVEY, Plaintiff, v. WILLIAM BORCHARD, MIDGE HYMAN, BAILA CELEDONIA, CHRISTOPHER JENSEN, COWAN, LIEBOWITZ & LATMAN, PC; CLEAR CHANNEL COMMUNICATIONS, INC.; INSTANTLIVE CONCERTS, LLC; LIVE NATION, INC.; NEXTICKETING, LLC, DALE HEAD, STEVE SIMON, AND SUSAN SHICK Defendants. | Civil Action No. 06-CV-1202 (BSJ) ORAL ARGUMENT REQUESTED JURY TRIAL REQUESTED |

**LIVE NATION, INC.'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND LIVE NATION, INC.'S, CLEAR CHANNEL COMMUNICATIONS, INC.'S, INSTANTLIVE CONCERTS, LLC'S, AND NEXTICKETING, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED**

**BAKER BOTTS L.L.P.**

Steven G. Schortgen
Jonathan B. Rubenstein
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Admitted *Pro Hac Vice*

Ian H. Hummel (IH-9728)
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2512
Facsimile: (212) 408-2501

*Attorneys for Live Nation, Inc., InstantLive Concerts, LLC, NexTicketing, LLC and Clear Channel Communications, Inc.*

PLEASE TAKE NOTICE that at the Court's earliest convenience, in the United States Courthouse, Southern District of New York, 500 Pearl Street, New York, New York, before the Honorable Barbara S. Jones, Defendants Live Nation, Inc. and Clear Channel Communications, Inc. will move this Court to dismiss all of Plaintiff's claims against them pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, and subject to that Motion, Live Nation, Inc. and Clear Channel Communications, Inc. will join InstantLive Concerts, LLC and NexTicketing, LLC in moving the Court to dismiss all of Plaintiff's claims against each of the above-referenced Defendants pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief can be granted.

This Motion is based on this Notice of Motion and Motion, the contemporaneously submitted Memorandum of Law in support thereof and accompanying exhibits, the Proposed Order, pleadings and papers on file, and upon such other matters as may be presented to the Court at the time of the hearing.

April 25, 2008

By: /s/ Steven G. Schortgen

BAKER BOTTS L.L.P.

Steven G. Schortgen
Jonathan B. Rubenstein
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Admitted *Pro Hac Vice*

Ian H. Hummel (IH-9728)
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2512
Facsimile: (212) 408-2501

*Attorneys for Live Nation, Inc., InstantLive Concerts, LLC, NexTicketing, LLC and Clear Channel Communications, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below, true and correct copies of the following documents were electronically filed:

1) LIVE NATION, INC.'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND LIVE NATION, INC.'S, CLEAR CHANNEL COMMUNICATIONS, INC.'S, INSTANTLIVE CONCERTS, LLC'S, AND NEXTICKETING, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED;

2) MEMORANDUM OF LAW IN SUPPORT OF LIVE NATION, INC.'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND LIVE NATION, INC.'S, INSTANTLIVE CONCERTS LLC'S, NEXTICKETING, LLC'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED;

3) DECLARATION OF HAMLET T. NEWSOM, JR. IN SUPPORT OF CLEAR CHANNEL COMMUNICATIONS, INC.'S NOTICE OF MOTION TO DISMISS;

4) DECLARATION OF RICHARD A. MUNISTERI IN SUPPORT OF LIVE NATION, INC.'S MOTION TO DISMISS; AND

3) PROPOSED ORDER.

Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system and also by First Class Mail, postage prepaid upon:

Olimpio Lee Squitieri, Esq.
Squitieri & Fearon LLP
32 East 57th Street, 12th Floor
New York, NY 10022
*Attorneys for Plaintiff*

John Richard Supple, Jr., Esq.
Schuyler Blake Kraus, Esq.
Hinshaw & Culbertson, L.L.P.
780 Third Avenue
New York, NY 10017
*Attorneys for Cowan, Liebowitz & Lathman, PC*

Andrew B. Cripe, Esq.
Hinshaw & Culbertson, L.L.P.
222 N. LaSalle Street
Chicago, IL 60601
*Attorney for Cowan, Liebowitz & Lathman, PC*

Dated: April 25, 2008

/s/ Steven G. Schortgen
Steven G. Schortgen

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

---------------------------------- X

AMY R. GURVEY,

Plaintiff,

v.

WILLIAM BORCHARD, MIDGE HYMAN, BAILA CELEDONIA, CHRISTOPHER JENSEN, COWAN, LIEBOWITZ & LATMAN, PC; CLEAR CHANNEL COMMUNICATIONS, INC.; INSTANTLIVE CONCERTS, LLC; LIVE NATION, INC.; NEXTICKETING, LLC, DALE HEAD, STEVE SIMON, MICHAEL GORDON, and SUSAN SHICK

Defendants.

---------------------------------- X

Civil Action No. 06-CV-1202 (BSJ)

ORAL ARGUMENT REQUESTED

JURY TRIAL REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF LIVE NATION, INC.'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND LIVE NATION, INC.'S, INSTANTLIVE CONCERTS LLC'S, NEXTICKETING, LLC'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED**

**BAKER BOTTS L.L.P.**

Steven G. Schortgen
Jonathan B. Rubenstein
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Admitted *Pro Hac Vice*

Ian H. Hummel (IH-9728)
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2512
Facsimile: (212) 408-2501

*Attorneys for Live Nation, Inc., InstantLive Concerts, LLC, NexTicketing, LLC and Clear Channel Communications, Inc.*

## TABLE OF CONTENTS

I. INTRODUCTION. ..... 1

II. LIVE NATION AND CLEAR CHANNEL SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(2) FOR LACK OF PERSONAL JURISDICTION. ..... 2

A. It is Improper for the Court to Exercise General Jurisdiction over Live Nation Or Clear Channel ..... 2

B. It is Also Improper for the Court to Exercise Specific Jurisdiction over Live Nation and Clear Channel. ..... 5

III. THE, LIVE NATION DEFENDANTS SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) BECAUSE PLAINTIFF HAS FAILED TO STATE ANY CLAIM FOR WHICH RELIEF CAN BE GRANTED. ..... 6

A. Relevant Facts. ..... 6

B. Arguments and Authorities. ..... 9

1. Plaintiffs' Misappropriation of Trade Secrets Claim Fails ..... 10

a. The Statute of Limitations Has Run on Plaintiff's Trade Secret Misappropriation Claims. ..... 10

b. Even if Plaintiff's Claim Was Not Barred by the Statute of Limitations, She Fails to State a Claim For Which Relif Can Be Granted. ..... 11

2. Plaintiff's Sherman Act and Various State Antitrust Claims Fail. ..... 13

a. The Statute of Limitations Has Run on Plaintiff's Sherman Act Claim. ..... 13

b. Even if Plaintiff's Claim Was Not Barred by the Statute of Limitations, She Fails to State a Claim For Which Relief Can Be Granted. ..... 15

3. Plaintiff's Lanham Act Claim Fails. ..... 18

4. Plaintiff's Misappropriation of Ideas, Labor, or Skill Claim Fails ..... 19

5. Plaintiff's Interference With Prospective Economic Relations Claim Fails. ..... 20

a. The Statute of Limitations Has Run on a Tortious Interference Claim. ..... 20

b. Even if Plaintiff's Claim Were Not Barred by the Statute of Limitations, She Fails to State a Claim For Which Relief Can Be Granted. ..... 21

6. Plaintiff's "Causes of Action" for Unjust Enrichment and an Accounting Fail. ..... 21

IV. CONCLUSION ..... 22

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ashland Mgmt., Inc. v. Janien*,
82 N.Y.2d 395 (N.Y. 1993) ....................11

*Beatie and Osborn LLP v. Patriot Scientific Corp.*,
431 F. Supp. 2d 367 (S.D.N.Y. 2006)....................3

*Bell Atlantic Corp. v. Twombly*,
127 S.Ct. 1955 (U.S. 2007)....................1, 8, 10, 12, 15, 17, 19, 22

*Caprer v. Nussbaum*,
825 N.Y.S.2d 55 (App. Div. 2006) ....................21

*Classic Appraisals Corp. v. DeSantis*,
552 N.Y.S.2d 402 (App. Div. 1990) ....................20

*Cohen v. Koenig*,
25 F.3d 1168 (2d Cir. 1994)....................9

*Corcoran v. New York Power Auth.*,
935 F. Supp. 376 (S.D.N.Y. 1996)....................9

*CutCo Indus., Inc. v. Naughton*,
806 F.2d 361 (2d Cir. 1986)....................6

*Frummer v. Hilton Hotels Int'l, Inc.*,
19 N.Y.2d 533 (N.Y. 1967) ....................3

*Helicopteros Nacionales de Colombia v. Hall*,
466 U.S. 408 (1984)....................2

*Higgins v. New York Stock Exchange*,
942 F.2d 829 (2d Cir. 1991)....................13

*Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*,
763 F.2d 55 (2d Cir. 1985)....................3

*In re Magnetic Audiotape Antitrust Litig.*,
334 F.3d 204 (2d Cir. 2003)....................2

*Integrated Cash Mgmt. Svcs., Inc. v. Digital Transactions, Inc.*,
920 F.2d 171 (2d Cir. 1990)....................11

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*,
32 F.3d 697 (2d Cir. 1994)....................9

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165 (S.D.N.Y. 2004)....18

*Lemelson v. Carolina Enterprises, Inc.*, 541 F.Supp. 645 (S.D.N.Y. 1982)....10

*Link Co, Inc. v. Fujitsu Corp.*, 230 F.Supp.2d 492 (S.D.N.Y. 2002)....19

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)....2

*Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004)....5

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966)....15

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117 (2d Cir. 1996)....4

*Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994)....9

STATUTES

15 U.S.C. § 15b....13

N.Y.C.P.L.R. § 214....20

N.Y.C.P.L.R. § 301 (McKinney 2001)....3

N.Y.C.P.L.R. § 302(a)(1) (McKinney 2001)....6

N.Y.CPLR § 214(4)....10, 11

Federal Rule of Civil Procedure 8....18

Federal Rule of Civil Procedure 12(b)(2)....1, 2

Federal Rule of Civil Procedure Rule 12(b)(6)....1, 6, 9

Pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, Defendants Live Nation, Inc. ("Live Nation") and Clear Channel Communications, Inc. ("Clear Channel") respectfully submit this Memorandum of Law in support of their Motion to Dismiss for Lack of Personal Jurisdiction. Subject to that Motion, Live Nation and Clear Channel join InstantLive Concerts, LLC ("InstantLive") and NexTicketing, LLC ("NexTicketing") (all entities collectively referred to as the "Live Nation Defendants") in respectfully submitting this Memorandum of Law in support of their Motion to Dismiss under Rule 12(b)(6) for failure to state a claim for which relief can be granted.

## I. INTRODUCTION.

Regardless of how many times Plaintiff amends her Complaint,[1] the underlying facts have not changed and dismissal is still appropriate. First, the Court does not have personal jurisdiction over Live Nation or Clear Channel, as neither entity has any contacts with the State of New York—either in connection with Plaintiff's allegations in this case or otherwise. Furthermore, even if the Court could exercise personal jurisdiction over Live Nation or Clear Channel, and all of Plaintiff's allegations are taken as true, Plaintiff's Third Amended Complaint fails to state a claim for which relief can be granted against any of the Live Nation Defendants, and it should be dismissed in its entirety. Plaintiff's factual allegations remain a series of disjointed assertions with no alleged connection between Plaintiff's alleged harm and any Live Nation Defendant's alleged wrongdoing. Plaintiff certainly has not pled—under the more strict pleading standards espoused by *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (U.S. 2007)—and cannot plead facts sufficient to sustain any cause of action. Consequently, all claims against the Live Nation Defendants should be dismissed.

[1] The current Complaint is Plaintiff's *fourth* attempt to state a claim. Plaintiff is herself an attorney licensed in the State of New York.

## II. LIVE NATION AND CLEAR CHANNEL SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(2) FOR LACK OF PERSONAL JURISDICTION.

As a threshold matter, Live Nation and Clear Channel should not be parties to this dispute because the Court lacks personal jurisdiction over them. They should be dismissed pursuant to Rule 12(b)(2). When considering a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, it is well settled that "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam). The Court's ability to assert jurisdiction over an out-of-state defendant "is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963)). To determine whether personal jurisdiction exists, the Court must engage in a two-part inquiry: "First, it must determine whether there is personal jurisdiction over [Live Nation and Clear Channel] under New York state law; second, if New York law provides for personal jurisdiction, the Court must determine whether the assertion of jurisdiction comports with the constitutional requirements of due process." *Id.*

### A. It is Improper for the Court to Exercise General Jurisdiction over Live Nation Or Clear Channel.

There are two types of jurisdiction that a court may exercise over a defendant: general and specific. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984). "In the case of general jurisdiction, plaintiff's claim need not arise out of defendant's contacts with the forum state, but defendant's contacts must be substantial; with specific jurisdiction, however, defendant's contacts need not be as substantial, but plaintiff's claim must arise out of the

contacts." *Beatie and Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 386 (S.D.N.Y. 2006).

The text of the New York statute concerning general jurisdiction is Civil Practice Law and Rules section 301, and it simply provides that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." N.Y.C.P.L.R. § 301 (McKinney 2001). The New York Court of Appeals has interpreted this provision to mean that "a foreign [defendant] is amenable to suit in [New York] if it is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 536 (N.Y. 1967) (internal quotations omitted). The pragmatic test for "doing business" focuses upon several factors, including: "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of the employees of the foreign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985) (citations omitted).

Neither Live Nation nor Clear Channel has any contacts with the State of New York whatsoever, let alone continuous and systematic contacts sufficient to invoke this Court's general jurisdiction over them. Specifically, both Live Nation and Clear Channel are holding companies whose sole purpose is to hold stock in a number of other companies. (Newsom Decl. at ¶ 3; Munisteri Decl. at ¶ 3.) Other than holding stock in its subsidiaries, neither company conducts any other business. (Newsom Decl. at ¶ 4; Munisteri Decl. at ¶ 4.) Neither Live Nation nor Clear Channel maintains a place of business in New York, and neither is registered to do business in New York. (Newsom Decl. at ¶ 8; Munisteri Decl. at ¶ 8.) Moreover, neither Live Nation nor Clear Channel has any assets, employees, or agents in New York, and neither

conducts any business in New York or directs any of its activities toward residents of New York. (*Id.*) Finally, neither Live Nation nor Clear Channel directs the actions of any of their subsidiaries and neither controls the general policies or daily operating decisions of any of its subsidiaries. (Newsom Decl. at ¶ 9; Munisteri Decl. at ¶ 9.) Thus, because Live Nation and Clear Channel have no connection whatsoever to the State of New York, "continuous and systematic contacts" with the State sufficient for this Court to invoke general jurisdiction simply do not exist.

In an apparent recognition that personal jurisdiction over Clear Channel is not appropriate, Plaintiff attempts to salvage its claims by haphazardly alleging that "[Clear Channel], through its wholly owned subsidiaries, is the owner of some 1,200 radio stations in the United States with 24 in the tri-state area alone and 150 pop concert venues, 5 being in New York City." (Third Am. Compl. at ¶ 7.) However, in making such an allegation, Plaintiff exhibits a fundamental misunderstanding of the basic law surrounding parents and subsidiaries as well as the structure of the Clear Channel entities. As stated above, Clear Channel, Inc. is merely a holding company for the stock of its subsidiaries, which are the entities that actually conduct business. Further, in determining whether a subsidiary is a "mere department" of the parent for purposes of jurisdiction, the Court must consider the four *Beech Aircraft* factors: (1) common ownership—which is essential; (2) financial dependency of the subsidiary on the parent corporation; (3) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1996).

Plaintiff has not made a single allegation to support any theory that Clear Channel should be liable for any actions of its subsidiaries. Rather, Plaintiff hinges this last-ditch effort at saving personal jurisdiction over Clear Channel on the District of Colorado's decision in *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004), and claims that jurisdiction is appropriate because of an alter-ego-related finding in that case. (Third Am. Compl. at ¶ 7.) The *Nobody in Particular* case is inapposite, as the decision is very fact-specific, and those facts are irrelevant to this case. For example, *Nobody in Particular* involved subsidiaries not even named in Plaintiff's Third Amended Complaint and has no instructional value for the entities at issue here. Plaintiff cannot substitute the pleadings of an unrelated action in a different jurisdiction and regarding different Clear Channel subsidiaries for adequate pleading of factual allegations in *this* litigation.

Plaintiff half-heartedly attempts the same type of allegation against Live Nation. Specifically, Plaintiff alleges that, "Defendant Live Nation, through its wholly owned subsidiaries, is a leading producer and promoter for pop concerts and events staged at concert venues around the world, some of which it owns through wholly owned subsidiaries and are located in New York City." (Third Am. Compl. at ¶ 8.) Aside from the fact that this allegation contains no specific facts and is impermissibly vague, it fails for the same reasons described in the paragraph above. Thus, because neither Live Nation nor Clear Channel conduct any business whatsoever in New York, the Court cannot exercise general jurisdiction over them, and they should be dismissed.

**B.     It is Also Improper for the Court to Exercise Specific Jurisdiction over Live Nation and Clear Channel.**

Civil Practice Law and Rules section 302 allows a court to exercise specific jurisdiction over an out-of-state defendant who, in person or through an agent, "transacts business within the

state." N.Y. C.P.L.R. § 302(a)(1) (McKinney 2001). Thus, jurisdiction is proper under section 302(a)(1) when (1) the defendant has transacted business in New York; and (2) the cause of action arises out of the subject matter of the transacted business. *Id.*; *see also CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (requiring "an articulable nexus between the business transaction and the cause of action sued upon"). Not only has Plaintiff failed to allege any facts concerning some sort of transaction or business dealing by Live Nation or Clear Channel that would allegedly form the basis for one of her causes of action—as her burden requires—but, as described in the section above, neither Live Nation nor Clear Channel conducts any type of business whatsoever, let alone in New York. This fact makes it impossible to have an "articulable nexus" between a business transaction and any of Plaintiff's causes of action. If a company does not "do business" at all, then it certainly cannot "transact business within the state."

Consequently, because neither general nor specific jurisdiction exists with respect to Live Nation and Clear Channel, the Court lacks personal jurisdiction over them, and it should dismiss all claims against them. More importantly, by now Plaintiff, herself a licensed New York attorney, and her trial counsel have collectively had more than two years and four attempts at providing the Court with a Complaint that adequately alleges personal jurisdiction. Plaintiff's failure to plead basic jurisdictional requirements at this point is particularly inexcusable.

## III. THE, LIVE NATION DEFENDANTS SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) BECAUSE PLAINTIFF HAS FAILED TO STATE ANY CLAIM FOR WHICH RELIEF CAN BE GRANTED.

### A. Relevant Facts.

The facts alleged in the Third Amended Complaint, and viewed most favorably to Plaintiff, may be summarized as follows. Prior to this lawsuit, Plaintiff was an attorney with and a client of Defendant Cowan, Liebowitz & Latman, PC ("CLL"). (Third Am. Compl. at ¶¶ 2,

30.) Before working for CLL, Plaintiff allegedly developed ideas for certain technologies and start-up businesses. (*Id.* at ¶ 24.) CLL served as Plaintiff's attorneys before the United States Patent and Trademark Office and assisted her in filing two provisional patent applications allegedly concerning "the packaging, editing, management and distribution of live recordings emanating from events at concert, sports and gaming venues, including associated electronic ticketing methods." (*Id.* at ¶ 25.) Shortly after she started working for CLL, Plaintiff presented her ideas and business plans to a group of people at CLL, which included both CLL attorneys and other individuals. (*Id.* at ¶¶ 34-35.) During the presentation, Plaintiff discussed and distributed information concerning her business proposals and inventions, apparently without any sort of confidentiality or non-disclosure agreement in place. (*Id.* and ¶ 39.) In fact, Plaintiff alleges that people who were not present at her presentation ultimately came to learn many of the details of her business plan. (*Id.* at ¶ ¶ 39, 41.) After her presentation, Plaintiff claims that a partner at CLL told her that Clear Channel, another client of CLL, may be of interest to her as a strategic partner. (*Id.* at ¶ 36.)

Plaintiff then makes a wild and unsupportable leap from the scenario described above to her allegations against Live Nation and the other Defendants, concluding that, based on information she read in news publications in which Live Nation announced a product offering, that the Live Nation Defendants simply must have stolen her trade secrets, competed unfairly, falsely advertised, interfered with some prospective and unidentified business arrangements, and somehow wielded monopoly power in an undefined market to which her alleged inventions and business plans applied. However, the total dearth of factual allegations connecting the Live Nation Defendants to any of this alleged wrongdoing is telling and dooms her Complaint.

Significantly, Plaintiff fails to connect any allegation, instead, merely surmising that "*Upon information and belief*, [ . . .] the Clear Channel Live Nation Defendants learned plaintiffs' trade secrets through CLL and the individual CLL Live Nation Defendants." (Third Am. Compl. at ¶ 41). As discussed below, *Twombly* expressly forbids this sort of conclusory, factually inert allegation. Furthermore, Plaintiff's trade secret claim is barred by the statute of limitations. Additionally, Plaintiff has not alleged that she had any sort of relationship with the Live Nation Defendants or that they owed her any duty with respect to her alleged trade secrets. Moreover, Plaintiff fails to specify the trade secrets that she claims were misappropriated by the Live Nation Defendants or make any allegation about how the Live Nation Defendants may have used Plaintiff's undefined trade secrets. In fact, to the contrary, Plaintiff's pleading essentially admits that another defendant, not any of those subject to this Motion, publicly disclosed her alleged trade secrets. (*See* Third Amd. Compl. at ¶ 39 ("CLL did not advise plaintiffs that non-attorneys were also in attendance at the firm conference and as such, failed to ensure the confidentiality and protection of plaintiff's properties, inventions and trade secrets."); ¶ 48 ("CLL also did not take adequate precautions to ensure that plaintiff's confidential trade secrets were protected. [ . . .] Some of plaintiff's files were left by the CLL Defendants in public places with access to anyone."). Plaintiff's Sherman Act claim is likewise barred by the statute of limitations. Moreover, with respect to Plaintiff's claim for violations of the Sherman Act and various undefined state antitrust laws, the Third Amended Complaint does not adequately or meaningfully define the relevant product market to which her trade secrets or business plan may apply let alone contain any allegation concerning how the Live Nation Defendants' alleged violations have restrained trade, all of which are essential elements of a monopoly claim. Further, the Third Amended Complaint contains no allegation that, even if true, would support

bad faith by the Live Nation Defendants in support of her unfair competition claim or how the Live Nation Defendants misappropriated Plaintiff's ideas. For her Lanham Act claim, there exists no allegation as to how any of the Live Nation Defendants' advertisements were misleading. Even further, nowhere in the Third Amended Complaint can one find any factual allegations supporting a proposed business arrangement with respect to her alleged business plan—let alone one that the Live Nation Defendants knew about—which makes it impossible for the Live Nation Defendants to have tortiously interfered with any prospective business relationship.

In the end, Plaintiffs claims against the Live Nation Defendants amount to nothing more than a hodgepodge of unconnected factual allegations, guess work, and wild finger-pointing. But, even if all of Plaintiff's factual allegations are taken as true, Plaintiff still fails to allege facts sufficient to support her causes of action, and each of her claims against the Live Nation Defendants should be dismissed.

**B. Arguments and Authorities.**

The Court can dismiss this action pursuant to Rule 12(b)(6) if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In considering this Motion, the Court must take "as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir. 1994). However, the Court need not accept as true naked assertions without supporting facts. *Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994). Moreover, if the Court assumes that all of Plaintiff's factual allegations are true, and Plaintiff "still fails to plead the basic elements of a cause of action," the Court can dismiss the claim. *Corcoran v. New York Power Auth.*, 935 F. Supp. 376, 382 (S.D.N.Y. 1996).

The Supreme Court recently clarified these standards in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (U.S. 2007). In *Twombly*, like this case, Plaintiffs made disconnected and conclusory allegations in support of its purported Sherman Act claim. In reversing the Second Circuit, the Supreme Court held that, in order to defeat a motion to dismiss, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 1965. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Ultimately, in cases where a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 1974. Plaintiff's Third Amended Complaint does not even approach that line. The Court should dismiss each of Plaintiff's claims.

**1. Plaintiffs' Misappropriation of Trade Secrets Claim Fails.**

**a. The Statute of Limitations Has Run on Plaintiff's Trade Secret Misappropriation Claims.**

Plaintiff's allegation of trade secret misappropriation against the Live Nation Defendants is fraught with fatal errors. First, it fails under the statute of limitations. Plaintiff's trade secret misappropriation claim possesses a three year statute of limitations. *Lemelson v. Carolina Enterprises, Inc.*, 541 F.Supp. 645 (S.D.N.Y. 1982); *see also* CPLR § 214(4). Plaintiff asserted her trade secret misappropriation claim more than three years from the date by which she admits she had knowledge of the claim. The Third Amended Complaint alleges that the misappropriation began right after Plaintiff gave her presentation to the members of the CLL law firm, on her "second day on the job." (*Id.* at ¶ 34). While Plaintiff does not allege a specific date for this presentation, she does allege that she negotiated her "of counsel" position with CLL in "late 2001 and early 2002." (*Id.* at ¶ 29). If this presentation happened at the end of that date

range, the misappropriation occurred well outside of the limitations period. Additionally, by her own admission, however, she was aware, no later than March, 2003, that "Instant Live was offering" a service she alleged to own. (*Id.* at ¶ 55). In fact, Plaintiff states she "immediately advised" Live Nation and Clear Channel executives of her pending patents and concerns. (*Id.* at ¶ 56). At the very latest, by May 5, 2003, the date of *The New York Times* article she states "described Plaintiff's entire confidential business models," she believed misappropriation had occurred. (*Id.* at ¶ 52). Under any version of Plaintiff's own pled facts, her misappropriation claim is time barred. Plaintiff first notified the Live Nation Defendants of her misappropriation claim in the Amended Complaint, filed June 5, 2006. Consequently, her claims were time barred when filed.

        b.    **Even if Plaintiff's Claim Was Not Barred by the Statute of Limitations, She Fails to State a Claim For Which Relief Can Be Granted.**

Plaintiff has failed to allege facts that support either element of a trade secret misappropriation action. Under New York law, the elements of a cause of action for misappropriation of trade secrets are that (1) the plaintiff possesses a trade secret and (2) the defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. *Integrated Cash Mgmt. Svcs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 172 (2d Cir. 1990) (analyzing New York law). New York has adopted the Restatement (Second) of Torts' definition of a trade secret, which states that a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 407 (N.Y. 1993). Plaintiff's Third Amended Complaint falls woefully short.

Plaintiff never specifically identifies what her "trade secrets" claim to be and never alleges why they would even qualify as trade secrets. Moreover, the Third Amended Complaint is devoid of any specific factual allegation that the Live Nation Defendants learned of her secrets or acquired them improperly from the Cowan, Liebowitz & Latman ("CLL") Live Nation Defendants or otherwise. Instead, she wildly and improperly speculates on "information and belief." (Third. Am. Compl. at ¶ 41). There is no factual allegation that the Live Nation Defendants used Plaintiff's "trade secrets" in the breach of an agreement, confidence, or duty owed Plaintiff. This is precisely the sort of facially deficient and conclusory pleading that *Twombly* forbids. *See Twombly*, 127 S. Ct. at 1974 (where the plaintiff "has not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed.").

In fact, Plaintiff's factual allegations directly contradict such a conclusion. On the face of the Third Amended Complaint, there is clearly no confidentiality for Plaintiff's alleged trade secrets, as she willingly discussed them with members of the CLL firm as well as other individuals not related to the firm without any type of protection by a confidentiality or non-disclosure agreement. (*See* Third Amd, Compl. at ¶ 39 ("CLL did not advise plaintiffs that non-attorneys were also in attendance at the firm conference and as such, failed to ensure the confidentiality and protection of plaintiff's properties, inventions and trade secrets."); ¶ 48 ("CLL also did not take adequate precautions to ensure that plaintiff's confidential trade secrets were protected. [ . . .] Some of plaintiff's files were left by the CLL Defendants in public places with access to anyone.")). Plaintiff's Complaint further states that she disclosed her alleged trade secrets in a "meeting with Peter Gelb, then president of Sony Classical" without any allegation that such disclosure was confidential. *Id.* at ¶ 35. Plaintiff's Complaint further states that she disclosed her trade secrets to Nolan Bushnell without any allegation that this disclosure was

confidential. *Id.* at ¶¶ 10, 46. Plaintiff's Complaint further suggests she disclosed her "business model and trade secrets" to Laura Nyro and Jose Carreras without any allegation that these disclosures were confidential. *Id.* at ¶ 31. In sum, Plaintiff's Complaint facially demonstrates that her ideas, whatever they allegedly entailed, were not maintained in secrecy. This pleading defect alone dooms her entire Complaint as the remainder of her allegations (*e.g.*, her purported Sherman Act claim) require a trade secret misappropriation as an animating act.

Furthermore, there is no allegation whatsoever that any of the Live Nation Defendants were either present at her presentation, knew of or otherwise requested Defendant CLL to disclose Plaintiff's supposed trade secrets, or otherwise owed Plaintiff any type of duty with respect to her alleged trade secrets. Plaintiff essentially admits, by way of her allegations, that a different defendant allegedly disclosed her supposed trade secrets, not any of the Live Nation Defendants subject to this Motion. Plaintiff has, thus, pleaded herself out of any type of trade secret misappropriation claim—or any claim based on the misappropriation of trade secrets—against any of the Live Nation Defendants. Because of Plaintiff's unsupported assertions and failure to allege any facts that, if true, would support either element of her cause of action, her trade secret misappropriation claim must fail, and should be dismissed.

**2. Plaintiff's Sherman Act and Various State Antitrust Claims Fail.**

**a. <u>The Statute of Limitations Has Run on Plaintiff's Sherman Act Claim.</u>**

Next, Plaintiff claims the Live Nation Defendants violated Section 2 of the Sherman Act. As a threshold matter, Plaintiff cannot sustain a cause of action under the Sherman Act because the statute of limitations has long since run. The statute of limitations for claim under Section 2 of the Sherman Act is four years. 15 U.S.C. § 15b. "A cause of action for violation of the antitrust laws ordinarily accrues as soon as there is an injury to competition." *Higgins v. New*

*York Stock Exchange*, 942 F.2d 829, 832 (2d Cir. 1991). Plaintiff's claim under Section 2 of the Sherman Act was first asserted against the Live Nation Defendants in her Third Amended Complaint, which was filed on March 4, 2008,[2] but any alleged Sherman Act claim, according to Plaintiff's allegations, accrued more than four years before that date.

In the Third Amended Complaint, Plaintiff alleges that the "CCC Defendants' misappropriation of plaintiff's trade secrets, confidential business models and proprietary technologies . . . is *the* vehicle that CCC used to establish or attempt to establish a monopoly." (Third Am. Compl. ¶ 72 (emphasis in original)). If the alleged misappropriation of Plaintiff's trade secrets was *the* event that caused her Sherman Act claim to accrue, then, according to Plaintiff's own allegations, this happened well outside the four-year limitations period. As discussed above, Plaintiff's trade secret misappropriation claim accrued in 2001 or 2002, or, at the very latest, by May 5, 2003, the date of *The New York Times* article she states "described Plaintiff's entire confidential business models." (*Id.* at ¶ 52). Under any analysis, she asserts her Sherman Act claims more than four years beyond the date of the event she claims constituted "*the* vehicle that CCC used to establish or attempt to establish a monopoly." (*Id.* at ¶ 72).

Furthermore, even if Plaintiff were not to peg her hopes of a Sherman Act claim on the misappropriation of trade secrets, she has still pleaded herself out of a Sherman Act claim. The Third Amended Complaint contains the following allegation in the subsection relating to "anti-competitive activity": "The delays in finalizing deals with artists and her other industry contracts have further damaged plaintiff since 2003 and damaged her in her relations with her investors,

---

[2] Plaintiff failed to assert any facts sufficient to support a Sherman Act claim before this date. Because of the nature of her claim and factual allegations, there is neither tolling nor relation back to any earlier time sufficient to save this claim.

strategic partners, labels, agents and managers." (*Id.* at ¶ 77). Any of these dates bar Plaintiff's claim as a matter of law.

Under any version of Plaintiff's facts, Plaintiff's Sherman Act cause of action accrued more than four years from the date the claim was filed. Therefore, Plaintiff's claim is barred by the statute of limitations.

        b.    **Even if Plaintiff's Claim Was Not Barred by the Statute of Limitations, She Fails to State a Claim For Which Relief Can Be Granted.**

In order to sustain a claim under section 2 of the Sherman Act, Plaintiff must show three elements: (1) the possession of monopoly power, (2) in the relevant market, and (3) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Nowhere in Plaintiff's Third Amended Complaint can one find a single allegation that would support any element, let alone all of the elements, of a claim under section 2 of the Sherman Act as to any Live Nation Defendant.

The Third Amended Complaint contains a hodgepodge of allegations supposedly connected to the Sherman Act claim, but none of them relate at all to the required elements of the cause of action. Plaintiff includes certain Sherman Act buzzwords, such as "monopoly power," "market power," and "relevant market," (Third Am. Compl. at pp. 31-35) but Plaintiff makes no effort to allege facts that, if true, would show that any particular Live Nation Defendant had achieved monopoly power, or even any facts to sufficiently define the relevant market for this case. Such an effort falls woefully short of the standard espoused by the *Twombly* Court that, in order for a Complaint to pass muster, its factual allegations must "raise a right to relief above the speculative level" and provide more than mere "labels . . . conclusions . . . [or] formulaic recitation[s] of the elements . . . ." *Twombly*, 127 S.Ct. at 1965. Plaintiff's allegations are a

transparent attempt to simply throw what she can on the wall to see if any of it will stick. In this case, it all slides to the floor. Plaintiff does not come close to articulating a proper Sherman Act claim or alleging facts supporting one.

First, Plaintiff herself alleges that the Live Nation Defendants' supposed misappropriation of her trade secrets "is *the* vehicle" purportedly used to "establish or attempt to establish a monopoly in the relevant market." (Third Am. Compl. at ¶ 72 (emphasis in original)). Because Plaintiff's trade secret misappropriation claim fails as a matter of law, by her own admission, so too do her antitrust claims.

Second, Plaintiff fails, as a matter of law, to recite any facts sufficient to support an allegation of monopoly power in the relevant market. In fact, Plaintiff's Complaint never truly identifies the relevant market, let alone establish that any Defendant possesses monopoly power within that market. Instead, Plaintiff makes sweeping statements, hoping the Court will not peer too carefully behind them. For example, Plaintiff sets forth certain alleged "facts" concerning Clear Channel Communications' ownership of radio stations. Third Am. Compl. at ¶ 67. These allegations, even if true, have nothing to do with the relevant market for and any Live Nation Defendants' market power in the market for recording live concerts and making them available to concert patrons as they exit. (*See, e.g., id.* at ¶ 52 where Plaintiff describes her "confidential business model" as "the onsite distribution of live recordings at concerts." and ¶ 55, which is the closest Plaintiff comes to implying her relevant market).

Moreover, Live Nation, Instant Live and Next Ticketing are not associated in any way with the market for radio stations, nor does Plaintiff otherwise plead. Absent, too, from Plaintiff's Complaint are any market power allegations relating specifically to Live Nation, Instant Live and Next Ticketing. Instead, Plaintiff sloppily and impermissibly runs all Live

Nation Defendants together and hopes it sticks. *Id.* at ¶¶ 75, 129. Also missing is any allegation that Live Nation, Instant Live and Next Ticketing possess monopoly power in Plaintiff's undefined relevant market or that they possess the ability to control prices or exclude competition. Plaintiff fails to set forth any facts suggesting that Live Nation, Instant Live and Next Ticketing acted in conjunction with or conspired with other Live Nation Defendants to achieve a monopoly in the relevant market, whatever that may be. *Twombly* dictates that Plaintiff's pleading is fatally defective.

Furthermore, Plaintiff's own Complaint evidences its deficiencies in pleading supposed monopoly power. Plaintiff complains that certain of the Live Nation Defendants' press releases "demonstrate a *de facto* attempted monopoly in the relevant market in violation of Section 2 of the Sherman Act." *Id.* at ¶ 69. Yet, by her own admission nine paragraphs earlier, Plaintiff states that these very same press releases could not give Live Nation Defendants "a monopoly on distributing live concert recordings since many other methods to package, edit and manage distribution exist including those that are more comprehensive, faster and more beneficial to the relevant industry." *Id.* at 60. Plaintiff's flat inconsistency is telling and dooms her antitrust allegations.

Plaintiff's allegations are exactly the sort that *Twombly* condemns. As *Twombly* holds, a "plaintiffs obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do. [internal citations omitted]. Factual allegations must be enough to raise a right to relief above the speculative level." 127 S.Ct. at 1964-65. Unless Plaintiff has "nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.* at 1975.

After Plaintiff's wholly inadequate attempt to allege a Sherman Act claim, she next includes a cause of action for "violations of the antitrust laws of the states of New York, Texas, and California." (Third Am. Compl. at ¶ 140.) The preceding quotation is the extent of Plaintiff's pleading with respect to those state law claims. Plaintiff's failure to even notify the Live Nation Defendants of the specific antitrust laws she believes they violated, let alone plead facts sufficient to support each element of such claims, is a defect on its face. This type of conclusory pleading does not comport with the rules outlined in Federal Rule of Civil Procedure 8.

Therefore, because Plaintiff has failed to allege any facts that, if true, would support each element of a Sherman Act claim, and because she has also failed to properly plead any claim for violations of state antitrust laws, all of Plaintiff's antitrust-related claims should be dismissed.

**3. Plaintiff's Lanham Act Claim Fails.**

Plaintiff attempts to assert a claim for violation of section 43 of the Lanham Act. To establish a false advertising claim under section 43(a) of the Lanham Act against Live Nation and Clear Channel, Plaintiff must prove the following elements: "(1) the defendant has made a false or misleading statement; (2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) there is a likelihood of injury to plaintiff, such as declining sales or loss of goodwill; and (5) the goods traveled in interstate commerce." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 178 (S.D.N.Y. 2004).

Plaintiff's Lanham Act allegations are no less deficient than any of her others. Plaintiff first mentions a New York Times articles (Third Am. Compl. at ¶ 52), but fails to allege how this article operated to violate the Lanham Act. Plaintiff also references website advertisements (*id.*

at ¶¶ 55, 56) and press releases (*id.* at ¶¶ 57, 59), but fails to even explain how such advertisements and press releases were false, let alone allege facts to support the other required elements of her Lanham Act claim. Such an effort amounts to nothing more than a collection of "labels and conclusions," which the *Twombly* Court held to be insufficient for pleading a cause of action. This Court should follow suit and dismiss Plaintiff's Lanham Act claim.

**4. Plaintiff's Misappropriation of Ideas, Labor, or Skill Claim Fails.**

Like the causes of action above, Plaintiff's unfair competition claim based on "idea misappropriation" is unsustainable. The central principle underlying a claim for unfair competition under New York law is that one may not misappropriate the results of the labor, skill, and expenditures of another. *Link Co, Inc. v. Fujitsu Corp.*, 230 F.Supp.2d 492, 501 (S.D.N.Y. 2002). An unfair competition claim must also involve some degree of bad faith. *Id.* A claim for idea misappropriation—the variety of unfair competition that Plaintiff appears to allege—requires "(1) a legal relationship between the parties in the form of a fiduciary relationship, an express or implied-in-fact-contract, or quasi-contract, and (2) a novel and concrete idea." *Id.*

Plaintiff's factual allegations again fall short of the mark for this cause of action. First, like her trade secret claim, this claim too is barred by the same statute of limitations. *See* section III.B.1, above. Second Plaintiff does not and cannot allege that any of the Live Nation Defendants acted in bad faith or with any intent to harm Plaintiff or deprive her of any supposed property right. Third, Plaintiff cannot possibly maintain a claim for idea misappropriation because none of the Live Nation Defendants ever had any type of fiduciary duty to Plaintiff, nor has she alleged that such a relationship existed. Further, the Third Amended Complaint is devoid of any allegation of contract, of any sort, involving the Live Nation Defendants. Thus,

Plaintiff's Third Amended Complaint, on its face, cannot support a cause of action for unfair competition—based on idea misappropriation or any other variety—and it should be dismissed.

**5. Plaintiff's Interference With Prospective Economic Relations Claim Fails.**

a. **The Statute of Limitations Has Run on a Tortious Interference Claim.**

Plaintiff seeks damages from the Live Nation Defendants for tortious interference with prospective economic relations. As a threshold matter, Plaintiff cannot sustain a cause of action for tortious interference because the statute of limitations has long since run. The statute of limitations for a tortious interference claim is three years. N.Y.C.P.L.R. § 214; *Classic Appraisals Corp. v. DeSantis*, 552 N.Y.S.2d 402, 403 (App. Div. 1990). Plaintiff's tortious interference claim was first asserted against the Live Nation Defendants in her Third Amended Complaint, which was filed on March 4, 2008. Although, a similar (but not identical) tortious interference claim was asserted against the Live Nation Defendants in her Amended Complaint, which was filed on June 5, 2006. Even if Plaintiff were to get the benefit of the doubt, and the Court concluded that this cause of action was first filed in June 2006, this claim still accrued more than three years before that filing date. Like Plaintiff's other claims, the allegations are scant and are tied directly to her trade secret misappropriation claim. (Third Am. Compl. at ¶¶ 146, 147.) As established above, Plaintiff alleges trade secret misappropriation in the time period of late 2001 or early 2002, or at the very latest, May 5, 2003 (the date of the *New York Times* article). (Third Am. Compl. at ¶ 52). Thus, her tortious interference claim must have necessarily accrued in this time period, which is well outside the three-year limitations period, as Plaintiff filed this claim no earlier than June 2006. It is, therefore, time-barred.

b. **Even if Plaintiff's Claim Were Not Barred by the Statute of Limitations, She Fails to State a Claim For Which Relief Can Be Granted.**

To establish a claim of tortious interference with prospective economic advantage, Plaintiff must demonstrate that the Live Nation Defendants' "interference with its prospective business relations was accomplished by 'wrongful means' or that defendant acted for the sole purpose of harming the plaintiff." *Caprer v. Nussbaum*, 825 N.Y.S.2d 55, 78 (App. Div. 2006). In addition, knowledge of the prospective economic relation is an implicit element of tortious interference. *Id.* Nowhere in the Third Amended Complaint does Plaintiff mention any proposed business relationship between her or another party concerning her alleged trade secrets or business plan. Of course, it follows that, if such a relationship did not exist outside of her imagination, there is nothing for the Live Nation Defendants to either have known about or interfered with. Likewise, the Third Amended Complaint is devoid of any specific allegation that the Live Nation Defendants engaged in wrongful means in conjunction with interfering with a phantom relationship. As with each of her other claims, Plaintiff's factual allegations, even if taken as true, fall woefully short of supporting each element of a tortious interference with prospective economic relations cause of action, and her claim against the Live Nation Defendants should be dismissed.

6. **Plaintiff's "Causes of Action" for Unjust Enrichment and an Accounting Fail.**

In the Third Amended Complaint, Plaintiff includes distinct "causes of action" against the Live Nation Defendants for "unjust enrichment" and "an accounting." (Third Am. Compl. at pp. 31, 36.) As the Court is aware, unjust enrichment and an accounting are not affirmative claims for relief; rather, they are remedies that a party may choose to seek if a cause of action is properly pled. In this case, however, Plaintiff has failed to properly plead any of her claims for

relief. Therefore, the Court should disregard Plaintiff's "causes of action" for unjust enrichment and an accounting.

## IV.    CONCLUSION

As a threshold matter, Plaintiff's Third Amended Complaint should be dismissed as to Live Nation and Clear Channel because the Court lacks personal jurisdiction over each of them. Neither entity has any connection whatsoever to the State of New York. In fact, both entities are merely holding companies that do not have day-to-day operations or offer any goods or services. Because of this, it is also impossible to have any type of articulable nexus between a business transaction and any of Plaintiff's causes of action. Additionally, Plaintiff's Third Amended Complaint should be dismissed as to each of the Live Nation Defendants for failure to state a claim for which relief can be granted. Those of Plaintiff's claims that are not barred by applicable statutes of limitations amount to nothing more than random, unconnected factual allegations. Plaintiff falls woefully short of her burden—which, after the *Twombly* decision, is crystal clear—of alleging specific facts that, even if taken as true, would support each of the elements of her causes of action. For all of these reasons, Plaintiff's Third Amended Complaint should be dismissed in its entirety, and the Court should award the Live Nation Defendants any further relief that it deems just and proper.

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/29/10 Page 77 of 153

April 25, 2008

Respectfully submitted,

BAKER BOTTS L.L.P.

By: /s/ Steve Schortgen

Steven G. Schortgen
Jonathan B. Rubenstein
2001 Ross Avenue
Dallas, Texas 75201
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
Admitted *Pro Hac Vice*

Ian H. Hummel (IH-9728)
30 Rockefeller Plaza
New York, New York 10112-4498
Telephone: (212) 408-2512
Facsimile: (212) 408-2501

*Attorneys for Live Nation, Inc., InstantLive Concerts, LLC, NexTicketing, Inc. and Clear Channel Communications, Inc*

**CERTIFICATE OF SERVICE**

It is hereby certified that a copy of:

1) LIVE NATION, INC.'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND LIVE NATION, INC.'S, CLEAR CHANNEL COMMUNICATIONS, INC.'S, INSTANTLIVE CONCERTS, LLC'S, AND NEXTICKETING, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED;

2) MEMORANDUM OF LAW IN SUPPORT OF LIVE NATION, INC.'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND LIVE NATION, INC.'S, INSTANTLIVE CONCERTS LLC'S, NEXTICKETING, LLC'S AND CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED; and

3) PROPOSED ORDER

were served on the 25th day of April, 2008, on all counsel of record.

______________________________
Jonathan B. Rubenstein

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY R. GURVEY,<br><br>Plaintiff,<br><br>v.<br><br>COWAN, LIEBOWITZ & LATMAN, PC; CLEAR CHANNEL COMMUNICATIONS, INC.; INSTANTLIVE CONCERTS, LLC; CLEAR CHANNEL COMMUNICATIONS, INC.; NEXTICKETING, INC., AND DOES 1-10, INCLUSIVE,<br><br>Defendants. | Civil Action No. 06-CV-1202 (JONES)<br><br>ORAL ARGUMENT REQUESTED<br><br>JURY TRIAL REQUESTED |

**DECLARATION OF HAMLET T. NEWSOM, JR. IN SUPPORT OF CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS**

I, Hamlet T. Newsom, Jr., declare as follows:

1. I am currently employed by Clear Channel Management Services, L.P. My title is Associate General Counsel and Assistant Secretary. My responsibilities include overseeing the corporate governance for certain subsidiaries of Clear Channel Communications, Inc. I make this declaration of my personal knowledge and, if called as a witness, could and would testify competently to these statements.

2. Clear Channel Communications, Inc. is incorporated and organized under the laws of the State of Texas. Clear Channel Communications, Inc. maintains its principal place of business in San Antonio, Texas.

3. Clear Channel Communications, Inc. is a holding company whose sole purpose is to hold stock in a number of companies. Many of the companies in which Clear Channel Communications, Inc. holds stock, or which Clear Channel Communications, Inc. indirectly

owns, use as part of their names the word "Clear Channel" with a an identifier, such as Clear Channel Broadcasting, Inc. or Clear Channel Outdoor, Inc.

4.      Other than holding stock in its subsidiaries, Clear Channel Communications, Inc. conducts no other business. Clear Channel Communications, Inc. does not, for example, provide any goods or services.

5.      Clear Channel Communications, Inc. does not sell or advertise any product. Specifically, Clear Channel Communications, Inc. has not and does not offer for sale, sell, advertise, make or provide any products or services to any customers in the State of New York. Clear Channel Communications, Inc. does not operate a website.

6.      Clear Channel Communications, Inc. observes all corporate formalities, including having its own board of directors and its own officers that function independently from those of its subsidiaries.    Clear Channel Communications, Inc. pays none of the salaries of its subsidiaries' employees.  All of Clear Channel Communications, Inc.'s operating subsidiaries operate with sufficient capital to conduct day-to-day operations.

7.      Clear Channel Communications, Inc. does not maintain a place of business in New York, is not registered to do business in New York, and has no assets, employees, or agents in New York. Clear Channel Communications, Inc. also manufactures no goods and provides no services in New York. Clear Channel Communications, Inc. conducts no business in New York and directs none of its activities toward residents of New York.

8.      Clear Channel Communications, Inc. does not direct its subsidiaries and does not control general policies or daily operating decisions for or on behalf of its subsidiaries. No Clear Channel Communications, Inc. business is conducted through its subsidiaries.  Clear Channel

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/29/10 Page 81 of 153

Communications, Inc. maintains a separate set of banking and accounting records from those of its subsidiaries.

9. None of Clear Channel Communications, Inc.'s subsidiaries has the authority to bind Clear Channel Communications, Inc. in any contract, lease, or other transaction.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 26, 2006

Hamlet T. Newsom, Jr.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY R. GURVEY, Plaintiff, v. | Civil Action No. 06-CV-1202 (JONES) |
| | ORAL ARGUMENT REQUESTED |
| COWAN, LIEBOWITZ & LATMAN, PC; CLEAR CHANNEL COMMUNICATIONS, INC.; INSTANTLIVE CONCERTS, LLC; LIVE NATION, INC.; NEXTICKETING, INC., AND DOES 1-10, INCLUSIVE, Defendants. | JURY TRIAL REQUESTED |

## DECLARATION OF RICHARD A. MUNISTERI IN SUPPORT OF LIVE NATION, INC.'S MOTION TO DISMISS

I, Richard A Munisteri, declare as follows:

1. I am currently employed by Live Nation Worldwide, Inc My title is Associate General Counsel My responsibilities include overseeing the corporate governance for certain subsidiaries of Live Nation, Inc. I make this declaration of my personal knowledge and, if called as a witness, could and would testify competently to these statements

2. Live Nation, Inc. is incorporated and organized under the laws of the State of Delaware. Live Nation, Inc. maintains its principal place of business in Beverly Hills, California.

3. Live Nation, Inc is a holding company whose sole purpose is to hold stock in a company called CCE Holdco #1, Inc. Many of the subsidiaries of Live Nation, Inc. use as part of their names the word "Live Nation" with a geographic or other identifier, such as Live Nation Mexico, LLC or Live Nation Worldwide, Inc.

4 Other than holding stock in CCE Holdco #1, Inc., Live Nation, Inc. conducts no other business. Live Nation, Inc. does not, for example, provide any goods or services.

5. Live Nation, Inc. does not sell or advertise any product Specifically, Live Nation, Inc. has not and does not offer for sale, sell, advertise, make or provide any products or services to any customers in the State of New York. Live Nation, Inc. also does not operate a website.

6. Live Nation, Inc. does not own any United States trademarks.

7. Live Nation, Inc. observes all corporate formalities, including having its own board of directors and its own officers that function independently from those of its subsidiaries Live Nation, Inc pays none of the salaries of its subsidiaries' employees. All of Live Nation, Inc.'s operating subsidiaries operate with sufficient capital to conduct day-to-day operations.

8. Live Nation, Inc. does not maintain a place of business in New York, is not licensed to do business in New York, and has no assets, employees, or agents in New York. Live Nation, Inc. also manufactures no goods and provides no services in New York Live Nation, Inc. conducts no business in New York and directs none of its activities toward residents of New York.

9. Live Nation, Inc does not direct its subsidiaries and does not control general policies or daily operating decisions for or on behalf of its subsidiaries No Live Nation, Inc business is conducted through its subsidiaries. Live Nation, Inc. maintains a separate set of banking and accounting records from those of its subsidiaries

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 26, 2006

Richard A. Munisteri

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY R. GURVEY,<br><br>Plaintiff,<br><br>v.<br><br>COWAN, LIEBOWITZ & LATMAN, PC; CLEAR CHANNEL COMMUNICATIONS, INC.; INSTANTLIVE CONCERTS, LLC; CLEAR CHANNEL COMMUNICATIONS, INC.; NEXTICKETING, INC., AND DOES 1-10, INCLUSIVE,<br><br>Defendants. | Civil Action No. 06-CV-1202 (JONES)<br><br>ORAL ARGUMENT REQUESTED<br><br>JURY TRIAL REQUESTED |

**DECLARATION OF HAMLET T. NEWSOM, JR. IN SUPPORT OF CLEAR CHANNEL COMMUNICATIONS, INC.'S MOTION TO DISMISS**

I, Hamlet T. Newsom, Jr., declare as follows:

1. I am currently employed by Clear Channel Management Services, L.P. My title is Associate General Counsel and Assistant Secretary. My responsibilities include overseeing the corporate governance for certain subsidiaries of Clear Channel Communications, Inc. I make this declaration of my personal knowledge and, if called as a witness, could and would testify competently to these statements.

2. Clear Channel Communications, Inc. is incorporated and organized under the laws of the State of Texas. Clear Channel Communications, Inc. maintains its principal place of business in San Antonio, Texas.

3. Clear Channel Communications, Inc. is a holding company whose sole purpose is to hold stock in a number of companies. Many of the companies in which Clear Channel Communications, Inc. holds stock, or which Clear Channel Communications, Inc. indirectly

owns, use as part of their names the word "Clear Channel" with a an identifier, such as Clear Channel Broadcasting, Inc. or Clear Channel Outdoor, Inc.

4.      Other than holding stock in its subsidiaries, Clear Channel Communications, Inc. conducts no other business. Clear Channel Communications, Inc. does not, for example, provide any goods or services.

5.      Clear Channel Communications, Inc. does not sell or advertise any product. Specifically, Clear Channel Communications, Inc. has not and does not offer for sale, sell, advertise, make or provide any products or services to any customers in the State of New York. Clear Channel Communications, Inc. does not operate a website.

6.      Clear Channel Communications, Inc. observes all corporate formalities, including having its own board of directors and its own officers that function independently from those of its subsidiaries.    Clear Channel Communications, Inc. pays none of the salaries of its subsidiaries' employees.  All of Clear Channel Communications, Inc.'s operating subsidiaries operate with sufficient capital to conduct day-to-day operations.

7.      Clear Channel Communications, Inc. does not maintain a place of business in New York, is not registered to do business in New York, and has no assets, employees, or agents in New York. Clear Channel Communications, Inc. also manufactures no goods and provides no services in New York. Clear Channel Communications, Inc. conducts no business in New York and directs none of its activities toward residents of New York.

8.      Clear Channel Communications, Inc. does not direct its subsidiaries and does not control general policies or daily operating decisions for or on behalf of its subsidiaries. No Clear Channel Communications, Inc. business is conducted through its subsidiaries.  Clear Channel

Communications, Inc. maintains a separate set of banking and accounting records from those of its subsidiaries.

9. None of Clear Channel Communications, Inc.'s subsidiaries has the authority to bind Clear Channel Communications, Inc. in any contract, lease, or other transaction.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 26, 2006

[signature]
Hamlet T. Newsom, Jr.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY R. GURVEY, Plaintiff, v. COWAN, LIEBOWITZ & LATMAN, PC; CLEAR CHANNEL COMMUNICATIONS, INC.; INSTANTLIVE CONCERTS, LLC; LIVE NATION, INC.; NEXTICKETING, INC., AND DOES 1-10, INCLUSIVE, Defendants. | Civil Action No. 06-CV-1202 (JONES) ORAL ARGUMENT REQUESTED JURY TRIAL REQUESTED |

**DECLARATION OF RICHARD A. MUNISTERI IN SUPPORT OF LIVE NATION, INC.'S MOTION TO DISMISS**

I, Richard A Munisteri, declare as follows:

1. I am currently employed by Live Nation Worldwide, Inc My title is Associate General Counsel My responsibilities include overseeing the corporate governance for certain subsidiaries of Live Nation, Inc. I make this declaration of my personal knowledge and, if called as a witness, could and would testify competently to these statements

2. Live Nation, Inc. is incorporated and organized under the laws of the State of Delaware. Live Nation, Inc. maintains its principal place of business in Beverly Hills, California.

3 Live Nation, Inc is a holding company whose sole purpose is to hold stock in a company called CCE Holdco #1, Inc. Many of the subsidiaries of Live Nation, Inc. use as part of their names the word "Live Nation" with a geographic or other identifier, such as Live Nation Mexico, LLC or Live Nation Worldwide, Inc.

4 Other than holding stock in CCE Holdco #1, Inc., Live Nation, Inc. conducts no other business Live Nation, Inc does not, for example, provide any goods or services

5. Live Nation, Inc. does not sell or advertise any product Specifically, Live Nation, Inc. has not and does not offer for sale, sell, advertise, make or provide any products or services to any customers in the State of New York Live Nation, Inc. also does not operate a website.

6 Live Nation, Inc does not own any United States trademarks.

7. Live Nation, Inc observes all corporate formalities, including having its own board of directors and its own officers that function independently from those of its subsidiaries Live Nation, Inc pays none of the salaries of its subsidiaries' employees All of Live Nation, Inc.'s operating subsidiaries operate with sufficient capital to conduct day-to-day operations.

8. Live Nation, Inc. does not maintain a place of business in New York, is not licensed to do business in New York, and has no assets, employees, or agents in New York. Live Nation, Inc. also manufactures no goods and provides no services in New York Live Nation, Inc conducts no business in New York and directs none of its activities toward residents of New York.

9. Live Nation, Inc does not direct its subsidiaries and does not control general policies or daily operating decisions for or on behalf of its subsidiaries No Live Nation, Inc business is conducted through its subsidiaries. Live Nation, Inc. maintains a separate set of banking and accounting records from those of its subsidiaries

I declare under the penalty of perjury that the foregoing is true and correct

Dated: June 26, 2006

Richard A. Munisteri

EXHIBIT 4



Last Update: 03/19/2010 - 4:03pm EST

TicketNews
The source for ticketing news and information

The ticketing industry just changed... Isn't it time for you to change too? tix

Home Rankings Resources Topics A-Z Ticket Industry Tours Legal Sports Theater Onsales World Wire Ticket Summit

Search

With merger finished, Live Nation Entertainment re

WELCOME!

Thanks for visiting TicketNews, the source for ticketing news and information!

Feel free to explore the site, and while you're at it, you can also subscribe to our RSS feed, create a user account or buy discount theater tickets

Want to keep up-to-date with the latest ticketing news and information? Subscribe to the TicketNewsletter:

Email SUBMIT

E-mail
Save This
Add new comment
Print
Share

Sign up for the TicketNewsletter!
Email

More ways to connect >
Advertise About Us

# Promoter Seth Hurwitz responds to Live Nation claims with counter motion

Fri, Jun 19th 2009 6:49 pm EST
By Alfred Branch Jr.

Attorneys for Maryland-based promoter Seth Hurwitz, owner of Washington, DC's famed 9:30 Club, filed counter motions this month against Live Nation in the antitrust case Hurwitz filed against the company earlier this year. Hurwitz had been working on the original lawsuit for about a year but filed it after he testified before Congress in February against the proposed Ticketmaster/Live Nation merger, giving the impression his lawsuit was about that plan, but it was separate.

"Contrary to Live Nation's arguments, plaintiffs have identified specific artists who would have utilized I.M.P.'s promotional services and appeared at Merriweather Post Pavilion ("Merriweather"), an amphitheatre in Columbia, Maryland I.M.A. operates, but for Live Nation's conduct," Hurwitz's most recent motion states. "Further, rather than conceding Live Nation promoted artists have appeared at Merriweather, as Live Nation claims, plaintiffs actually allege that Live Nation so dominates the concert industry that it was able to force artists to require plaintiffs to pay 25% of their profits with respect to concerts that Live Nation did not promote and with which it would have had no involvement. This is extraordinary economic power, akin to Coca-Cola requiring Pepsi-Cola to share its profits for permitting retailers to stock Pepsi. Live Nation's contention that plaintiff's Complaint defies economic sense ignores their own Chief Executive Officer's admissions while testifying before the Antitrust Committee that Live Nation loses money on promotional services and profits only through sales at its venues."

In a motion to dismiss filed during the spring, Live Nation argued that it does not own or operate venues in the Washington, DC or Baltimore markets, nor does it steer artists away from those areas or the facilities that Hurwitz controls or manages.

U2 Tickets
U2 Concert Tickets. Tickets Sold at Market Prices.
www.StubHub.com

Become a Ticket Broker
Learn How to Become a Ticket Broker With No Experience. Start With Us
www.eventexperts.net

Tickets Online
Great Deals on Concert Tickets Find Tickets for any Event Here!
TicketsReview.com

"At this point I am going to let the suit, which we have been preparing for more than a year, speak for itself. It says it all and I would prefer people read it and fully understand the claims we are making," Hurwitz said in a prepared statement. "But, basically, we contend that the essence of the tour deal is to use monopoly power to force artists to play only for Live Nation venues and where they wouldn't otherwise, to the detriment of concertgoers, independent promoters and the artists."

He continued, "There is a huge difference between enticing artists to play your venues by doing a better job, versus forcing them to play your venues by controlling the market and the acts. Live Nation has attempted to portray this as evolution into a better business model, but we contend that it is intended to prevent fair legitimate competition, which is illegal. All I want is the opportunity to compete fairly, and we are asking the Court to give us that opportunity."

NETFLIX

Live Nation Global Music CEO Jason Garner told the *Washington Post* that while the company competes with Hurwitz's company I.M.P., it's I.M.P. that has the clout in that market. "We compete heavily with Seth in the D.C. market. And the fact is, he is the dominant promoter in the Washington, D.C., area. We do 5 percent of the shows in the market. ... If we had the supposed power that Seth alleges, we wouldn't have 5 percent of the market share."

Add new comment Save this E-mail Print

Latest Ticketmaster / Live Nation Merger Articles

DOJ official Christine Varney defends Ticketmaster / Live Nation merger

Ticketmaster / Live Nation merger: UK Competition Commission to offer new opinion by May 11

Ticketmaster / Live Nation merger: UK regulators to give deal a second look

1 2 3 4 5 > »

Latest News Headlines

Dame Edna, Michael Feinstein square off in critically panned 'All About Me'

With merger finished, Live Nation Entertainment reportedly begins laying off employees

Lady GaGa, Kings of Leon tickets on sale throughout the weekend

Lilith Fair announces first round of presales, onsales for 2010 return

DOJ official Christine Varney defends Ticketmaster / Live Nation merger

Philadelphia Phillies' season ticket demands force team to cap sales

Phish tour maintains zero tolerance stance on ticket resale for summer 2010 concerts

With attendance down, Golden State Warriors drop ticket prices

Arizona legislators consider ticket surcharge to help Chicago Cubs build spring training stadium

Broadway ticket sales skyrocket with the help of four new productions

Buy Tickets

Buy Discount Theater Tickets

seatwave
EUROPE'S #1
ticket exchange*
*ComScore October 2009

TOP SELLERS

Month of February 2010

| | Seller |
|---|---|
| 1 | Ticketmaster.com |
| 2 | StubHub.com |
| 3 | TicketCity.com |
| 4 | TicketLiquidator.com |
| 5 | TicketsNow.com |
| 6 | LiveNation.com |
| 7 | Telecharge.com |
| 8 | TicketWeb.com |
| 9 | ABCTickets.com |
| 10 | TicketNetwork.com |
| 11 | GoTickets.com |
| 12 | ETix.com |
| 13 | TickCo.com |
| 14 | Vividseats.com |
| 15 | RazorGator.com |
| 16 | BrownPaperTickets.com |
| 17 | Tickets.com |
| 18 | EventTicketsCenter.com |
| 19 | Wantickets.com |
| 20 | CoasttoCoastTickets.com |

Subscribe to this feed

buy 1, get 1 FREE!
on
college
posters
+ 50 free
prints

TOP EVENTS

Week Ending 3/14/2010

| | Event |
|---|---|
| 1 | Wicked Tickets |
| 2 | Elton John Tickets |
| 3 | Glee Live Tickets |
| 4 | Michael Buble Tickets |
| 5 | Taylor Swift Tickets |
| 6 | The Eagles Tickets |
| 7 | Tom Petty & The Heartbreakers Tickets |
| 8 | Lion King Tickets |
| 9 | James Taylor & Carole King Tickets |
| 10 | Brooks & Dunn Tickets |
| 11 | Paul McCartney Tickets |
| 12 | Conan O'Brien Tickets |

Who's online

Create Account | Advertise | Buy Tickets | Ticket Resale & Tax Laws | Community | About Us

## Comments

Comments represent the opinions of users and do not necessarily reflect the views of TicketNews.

**smart move**
Submitted by Anonymous on Sat, 09/03/2009 - 9:14pm

The reason seems to be that this lawsuit is made so that if the merger goes through Ticketmaster will force live nation to settle it. Smart move we know that live nation settled all the previous suits before when they got spun off by clear channel

Reply E-mail

Advertise on TicketNews

13 Simon and Garfunkel Tickets
14 Black Eyed Peas Tickets
15 Tim McGraw & Lady Antebellum Tickets
16 Bon Jovi Tickets
17 Jersey Boys Tickets
18 Boston Red Sox Tickets
19 WWE Tickets
20 Jay-Z Tickets

Subscribe to this feed

TOP VENUES

Week Ending 3/14/2010

| | Venue |
|---|---|
| 1 | Madison Square Garden Tickets |
| 2 | Gershwin Theatre Tickets |
| 3 | Radio City Music Hall Tickets |
| 4 | Reliant Stadium Tickets |
| 5 | Pepsi Center Tickets |
| 6 | Wachovia Center Tickets |
| 7 | MGM Grand Garden Arena Tickets |
| 8 | Staples Center Tickets |
| 9 | American Airlines Center Tickets |
| 10 | Sprint Center Tickets |
| 11 | Dallas Cowboys Stadium Tickets |
| 12 | Fenway Park Tickets |
| 13 | Hollywood Bowl Tickets |
| 14 | TD Garden (Fleet Center) Tickets |
| 15 | United Center Tickets |
| 16 | Bridgestone Arena (Formerly Sommet Center) Tickets |
| 17 | Sun Life Stadium (Formerly Dolphin Stadium) Tickets |
| 18 | Virginia/August Wilson Theatre - NY Tickets |
| 19 | Xcel Energy Center Tickets |
| 20 | Target Field Tickets |

Subscribe to this feed

TICKETNEWS AFFILIATIONS

**Event Tickets - U.S.**
ABC Tickets
AwesomeSeating
Barry's Tickets
Empire Tickets
eSeats
EZ Ticket Search
Purchase Tix
RazorGator
Select A Ticket
StubHub
Superbowl Rooms
TickCo
Ticket Solutions
Ticketmaster
Tickets.Ebay.com
TicketWeb
Vivid Seats
TicketLiquidator
TicketNetwork
Wantickets
Vegastickets.com
**Event Tickets - Europe**
**Attraction Tickets**
**MP3 Downloads**
**Memorabilia**

© Copyright 2009 • TicketNews.com • Vernon, CT, USA



Promoter Seth Hurwitz responds to Live Nation claims with counter motion | TicketNews Page 1 of 2

TicketNews
The source for ticketing news and information

Last Update: 03/19/2010 - 4:03pm EST

The ticketing industry just changed...
Isn't it time for you to change too?

Home Rankings Resources Topics A-Z Ticket Industry Tours Legal Sports Theater Onsales World Wire Ticket Summit

Search

With merger finished, Live Nation Entertainment re

WELCOME! x

Thanks for visiting TicketNews, the source for ticketing news and information!

Feel free to explore the site, and while you're at it, you can also subscribe to our RSS feed, create a user account or buy discount theater tickets.

Want to keep up-to-date with the latest ticketing news and information? Subscribe to the TicketNewsletter.

Email SUBMIT

## Promoter Seth Hurwitz responds to Live Nation claims with counter motion

Fri, Jun 19th 2009 6:48 pm EST
By Alfred Branch Jr.

Attorneys for Maryland-based promoter Seth Hurwitz, owner of Washington, DC's famed 9:30 Club, filed counter motions this month against Live Nation in the antitrust case Hurwitz filed against the company earlier this year. Hurwitz had been working on the original lawsuit for about a year but filed it after he testified before Congress in February against the proposed Ticketmaster/Live Nation merger, giving the impression his lawsuit was about that plan, but it was separate.

"Contrary to Live Nation's arguments, plaintiffs have identified specific artists who would have utilized I.M.P.'s promotional services and appeared at Merriweather Post Pavilion ("Merriweather"), an amphitheatre in Columbia, Maryland I.M.A. operates, but for Live Nation's conduct," Hurwitz's most recent motion states. "Further, rather than conceding Live Nation promoted artists have appeared at Merriweather, as Live Nation claims, plaintiffs actually allege that Live Nation so dominates the concert industry that it was able to force artists to require plaintiffs to pay 25% of their profits with respect to concerts that Live Nation did not promote and with which it would have had no involvement. This is extraordinary economic power, akin to Coca-Cola requiring Pepsi-Cola to share its profits for permitting retailers to stock Pepsi. Live Nation's contention that plaintiff's Complaint defi es economic sense ignores their own Chief Executive Officer's admissions while testifying before the Antitrust Committee that Live Nation losses money on promotional services and profits only through sales at its venues."

In a motion to dismiss filed during the spring, Live Nation argued that it does not own or operate venues in the Washington, DC or Baltimore markets, nor does it steer artists away from those areas or the facilities that Hurwitz controls or manages.

U2 Tickets
U2 Concert Tickets. Tickets Sold at Market Prices.
www.StubHub.com

Become a Ticket Broker
Learn How to Become a Ticket Broker With No Experience. Start With Us
www.eventexperts.net

Tickets Online
Great Deals on Concert Tickets Find Tickets for any Event Here!
TicketsReview.com

"At this point I am going to let the suit, which we have been preparing for more than a year, speak for itself. It says it all and I would prefer people read it and fully understand the claims we are making," Hurwitz said in a prepared statement. "But, basically, we contend that the essence of the tour deal is to use monopoly power to force artists to play only for Live Nation venues and where they wouldn't otherwise, to the detriment of concertgoers, independent promoters and the artists."

He continued, "There is a huge difference between enticing artists to play your venues by doing a better job, versus forcing them to play your venues by controlling the market and the acts. Live Nation has attempted to portray this as evolution into a better business model, but we contend that it is intended to prevent fair legitimate competition, which is illegal. All I want is the opportunity to compete fairly, and we are asking the Court to give us that opportunity."

NETFLIX

Live Nation Global Music CEO Jason Garner told the *Washington Post* that while the company competes with Hurwitz's company I.M.P., it's I.M.P. that has the clout in that market. "We compete heavily with Seth in the D.C. market. And the fact is, he is the dominant promoter in the Washington, D.C., area. We do 5 percent of the shows in the market. ... If we had the supposed power that Seth alleges, we wouldn't have 5 percent of the market share."

Add new comment
Save this E-mail Print

E-mail
Save This
Add new comment
Print
Share

Latest Ticketmaster / Live Nation Merger Articles

DOJ official Christine Varney defends Ticketmaster / Live Nation merger

Ticketmaster / Live Nation merger: UK Competition Commission to offer new opinion by May 11

Ticketmaster / Live Nation merger: UK regulators to give deal a second look

1 2 3 4 5 > »

Latest News Headlines

Dame Edna, Michael Feinstein square off in critically panned 'All About Me'

With merger finished, Live Nation Entertainment reportedly begins laying off employees

Lady GaGa, Kings of Leon tickets on sale throughout the weekend

Lilith Fair announces first round of presales, onsales for 2010 return

DOJ official Christine Varney defends Ticketmaster / Live Nation merger

Philadelphia Phillies' season ticket demands force team to cap sales

Phish tour maintains zero tolerance stance on ticket resale for summer 2010 concerts

With attendance down, Golden State Warriors drop ticket prices

Arizona legislators consider ticket surcharge to help Chicago Cubs build spring training stadium

Broadway ticket sales skyrocket with the help of four new productions

Sign up for the TicketNewsletter!
Email

More ways to connect >
Advertise About Us

Buy Tickets
Buy Discount Theater Tickets

seatwave
EUROPE'S #1
ticket exchange*
*ComScore October 2009

TOP SELLERS

Month of February 2010

| | Seller |
|---|---|
| 1 | Ticketmaster.com |
| 2 | StubHub.com |
| 3 | TicketCity.com |
| 4 | TicketLiquidator.com |
| 5 | TicketsNow.com |
| 6 | LiveNation.com |
| 7 | Telecharge.com |
| 8 | TicketWeb.com |
| 9 | ABCTickets.com |
| 10 | TicketNetwork.com |
| 11 | GoTickets.com |
| 12 | ETix.com |
| 13 | TickCo.com |
| 14 | Vividseats.com |
| 15 | RazorGator.com |
| 16 | BrownPaperTickets.com |
| 17 | Tickets.com |
| 18 | EventTicketsCenter.com |
| 19 | Wantickets.com |
| 20 | CoasttoCoastTickets.com |

Subscribe to this feed

buy 1, get 1 FREE!
on
college
posters
+ 50 free
prints

TOP EVENTS

Week Ending 3/14/2010

| | Event |
|---|---|
| 1 | Wicked Tickets |
| 2 | Elton John Tickets |
| 3 | Glee Live Tickets |
| 4 | Michael Buble Tickets |
| 5 | Taylor Swift Tickets |
| 6 | The Eagles Tickets |
| 7 | Tom Petty & The Heartbreakers Tickets |
| 8 | Lion King Tickets |
| 9 | James Taylor & Carole King Tickets |
| 10 | Brooks & Dunn Tickets |
| 11 | Paul McCartney Tickets |
| 12 | Conan O'Brien Tickets |

Who's online
... and 72 ...

Create Account | Advertise | Buy Tickets | Ticket Resale & Tax Laws | Community | About Us



## Comments

Comments represent the opinions of users and do not necessarily reflect the views of TicketNews.

**smart move**
Submitted by Anonymous on Sat, [illegible] - 3:14pm

The reason seems to be that this lawsuit is made so that if the merger goes through Ticketmaster will force live nation to settle it. Smart move we know that live nation settled all the previous suits before when they got spun off by clear channel

Reply E-mail

Advertise on TicketNews

13 Simon and Garfunkel Tickets
14 Black Eyed Peas Tickets
15 Tim McGraw & Lady Antebellum Tickets
16 Bon Jovi Tickets
17 Jersey Boys Tickets
18 Boston Red Sox Tickets
19 WWE Tickets
20 Jay-Z Tickets

Subscribe to this feed

TOP VENUES

Week Ending 3/14/2010

**Venue**

1 Madison Square Garden Tickets
2 Gershwin Theatre Tickets
3 Radio City Music Hall Tickets
4 Reliant Stadium Tickets
5 Pepsi Center Tickets
6 Wachovia Center Tickets
7 MGM Grand Garden Arena Tickets
8 Staples Center Tickets
9 American Airlines Center Tickets
10 Sprint Center Tickets
11 Dallas Cowboys Stadium Tickets
12 Fenway Park Tickets
13 Hollywood Bowl Tickets
14 TD Garden (Fleet Center) Tickets
15 United Center Tickets
16 Bridgestone Arena (Formerly Sommet Center) Tickets
17 Sun Life Stadium (Formerly Dolphin Stadium) Tickets
18 Virginia/August Wilson Theatre - NY Tickets
19 Xcel Energy Center Tickets
20 Target Field Tickets

Subscribe to this feed

TICKETNEWS AFFILIATIONS

**Event Tickets - U.S.**
ABC Tickets
AwesomeSeating
Barry's Tickets
Empire Tickets
eSeats
EZ Ticket Search
Purchase Tix
RazorGator
Select A Ticket
StubHub
Superbowl Rooms
TickCo
Ticket Solutions
Ticketmaster
Tickets Ebay.com
TicketWeb
Vivid Seats
TicketLiquidator
TicketNetwork
Warrtickets
Vegastickets.com
**Event Tickets - Europe**
**Attraction Tickets**
**MP3 Downloads**
**Memorabilia**

© Copyright 2009 • TicketNews.com • Vernon, CT, USA



CLEARCHANNEL

ENTERTAINMENT | OUTDOOR | RADIO | TELEVISION | INTERN.

How many ways has Clear Channel reached you today?

ENTERTAINMENT

Home > Entertainment > Venues

Music
Theater & Family Entertainment
Motor Sports
Television and Film
SFX Sports Group
Exhibitions

Press Room
Concert and Event Information
Venue Listing
Executives
Contact
Home

The following is a list of venues (as of 7/31/02) that Clear Channel Entertainn either owns, operates, and/or exclusively books.

USA

**Saratoga Performing Arts Center**
Market: Albany, NY Seating: 25(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Journal Pavilion**
Market: Albuquerque, NM Seating: 15(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Lakewood Amphitheater**
Market: Atlanta, GA Seating: 19(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Chastain Park Amphitheater**
Market: Atlanta, GA Seating: 70
Type: **Amphitheater** Division: **Music** Country:**USA**

**Roxy Theater**
Market: Atlanta, GA Seating: 15
Type: **Club** Division: **Music** Country:**USA**

**Tabernacle**
Market: Atlanta, GA Seating: 8(
Type: **Theater** Division: **Music** Country:**USA**

**Tweeter Center for the Performing Arts**
Market: Boston-Worcester-Lawrence, MA Seating: 19!
Type: **Amphitheater** Division: **Music** Country:**USA**

**FleetBoston Pavilion**
Market: Boston-Worcester-Lawrence, MA Seating: 50
Type: **Amphitheater** Division: **Music** Country:**USA**

**Orpheum Theatre**
Market: Boston-Worcester-Lawrence, MA Seating: 27
Type: **Theater** Division: **Music** Country:**USA**

**Avalon**
Market: Boston-Worcester-Lawrence, MA Seating: 13
Type: **Club** Division: **Music** Country:**USA**

**Wilbur Theatre**
Market: Boston-Worcester-Lawrence, MA Seating: 12
Type: **Theater** Division: **Theatrical** Country:**USA**

**Colonial Theatre**

http://www.clearchannel.com/Entertainment/ent_venue.php 9/4/02

Clear Ch Case 1:10-cv-00153-RMC Document 13-5 Filed 06/29/10 Page 95 of 153 Page 80

Market: Boston-Worcester-Lawrence, MA Seating: 17
Type: **Theater** Division: **Theatrical** Country:**USA**

**Charles Playhouse**
Market: Boston-Worcester-Lawrence, MA Seating: 7:
Type: **Theater** Division: **Theatrical** Country:**USA**

**Verizon Wireless Amphitheatre, Charlotte**
Market: Charlotte-Gastonia-Rock Hill, NC Seating: 18(
Type: **Amphitheater** Division: **Music** Country:**USA**

**The Tweeter Center – Chicago**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 28(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Allstate Arena**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 17!
Type: **Arena** Division: **Music** Country:**USA**

**Rosemont Theater**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 44
Type: **Theater** Division: **Music** Country:**USA**

**Fiesta Palace**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 15
Type: **Club** Division: **Music** Country:**USA**

**Alamo Ballroom**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 17
Type: **Club** Division: **Music** Country:**USA**

**Planeta Musical**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 3:
Type: **Club** Division: **Music** Country:**USA**

**Mario's ballroom**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 5‹
Type: **Club** Division: **Music** Country:**USA**

**Noa Noa West**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 20
Type: **Club** Division: **Music** Country:**USA**

**OK Corral**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 5:
Type: **Club** Division: **Music** Country:**USA**

**Ford Center Theater for the Performing Arts Oriental Theater**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 21
Type: **Theater** Division: **Theatrical** Country:**USA**

**The Cadillac Palace Theater**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 23
Type: **Theater** Division: **Theatrical** Country:**USA**

**Shubert**
Market: Chicago, IL - Gary, IN - Kenosha, WI Seating: 18
Type: **Theater** Division: **Theatrical** Country:**USA**

**Riverbend Amphitheater**
Market: Cincinnati, OH Seating: 19(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Taft Theater**
Market: Cincinnati, OH — Seating: 24
Type: **Theater** Division: **Music** Country:**USA**

**Bogart's**
Market: Cincinnati, OH — Seating: 14
Type: **Club** Division: **Music** Country:**USA**

**Polaris Amphitheater**
Market: Columbus, OH — Seating: 20(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Smirnoff Music Center**
Market: Dallas-Fort Worth, TX — Seating: 20!
Type: **Amphitheater** Division: **Music** Country:**USA**

**Universal Lending CityLights**
Market: Denver, CO — Seating: 45
Type: **Pavilion** Division: **Music** Country:**USA**

**Denver Fillmore Auditorium**
Market: Denver, CO — Seating: 30
Type: **Theater** Division: **Music** Country:**USA**

**Pine Knob Music Theatre**
Market: Detroit-Ann Arbor-Flint, MI — Seating: 16(
Type: **Amphitheater** Division: **Music** Country:**USA**

**The Palace at Auburn Hills**
Market: Detroit-Ann Arbor-Flint, MI — Seating: 15(
Type: **Arena** Division: **Music** Country:**USA**

**Meadowbrook Music Festival**
Market: Detroit-Ann Arbor-Flint, MI — Seating: 76
Type: **Amphitheater** Division: **Music** Country:**USA**

**Detroit State Theatre**
Market: Detroit-Ann Arbor-Flint, MI — Seating: 30
Type: **Theater** Division: **Music** Country:**USA**

**Historic St. Andrews Hall**
Market: Detroit-Ann Arbor-Flint, MI — Seating: 10
Type: **Club** Division: **Music** Country:**USA**

**Clutch Cargo (Pontiac, MI)**
Market: Detroit-Ann Arbor-Flint, MI — Seating: 14
Type: **Club** Division: **Music** Country:**USA**

**CT Now.com (Meadows)**
Market: Hartford, CT — Seating: 25(
Type: **Amphitheater** Division: **Music** Country:**USA**

**CT Now.com (Oakdale)**
Market: Hartford, CT — Seating: 48
Type: **Theater** Division: **Music** Country:**USA**

**Cynthia Woods Mitchell Pavilion**
Market: Houston-Galveston-Brazoria, TX — Seating: 15I
Type: **Amphitheater** Division: **Music** Country:**USA**

**Verizon Wireless Theater**
Market: Houston-Galveston-Brazoria, TX — Seating: 28

Type: **Theater** Division: **Music** Country:**USA**

**Verizon Wireless Music Center**
Market: Indianapolis, IN Seating: 21
Type: **Amphitheater** Division: **Music** Country:**USA**

**Murat Theatre**
Market: Indianapolis, IN Seating: 27
Type: **Theater** Division: **Music** Country:**USA**

**Verizon Wireless Amphitheater**
Market: Kansas City, KS Seating: 18
Type: **Amphitheater** Division: **Music** Country:**USA**

**Memorial Hall**
Market: Kansas City, KS Seating: 30
Type: **Theater** Division: **Music** Country:**USA**

**Glen Helen Blockbuster Pavilion**
Market: Los Angeles-Riverside-Orange County, CA Seating: 25
Type: **Amphitheater** Division: **Music** Country:**USA**

**Verizon Wireless Amphitheater**
Market: Los Angeles-Riverside-Orange County, CA Seating: 15
Type: **Amphitheater** Division: **Music** Country:**USA**

**Thousand Oaks Civic Arts Plaza**
Market: Los Angeles-Riverside-Orange County, CA Seating: 18
Type: **Theater** Division: **Music** Country:**USA**

**Wiltern**
Market: Los Angeles-Riverside-Orange County, CA Seating: 22
Type: **Theater** Division: **Music** Country:**USA**

**Palace Theatre**
Market: Louisville, KY Seating: 28
Type: **Theatre** Division: **Theatrical** Country:**USA**

**Alpine Valley Music Theater**
Market: Milwaukee-Racine, WI Seating: 35
Type: **Amphitheater** Division: **Music** Country:**USA**

**Modjeska Theater**
Market: Milwaukee-Racine, WI Seating: 18
Type: **Theater** Division: **Music** Country:**USA**

**Target Center**
Market: Minneapolis, MN Seating: 20
Type: **Arena** Division: **Music** Country:**USA**

**Oak Mountain**
Market: Montgomery, AL Seating: 10
Type: **Amphitheater** Division: **Music** Country:**USA**

**Amsouth Amphitheater**
Market: Nashville, TN Seating: 17
Type: **Amphitheater** Division: **Music** Country:**USA**

**Seanger Theater**
Market: New Orleans, LA Seating: 27
Type: **Theater** Division: **Music** Country:**USA**

**PNC Bank Arts Center**

Market: New York City - Long Island, NY - Northern New Jersey Seating: 17!
Type: **Amphitheater** Division: **Music** Country:**USA**

**Tommy Hilfiger at Jones Beach Theater**
Market: New York City - Long Island, NY - Northern New Jersey Seating: 14‹
Type: **Amphitheater** Division: **Music** Country:**USA**

**Roseland Ballroom**
Market: New York City - Long Island, NY - Northern New Jersey Seating: 36
Type: **Theater** Division: **Music** Country:**USA**

**Westbury Music Fair**
Market: New York City - Long Island, NY - Northern New Jersey Seating: 28
Type: **Theater** Division: **Music** Country:**USA**

**Irving Plaza**
Market: New York City - Long Island, NY - Northern New Jersey Seating: 11
Type: **Theater** Division: **Music** Country:**USA**

**Beacon Theatre**
Market: New York City - Long Island, NY - Northern New Jersey Seating: 28
Type: **Theater** Division: **Music** Country:**USA**

**Ford Center for the Performing Arts**
Market: New York City - Long Island, NY - Northern New Jersey Seating: 18
Type: **Theater** Division: **Theatrical** Country:**USA**

**Verizon Wireless, Virginia Beach Amphitheatre**
Market: Norfolk-Virginia Beach-Newport News, VA Seating: 20(
Type: **Amphitheater** Division: **Music** Country:**USA**

**The Boathouse**
Market: Norfolk-Virginia Beach-Newport News, VA Seating: 24
Type: **Club** Division: **Music** Country:**USA**

**The Abyss**
Market: Norfolk-Virginia Beach-Newport News, VA Seating: 9(
Type: **Club** Division: **Music** Country:**USA**

**E-Centre**
Market: Philadelphia, PA -Wilmington, DE - Atlantic City, NJ Seating: 25(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Hershey Star Pavilion**
Market: Philadelphia, PA -Wilmington, DE - Atlantic City, NJ Seating: 25(
Type: **Amphitheater** Division: **Music** Country:**USA**

**Tower Theater**
Market: Philadelphia, PA -Wilmington, DE - Atlantic City, NJ Seating: 30
Type: **Theater** Division: **Music** Country:**USA**

**Electric Factory**
Market: Philadelphia, PA -Wilmington, DE - Atlantic City, NJ Seating: 30
Type: **Club** Division: **Music** Country:**USA**

**Theater of the Living Arts**
Market: Philadelphia, PA -Wilmington, DE - Atlantic City, NJ Seating: 8:

Type: Theater Division: Music Country:USA

**Merriam**

Market: Philadelphia, PA -Wilmington, DE - Atlantic City, NJ Seating: 18

Type: Theater Division: Theatrical Country:USA

**Cricket Pavilion**

Market: Phoenix-Mesa, AZ Seating: 19

Type: Amphitheater Division: Music Country:USA

**Post Gazette at Star Lake**

Market: Pittsburgh, PA Seating: 22

Type: Amphitheater Division: Music Country:USA

**I.C. Light Amphitheater**

Market: Pittsburgh, PA Seating: 42

Type: Amphitheater Division: Music Country:USA

**Alltel Pavililion at Walnut Creek Amphitheater**

Market: Raleigh-Durham-Chapel Hill, NC Seating: 20(

Type: Amphitheater Division: Music Country:USA

**Harro East Theater**

Market: Rochester, NY Seating: 10

Type: Theater Division: Music Country:USA

**Sacramento Valley Amphitheatre**

Market: Sacramento-Yolo, CA Seating: 18

Type: Amphitheater Division: Music Country:USA

**Punch Line Comedy Club**

Market: Sacramento-Yolo, CA Seating: 2

Type: Club Division: Music Country:USA

**Riverport Amphitheater**

Market: Saint Louis, MO Seating: 21(

Type: Amphitheater Division: Music Country:USA

**The American**

Market: Saint Louis, MO Seating: 20

Type: Theater Division: Music Country:USA

**The Pagaent**

Market: Saint Louis, MO Seating: 25

Type: Theater Division: Music Country:USA

**Majestic Theater**

Market: San Antonio, TX Seating: 23

Type: Theater Division: Music Country:USA

**Empire Theater**

Market: San Antonio, TX Seating: 8

Type: Theater Division: Music Country:USA

**Verizon Wireless Amphitheater**

Market: San Antonio, TX Seating: 20(

Type: Amphitheater Division: Music Country:USA

**San Diego Sports Arena**

Market: San Diego, CA Seating: 14

Type: Arena Division: Music Country:USA

**Shoreline Amphitheater**

Market: San Francisco - Oakland - San Jose, CA    Seating: 22(

Type: **Amphitheater**    Division: **Music**    Country:**USA**

**Chronicle Pavilion**

Market: San Francisco - Oakland - San Jose, CA    Seating: **12!**

Type: **Amphitheater**    Division: **Music**    Country:**USA**

**Greek Theater**

Market: San Francisco - Oakland - San Jose, CA    Seating: **85**

Type: **Theater**    Division: **Music**    Country:**USA**

**Warfield Theatre**

Market: San Francisco - Oakland - San Jose, CA    Seating: **22**

Type: **Theater**    Division: **Music**    Country:**USA**

**Fillmore Auditorium**

Market: San Francisco - Oakland - San Jose, CA    Seating: **12**

Type: **Theater**    Division: **Music**    Country:**USA**

**Punchline-San Francisco**

Market: San Francisco - Oakland - San Jose, CA    Seating: **1**

Type: **Club**    Division: **Music**    Country:**USA**

**Montage Mountain Amphitheater**

Market: Scranton, PA    Seating: **18(**

Type: **Amphitheater**    Division: **Music**    Country:**USA**

**White River Amphitheatre**

Market: Seattle - Tacoma - Bremerton, WA    Seating: **20(**

Type: **Amphitheater**    Division: **Music**    Country:**USA**

**Nissan Pavilion at Stone Ridge**

Market: Washington, DC - Baltimore, MD    Seating: **25(**

Type: **Amphitheater**    Division: **Music**    Country:**USA**

**Merriweather-Post Pavilion**

Market: Washington, DC - Baltimore, MD    Seating: **18(**

Type: **Amphitheater**    Division: **Music**    Country:**USA**

**Warner Theater**

Market: Washington, DC - Baltimore, MD    Seating: **38**

Type: **Theater**    Division: **Theatrcial**    Country:**USA**

**Mechanic Theater**

Market: Washington, DC - Baltimore, MD    Seating: **15**

Type: **Theater**    Division: **Theatrical**    Country:**USA**

**Mars Music Amphitheater**

Market: West Palm Beach - Boca Raton, FL    Seating: **20(**

Type: **Amphitheater**    Division: **Music**    Country:**USA**

**Royal Poinciana Playhouse**

Market: West Palm Beach - Boca Raton, FL    Seating: **8**

Type: **Theater**    Division: **Theatrical**    Country:**USA**

**UK**

**Alexandra**

Market: Birmingham, England    Seating: **13**

Type: **Theater**    Division: **Europe**    Country:**UK**

**Hippodrome**

Market: Bristol, England — Seating: 20
Type: **Theater** Division: **Europe** Country: **UK**

**International Arena**
Market: Cardiff, Wales — Seating: 67
Type: **Arena** Division: **Europe** Country: **UK**

**The Point**
Market: Dublin, Ireland — Seating: 90
Type: **Arena** Division: **Europe** Country: **UK**

**The Playhouse**
Market: Edinburgh, Scotland — Seating: 33
Type: **Theater** Division: **Europe** Country: **UK**

**Spa Pavilion**
Market: Felixstowe, England — Seating: 9(
Type: **Theater** Division: **Europe** Country: **UK**

**Leas Cliff Hall**
Market: Folkstone England — Seating: 8(
Type: **Theater** Division: **Europe** Country: **UK**

**Grimsby Audiorium**
Market: Grimsby, England — Seating: 12
Type: **Theatre** Division: **Europe** Country: **UK**

**Beck Theater**
Market: Hayes, England — Seating: 6(
Type: **Theater** Division: **Europe** Country: **UK**

**Donington Park**
Market: Leicestershire, England — Seating: 72!
Type: **Outdoor Arena** Division: **Europe** Country: **UK**

**Empire**
Market: Liverpool, England — Seating: 23
Type: **Theater** Division: **Europe** Country: **UK**

**Apollo Victoria Theater**
Market: London, England — Seating: 15
Type: **Theater** Division: **Europe** Country: **UK**

**Lyceum**
Market: London, England — Seating: 20
Type: **Theater** Division: **Europe** Country: **UK**

**Apollo Hammersmith Theater**
Market: London, England — Seating: 32
Type: **Theater** Division: **Europe** Country: **UK**

**Dominion**
Market: London, England — Seating: 20
Type: **Theater** Division: **Europe** Country: **UK**

**Manchester Opera House**
Market: Manchester, England — Seating: 20
Type: **Theater** Division: **Europe** Country: **UK**

**Manchester Palace Theater**
Market: Manchester, England — Seating: 20
Type: **Theater** Division: **Europe** Country: **UK**

**Apollo Manchester Theater**
Market: Manchester, England Seating: 26
Type: **Theatre** Division: **Europe** Country:**UK**

**Tameside Hippodrome**
Market: Manchester, England Seating: 12
Type: **Theater** Division: **Europe** Country:**UK**

**Milton Keynes Bowl**
Market: Milton Keynes, England Seating: 60(
Type: **Outdoor Arena** Division: **Europe** Country:**UK**

**Apollo**
Market: Oxford, England Seating: 18
Type: **Theater** Division: **Europe** Country:**UK**

**Old Fire Station**
Market: Oxford, England Seating: 2(
Type: **Club** Division: **Europe** Country:**UK**

**Futurist**
Market: Scarborough, England Seating: 21
Type: **Theater** Division: **Europe** Country:**UK**

**Sheffield Arena**
Market: Sheffield, England Seating: 12(
Type: **Theater** Division: **Europe** Country:**UK**

**Southport Theater & Floral Hall**
Market: Southport, England Seating: 16
Type: **Theater** Division: **Europe** Country:**UK**

**Sunderland Empire**
Market: Sunderland, England Seating: 20
Type: **Theater** Division: **Europe** Country:**UK**

**Wyvern Theater**
Market: Swindon, England Seating: 6(
Type: **Theater** Division: **Europe** Country:**UK**

**Princess Theater**
Market: Torquay, England Seating: 14
Type: **Theater** Division: **Europe** Country:**UK**

**Grand Opera House**
Market: York, England Seating: 10
Type: **Theater** Division: **Europe** Country:**UK**

**Sweden**

**Cirkus**
Market: Stockholm, Sweden Seating: 16
Type: **Theater** Division: **Europe** Country:**SWE**

**Canada**

**Canon Theatre**
Market: Toronto, Canada Seating: 22
Type: **Theater** Division: **Theatrical** Country:**CAN**

**General Motors Place**
Market: Vancouver, BC Seating: 20:

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 103 of 153

EXHIBIT 5



JULY 12, 2004

## UP FRONT

### Burning To Burn Instant CDs

There's a battle brewing in concert halls across the U.S. Clear Channel Communications' (CCU) Instant Live unit records concerts and burns CDs for sale right after a show. But rivals in that nascent business fret that Clear Channel, which owns a substantial number of concert venues, will block the use of their services.

In a Mar. 31 e-mail obtained by *BusinessWeek*, Clear Channel Executive Vice-President Steven Simon wrote to Sami Valkonen, president of rival DiscLive: "DiscLive will not be permitted in our venues or at our shows." Valkonen confirmed the e-mail but declined comment. Another rival, Brady Lahr, president of Kufala Recordings, says his service was blocked at a July, 2003, show at a Los Angeles Clear Channel venue.

In an interview with *BusinessWeek*, Simon said that artists could choose any service. A Clear Channel spokesperson says the e-mail was sent because DiscLive did not make prior arrangements, and that it allows third parties at its venues. As for the Kufala allegation, "nobody knows what they're talking about."

Another concern: Clear Channel recently acquired a patent for Instant Live's technology. DiscLive and others argue that the patent ignores prior technology. On June 30, the Electronic Frontier Foundation said it will petition to revoke the patent as part of an effort to fight patents it believes are overly broad.

The instant-CD market is showing signs of life. Around 20% of concertgoers buy the $20 to $30 disks for acts such as Kiss and Jewel. And Clear Channel has a deal to sell its disks at music chains FYE, Virgin, and Tower Records. In the moribund music biz, that's a revenue stream worth fighting for.

*By Brian Hindo*

Copyright 2000-2004, by The McGraw-Hill Companies Inc. All rights reserved
Terms of Use Privacy Notice

A Division of The McGraw-Hill Companies

22

BY RAY WADDELL

# UMG Deal Should Boost Concert CD Business

## Label Is First Major To Sign Up With Clear Channel's Instant Live Service

Instant Live's "preferred provider" agreement with Universal Music Group should streamline the process for the company's acts to offer live CDs and downloads immediately following concerts.

The UMG deal with Instant Live is the first between a major label and a concert CD firm (billboard.biz, Sept. 26). Instant Live is the live-concert CD arm of Clear Channel Entertainment.

The agreement will be administered under eLabs, UMG's new-media division.

The deal is expected to open the door for smoother relationships between the traditional record business and concert CD providers. The concept was introduced by CCE in spring 2003.

"Now we have the stamp of approval from the world's largest record company and that means a lot to us," Instant Live GM Stephen Prendergast says.

Among the acts that have already offered Instant Live CDs are the Allman Brothers Band, the Black Crowes, Hall & Oates and developing bands like the Dears and the Decemberists.

Prendergast expects more to be onboard by next spring. "This is the end of the R&D period. Now we're turning this into a business," he says. "Profitability is within range. We think next year will be the year we get our head above water."

**BLUEPRINT OF A DEAL**

Prendergast says UMG sees Instant Live as a revenue producer and a marketing opportunity for artists.

The agreement provides a blueprint for UMG's labels to customize Instant Live deals for each act. "Each label head can decide what terms best suit their client," Prendergast says. "A mature act like U2 would certainly require different terms and benefits than a new act."

Instant Live will act as a "service provider," Prendergast adds. "UMG will own the works, though we will have rights to them for a period of time."

The accounting details for live concert CDs are complicated. "There are a lot of people in the chain: the label, the artist, the venue, the union for the live recording, the musician's union, us," Prendergast says. "That's why it has taken us over two years to get to this point."

Under the blueprint, labels and artists get 30%-40% of a $25 Instant Live CD sale, which they typically split equally, according to Prendergast.

The remaining gross receipts are broken down as follows: 5%-10% to the venue, 10% for packaging, varying percentages for sales tax, shipping, production and transportation costs, and perhaps 20% to Instant Live, "if we're lucky," Prendergast says.

"It's not purely a financial play for us," he says. "It's a significant artist development play, to help us grow our relationships with the artists and the labels."

For the bands, Instant Live represents another revenue stream. "Nobody is going to retire on this, but it's an ancillary revenue stream we don't have to do anything for," Allman Brothers Band manager Bert Holman says. He notes that the group's Instant Live sales have not cannibalized other revenue. "Our merch holds steady," he says.

To reduce costs, Prendergast says Instant Live is moving toward a presale model where fans can buy CDs before the show. Eventually, Instant Live hopes to emphasize digital delivery.

"Next year, we're going to be looking at situations where people will be able to take their digital recorder, PDA or whatever that device may be, walk over to someone in the building and get a digital copy transferred to their device after the show and walk out in maybe 20-30 seconds."

The UMG/Instant Live deal will likely attract the attention of other majors, and gives Instant Live a leg up on its primary competitor, Disc Live.

"There are favored-nations provisions in this agreement so that we'll present similar terms and benefits to the others," Prendergast says. ....

PRENDERGAST

**$25**

Price of an Instant Live CD, of which 30%-40% will be paid to labels and artists

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 106 of 153

EXHIBIT 6

The New York Times
nytimes.com

May 5, 2003

# Concert CD's Sold on the Spot By a Radio Giant

By MATTHEW MIRAPAUL

Clear Channel Communications, the radio broadcasting and concert promotion giant, plans to introduce a venture today that will sell live recordings on compact disc within five minutes of a show's conclusion. The venture, Instant Live, will enable a band's still-sweating fans to leave with a musical souvenir instead of say, a pricey T-shirt or a glossy program.

Although initially modest, involving only small-audience clubs and theaters in the Boston area, the venture could eventually extend beyond radio and concerts into music distribution. And that could prove troubling to critics, who already complain that the company's rigidly formatted radio stations prevent diverse artists from reaching the airwaves and that its dominance of the concert business too often forces touring acts to accept unfavorable deals.

Josh Bernoff, a music industry analyst at Forrester Research in Boston, said Clear Channel's entry into the CD business could alter the music industry's tenuous balance of power. At the moment, no single record label dominates the market the way that Clear Channel dominates the radio and concert business.

"For the labels," Mr. Bernoff said, "that means that their most important goal is to get Clear Channel to broadcast their acts and promote their concerts." The task could become more challenging, he said, if the labels find themselves competing against Clear Channel's own CD's for air time.

But Clear Channel executives say Instant Live is not so much a foray into the CD business as it is a way to wring further revenue from live music events. And they note that it is simply a continuation of the trend among various bands and start-ups in recent years to sell authorized recordings that are available on CD or as Internet downloads soon after the event. This practice can generate additional revenue for musicians and also thwart illicit concert recordings, they said.

"We're not interested in signing artists to exclusive recording contracts," said Steve Simon, an executive vice president in Clear Channel's concert promotion unit in Cambridge, Mass.

The Instant Live venture adds an element of immediate gratification for music consumers, with towers of CD burners turning out multiple copies of the digital recordings.

"They would look at it as another trinket to sell to concertgoers when they're at their venue, whether it's a T-shirt or an instant bootleg or a hot dog," said James M. Marsh, a broadcasting analyst at the investment bank SG Cowen Securities.

And at least one long-time manager of rock bands, Irving Azoff, said he was enthusiastic about the Instant Live concept, especially at a time when concert concession sales are declining. "I, for one, would rather have a live CD of the show that I can take home than a T-shirt," he said. "So I think it's the future of the touring merchandising business."

Mr. Azoff said he was talking to Clear Channel about offering Instant Live discs during a summer tour of the vintage rock bands Journey and REO Speedwagon, provided that the company can demonstrate its ability to churn out enough discs to satisfy an arena-size audience.

Clear Channel has tested the Instant Live service at a half-dozen small-venue concerts since Feb. 27. In the first instance, people attending a performance by the alternative-rock band Machinery Hall at the Paradise Rock Club in Boston could buy a two-CD recording of that night's show for $15. So far, as many as 30 percent of the Instant Live concertgoers have purchased CD's at a given event, Mr. Simon said.

To make the discs, a master recording is made that blends music from the band's mixing board with ambient sounds, including crowd noise, from other microphones. As soon as the show ends, the master copy is taken to a small tower of CD burners, each of which can duplicate up to eight discs at a time. Fans will be able to preorder the discs when they buy tickets for the concert or place orders at any time during or after the performance.

Mr. Simon said Clear Channel would hold as many as five Instant Live concerts a month at small clubs in the Boston area. He said the venture would expand to larger venues and other cities. Clear Channel also has an exclusive distribution agreement with the Best Buy consumer electronics chain to sell Instant Live CD's in eight of its Boston-area stores and, beginning in mid-May, through its BestBuy.com Web site.

So far, the Instant Live performers have been bands like Spookie Daly Pride and Bomb Squad that do not have major record deals. The larger labels would probably frown upon a flood of Instant Live discs competing against their own official releases.

But Mr. Simon said that Instant Live's success did not depend on adding big-name acts from major labels. "It would be disingenuous to suggest that we don't want to expand the universe and do it with signed acts," he said, "but it is a business regardless." He declined to make sales forecasts.

Dan Millen, manager of Spookie Daly Pride, said the Instant Live program could be a bet on the possibility that at least one of the acts would eventually break out. In his own case, if the band lands a record deal and has a hit tune, demand for the Instant Live release would soar, he said. "If we sold 2 million copies of our album and 100,000 of our live bootleg from Clear Channel, then Clear Channel is going to significantly recoup their investment and then some," he said.

Meanwhile, Mr. Millen said, Spookie Daly Pride receives promotional support and radio play that it might not receive without Clear Channel's backing -- even though the band is exactly the kind of indie-rock outfit that would otherwise have difficulty cracking Clear Channel's formats.

Indeed, because Clear Channel's four Boston stations do not play alternative rock music, Mr. Simon is working with two non-Clear Channel stations to promote the Instant Live acts. Mr. Simon declined to discuss how the Instant Live venture might complement Clear Channel's radio programming other than to say, "There's a panoply of alliance and bundling opportunities that this product would offer." Translated, this might mean that stations could someday offer an "Instant Live Hour," or some such program, that would promote the discs.

Mr. Simon said he could also envision making the audio recordings available at the shows as digital downloads to MP3 players or similar devices. And he said that DVD-recording technology is about 10 months away from being able to produce large numbers of concert video recordings on the spot.

Mr. Millen and other band managers said they received one-third to one-half of the $15 disc price, terms they found agreeable. And while all noted that Clear Channel's reputation among musicians is not generally high, none said they felt pressured into accepting a bad deal. "It wasn't 'We want the whole farm and we'll give you this corn row over here,' " Mr. Millen said. "It was, 'We'll give you a lot of the farm, and if you need anything else, let us know.' "

Although the instant CD idea may work for unsigned acts, it could pose many problems for musicians signed to major labels. Standard contracts, for instance, can stipulate that artists must produce a specific number of albums, so care would need to be taken to ensure that a week's worth of live CD's did not fulfill the band's contract obligation. And negotiating song licenses, particularly when versions of another band's tunes are involved, can also be thorny.

But the biggest obstacle to major-label acceptance could be the fear that the instant CD's would cannibalize the sales of an official release.

That is why DiscLive, a company that has also started to test the instant disc market at small clubs in New York, is taking a slightly different approach by limiting its releases to on-site sales, with no subsequent distribution planned. "What we're selling is a collector's item, a memorabilia piece," said Rich Isaacson, DiscLive's chief executive.

It is too early to know how big the market for instant concert CD's might become. Although the experience is not a direct comparison, John Paluska, manager of the jam band Phish, said that the group had already sold close to $1 million in concert-show downloads over the Internet since opening the livephish.com site in late December. The recordings are typically made available within 48 hours of a performance. So far, Phish fans have downloaded nearly 100,000 concert copies, compared with sales of 180,000 copies of the band's most recent album, "Round Room."

"In our eyes, it's been a big success," Mr. Paluska said.

But he said it would not be easy for Clear Channel to move into the instant-CD sphere. With all the legal issues involved, he said, "They're going to be surprised at how complicated it is."

Copyright 2008 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Conta

# Concert CD's Sold on the Spot By a Radio Giant

By MATTHEW MIRAPAUL

Clear Channel Communications, the radio broadcasting and concert promotion giant, plans to introduce a venture today that will sell live recordings on compact disc within five minutes of a show's conclusion. The venture, Instant Live, will enable a band's still-sweating fans to leave with a musical souvenir instead of, say, a pricey T-shirt or a glossy program.

Although initially modest, involving only small-audience clubs and theaters in the Boston area, the venture could eventually extend beyond radio and concerts into music distribution. And that could prove troubling to critics, who already complain that the company's rigidly formatted radio stations prevent diverse artists from reaching the airwaves and that its dominance of the concert business too often forces touring acts to accept unfavorable deals.

Josh Bernoff, a music industry analyst at Forrester Research in Boston, said Clear Channel's entry into the CD business could alter the music industry's [illegible] balance of power. At the moment, no single record label dominates the market the way that Clear Channel dominates the radio and concerts business.

[illegible]

But Clear Channel executives say Instant Live [illegible] CD business [illegible] revenue from live [illegible] events. And they [illegible]

Continued on Page 5

# Concert CD's Sold After the Concert by a Radio Giant

*Continued From First Business Page*

note that it is simply a continuation of the trend among various bands and start-ups in recent years to sell authorized recordings that are available on CD or as Internet downloads soon after the event. This practice can generate additional revenue for musicians and also thwart illicit concert recordings, they said.

"We're not interested in signing artists to exclusive recording contracts," said Steve Simon, an executive vice president in Clear Channel's concert promotion unit in Cambridge, Mass.

The Instant Live venture adds an element of immediate gratification for music consumers, with towers of CD burners turning out multiple copies of the digital recordings.

"They would look at it as another trinket to sell to concertgoers when they're at their venue, whether it's a T-shirt or an instant bootleg or a hot dog," said James M. Marsh, a broadcasting analyst at the investment bank SG Cowen Securities.

And at least one long-time manager of rock bands, Irving Azoff, said he was enthusiastic about the Instant Live concept, especially at a time when concert concession sales are declining. "I, for one, would rather have a live CD of the show that I can take home than a T-shirt," he said. "So I think it's the future of the touring merchandising business."

Mr. Azoff said he was talking to Clear Channel about offering Instant Live discs during a summer tour of the vintage rock bands Journey and REO Speedwagon, provided that the company can demonstrate its ability to churn out enough discs to satisfy an arena-size audience.

Clear Channel has tested the Instant Live service at a half-dozen small-venue concerts since Feb. 27. In the first instance, people attending a performance by the alternative-rock band Machinery Hall at the Paradise Rock Club in Boston could buy a two-CD recording of that night's show for $15. So far, as many as 30 percent of the Instant Live concertgoers have purchased CD's at a given event, Mr. Simon said.

To make the discs, a master recording is made that blends music from the band's mixing board with ambient sounds, including crowd noise, from other microphones. As soon as the show ends, the master copy is taken to a small tower of CD burners, each of which can duplicate up to eight discs at a time. Fans will be able to preorder the discs when they buy tickets for the concert or place orders at any time during or after the performance.

Mr. Simon said Clear Channel would hold as many as five Instant Live concerts a month at small clubs in the Boston area. He said the venture would expand to larger venues and other cities. Clear Channel also has an exclusive distribution agreement with the Best Buy consumer electronics chain to sell Instant Live CD's in eight of its Boston-area stores and, beginning in mid-May, through its BestBuy.com Web site.

Jodi Hilton for The New York Times

Steve Simon, executive vice president in Clear Channel's concert promotion unit, with CD's to sell at shows.

So far, the Instant Live performers have been bands like Spookie Daly Pride and Bomb Squad that do not have major record deals. The larger labels would probably frown upon a flood of Instant Live discs competing against their own official releases.

But Mr. Simon said that Instant Live's success did not depend on adding big-name acts from major labels. "It would be disingenuous to suggest that we don't want to expand the universe and do it with signed acts," he said, "but it is a business regardless." He declined to make sales forecasts.

Dan Millen, manager of Spookie Daly Pride, said the Instant Live program could be a bet on the possibility that at least one of the acts would eventually break out. In his own case, if the band lands a record deal and has a hit tune, demand for the Instant Live release would soar, he said. "If we sold 2 million copies of our album and 100,000 of our live bootleg from Clear Channel, then Clear Channel is going to significantly recoup their investment and then some," he said.

Meanwhile, Mr. Millen said, Spookie Daly Pride receives promotional support and radio play that it might not receive without Clear Channel's backing — even though the band is exactly the kind of indie-rock outfit that would otherwise have difficulty cracking Clear Channel's formats.

Indeed, because Clear Channel's four Boston stations do not play alternative rock music, Mr. Simon is working with two non-Clear Channel stations to promote the Instant Live acts. Mr. Simon declined to discuss how the Instant Live venture might complement Clear Channel's radio programming other than to say, "There's a panoply of alliance and bundling opportunities that this product would offer." Translated, this might mean that stations could someday offer an "Instant Live Hour," or some such program, that would promote the discs.

Mr. Simon said he could also envision making the audio recordings available at the shows as digital downloads to MP3 players or similar devices. And he said that DVD-recording technology is about 10 months away from being able to produce large numbers of concert video recordings on the spot.

Mr. Millen and other band managers said they received one-third to one-half of the $15 disc price, terms they found agreeable. And while all noted that Clear Channel's reputation among musicians is not generally high, none said they felt pressured into accepting a bad deal. "It wasn't 'We want the whole farm and we'll give you this corn row over here,'" Mr. Millen said. "It was, 'We'll give you a lot of the farm, and if you need anything else, let us know.'"

Although the instant CD idea may work for unsigned acts, it could pose many problems for musicians signed to major labels. Standard contracts, for instance, can stipulate that artists must produce a specific number of albums, so care would need to be taken to ensure that a week's worth of live CD's did not fulfill the band's contract obligation. And negotiating song licenses, particularly when versions of another band's tunes are involved, can also be thorny.

But the biggest obstacle to major-label acceptance could be the fear that the instant CD's would cannibalize the sales of an official release.

That is why DiscLive, a company that has also started to test the instant disc market at small clubs in New York, is taking a slightly different approach by limiting its releases to on-site sales, with no subsequent distribution planned. "What we're selling is a collector's item, a memorabilia piece," said Rich Isaacson, DiscLive's chief executive.

It is too early to know how big the market for instant concert CD's might become. Although the experience is not a direct comparison, John Paluska, manager of the jam band Phish, said that the group had already sold close to $1 million in concert-show downloads over the Internet since opening the livephish.com site in late December. The recordings are typically made available within 48 hours of a performance. So far, Phish fans have downloaded nearly 100,000 concert copies, compared with sales of 180,000 copies of the band's most recent album "Round Room."

"In our eyes, it's been a big success," Mr. Paluska said.

But he said it would not be easy for Clear Channel to move into the instant-CD sphere. With all the legal issues involved, he said, "They're going to be surprised at how complicated it is."

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 112 of 153

EXHIBIT 7





Search eff.org

Enter search terms

Search EFF

Powered by Google

» About EFF's search

**Prior Art Description »**
Find out exactly what information we need to bust Clear Channel's patent.

**Contribute »**
Want to help? Click here to contribute prior art.

# Wanted: Clear Channel

**Patent Name:** System and method of creating digital recordings of live performances
**Patent Number:** 6,614,729
**Critical Date:** September 26, 2000

**Description:** A system and method for recording live performances (e.g. music concerts), editing them into tracks during the performance, and recording them to media (e.g. CDs) within minutes of the performance ending.

## Crimes against the public domain

- Claiming to own a monopoly on all-in-one technologies that produce post-concert live recordings on digital media
- Forcing bands like the Pixies to use ClearChannel's CD-burning systems instead of their own or those of small start-up companies
- Threatening to sue anyone who produces post-show live recordings at any of its 100+ venues in the U.S.
- Twisting artists' arms to give up a significant chunk of their concert merchandise sales, one of the few revenue streams not already taxed by most recording labels
- Inhibiting investment and innovation in the post-event content distribution market by companies such as Kufala and Hyburn

## News

EFF Press Release: Bogus Clear Channel Patent May Be Revoked
*April 3, 2006*

## Documents

**Prior Art Description**

Prior Art Description

**Re-examination Request**

Patent Re-examination Request [PDF, 326K] *February 14, 2006*

Order granting Reexamination and Non-final Office Action Rejecting All Patent Claims as Invalid [PDF, 1.4M]

Supplemental Order re: Reexam [PDF, 253k] *July 20, 2006*

**Prior art**

EDAT-Zing Digital Conversion Cards (Telex Form No. ED 20442-3) (EDAT Brochure) [PDF, 520K] *July 1999*

EFFector

**Subscribe to EFFector!**
[our free email newsletter]

Email:

Zip / Postal Code *(optional)*

Subscribe!

» EFFector Archive

Topics & Areas
Privacy
Intellectual Property
Fair Use and DRM
Innovation
FLAG Project
File Sharing
Free Speech
Bloggers' Rights
International
E-voting
Awards
EFF Victories
EFF White Papers
EFF en Español
» Recursos e información de EFF en Español.

User Instructions EDAT-Zing Analog to Digital Audio Signal
Conversion, EDAT Cassette Mastering and Duplication (Telex Form
No. 38109-769 Rev A) (EDAT Instructions) [PDF, 5M] *October 1999*

CDP-2001 Desktop CD Duplicator (Telex Form No. ED 20466) (CDP
Brochure), [PDF, 393K] 1998

EDAT Instructions: Fast EdDit Sound File Editor Part 1 [PDF, 9M]
Part 2 [PDF, 3M] (Telex form No. 8109-713 Rev C) ("Fast EdDit
Manual) *October 1999*

Telex EDAT System of Choice for the Little Warehouse (Telex Press
Release) (EDAT Release), *June 2, 1998*

**Press releases referenced**

Press release announcing the sale of EDAT [PDF, 518K] *April 18,
1997*

Press release announcing the use of EDAT at a church [PDF, 68K]
*June 29, 1998*

Press release announcing the the sale of the CDP-2001, and how it can
be used in conjunction with EDAT [PDF, 278K] *September 26, 1998*

**Other documents**

Prosecution History [PDF, 3.1M]

# Links

Clear Channel scoops up live CD patent *Arstechnica, May 25, 2004*

Clear Channel Limits Live CDs *Rolling Stone, May 24, 2004*

Live Disc Recording Patent Not Relevant To Immediatek's DiscLive
[PDF] *Immediatek Release, May 26, 2004*

Clear Channel Buys Patent For Instant Live CDs *Slashdot, May 26,
2004*

Clear Channel's Live-CD Patent Under Attack *The Digital Music
Weblog, May 28, 2004*

Clear Channel sparking controversy with Instant Live push *Bizjournal,
July 16 2004*

# April 03, 2006

## Bogus Clear Channel Patent May Be Revoked

Patent Office Orders Reexamination at EFF's Request

San Francisco - At the request of the Electronic Frontier Foundation (EFF), the US Patent and Trademark Office (PTO) today agreed to reexamine an illegitimate patent held by Clear Channel Communications. The patent -- for a system and method of creating digital recordings of live performances -- locks musical acts into using Clear Channel technology and blocks innovations by others.

"The Patent Office agrees that there are serious questions about the patent's validity," said EFF Staff Attorney Jason Schultz. "This is a significant victory for artists and innovators harmed by Clear Channel's patent and for anyone concerned about overreaching, illegitimate patents."

Clear Channel now has two months to file comments defending its patent, to which EFF will get to respond. The PTO will then determine whether to invalidate the patent. In roughly 70% of instances like this one in which a request for reexamination is granted, the patent is narrowed or completely revoked.

"Patents serve an important role in our economy," said Schultz. "Keeping illegitimate patents out of that system benefits all of us, helping up-and-coming artists and entrepreneurs."

EFF filed the request for reexamination in conjunction with Theodore C. McCullough of the Lemaire Patent Law Firm and with the help of students at the Glushko-Samuelson Intellectual Property Clinic at American University's Washington College of Law. The Clear Channel patent challenge is part of EFF's Patent Busting Project, aimed at combating the chilling effects bad patents have on public and consumer interests. The Patent Busting Project seeks to document the threats and fight back by filing requests for reexamination against the worst offenders.

For more information about EFF's request and Clear Channel's patent:
http://www.eff.org/patent/wanted/patent.php?p=clearchannel

For EFF's Patent Busting Project:
http://www.eff.org/patent/

Contacts:

Jason Schultz
Staff Attorney
Electronic Frontier Foundation
jason@eff.org

Theodore C. McCullough
Attorney
Lemaire Patent Law Firm

Posted at 12:32 PM

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE


PATENT NO.:        6,614,729

ISSUED:            September 2, 2003

FOR:               SYSTEM AND METHOD OF CREATING DIGITAL
                   RECORDINGS OF LIVE PERFORMANCES


ATTACHMENT TO FORM SB-58/PTO-1465 REQUEST FOR INTER PARTES
REEXAM TRANSMITTAL FORM


SIR or MADAM:

The Electronic Frontier Foundation (EFF), a not-for-profit public service organization that works to protect free expression in all forms of electronic media, respectfully requests *inter partes* reexamination ("Request") under 35 U.S.C. §§ 311-318 and 37 C.F.R. § 1.913, of claims 1-5 of United States Patent No. 6,614,729 to Griner et al. ("'729 Patent")[1] and assigned to Instant Live, L.L.C. ("Instant Live"), a subsidiary of Clear Channel Communications, Inc. ("Clear Channel").[2] The '729 Patent claims priority back to a provisional application filed on September 26, 2000, and presently the '729 Patent is still enforceable. As discussed below, the '729 Patent is causing significant public harm by restraining innovation and free expression and, importantly, is invalid as anticipated and/or rendered obvious under 35 U.S.C. §§ 102 et seq. and 103(a) by various printed prior-art publications.

## I.    THE '729 PATENT IS CAUSING SIGNIFICANT PUBLIC HARM AND IS RESTRAINING INNOVATION AND FREE EXPRESSION

The '729 Patent claims methods for capturing, mixing, and recording live performances and events. More specifically, the '729 Patent claims target the ability of independent musicians to record their own concerts for distribution to fans shortly after their shows. As a fundamental expression of these artists' First Amendment rights, these activities should not be unduly constrained, especially by an overbroad and invalid patent. Already, it has been reported that Clear Channel, the parent company of Assignee

---

[1] Appendix A contains a copy of the '729 Patent.
[2] This request for reexamination was prepared with the assistance of Ashley Bollinger and Lori President, law students under the supervision of Joshua Sarnoff, Assistant Director of the Glushko-Samuelson Intellectual Property Clinic at American University's Washington College of Law.

Instant Live, is using this patent to leverage concert contracts with performing artists and control their ability to communicate with their audiences. Thus, the '729 patent is causing substantial public harm to the rights of artists and music fans. Although this issue is not itself grounds to grant this request for reexamination, EFF respectfully requests that it be considered when determining whether the validity of the '729 patent merits review by your office.

## II. THE SUBSTANTIAL NEW QUESTION OF PATENTABILITY

The substantial new question of patentability[3] raised by this Request is whether claims 1-5 of the '729 Patent are anticipated and/or rendered obvious by various printed publications published by Telex Communication, Inc. ("Telex") from 1998-1999. These publications were not provided to the USPTO during the examination of the '729 Patent. The '729 Patent claims priority back to September 26, 2000. However, since at least 1997[4] Telex has disclosed, via the publications, a system that performs each and every step disclosed in claims 1-5 of the '729 Patent. More specifically, Telex's publications disclose an EDAT system that captures one or more analog audio signals, converts these signals into one or more digital files on a computer, edits these files, and then simultaneously records the files onto one or more recording media. As a June 2, 1998 Telex Press Release stated: "Many times the sermons are recorded on DAT by volunteers with material that needs to be edited. With EDAT, the sermon can be recorded directly onto the hard drive, saving transfer time, and minutes of material can be quickly edited out allowing the duplication of cassettes to proceed. Parishioners, in many cases, receive tapes before they leave to go home." EDAT Release, at ¶ 4, ll. 2-6. Thus, the EDAT system provided the exact same functionality and benefits of the '729 Patent over a year before the '729 Patent priority date.[5]

---

[3] *See* MPEP 2642 ("It is not necessary that a prima facie case of unpatentability exist as to the claim in order for 'a substantial new question of patentability' to be present as to the claim. Thus, 'a substantial new question of patentability' as to a patent claim could be present even if the examiner would not necessarily reject the claim as either anticipated by, or obvious in view of, the prior art patents or printed publications. The difference between 'a substantial new question of patentability' and a 'prima facie' case of unpatentability is important."). *See generally id.* (Defining a substantial new question of patentability as where: "(A) The prior art patents and/or printed publications raise a substantial question of patentability regarding at least one claim, i.e., the teaching of the prior art patents and printed publications is such that a reasonable examiner would consider the teaching to be *important* in deciding whether or not the claim is patentable; and (B) The same question of patentability as to the claim has not been decided by the Office in a previous examination or pending reexamination of the patent or in a final holding of invalidity by the Federal Courts in a decision on the merits involving the claim.") (emphasis in the original).

[4] *See* Appendix B (Telex Press Release titled "Telex Introduces the EDAT Digital Master Editing and Duplication System at NSCA EDAT" dated April 18, 1997.).

[5] *See* Appendix C (Telex Press Release titled "Telex Launches CDP 2001 Desktop CD Duplicator at 105th AES Convention" dated September 26, 1998. In this press release, Telex describes the use of its CDP-2001 multiple CD duplicator in conjunction with the EDAT system stating, among other things, that "Direct SCSI™ allows the duplicator to operate stand-alone, *as well as to connect directly to a CPU/EDAT Duplication Workstation*™. All CD-R or DVD-R drives in the CDP 2001 become a target writer of PC, Mac and Workstation. A duplicate can be copied directly from the host system on the fly without burning a master CD or DVD." (*Id.* at ¶ 3, ll. 1-4) (emphasis added). Furthermore, the press release states that use of the EDAT system and CDP-2001 together allows for copying "disc-at-once to disc-at-once and

The EDAT system is made up of three essential components: An EDAT-Zing card to capture analog signals (*e.g.*, microphone signals) and convert these analog signals into digital .wav files, an EDAT card and accompanying software running on a standard PC to access and edit these files, and a media recording device, such as the Telex CDP-2001 multiple CD duplicator, to simultaneously copy these files to recordable media. A list of the relevant Telex printed publications, and their respective publication dates, is provided below:

A. *EDAT-Zing Digital Conversion Cards* (Telex Form No. ED 20442-3) ("EDAT Brochure"), July 1999[6]

B. *User Instructions EDAT-Zing Analog to Digital Audio Signal Conversion, EDAT Cassette Mastering and Duplication* (Telex Form No. 38109-769 Rev A) ("EDAT Instructions"), October 1999[7]

C. *CDP-2001 Desktop CD Duplicator* (Telex Form No. ED 20466) ("CDP Brochure"), 1998[8]

D. *EDAT Instructions: Fast EdDit Sound File Editor* (Telex form No. 8109-713 Rev C) ("Fast EdDit Manual"), October 1999[9]

E. *Telex EDAT System of Choice for the Little Warehouse* (Telex Press Release) ("EDAT Release"), June 2, 1998[10]

Each section below sets forth in detail and via an element-by-element claim chart the manner of applying[11] these printed publications, either alone or in combination, to render all claims of the '729 Patent invalid.

---

multisession to multisession. It also converts multisession to disc-at-once and can turn incremental writing on or off when copying a master to multisession. *The system can have simultaneous disc-to-disc copying while downloading the master to the hard drive, which is ideal for network operation.*" (*Id.* at ¶ 4, ll. 1-4.) (emphasis added). Finally, this press release describes how *"Up to 910 copies an hour can be produced when using a 60-minute master."* (*Id.* at ¶ 6, l. 3.) (emphasis added).).

[6] *See* Appendix D.

[7] *See* Appendix E.

[8] *See* Appendix F.

[9] *See* Appendix G.

[10] *See* Appendix H.

[11] *See* MPEP 2617 ("the request for inter partes reexamination must . . . include [a] statement pointing out each substantial new question of patentability based on the cited patents and printed publications, and a detailed explanation of the pertinency and manner of applying the patents and printed publications to every claim for which reexamination is requested.").

### A. The EDAT Brochure Alone Anticipates and/or Renders Obvious Claims 1-5 of the '729 Patent

In July of 1999,[12] Telex publicly published an EDAT Brochure that invalidates all claims of the '729 Patent. Having been published more than one year before the '729 Patent's priority date, the EDAT Brochure is prior art to the '729 Patent under 35 U.S.C. § 102(b).[13] The EDAT Brochure fully discloses a system that captures one or more analog signals, converts these signals using a personal computer ("PC") into a digital .wav file that is accessible as it is stored, edits the file, and then simultaneously outputs this edited file to a plurality of media recording devices.[14] More to the point, the system uses Telex EDAT-Zing and EDAT cards that are inserted into the PCI slots of a PC meeting certain performance criteria, with the EDAT-Zing card linked to an analog input device, and the EDAT card linked to a digital recording device. The EDAT Brochure also discloses, *inter alia*, a graphic illustrating a network diagram with an Analog Input device such as a "Mic." connected to an EDAT-Zing editing card for "analog to digital input", and an EDAT card connected to a "Digital Output" such as a multiple CD duplicator.[15]

Furthermore, the EDAT Brochure renders obvious claim 2 of the '729 Patent. Claim 2 depends from claim 1 and attempts to add as its only additional element a second editing station to the editing module. Not only would the mere duplication of the editing module's functionality have been obvious to one of skill in the art under 103(a), but it is also obvious as a mere duplication of parts.[16] Under MPEP 2144.04, "the mere duplication of parts has no patentable significance unless a new and unexpected result is produced".[17] Here claim 2 of the '729 Patent merely attempts to duplicate the editing module, and associated functionality, disclosed in the EDAT Brochure by adding "two or more editing stations". Such a duplication renders claim 2 of the '729 Patent obvious. Moreover, the technique of using more than one PC computer on a network to edit separate files simultaneously was well-known in the art before September 26, 2000 and would have been obvious to one of ordinary skill in the art at the time.

Additionally, the EDAT Brochure also renders claim 3 of the '729 Patent obvious under § 103(a) and as a mere duplication of parts.[18] Claim 3 depends from claim 2 and attempts to add as its only additional element a soundboard with a mixer. Thus, claim 3 attempts to take something that is old in the art (*i.e.,* a sound mixer), with functionality that is old in the art, and use it to duplicate the editing functionality of the EDAT card, a card that, among other things, has functionality identical to that of a sound mixer. As disclosed within the EDAT Brochure, "EDAT editing can combine with other .wav files,

---

12 *See* EDAT Brochure at 3 (lower right corner).
13 Even if the EDAT Brochure is not § 102(b) art, it would qualify alternatively as § 102(a) art.
14 *See* Appendix D.
15 *See* EDAT Brochure at 3.
16 *See* MPEP 2144.04 ("Duplication of Parts").
17 *See id.* (citing *In re Harza*, 274 F.2d 669, 124 USPQ 378 (CCPA 1960).).
18 *See* MPEP 2144.04 ("Duplication of Parts").

mix in other tracks, rearrange the order of the music, cuts, etc.",[19] hence demonstrating functionality similar to a sound mixer. Accordingly, the EDAT brochure contains the additional element disclosed in claim 3 and renders it obvious with the same force as claim 2. Moreover, claim 3 is also mere duplication of parts and as such is rendered obvious under § 103(a).

The EDAT Brochure also anticipates claim 4 of the '729 Patent under § 102(b) via the doctrine of Inherent Anticipation.[20] Claim 4 depends from claim 1 and attempts to claim as its only additional element a magnetic digital or analog secondary backup device to create backup recordings,[21] used in conjunction with a primary RAM array file storage device.[22] The limitation of a primary storage device in the form of a RAM array is inherent in the PC disclosed in the EDAT Brochure.[23] That is, while disclosed, but not discussed in the EDAT Brochure, it is inherent in that a PC would use RAM as a primary file storage device when capturing and/or editing an event signal. The PC disclosed in the EDAT Brochure also contains a hard drive as a secondary backup device.[24] Thus, the backup module disclosed in claim 4 is anticipated within the meaning of 102(b) by the PC disclosed in the EDAT Brochure containing a hard drive and RAM.

Finally, the EDAT Brochure anticipates claim 5 of the '729 Patent. Claim 5 depends from claim 4 and adds the additional element of interposing a soundboard between the signal source and the primary storage module. The EDAT Brochure discloses the EDAT Zing as capable of performing soundboard functionality as it digitizes signal sources and saves them into the primary storage module.[25] Moreover, claim 5 is also obvious under § 103(a) as based upon a rearrangement of parts.[26] This soundboard would perform much of the same functionality as the editing functionality associated with the EDAT card, including the mixing of tracks and the like. Someone of skill in the art would have the suggestion or motivation to interpose the soundboard between the signal source and the primary storage module and use it for editing purposes. Thus, claim 5 is rendered obvious by the EDAT Brochure within the meaning of § 103(a).

The following chart demonstrates element-by-element how the EDAT Brochure anticipates and/or renders obvious claims 1-5 of the '729 Patent:

---

[19] *See* EDAT Brochure at 3. See also *id.* at 2, ¶ 2 ("You can set the file name, gain level, channel format (mono or stereo)….").

[20] *See* MPEP 2112 ("Requirements of Rejection Based on Inherency").

[21] *See* '729 Patent, Col. 6, ll. 7-11.

[22] *See id.* Col. 5, ll. 46-49.

[23] *See* EDAT Brochure at 4 (disclosing an EDAT-Zing card used in conjunction with 32 megabytes (MB) of Random Access Memory (RAM) in a PC).

[24] *See id* at 2 ¶ 4, ll. 2-3 ("Using the hard drive, one can download information from the PC's hard drive and create a digital master.").

[25] *See* EDAT Brochure at 2, ¶ 2 ("You can set the file name, gain level, channel format (mono or stereo)….").

[26] *See* MPEP 2144.04 ("Rearrangement of Parts").

| | '729 Patent | Telex EDAT System |
|---|---|---|
| **Claim 1**<br><br>**102(b)** | 1. An event recording system, comprising:<br><br>(i) an event-capture module to capture an event signal and transform it into a primary event file that is accessible as it is being formed | As outlined above, the EDAT Brochure anticipates claim 1. Using a network diagram and its accompanying text, the EDAT Brochure discloses an event-capture module that captures an event signal and transforms it into an accessible primary event file. Specifically, the EDAT brochure discloses a network diagram wherein the "Analog Input" such as a "Mic."[27] is connected to the EDAT-Zing card and analog signals from this Analog Input device are "loaded directly onto" a PC via the EDAT-Zing card.[28] *See* EDAT Brochure at 3.<br><br>Furthermore, the EDAT Brochure discloses the ability of the EDAT-Zing card to "digitize multiple audio channels (.wav files) from analog sources." *Id.* at 2, ¶ 1, ll. 4-5.[29] *See also id.* at 2, ¶ 1, ll. 7-9 ("EDAT Zing makes multiple channel/multiple speed analog to digital conversion possible within the PC environment.")<br><br>Finally, the EDAT Brochure discloses the ability of the EDAT-Zing card to access the files as they are being formed to "set the file name, gain level, channel format (mono or stereo), as well the option to |

---

[27] *Compare* '729 Patent, Col. 8, ll. 49-58 ("For example, performance audio signal detector 115A could comprise *one or more microphones positioned to capture an audio performance and a signal processor capable of converting the microphone output from analog to digital.* Audience audio signal detector 115B could comprise one or more microphones positioned to capture audience sounds (audience microphones are often used on performance recordings to make the recording sound 'live') and a signal processor capable of converting the microphone output from analog to digital.") (emphasis added). *See also id.* Fig. 1 #110 (depicting a microphone).

[28] *Compare* '729 Patent, Col. 5, ll. 42-44 ("Signal processor 131 receives and performs any necessary processing on the event output signal *to make it operably available to computer 132.* For example, it may convert the event output signal from an analog to a digital signal. *Signal processor 131 may comprise, for example, any computer sound card capable of high quality A/D conversion.*") (emphasis added). *See also id.* Fig. 4 #504 (depicting a step wherein "Mixed analog signal is converted to digital form").

[29] *Compare* '729 Patent, Col. 5, ll. 44-46 ("*Computer 132 stores the digital event output signal into the primary file storage device 133 as the primary event file.*") (emphasis added).

| | | |
|---|---|---|
| | | reverse the audio after it loads onto the hard drive." *Id.* at 2, ¶ 2, ll. 10-12. |
| | (ii) an editing module communicatively connected to the event capture module, wherein the editing module | The EDAT Brochure also discloses an editing module connected to the event capture module. Specifically, it discloses a network diagram wherein the EDAT card, and accompanying software, can take a digitized analog signal in the form of a .wav file, generated by the EDAT-Zing card, and combine it with "other .wav files", "mix in other tracks" or use these cards and accompanying software to "rearrange the order of music cuts, etc."[30] *See id.* at 3. *See also* EDAT Brochure at 2, ¶ 3, ll. 1-2 ("The EDAT System also offers the tools you need to edit your digital file, if desired."). |
| | accesses and parses the primary event file into one or more digital track files that can be recorded onto a recording media; and | The EDAT Brochure also discloses the ability to access and parse a primary event file into one or more digital track files. Specifically, it discloses the ability to "make a half-track (mono) or quarter track (stereo) master that is incredibly clean. EDAT then gives you the flexibility to combine that file with other .wav files, mix in other tracks, rearrange the order of music cuts, etc." *Id.* at 2, ¶ 3, ll. 3-6. |
| | (iii) a media recording module communicatively linked to the editing module for receiving the one or more digital track files, the media recording module | Finally, the EDAT Brochure discloses a media recording module connected to the editing module that receives digital tracks and has a plurality of media records. Specifically, it discloses a network diagram wherein a "Digital Output" |

[30] *Compare* '729 Patent, Col. 6, ll. 53-59 ("The digital audio editor can be any software program with a suitable graphical interface capable of performing appropriate signal processing functions on digital audio files, *combining separate sequential digital audio files into one file* (commonly referred to as stitching), saving the resulting digital track files to a specified location, and--if necessary--video integration and synchronization.") (emphasis added).

| | | |
|---|---|---|
| | having a plurality of media recorders for simultaneously recording the one or more digital track files onto a plurality of recording media. | device in the form of a multiple CD duplicator is coupled to the EDAT card.[31] *Id.* at 3. *See also id.* at 2, ¶ 4, ll. 6-8 ("At that point, you can copy to cassette, or, if you own a CD-R drive and the appropriate software, can burn CDs through the EDAT system.")<br><br>Finally, the EDAT Brochure states that "EDAT will accommodate a variety of duplication speeds: 2x, 8x and 16x. The new Telex XGEN cassette duplicator copies at either 8x or 16x speed, and is expandable up to 58 tapes at once." *Id.* at 2, ¶ 5, ll. 1-4.<br><br>Thus, the EDAT brochure discloses all elements of claim 1. |
| **Claim 2**<br><br>**103(a)** | The system of claim 1, wherein the editing module has two or more editing station <sic> for simultaneously editing different portions of the primary event file in order to generate the one or more digital track files as the event is occurring. | As discussed above, the EDAT Brochure discloses all of the claim limitations of claim 1, and renders claim 2 obvious. Claim 2 depends from claim 1 and attempts to add as its only additional element a second editing station to the editing module. Not only would the mere duplication of the editing module's functionality have been obvious to one of skill in the art under 103(a), but it is also obvious as a mere duplication of parts.<br><br>Specifically, the EDAT Brochure discloses a network diagram wherein the EDAT card, and accompanying software, can take a digitized analog signal in the form of a .wav file, generated by the |

[31] *Compare* '729 Patent, Col. 5-6, ll. 60-67, 1-7 ("*Each computer would control multiple CD-R drives*, which would serve as the recorders 320, and each CD-R drive would contain a blank CD-R disc, which would serve as the media 330. As the editing process for each digital track file is completed in the editing module 200, the completed digital track files would be copied to the hard drive of each recording controller. The completed digital track files would then be burned onto blank CD-R discs by the CD-R recorders in a manner conforming to the Red Book standard for audio CDs. Although the recording media in this preferred embodiment are CD-R disks, any form of digital recording media capable of recording digital audio and/or video could be used.") (emphasis added). *See also id.* Fig. 1 #300 (depicting a Media Recording Module 300 with a number of recorders and recording media).

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 124 of 153

| | | |
|---|---|---|
| | | EDAT-Zing card, and combine it with "other .wav files", "mix in other tracks" or use these cards and accompanying software to "rearrange the order of music cuts, etc." *Id.* at 3.<br><br>Further, The EDAT Brochure discloses the ability to "make a half-track (mono) or quarter track (stereo) master that is incredibly clean. EDAT then gives you the flexibility to combine that file with other .wav files, mix in other tracks, rearrange the order of music cuts, etc." *Id.* at 2, ¶ 3, ll. 3-6.<br><br>Finally, the technique of using more than one PC computer on a network to edit separate files simultaneously was well-known in the art before September 26, 2000 and would have been obvious to one of ordinary skill.<br><br>Thus, the EDAT Brochure renders obvious the sole additional element of claim 2. |
| **Claim 3**<br><br>**103(a)** | The system of claim 2, wherein the event capture module includes one or more event signal sources, a soundboard with a mixer operably connected to the one or more event signal sources for receiving the event signal therefrom, and a primary storage module for storing the event signal into the primary storage file. | As disclosed above, the EDAT Brochure discloses or renders obvious all of the claim elements of claim 2. In addition, the EDAT Brochure discloses a network diagram wherein the EDAT card, and accompanying software, can take a digitized analog signal in the form of a .wav file, generated by the EDAT-Zing card, and combine it with "other .wav files", "mix in other tracks" or use these cards and accompanying software to "rearrange the order of music cuts, etc." *Id.* at 3.<br><br>Further, The EDAT Brochure discloses the ability to "make a half-track (mono) or quarter track (stereo) master that is incredibly clean. EDAT then gives you the flexibility to combine that file with other .wav files, mix in other tracks, |

| | | |
|---|---|---|
| | | rearrange the order of music cuts, etc." *Id.* at 2, ¶ 3, ll. 3-6.<br><br>Finally, the EDAT Brochure discloses the ability of the EDAT-Zing card to "set the file name, gain level, channel format (mono or stereo), as well the option to reverse the audio after it loads onto the hard drive." *Id.* at 2, ¶ 2, ll. 10-12.<br><br>Thus, the EDAT Brochure discloses the sole additional element of claim 3. |
| **Claim 4**<br><br>**102(b)** | The system of claim 1, further comprising a backup module connected to the event capture module for redundantly saving the primary event file and making it available to the editing module in case the primary event file(s) within the event capture module become inaccessible. | As noted above, the EDAT Brochure discloses all the elements of claim 1. In addition, the EDAT Brochure discloses a PC utilizing the EDAT-Zing card in conjunction with 32 megabytes of Random Access Memory (RAM) for storing the primary event file and a "SCSI II or Ultra DMA Capable Hard Drive" for serving as a backup module in case the primary event file becomes inaccessible. EDAT Brochure at 4; *Id.* at 2, ¶ 4, ll. 2-3 ("Using the hard drive, one can download information from the PC's hard drive and create a digital master.").<br><br>Thus, the EDAT brochure discloses the sole additional element of claim 4. |
| **Claim 5**<br><br>**103(a)** | The system of claim 4, wherein the soundboard receives one or more event signals from the signal source for processing and combining these signals to generate the output event signal that is provided to the primary storage module. | As noted above, the EDAT Brochure discloses all the elements of claim 4. In addition, it discloses the ability of the EDAT-Zing card to "digitize multiple audio channels (.wav files) from analog sources". *Id.* at 2, ¶ 1, ll. 4-5.<br><br>Additionally, "EDAT Zing comes with four channel PCI input card and installation software, and is designed to interface with existing analog playback machines." *Id.* at 2, ¶ 2, ll. 1-3. It also allows you to "combine that file with other .wav files, mix in other tracks, rearrange the order of music cuts, etc." *Id.* |

| | | |
|---|---|---|
| | | at 2, ¶ 2, ll. 4-6.<br><br>Finally, the EDAT Brochure discloses the ability of the EDAT-Zing card to "set the file name, gain level, channel format (mono or stereo), as well the option to reverse the audio after it loads onto the hard drive." *Id.* at 2, ¶ 2, ll. 10-12.<br><br>Thus, the EDAT Brochure discloses the sole additional element of claim 5. |

B. **The EDAT Instructions Anticipate and/or Renders Obvious Claims 1-5 of the '729 Patent**

A Telex EDAT Instructions document published in October of 1999[32] anticipates the '729 Patent. As discussed below, the EDAT Instructions anticipate the '729 Patent and its three main limitations of an event capture module, editing module, and a media recording module. Namely, the EDAT Instructions disclose an EDAT-Zing card to capture live audio as an input signal, a Fast EdDit tool for editing .wav files created from the live audio input signal by the EDAT-Zing card, and the ability to record the .wav files onto multiple media simultaneously. This reference discloses technology that covers all of the claims of the '729 Patent, and invalidate the '729 Patent within the meaning of § 102(a) or 103(a).

The following chart demonstrates element-by-element how the EDAT Instructions anticipates and/or renders obvious claims 1-5 of the '729 Patent:

| | **'729 Patent** | **Telex EDAT System** |
|---|---|---|
| **Claim 1**<br><br>**102(a)** | 1. An event recording system, comprising:<br><br>(i) an event-capture module to capture an event signal and transform it into a primary event file that is accessible as it is being formed | As outlined above, the EDAT Instructions anticipate claim 1. The EDAT Instructions state that "Live audio can also be used to provide analog input signals." *Id.* at 3, ¶ 2, ll. 2-3.<br><br>Moreover, the EDAT Instructions |

[32] *See* EDAT Instructions at 36 (lower right corner).

| | | |
|---|---|---|
| | | state that EDAT-Zing "allows you to create digital .wav files from multiple analog or digital sources at once". *Id.* at 1, ¶ 2, ll. 1-2.<br><br>Finally, the EDAT Instructions assert that EDAT-Zing "allows you to record analog audio signals, to convert these signals into digital .wav files, and to save these files on your personal computer." *Id.* at 3, ¶ 1, ll. 1-3. |
| | (ii) an editing module communicatively connected to the event capture module, wherein the editing module accesses and parses the primary event file into one or more digital track files that can be recorded onto a recording media; and | The EDAT Instructions state that "Included with EDAT is Fast EdDit, a tool for editing your digital files." *Id.* at 20, ¶ 3, ll. 1.<br><br>Further, the EDAT Instructions states that EDAT "lets you take a source recording that is noisy and produce a half-track (mono) or quarter track (stereo) master that is incredibly clean. You can then combine that file with other digital .wav files, mix other tracks, rearrange the order of music cuts, or perform other editing tasks." *Id.* at 20, ¶ 3, ll. 2-6.<br><br>Additionally, the EDAT Instructions disclose the ability "To organize various .wav files into a .pla (playlist) file, you can use the PlayList Editor software, provided with EDAT." *Id.* at 24, ¶ 4, ll. 1-2. |
| | (iii) a media recording module communicatively linked to the editing module for receiving the one or more digital track files, the media recording module having a plurality of media recorders for simultaneously recording the one or more digital track files onto a | The EDAT Instructions describe the ability to "Connect your duplicator module to the interface box". *Id.* at 23, Fig. 17.<br><br>Additionally, EDAT hardware connecting diagram depicts multiple copy modules making |

| | | |
|---|---|---|
| | plurality of recording media. | multiple simultaneous copies. *Id.* at 22.<br><br>Furthermore, the EDAT Instructions describe how "Telex's EDAT-Zing and EDAT allow you to create digital .wav files, use these .wav files to create master files, and reproduce these master files onto cassettes or other media." *Id.* at 1, ¶ 1, ll. 1-3.<br><br>Lastly, the EDAT Instructions describe how "You can then duplicate the master file onto cassettes, CD's, or other media", *Id.* at 20, ¶ 1, ll. 5-7, and "[w]hen used with the new Telex XGEN cassette duplicator, EDAT can produce copies at 8x or 16x speed, using up to 59 tapes at once." *Id.* at 20, ¶ 2, ll. 6-8. |
| **Claim 2**<br><br>**103(a)** | The system of claim 1, wherein the editing module has two or more editing station <sic> for simultaneously editing different portions of the primary event file in order to generate the one or more digital track files as the event is occurring. | As discussed above, the EDAT Instructions disclose all of the claim limitations of claim 1, and renders claim 2 obvious. Claim 2 depends from claim 1 and attempts to add as its only additional element a second editing station to the editing module. Not only would the mere duplication of the editing module's functionality have been obvious to one of skill in the art under 103(a), but it is also obvious as a mere duplication of parts<br><br>Specifically, the EDAT Instructions state that "Included with EDAT is Fast EdDit, a tool for editing your digital files." *Id.* at 20, ¶ 3, ll. 1.<br><br>Further, the EDAT Instructions states that EDAT "lets you take a source recording that is noisy and |

| | | |
|---|---|---|
| | | produce a half-track (mono) or quarter track (stereo) master that is incredibly clean. You can then combine that file with other digital .wav files, mix other tracks, rearrange the order of music cuts, or perform other editing tasks." *Id.* at 20, ¶ 3, ll. 2-6.<br><br>Additionally, the EDAT Instructions disclose the ability "To organize various .wav files into a .pla (playlist) file, you can use the PlayList Editor software, provided with EDAT." *Id.* at 24, ¶ 4, ll. 1-2.<br><br>Finally, the technique of using more than one PC computer on a network to edit separate files simultaneously was well-known in the art before September 26, 2000 and would have been obvious to one of ordinary skill.<br><br>Thus, the EDAT Instructions render obvious the sole additional element of claim 2. |
| **Claim 3**<br><br>**103(a)** | The system of claim 2, wherein the event capture module includes one or more event signal sources, a soundboard with a mixer operably connected to the one or more event signal sources for receiving the event signal therefrom, and a primary storage module for storing the event signal into the primary storage file. | As disclosed above, the EDAT Instructions disclose or render obvious all of the claim elements of claim 2. In addition, the EDAT Instructions state that "Included with EDAT is Fast EdDit, a tool for editing your digital files." *Id.* at 20, ¶ 3, ll. 1.<br><br>Further, the EDAT Instructions disclose the Fast EdDit tool as having soundboard functionality, i.e., that EDAT "lets you take a source recording that is noisy and produce a half-track (mono) or quarter track (stereo) master that is incredibly clean. You can then |

| | | |
|---|---|---|
| | | combine that file with other digital .wav files, mix other tracks, rearrange the order of music cuts, or perform other editing tasks." *Id.* at 20, ¶ 3, ll. 2-6.<br><br>Additionally, the EDAT Instructions disclose the ability "To organize various .wav files into a .pla (playlist) file, you can use the PlayList Editor software, provided with EDAT." *Id.* at 24, ¶ 4, ll. 1-2.<br><br>Finally, the technique of using more than one PC computer on a network to edit separate files simultaneously was well-known in the art before September 26, 2000 and would have been obvious to one of ordinary skill.<br><br>Thus, the EDAT Instructions disclose the sole additional element of claim 3. |
| **Claim 4**<br><br>**102(a)** | The system of claim 1, further comprising a backup module connected to the event capture module for redundantly saving the primary event file and making it available to the editing module in case the primary event file(s) within the event capture module become inaccessible. | As noted above, the EDAT Instructions disclose all the elements of claim 1. In addition, the EDAT Instructions disclose a PC utilizing the EDAT Zing card in conjunction with 32 megabytes of Random Access Memory (RAM) for storing the primary event file and a SCSI II or Ultra DMA Capable Hard Drive for serving as a backup module in case the primary event file becomes inaccessible. EDAT Instructions at 2; *Id.* at 2, ¶ 1, ll. 1-2 ("Use this procedure to create a cassette master file from a digital .wav or .pla (playlist) file on your computer's hard drive.").<br><br>Thus, the EDAT Instructions |

| | | |
|---|---|---|
| | | disclose the sole additional element of claim 4. |
| **Claim 5**<br><br>**102(a)** | The system of claim 4, wherein the soundboard receives one or more event signals from the signal source for processing and combining these signals to generate the output event signal that is provided to the primary storage module. | As noted above, the EDAT Instructions disclose all the elements of claim 4. In addition, the EDAT Instructions state that EDAT-Zing "allows you to create digital .wav files from multiple analog or digital sources at once". *Id.* at 1, ¶ 2, ll. 1-2.<br><br>Additionally, "EDAT-Zing consists of one 4-channel Telex PCI audio input card and the EDAT-Zing software. An optional second 4-channel input card can be linked to the first card, allowing you eight channels of input." *Id.* at 3, ¶ 3, ll. 1-3.<br><br>Additionally, the EDAT Instructions disclose the ability "To organize various .wav files into a .pla (playlist) file, you can use the PlayList Editor software, provided with EDAT." *Id.* at 24, ¶ 4, ll. 1-2.<br><br>Finally, the EDAT Instructions assert that EDAT-Zing "allows you to record analog audio signals, to convert these signals into digital .wav files, and to save these files on your personal computer." *Id.* at 3, ¶ 1, ll. 1-3.<br><br>Thus, the EDAT Instructions disclose the sole additional element of claim 5. |

### C. The EDAT Brochure in view of the CDP Brochure Renders Claim 1 of the '729 Patent Obvious

In the alternative, the above referenced[33] Telex EDAT Brochure in view of a CDP Brochure[34] published in 1998[35] also invalidates claim 1 of the '729 Patent by rendering it obvious. The network diagram[36] in the EDAT Brochure provides a suggestion or motivation to combine the technologies disclosed in the EDAT Brochure and the CDP Brochure. These two references disclose technology that covers all of the limitations of claim 1 of the '729 Patent, and renders claim 1 obvious pursuant to § 103(a).

The following chart demonstrates element-by-element how EDAT Brochure in view of the CDP Brochure Renders claim 1 of the '729 Patent obvious:

| | **'729 Patent** | **Telex EDAT System** |
|---|---|---|
| **Claim 1**<br><br>**103(a)** | 1. An event recording system, comprising:<br><br>(i) an event-capture module to capture an event signal and transform it into a primary event file that is accessible as it is being formed; | As discussed above, the EDAT Brochure in view of the CDP Brochure renders obvious claim 1. The EDAT Brochure discloses a graphic illustration of a network diagram with an "Analog Input" including a "Mic." EDAT Brochure at 3.<br><br>Moreover, EDAT Brochure discloses a network diagram wherein the "Analog Input" such as a "Mic." is connected to the EDAT-Zing card and analog signals from this Analog Input device "are loaded directly onto" a PC via the EDAT-Zing card. *Id.* at 3.<br><br>Finally, the EDAT Brochure discloses the ability of the EDAT- |

[33] *See* Appendix D.

[34] Automatic CD duplicators were well known in the art prior to 1999, and the Telex CDP Brochure was just one of many types and brand of duplicators available on the market prior to the critical date of September 26, 2000. (*See* Attachment I.).

[35] *See* CDP Brochure at 2 (lower right corner).

[36] *See* EDAT Brochure at 2. *See also* CDP Brochure at 2 ("The new The new Telex EDAT Digital Master Duplication Workstation, in conjunction with the CDP 2001 creates the most powerful editing and duplicating workstations on the market").

| | | |
|---|---|---|
| | | Zing card to "digitize multiple audio channels (.wav files) from analog sources". *Id.* at 2, ¶ 1, ll. 4-5. |
| | (ii) an editing module communicatively connected to the event capture module, wherein the editing module accesses and parses the primary event file into one or more digital track files that can be recorded onto a recording media; and | The EDAT Brochure discloses a graphic illustration of a network diagram wherein the EDAT-Zing and EDAT cards can take a digitized analog signal in the form of a .wav file and combine it with "other .wav files", "mix in other tracks" or use these cards and accompanying software to "rearrange the order of music cuts, etc." *Id.* at 3.<br><br>Additionally, the CDP Brochure describes a Direct SCSI function that: "allows the duplicator…to connect directly to your CPU/EDAT Duplication Workstation." CDP Brochure at 1, ¶ 4, ll. 1-2.<br><br>Finally, the CDP Brochure states that a user "can even turn incremental writing on or off when copying a master to multisession". *Id.* at 1, ¶ 5, ll. 2-4 |
| | (iii) a media recording module communicatively linked to the editing module for receiving the one or more digital track files, the media recording module having a plurality of media recorders for simultaneously recording the one or more digital track files onto a plurality of recording media. | The CDP Brochure states that "The new Telex EDAT Digital Master Duplication Workstation, in conjunction with the CDP 2001 creates the most powerful editing and duplicating workstations on the market". *Id.* at 2.<br><br>Lastly, CDP Brochure states that "as many as 280 CDs at a time" can be burned using the CDP Brochure in conjunction with an EDAT card. *Id.* at 1, ¶ 2, ll. 3-4 |

**D. The EDAT Brochure in view of both the EDAT Instructions and Fast EdDit Manual Renders Claim 1 of the '729 Patent Obvious**

Alternatively, the Telex EDAT Brochure, in view of both the EDAT Instructions[37] published in October of 1999[38], and a reference titled Fast EdDit Manual published in 1999[39] render claim 1 of the '729 Patent obvious. The network diagram[40] in the EDAT Brochure provides a suggestion or motivation to combine the technologies disclosed in various Telex-authored references, including those disclosed in the EDAT Brochure, EDAT Instructions Brochure, and the Fast EdDit Manual. These three references disclose technology that covers all of the limitations of claim 1 of the '729 Patent, and renders claim 1 obvious pursuant to § 103(a).

The following chart demonstrates element-by-element how the EDAT Brochure in view of both the User Instructions and Fast EdDit Manual Renders claim 1 of the '729 Patent obvious:

| | '729 Patent | Telex EDAT System |
|---|---|---|
| **Claim 1**<br><br>**103(a)** | 1. An event recording system, comprising:<br><br>(i) an event-capture module to capture an event signal and transform it into a primary event file that is accessible as it is being formed; | As outlined above, the EDAT Brochure in view of both the User Instructions and Fast EdDit Manual Renders the '729 Patent Obvious. The EDAT Instructions disclose that "Live audio can also be used to provide analog input signals." EDAT Instructions at 3, ¶ 2, ll. 2-3. *See also id.* at 1 ("Telex's EDAT-Zing and EDAT allow you to create digital .wav files, use these .wav files to create master files, and reproduce these master files onto cassettes or other media.")<br><br>Further, the EDAT Brochure discloses a graphic illustration of a network diagram with an "Analog Input" including a "Mic." EDAT Brochure at 3. |

[37] *See* Appendix D.
[38] *See* EDAT Instructions at 36 (lower right corner).
[39] *See* Fast EdDit Manual at ii (lower left corner).
[40] *See* EDAT Brochure at 3.

| | | |
|---|---|---|
| | | Moreover, EDAT Brochure discloses a network diagram wherein the "Analog Input" such as a "Mic." is connected to the EDAT-Zing card and analog signals from this Analog Input device are "loaded directly onto" a PC via the EDAT-Zing card. *Id.*<br><br>The Fast EdDit Manual discloses that "The Simultaneous Play/Record feature of Fast EdDit lets you listen to one digital stereo sound file while recording another. For instance, if you have a stereo recording with bass and drums, and you want to lay down a lead guitar track, you would use the play and record operation." Fast EdDit Manual at 40, ¶ 8, ll. 1-4.<br><br>Finally, the EDAT Brochure discloses the ability of the EDAT-Zing card to "digitize multiple audio channels (.wav files) from analog sources". *Id.* at 2, ¶ 1, ll. 4-5. |
| | (ii) an editing module communicatively connected to the event capture module, wherein the editing module accesses and parses the primary event file into one or more digital track files that can be recorded onto a recording media; and | The Fast EdDit Manual discloses that "The Simultaneous Play/Record feature of Fast EdDit lets you listen to one digital stereo sound file while recording another. For instance, if you have a stereo recording with bass and drums, and you want to lay down a lead guitar track, you would use the play and record operation." Fast EdDit Manual at 40, ¶ 8, ll. 1-4. *See also id.* at 1 ("Fast EdDit software let you edit digital .wav sound files, such as those created using Telex's EDAT Zing, and to arrange sound files in a desires sequence, for your duplicating needs."), ("Fast EdDit displays sound files visually, to let you review each file, identify sounds that need editing, and edit segments of the file.") |

| | | |
|---|---|---|
| | | Additionally, the EDAT Brochure discloses a graphic illustration of a network diagram wherein the EDAT-Zing and EDAT cards can take a digitized analog signal in the form of a .wav file and combine it with "other .wav files", "mix in other tracks" or use these cards and accompanying software to "rearrange the order of music cuts, etc." EDAT Brochure at 3.<br><br>Finally, Fast EdDit Manual disclose some changes that one can make including the ability to:<br><br>• Delete a portion of a .wav file<br>• Repeat a portion of a .wav file<br>• Move a portion of a .wav file<br>• Mute a portion of a .wav file<br>• Reverse a portion of a .wav file<br>• Fade a portion of a .wav file<br>• Crossfade two sounds<br>• Mix a recording over the faded portion<br>• Change the gain of a portion or an entire .wav file<br>• Normalize the volume of a portion or an entire .wav file. Fast EdDit Manual at 1, ¶ 2, ll. 5-15. |
| | (iii) a media recording module communicatively linked to the editing module for receiving the one or more digital track files, the media recording module having a plurality of media recorders for | The EDAT Brochure discloses a "Digital Output" device in the form of a multiple CD duplicator coupled to the EDAT card. EDAT Brochure at 3.<br><br>Moreover, the EDAT Brochure discloses the ability to "copy to cassette, or, if you own a CD-R drive and the |

| | | |
|---|---|---|
| | simultaneously recording the one or more digital track files onto a plurality of recording media. | appropriate software, can burn CDs through the EDAT system." *Id.* at 2, ¶ 4, ll. 6-8. |

### E. A Telex EDAT Release in View of the User Instructions Renders Claim 1 of the '729 Patent Obvious

Alternatively, an EDAT Release dated June 2, 1998, in view of the above described EDAT Instructions published in October of 1999[41] renders claim 1 of the '729 Patent obvious. The EDAT Release describes the use of a microphone in conjunction with the EDAT system to capture a live performance. The EDAT system is then used to edit this captured live performance, and simultaneously record this edited live performance to multiple cassettes. In particular, the EDAT Release describes the use of this EDAT system to capture, edit and record a church sermon, and distribute multiple copies of this sermon to parishioners, and in doing so provides a suggestion or motivation to combine. One embodiment of this EDAT system is disclosed in the above referenced EDAT Instructions[42]. These two references together disclose technology that covers all of the limitations of claim 1 of the '729 Patent, and renders it obvious pursuant to § 103(a).

The following chart demonstrates element-by-element how the A Telex EDAT Release in View of the User Instructions Renders claim 1 of the '729 Patent Obvious:

| | '729 Patent | Telex EDAT System |
|---|---|---|
| **Claim 1**<br><br>**103(a)** | 1. An event recording system, comprising:<br><br>(i) an event-capture module to capture an event signal and transform it into a primary event file that is accessible as it is being formed | As noted above, the EDAT Release in view of the User Instructions renders claim 1 obvious. The EDAT Release describes an "EDAT" "input source" that includes "wireless or wired microphones". EDAT Release at ¶ 3, ll. 5-6.<br><br>Furthermore, the EDAT Instructions state "Live audio can also be used to provide analog input signals. The digital .wav files you create can later be duplicated |

[41] *See* EDAT Instructions at 36 (lower right corner).
[42] *See* Appendix E.

| | | |
|---|---|---|
| | | onto CD, digital tape, or other media". EDAT Instructions at 3, ¶ 2, ll. 1-4. |
| | (ii) an editing module communicatively connected to the event capture module, wherein the editing module | The EDAT Instructions disclose a flow chart depicting a CPU with an EDAT-Zing card having "High-speed Analog Input (up to 8 channels)". *Id.* at 22.<br><br>Additionally, the EDAT Instructions state, "EDAT-Zing allows you to create digital .wav files from multiple analog or digital sources at once, at speeds up to eight times the normal speed. EDAT allows you to:<br><br>• Create digital master (.mst) files from the .wav or other audio files.<br>• Edit these master files<br>• Duplicate these master files.<br>• Duplicate these master files directly onto cassettes or other media". *Id.* at 1, ¶ 2, ll. 1-6.<br><br>Finally, the EDAT Release states that "EDAT offers powerful editing, leveling and mixing functions, allowing instantaneous customization of projects for every situation from a replication company to church ministries." EDAT Release at ¶ 3, ll. 6-8. |
| | accesses and parses the primary event file into one or more digital track files that can be recorded onto a recording media; and | The EDAT Instructions state that "Included with EDAT is Fast EdDit, at <sic> tool for editing your digital files. Fast EdDit lets you take a source recording that is noisy and produce a half-track (mono) or quarter track stereo master that is incredibly clean. You can then combine that file with other digital .wav files, mix in other tracks, rearrange the order of the music cuts, or perform other editing tasks". EDAT Instructions at 20, ¶ 3, ll. 1-6. |

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 139 of 153

| | | |
|---|---|---|
| | (iii) a media recording module communicatively linked to the editing module for receiving the one or more digital track files, the media recording module having a plurality of media recorders for simultaneously recording the one or more digital track files onto a plurality of recording media. | The EDAT Instructions disclose a flow chart depicting a CPU operatively coupled to an interface box that, in turn, is operatively coupled to a plurality of copy modules. *Id.* at 22.<br><br>Furthermore, the EDAT Instructions disclose the ability to "Duplicate these master files directly onto cassettes or other media". *Id.* at 1, ¶ 2, line 6.<br><br>Finally, the EDAT release states "Many times the sermons are recorded on DAT by volunteers with material that needs to be edited. With EDAT, the sermon can be recorded directly onto the hard drive, saving transfer time, and minutes of material can be quickly edited out allowing the duplication of cassettes to proceed. Parishioners, in many cases, receive tapes before they leave to go home." EDAT Release, at ¶ 4, ll. 2-6. |

## III. CONCLUSION

For the reasons set forth above, claims 1-5 of the '729 Patent are invalid as anticipated or obvious in light the above referenced Telex-printed publications. EFF respectfully requests that this claim be reexamined and ultimately canceled in its entirety.

Date

Theodore C. McCullough, Reg. No. 56,231
Jason Schultz, EFF Staff Attorney

EXHIBIT 8

# UpFront

TOURING BY RAY WADDELL

## Clear Channel Spinoff Outlines New Structure

NASHVILLE—Clear Channel's soon to be spun off live entertainment division is starting to take shape, but several key questions remain about the new structure of the company, currently operating as CCE Spinco.

An internal memo, obtained by *Billboard* and first revealed Nov. 17 on billboard.biz, describes the new structure forged by Spinco CEO Michael Rapino in preparation for the division's upcoming public offering, believed to be set for some time before Christmas.

According to Rapino's memo, he has downsized CCE Spinco from 14 business units to six.

The new organization sees Spinco broken down into three divisions on the "content" side of the business: Global Music, Global Theatrical and SFX Sports. There also are three divisions on the "distribution" side: Global Venue Management & Sponsorships, Marketing and Interactive Technologies.

Charlie Walker, formerly COO of North American Music, has been named president of the North American Global Music division, which runs the various CCE local promoter divisions like Tea Party in Boston, Electric Factory in Philadelphia, Avalon in Los Angeles and Cellar Door in Detroit. All the local offices will operate as before, according to a source.

Motorsports continues to be run by president Charlie Mancuso, now reporting to Walker.

Additionally, Alan Ridgeway is promoted to CFO of Spinco. He most recently headed CCE's European Music division. Carl Pernow is president of international, and Thomas Johansson is chairman of international. David Ian is chairman of the Global Theatrical division.

Conspicuously absent from the memo is any mention of the future of Spinco's global touring division, TNA International and TNA president Arthur Fogel. As producer of such tours as this year's monster U2 Vertigo trek, TNA has been a cash cow for CCE since 2000. Fogel and TNA will likely play an even bigger role in the new company.

Also not mentioned is CCE's Exhibitions division.

But no divisions were "eliminated" per se, according to a source briefed on the memo. "Things that had been 'spun out,' like the theatrical productions unit, were folded back into the main division," the source tells *Billboard*. The source adds that no part of Spinco will be sold prior to the spinoff, and there are no plans to sell any core business.

On the distribution side, Bruce Eskowitz is president of the newly formed Global Venue Management & Sponsorships group, which oversees the 141 Spinco venues (mostly amphitheaters). Reporting to Eskowitz are executive VP of national sales Russell Wallach and executive VP of local sales and premium seats Maureen Ford.

Faisel Durrani will lead the Marketing division as president, clearly an area of focus for Rapino.

"At the core of everything we do is marketing," he says in the memo. "We have done a great job to date building strong divisional marketing teams to sell tickets. But whether I ask talent or members of our staffs what we need to do to help sell more tickets, I hear a similar theme—more national marketing partners to drive ticket sales, more national programs to drive venue programs and more consumer products to increase revenue."

Bryan Perez is president of the Interactive Technologies division, which will include the company's Instant Live and Next Ticketing operations.

Rapino says that during the past few months Spinco has "created a lean head office, based in Los Angeles. The corporate team is charged with managing the new public-company requirements that our new freedom and flexibility brings. It will also lead our strategic growth plan."

Regarding the recent layoffs and office closings, Rapino says in the memo, "The decision to eliminate positions is never an easy one, but the choice here was clear. We are committed to beginning life as an independent company in the strongest, most focused position and that includes having the courage to make tough decisions." ...

- College Publisher Network

- Join the College Publisher Network
- Advertise Across the Network
- View Network Affiliates

- Select your search method
- Search

- Search This Paper
- Search Google

- Books
- Housing
- Movies

Boston Weather
44°F / 33°F

Home > A&E

# CONCERT LISTINGS:

**Issue date:** 1/24/05 **Section:** A&E
1.27 THE SECRET MACHINES WITH MOVING UNITS AND AUTOLUX
Middle East Club, Cambridge
WWW.TICKETMASTER.COM

1.28 Kristin Hersh, Ben Weaver
The Paradise, Boston
www.nextticketing.com

1.29 APOLLO SUNSHINE
The Paradise, Boston
WWW.NEXTTICKETING.COM

1.30 TOMMY STINSON
Middle East Club, Cambridge
WWW.TICKETMASTER.COM

2.3 THE ARCADE FIRE
The Roxy, Boston
WWW.TICKETMASTER.COM

2.5 The Hoffman External Fixator"
Presents "Fickfest 2005"
A Fundraiser for Staci Fick Cracktorch, Jake Brennan and The Confidence Men,Lost City Angels,Rock

City Crime Wave,Antler and more
Middle East Club, Cambridge
www.ticketmaster.com

2.5 DRESDEN DOLLS
Lupo's @ The Strand, Providence
WWW.TICKETMASTER.COM

2.5 KEANE
Orpheum Theater, Boston
WWW.TICKETMASTER.COM

2.9 THE INFORMATION, THE GOOD NORTH
The Paradise, Boston
WWW.NEXTTICKETING.COM

2.12 JIM CARROLL
Middle East Club, Cambridge
WWW.TICKETMASTER.COM

2.16 GOLDFINGER
Axis, Boston
WWW.TICKETMASTER.COM

2.23 FNX PRESENTS THE MUSIC AND Kasabian
The Paradise, Boston
WWW.NEXTTICKETING.COM

2.23 FNX PRESENTS SOCIAL DISTORTION
Avalon, Boston
WWW.NEXTTICKETING.COM

2.25 THE FUTUREHEADS
The Paradise, Boston
WWW.NEXTTICKETING.COM

2.27 KINGS OF LEON
The Paradise, Boston
WWW.NEXTTICKETING.COM

3.20 DROPKICK MURPHY'S
Avalon, Boston
WWW.NEXTTICKETING.COM

3.23 SOUNDTRACK OF OUR LIVES, THE DEARS
Axis, Boston
WWW.NEXTTICKETING.COM

3.25 NEW FOUND GLORY
WORCESTER PALLADIUM, WORCESTER
TICKETS.COM

3.28 GRAHAM COXON (EX-BLUR)
The Paradise, Boston
WWW.NEXTTICKETING.COM

4.1 DURAN DURAN
Agganis Arena , BOSTON
WWW.TICKETMASTER.COM

4.29 MISSION OF BURMA
Somerville Theatre, Somerville
www.ticketmaster.com

Page **1** of 1

Article Tools

Blog This

- Blogger

Add Our RSS to:

- My Yahoo!
- Google

Bookmark This

- del.icio.us
- digg
- newsvine

# Issue Summary

## News

- Russian Energy Giant Gazprom Defends Record and Argues for Co-Operation with the US
- Senate Makes Unprecedented Grant of $4500 to Support the Service Emersion Trek
- Harvard Business School Professor Robert Anthony Dies
- Fuzzy Faces
- HBS Community Lends a Helping Hand for Thanksgiving
- We Might Have Been Crushed in Football, But At Least We Still Have Debate

## Green Living

- Greening The Holidays

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 146 of 153

EXHIBIT 9

Billboard Feb. 25, 2006
2 pages

MOBILE BY ANTONY BRUNO

# Mobile Tix: Promise Now, Reality Later

The idea of using a mobile phone as a concert ticket is very much a current topic of conversation. During the past few weeks, two of the most powerful forces in the concert industry—Ticketmaster and Live Nation—have embraced the concept.

Ticketmaster will begin testing a wireless ticketing system in the United Kingdom and Australia this summer, and Live Nation partnered with Nokia to develop a similar system in the next two years (Billboard, Feb. 11).

Mobile ticketing certainly remains several years from a mainstream reality. Just ask Verizon Wireless. When the operator tested a mobile ticketing system during a free concert by the reunited Fugees that it hosted Feb. 6 in Hollywood, it learned firsthand the gap between promise and practice.

Subscribers who purchased the ringtone of the Fugees' new single, "Take It Easy," were sent a wireless message offering admission for two to the event. Those with advanced phones received a bar code on their screens. (Others received an e-mail they could print out.) The intent was to present the phones at the gate and have them scanned like any other tickets.

Problem was, it did not work. The scanners used by the event staff could not read the bar code on the phones' screens.

The situation illustrates the complexity behind a potentially groundbreaking concept: Alert fans about upcoming events, give them the ability to immediately buy tickets and then deliver them, all via wireless phone.

"A lot of people in the industry are looking at the wireless device as a good proxy for a unique identifier to allow access to an event," says David Golberg, executive VP of strategy and business development for Ticketmaster. "But there are a lot of logistics behind it that raise some issues."

Mobile phone screens do not have a standardized size or resolution, making it difficult to create a bar code that will appear the same on all of them. And as Verizon discovered, most existing bar code readers do not have the sensitivity needed to scan them, regardless.

There are nontechnical issues as well, such as how to enable one person to buy tickets for four friends. Would each person need to get their own mobile ticket? Or would one ticket provide entry to four friends? And in either event, how do you inform the system?

Mobile ticketing will require new or upgraded bar code readers, training for event staff and a massive educational campaign to gain consumer trust and understanding—all of which comes with a cost.

The industry has only recently adjusted to scanning bar codes from paper tickets instead of just ripping them in half. Upsetting the cart again would require a clear benefit for wireless ticketing to generate support.

Yet despite these challenges, the idea moves forward. The marketing and impulse purchase opportunities are simply too great to be ignored.

"There's only a couple of reasons to keep evolving technologies," Goldberg says. "One is to help make people more aware of events. The other is enticing the consumer to make a purchase. Technology has a role to play in both, particularly wireless."

Fans could register to receive alerts when tickets of their favorite artists go on sale and immediately buy them without having to run home to the computer.

Wireless ticketing also reduces ticket fraud and all but eliminates the market for scalping. Paper tickets can be lost or forgotten, but mobile ones can be replaced—and few people leave the h...

Scanners that can accurately read bar codes on cell phones are still in the development stage.

Grinspoon at Sydney's Metro Theatre last year. More than half the attendees at the two sold-out Australia shows opted for the mobile ticket instead of the paper version—35% of whom later redeemed the mobile ticket for a discount off the band's CD.

But convincing customers to trust mobile tickets instead of paper ones may take time. Event staff at Verizon's Fugees concert recalled less than 10 people who tried to enter using their mobile phone as a ticket.

"Yeah, somebody could roll out a program in a matter of months that allows you to scan the face of a phone and gain entry to the venue," says Jim Cannella, director of sponsorship for House of Blues, "but if that's only going to apply to 5% of the audience, then it's not worth doing."

The primary effort today is less about using mobile phones as an actual ticket and more about using them as a marketing and point-of-sale device. In that sense, the Verizon event was promising; 2000 text-messages ...

PANDORA'S BOX

Slim Device's Squeezebox Internet music player now supports the Pandora personalized Internet radio service.

Users can enter the name of any ... Squeezebox ...

Those with advanced phones received a bar code on their screens. (Others received an e-mail they could print out.) The intent was to present the phones at the gate and have them scanned like any other tickets.

Problem was, it did not work. The scanners used by the event staff could not read the bar code on the phones' screens.

The situation illustrates the complexity behind a potentially groundbreaking concept: Alert fans about

Mobile ticketing will require new or upgraded bar code readers, training for event staff and a massive educational campaign to gain consumer trust and understanding—all of which comes with a cost.

The industry has only recently adjusted to scanning bar codes from paper tickets instead

... great to be ignored.

"There's only a couple of reasons to keep evolving technologies," Goldberg says. "One is to help make people more aware of events. The other is enticing the consumer to make a purchase. Technology has a role to play in both, particularly wireless."

Fans could register to receive alerts when tickets of their favorite artists go on sale and immediately buy them without having to run home to the computer.

Wireless ticketing also reduces ticket fraud and all but eliminates the market for scalping. Paper tickets can be lost or forgotten, but mobile ones can be replaced—and few people leave the house these days without their mobile phones.

It also opens the door to a host of in-venue marketing opportunities facilitated by the mobile phone. Network Live CEO Kevin Wall plans to test a wireless ticketing system for a concert this summer—and offer a free mobile video download of the event to participants.

Scottish mobile marketing firm Mobiqa operated a mobile ticketing system for the band

but convincing customers to trust mobile tickets instead of paper ones may take time. Event staff at Verizon's Fugees concert recalled less than 10 people who tried to enter using their mobile phone as a ticket.

"Yeah, somebody could roll out a program in a matter of months that allows you to scan the face of a phone and gain entry to the venue," says Jim Cannella, director of sponsorship for House of Blues, "but if that's only going to apply to 5% of the audience, then it's not worth doing."

The primary effort today is less about using mobile phones as an actual ticket and more about using them as a marketing and point-of-sale device. In that sense, the Verizon event was promising: 2000 text-message invites were sent for a show ultimately attended by 10,000 fans. Many just printed an e-mailed ticket rather than attempting the mobile option.

Ultimately, that is the experience concert promoters hope to replicate.

"We're more focused on making the sale on the mobile phone than we are about facilitating the delivery of the ticket," Cannella says. "All [fans] really care about at the end of the day is getting in the door." ...

PANDORA'S BOX

**Slim Device's Squeezebox Internet music player now supports the Pandora personalized Internet radio service.**

Users can enter the name of any song into the Squeezebox system and Pandora creates a custom radio stream of songs with the same musical traits.

Pandora spent six years developing a song-recommendation database based on the input of 35 musicians and music analysts, who listen to each song and create a profile based on 400 attributes.

The Squeezebox system is a network bridge that streams music stored on a computer to a home entertainment system. It also connects directly to the Internet to access music services like Pandora Radio, Live365 and SHOUTcast, among others.

SqueezeBox customers can access Pandora Radio free for 90 days, after which it costs $36 per year. The Squeezebox costs $250 for a wired Internet connection and $300 for a wireless version.

—*Antony Bruno*

HOT RI



cc:

FOR PLAINTIFF STATE OF ARKANSAS
David A. Curran
Assistant Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
Tel: (501) 682-3561
Fax: (501) 682-8118
Email: david.curran@arkansasag.gov

FOR PLAINTIFF STATE OF CALIFORNIA
Paula Lauren Gibson
Deputy Attorney General
California Office of the Attorney General
300 So. Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 897-0014
Fax: (213) 897-2801
Email: Paula.Gibson@doj.ca.gov

FOR PLAINTIFF STATE OF FLORIDA
Patricia A. Conners
Antitrust Division
PL-01; The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850) 488-9134
Email: Lisa.McGlynn@myfloridalegal.com

FOR PLAINTIFF STATE OF ILLINOIS
Robert W. Pratt
Chief, Antitrust Bureau
Office of the Attorney General
State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
Tel: (312) 814-3722
Fax: (312) 814-4209
Email: RPratt@atg.state.il.us

FOR PLAINTIFF STATE OF IOWA
Layne M. Lindebak
Assistant Attorney General
Special Litigation Division
Iowa Department of Justice
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-7054
Fax: (515) 281-4902
Email: Layne.Lindebak@iowa.gov

FOR PLAINTIFF STATE OF LOUISIANA
Stacie L. de Blieux
Assistant Attorney General
Public Protection Division
1885 North Third St.
Baton Roughe, LA 70802
Tel: (225) 326-6400
Fax: (225) 326-6499
Email: deblieuxs@ag.state.la.us

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS
William T. Matlack,
Chief, Antitrust Division
Assistant Attorney General
Office of Attorney General Martha Coakley
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 727-5765
Email: William.Matlack@state.ma.us

FOR PLAINTIFF STATE OF NEBRASKA
Leslie Campbell-Levy
Assistant Attorney General
Chief, Consumer Protection & Antitrust
Nebraska Department of Justice
2115 State Capitol
Lincoln, NE 68509
Tel: (402) 471-2811
Fax: (402) 471-2957
Email: leslie.levy@nebraska.gov

FOR PLAINTIFF STATE OF NEVADA
Brian Armstrong
Senior Deputy Attorney General
State of Nevada, Office of the Attorney General
Bureau of Consumer Protection
555 E. Washington Ave., Suite 3900
Las Vegas, Nevada 89101
Tel: (702) 486-3420
Fax: (702) 486-3283
Email: BArmstrong@ag.nv.gov

FOR PLAINTIFF STATE OF OHIO
Jennifer L. Pratt
Chief, Antitrust Department
150 E. Gay St., 23rd Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0266
jennifer.pratt@ohioattorneygeneral.gov

Case 1:10-cv-00139-RMC Document 13-5 Filed 06/21/10 Page 152 of 153

FOR PLAINTIFF STATE OF OREGON
Caren Rovics
Senior Assistant Attorney General
Financial Fraud/Consumer Protection Section
Civil Enforcement Division
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 378-5017
Email: caren.rovics@doj.state.or.us

FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA
James A. Donahue, III
Chief Deputy Attorney General
Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Fax: (717) 705-7110
E-mail: jdonahue@attorneygeneral.gov

FOR PLAINTIFF STATE OF RHODE ISLAND
Patrick Lynch
Attorney General
State of Rhode Island
150 South Main Street
Providence, Rhode Island 02903
Tel: (401) 274-4400
Fax: (401) 222-2295
Email: plynch@riag.ri.gov

FOR PLAINTIFF STATE OF TENNESSEE
Robert E. Cooper, Jr.
Attorney General and Reporter
State of Tennessee
425 Fifth Avenue North
Nashville, TN 37243
Tel: (615) 532-5732
Fax: (615) 532-2910
Email: Bob.Cooper@Ag.Tn.Gov


FOR PLAINTIFF STATE OF TEXAS
David M. Ashton
Assistant Attorney General
Office of the Attorney General
300 W. 15th Street
Austin, Texas 78701
Tel: (512) 936-1781
Fax: (512) 320-0975
Email: david.ashton@oag.state.tx.us


FOR PLAINTIFF STATE OF WISCONSIN
Gwendolyn J. Cooley
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53703
Tel: (608) 261-5810
Fax: (608) 267-2778
Email: cooleygj@doj.state.wi.us